# Nos. 20-3977 & 20-3978

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

E. JEAN CARROLL,
*Plaintiff-Appellee,*

v.

DONALD J. TRUMP,
*Defendant-Appellant.*

UNITED STATES OF AMERICA,
*Movant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

**BRIEF OF APPELLANT UNITED STATES OF AMERICA**

---

JENNIFER B. DICKEY
*Acting Assistant Attorney General*

SOPAN JOSHI
*Senior Counsel to the Assistant Attorney
General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN
*Attorneys, Appellate Staff
Civil Division, Room 7258
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-4747*

**TABLE OF CONTENTS**

**Page**

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE..........................................................................2

      A.      Statutory Background...................................................................3

      B.      Factual Background And Prior Proceedings ..................................4

SUMMARY OF ARGUMENT.........................................................................8

STANDARD OF REVIEW ........................................................................... 10

ARGUMENT .............................................................................................. 11

I.      The Westfall Act Applies To The President ........................................... 11

      A.      The text and purpose of the Federal Tort Claims Act provide no basis for excluding the President of the United States from the ambit of the Westfall Act...........................................................11

      B.      The district court's contrary textual analysis is mistaken...........17

      C.      The United States did not waive entitlement to have the statute properly construed...................................................................22

      D.      Reading the FTCA to cover the President is consistent with both the President's immunity and *Franklin v. Massachusetts*...............25

II.     The District Court Was Wrong To Reject The Attorney General's Certification That The President Was Acting Within The Scope Of His Duties ................................................................................................ 29

      A.      The President was acting within the scope of his office when he responded to Ms. Carroll's allegations...........................................29

B.      The district court's "master-servant" analysis proceeds from an erroneous premise and is, in any case, mistaken ..........................................36

C.      Even if New York law were applicable, the district court's holding would be incorrect ..........................................................................39

CONCLUSION ............................................................................................... 41

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*"Agent Orange" Prod. Liab. Litig., In re,*
818 F.2d 194 (2d Cir. 1987) ...................................................................27-28

*Alexander v. Federal Bureau of Investigation,*
691 F. Supp. 2d 182 (D.D.C. 2010), *aff'd,*
56 F. App'x 1 (D.C. Cir. 2011)................................................................18-19

*Ali Jaber v. United States,*
155 F. Supp. 3d 70 (D.D.C. 2016), *aff'd,*
861 F.3d 241 (D.C. Cir.) ...........................................................................16

*Al-Tamimi v. Adelson,*
264 F. Supp. 3d 69 (D.D.C. 2017) ...............................................................19

*Bailey v. J & B Trucking Servs., Inc.,*
590 F. Supp. 2d 4 (D.D.C. 2008) ................................................................30

*Barimany v. Urban Pace LLC,*
73 A.3d 964 (D.C. 2013)...........................................................................30

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ................................................................................34

*Bowles v. United States,*
685 F. App'x 21 (2d Cir. 2017)........................................................10, 23, 31

*Butz v. Economou,*
438 U.S. 478 (1978) ................................................................................26

*Chapman v. Rahall,*
399 F. Supp. 2d 711 (W.D. Va. 2005) ...........................................................40

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ...........................................................................13, 17

*Council on American Islamic Relations v. Ballenger,*
444 F.3d 659 (D.C. Cir. 2006) ...........................................7, 8, 31, 32, 34, 40

iii

*District of Columbia v. Bamidele,*
　103 A.3d 516 (D.C. 2014) ...............................................................34

*District of Columbia v. Jones,*
　919 A.2d 604 (D.C. 2007) ...............................................................34

*Does 1-10 v. Haaland,*
　973 F.3d 591 (6th Cir. 2020) ........................................... 12, 16, 33, 40

*Fountain v. Karim,*
　838 F.3d 129 (2d Cir. 2016) ....................................................29, 36, 37

*Franklin v. Massachusetts,*
　505 U.S. 788 (1992) ................................................................... 26, 27

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
　561 U.S. 477 (2010) ........................................................................18

*Gravel v. United States,*
　408 U.S. 606 (1972) ................................................................... 16, 26

*Gutierrez de Martinez v. Lamagno,*
　515 U.S. 417 (1995) ..........................................................................4

*Holmes v. Spencer,*
　685 F.3d 51 (1st Cir. 2012) ..............................................................24

*Hoyt v. Lane Constr. Corp.,*
　927 F.3d 287 (5th Cir. 2019) ............................................................24

*Hui v. Castaneda,*
　559 U.S. 799 (2010) ........................................................................15

*Imbler v. Pachtman,*
　424 U.S. 409 (1976) ........................................................................26

*Jacobs v. Vrobel,*
　724 F.3d 217 (D.C. Cir. 2013) ..........................................................30

*Jamison v. Wiley,*
　14 F.3d 222 (4th Cir. 1994) ..............................................................26

iv

*Kamen v. Kemper Fin. Servs.*,
500 U.S. 90 (1991) ........................................................................24

*Klayman v. Obama,*
125 F. Supp. 3d 67 (D.D.C. 2015) ...............................................16

*Leitner v. Westchester Cmty. Coll.,*
779 F.3d 130 (2d Cir. 2015) .........................................................10

*Leone v. United States*,
910 F.2d 46 (2d Cir. 1990) ...........................................................38

*Levin v. United States*,
568 U.S. 503 (2013) ................................................................ 9, 15

*Main St. Legal Servs., Inc. v. National Sec. Council,*
811 F.3d 542 (2d Cir. 2016) .........................................................18

*McNamara v. United States*,
199 F. Supp. 879 (D.D.C 1961).....................................................13

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) .............................................................. 25, 39

*Operation Rescue Nat'l v. United States,*
975 F. Supp. 92 (D. Mass. 1997), *aff'd,*
147 F.3d 68 (1st Cir. 1998).......................................................40

*Operation Rescue Nat'l v. United States,*
147 F.3d 68 (1st Cir. 1998)..................................................... 16, 40

*Osborn v. Haley,*
549 U.S. 225 (2007) ..........................................................1, 16, 23

*Palmer v. Flaggman,*
93 F.3d 196 (5th Cir. 1996) ..........................................................37

*Rausman v. Baugh,*
248 A.D.2d 8 (N.Y. App. Div. 1998) ............................................40

*Rivera v. State,*
   142 N.E.3d 641 (N.Y. 2019) ................................................................40

*Riviello v. Waldron,*
   391 N.E.2d 1278 (N.Y. 1979) .............................................................40

*Ross v. Mitsui Fudosan, Inc.,*
   2 F. Supp. 2d 522 (S.D.N.Y. 1998) ....................................................39

*Saleh v. Bush,*
   848 F.3d 880 (9th Cir. 2017) ..............................................................16

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020) ........................................................................21

*Smith v. Clinton,*
   886 F.3d 122 (D.C. Cir. 2018) ...........................................................33

*Sullivan v. United States,*
   21 F.3d 198 (7th Cir. 1994), *abrogated on other grounds as recognized in*
   *Glade ex rel. Lundskow v. United States,*
   692 F.3d 718, 723 (7th Cir. 2012) ......................................................38

*United States v. Gaubert,*
   499 U.S. 315 (1991) ............................................................................27

*United States v. Hatter,*
   532 U.S. 557 (2001) ............................................................................14

*United States v. LePatourel,*
   571 F.2d 405 (8th Cir. 1978) ..............................................................14

*United States v. Smith,*
   499 U.S. 160 (1991) .................................................................. 8-9, 15, 25

*United States v. Van Smith,*
   530 F.3d 967 (D.C. Cir. 2008) ...........................................................24

*West v. Trump,*
   No. 3:19-CV-2522, 2020 WL 4721291 (N.D. Tex. July 23, 2020) .........16, 21

*Williams v. United States*,
71 F.3d 502 (5th Cir. 1995) ................................................16, 33, 40

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ................................................. 18, 33

*Wilson v. United States Gov't*,
735 F. App'x 50 (3d Cir. 2018) ....................................................21

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) ....................................................32

*Yee v. City of Escondido*,
503 U.S. 519 (1992) ....................................................................24

**U. S. Constitution:**

Art. II, § 1, cl. 8........................................................................14

Art. II, § 1, cls. 8-9...................................................................39

Art. II, § 2 .................................................................................18

Art. II, § 2, cl. 2........................................................................38

Art. II, § 3 .................................................................................39

**Statutes:**

3 U.S.C. § 102............................................................................ 14, 39

Administrative Procedure Act,
5 U.S.C. § 706(2).......................................................................27

28 U.S.C. § 1291 .........................................................................1

Federal Tort Claims Act:
28 U.S.C. § 1346(b)(1) .......................................................3, 11, 29
28 U.S.C. § 2671..................................... 3, 4, 8, 12, 17, 19, 20, 38
28 U.S.C. §§ 2671-2680........................................................ 3, 11
28 U.S.C. § 2672................................................................... 20, 21

28 U.S.C. § 2673 ............................................................................................22

28 U.S.C. § 2675 ............................................................................................21

28 U.S.C. § 2679(b) ............................................................................2, 11, 36

28 U.S.C. § 2679(b)(1) ............................................................................ 8, 29

28 U.S.C. § 2679(b)(2) ..................................................................................15

28 U.S.C. § 2679(c) ......................................................................................26

28 U.S.C. § 2679(d) .................................................... 1, 2, 8, 11, 26

28 U.S.C. § 2679(d)(1) ....................................................................................4

28 U.S.C. § 2679(d)(2) .......................................................................... 2, 4, 11

28 U.S.C. § 2680(a) .............................................................................. 27, 28

Pub. L. No. 79-601, ch. 753, tit. IV, § 402, 60 Stat. 812, 842 (1946)....................... 20, 25

Pub. L. No. 80-269, ch. 359, tit. I, 61 Stat. 585, 586 (1947) ............................................19

Pub. L. No. 80-641, ch. 467, 62 Stat. 423, 434 (1948) .....................................................13

Pub. L. No. 81-206, ch. 506, tit. I, 63 Stat. 631, 632 (1949) ............................................19

Pub. L. No. 89-348, 79 Stat. 1310, 1310 (1965) ...............................................................22

Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988) ............................................. 13, 20

## Legislative Materials:

105 Cong. Rec. 27 (1959) ...............................................................................22

106 Cong. Rec. 16,460 (1960).........................................................................22

S. Rep. No. 79-1400 (1946).............................................................................12

S. Rep. No. 97-649 (1982) ..............................................................................14

S. Res. 492, 97th Cong. 2d Sess. (1982), *reprinted in*
  S. Doc. No. 113-1 (2014), https://www.govinfo.gov/content/
  pkg/SMAN-113/pdf/SMAN-113.pdf ........................................................14

## Other Authorities:

Daily Comp. Pres. Docs., 2019 DCPD No. 410 (June 21, 2019)....................................5

Daily Comp. Pres. Docs., 2019 DCPD No. 414 (June 22, 2019 ........................................5

*Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of Government*, 26 Comp. Gen. 891 (1947) ...................................13

Judgement Fund Search Page, https://jfund.fiscal.treasury.gov/ jfradSearchWeb/JFPymtSearchAction.do (last visited Jan. 15, 2021) ......................................................................................19

## STATEMENT OF JURISDICTION

This appeal arises from the denial of a motion to have the United States substituted as the defendant in a tort action where the United States has certified that the named defendant was a government employee acting within the scope of his office or employment. *See* 28 U.S.C. § 2679(d) (providing for substitution under those circumstances). On October 27, 2020, the district court entered an order denying the United States' substitution motion. SPA61.[1] On November 25, 2020, the United States filed a timely notice of appeal from the denial of substitution. A421. President Donald J. Trump, who is the named defendant in the tort action, also filed a notice of appeal that same day. A423. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. *See Osborn v. Haley*, 549 U.S. 225, 238 (2007) (holding that denial of substitution under 28 U.S.C. § 2679(d) is a "collateral order" that "qualifies as a reviewable final decision within the compass of 28 U.S.C. § 1291").

## STATEMENT OF THE ISSUES

Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, which is commonly known as the Westfall Act, when "any employee of the government" is sued in his individual capacity under state tort law and the Attorney General certifies that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," the action is

---

[1] Citations of the form "SPA__" reference the Special Appendix attached to this brief. Citations of the form "A__" reference the joint appendix.

deemed to be a suit against the United States pursuant to the Federal Tort Claims Act (FTCA), and the United States is substituted as the sole defendant. 28 U.S.C. § 2679(b), (d).

This appeal arises from a defamation suit brought against President Donald J. Trump in his individual capacity. The Attorney General's delegate certified that the alleged defamation occurred while the President was acting within the scope of his office or employment. The district court rejected the United States' motion to be substituted as the defendant. The court concluded that the President is not an "employee of the government" for purposes of the FTCA and the Westfall Act. The court concluded, in the alternative, that the defamation alleged in the complaint did not fall within the scope of the President's office or employment.

The issues presented are:

1. Whether the President is an "employee of the government" for purposes of the FTCA and the Westfall Act.

2. Whether the President was acting within the scope of his office or employment when he made allegedly defamatory statements to reporters in the course of responding to publicized accusations of past misconduct.

## STATEMENT OF THE CASE

This litigation was originally filed in November 2019 in the Supreme Court of the State of New York, County of New York. A24-A51. The single-count complaint alleges that in June 2019, President Donald J. Trump defamed plaintiff E. Jean Carroll

2

in the course of making three statements to the media denying an accusation by Ms. Carroll that he had sexually assaulted her decades earlier. A49-A50.

On September 8, 2020, the United States filed a certification by a delegate of the Attorney General stating that the conduct alleged in the complaint occurred while the President was acting with the scope of his office or employment. A53-A54. That same day, the United States filed a notice of removal of the suit to the U.S. District Court for the Southern District of New York, *see* 28 U.S.C. 2679(d)(2), and a motion to have the United States substituted as the sole defendant. A2-A3, A12; *see also* A19-A21. Ms. Carroll opposed the substitution motion and, on October 27, 2020, the Hon. Lewis A. Kaplan issued an opinion denying the motion to substitute. SPA1-SPA61. The district court's decision will be reported and is currently available at 2020 WL 6277814.

### A. Statutory Background

The Federal Tort Claims Act creates a cause of action against the United States for the tortious acts of "any employee of the Government" that occur while the employee was acting "within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *see id.* §§ 2671-2680. The statute defines "[e]mployee of the government" to "include[]," among many other categories, "officers or employees of any federal agency." 28 U.S.C. § 2671. The term "[f]ederal agency," in turn, is defined to "include[] . . . the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States,

3

and corporations primarily acting as instrumentalities or agencies of the United States." *Id.*

In 1988, Congress adopted the Westfall Act, which provides that when a tort action is brought against a federal employee in the employee's individual capacity, the Attorney General, or his delegate, may certify "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose," whereupon the employee is dismissed from the action, the United States "shall be substituted" as the sole defendant, and the suit "shall be deemed an action against the United States" under the FTCA. 28 U.S.C. § 2679(d)(1). When a certification is filed in a case that was originally brought in state court, the action "shall be removed" to federal court. *Id.* § 2679(d)(2). The certification is "conclusive[]" of federal jurisdiction for purposes of the removal, *id.*, but whether the employee was acting within the scope of his office or employment is subject to judicial review, *see Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995).

### B. Factual Background And Prior Proceedings

**1.** In 2019, Ms. Carroll published a book excerpt in which she alleged that she was sexually assaulted by President Trump in the 1990s while he was still a private citizen. SPA3. In response to this accusation, President Trump made three statements that denied the allegations and questioned Ms. Carroll's credibility and motivations. SPA12-SPA14. The first denial was made in a written statement released by the White House Office of the Press Secretary to media outlets within

4

hours of publication of the book excerpt. SPA12. Over the ensuing three days, President Trump denied the allegations twice more in direct response to questions from reporters: once during a "press gaggle" as he was departing the White House for Camp David, and once during a wide-ranging press interview in the Oval Office. SPA13-SPA14. The first two statements appear in the Daily Compilation of Presidential Documents, *see* Daily Comp. Pres. Docs., 2019 DCPD No. 410 (June 21, 2019); Daily Comp. Pres. Docs., 2019 DCPD No. 414 (June 22, 2019).

**2.** In November 2019, Ms. Carroll filed suit in New York state court against President Trump in his personal capacity. The single-count complaint alleged that the three statements made by the President constituted defamation under New York state law. A24-A51. Ten months after the suit was filed, the Director of the Torts Branch of the Civil Division of the U.S. Department of Justice certified on behalf of the Attorney General that the President was acting within the scope of his office or employment with respect to the allegations in the complaint. A53-A54.

In conjunction with filing this certification, the United States filed a notice of removal of the action to the U.S. District Court for the Southern District of New York (A19), and filed a motion to have itself substituted as the defendant on the basis of the certification (A12). Ms. Carroll opposed substitution, arguing that the President is not an employee of the federal government for purposes of the Westfall Act and that, in any case, the conduct alleged in the complaint fell outside the scope of the President's office or employment. A314-A358. In reply, the United States

5

explained that the text of the statute as well as its policies make clear that the President falls within the scope of the statute. A404-A408. The government also explained that statements by an elected office holder in response to accusations calling into question his fitness to hold the public trust fall within the scope of employment, even assuming that the response may later be adjudged defamatory. A398-A404.

3. The district court scheduled an in-person hearing for consideration of the substitution motion. A391. However, on the day of the hearing, counsel for the United States was unable to gain entry to the courthouse because of pandemic-related travel restrictions. A414. The United States moved to have the hearing continued, but the court denied the motion and held the hearing, with government counsel participating by telephone. A414, A415-A419, A420. In response to the government's request to have the substitution motion submitted on the papers, plaintiff asked for the opportunity to submit a sur-reply brief, which the government opposed. A417-A418. The court determined that the "fairest" result would be to consider the motion on the existing papers and to invoke "the time-honored principle that new arguments raised for the first time in a reply brief will not be considered." A418. The United States agreed to this approach. A418.

4. The district court denied the motion for substitution. SPA1-SPA61. The court first concluded that the President is not an "employee of the government" for purposes of the FTCA and the Westfall Act and, thus, that it would never be proper for the United States to substitute itself for the President. SPA16-SPA35. In reaching

6

that conclusion, the court found that the United States had waived its primary statutory interpretation argument (SPA19 n.48), and, in any case, that the statute is best read to exclude the President (SPA18-SPA26). The court found additional support for its restrictive interpretation of the term "employee of the government" in the legislative history of the Westfall Act and the presumption against judicial review of the President's official acts. SPA26-SPA33.

The district court further held that the conduct alleged in the complaint was not within the scope of the President's office or employment. SPA35-SPA61. The court stated that the Westfall Act is applicable only when the employee is acting within the scope of a master-servant relationship; because the President has no master, the court reasoned, he could not have been acting within the scope of his employment. SPA43-SPA47. The court also determined that in responding to Ms. Carroll's accusation, the President was acting outside the scope of his employment under the law of either the District of Columbia (SPA47-SPA59) or New York (SPA59-SPA61). The district court acknowledged that its scope of employment analysis under D.C. law was at odds with that of the D.C. Circuit in *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 665-66 (D.C. Cir. 2006). SPA49-SPA53. The court concluded, however, that the D.C. Circuit's opinion "misstates D.C. law." SPA51. The court also again invoked waiver principles in rejecting the United States' argument that the President's duties include responding to accusations of wrongdoing that threaten his ability to govern effectively. SPA54.

7

**SUMMARY OF ARGUMENT**

In this suit, Ms. Carroll seeks to impose common law tort liability on President Trump in his individual capacity, alleging that the President defamed her in the course of responding through the White House media to Ms. Carroll's public accusation that he committed a serious criminal offense.  Under the Westfall Act, the exclusive remedy for common law torts committed by federal officers acting within the scope of their offices is a suit against the United States pursuant to the FTCA.  *See* 28 U.S.C. § 2679(b)(1); *see also id.* § 2671.  As many courts have recognized, an elected official acts within the scope of his office when he comments on matters of public concern. That is the case when the official addresses an issue potentially relevant to his ability to perform the duties of his office effectively.  *See, e.g.*, *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006).  Consistent with that body of precedent, the Attorney General's delegate certified that the President was acting within the scope of his office in connection with the allegations in this suit and the United States sought to have itself substituted as the defendant.  *See* 28 U.S.C. § 2679(d).

The district court denied substitution on two principal grounds, neither of which withstands scrutiny.  First, the court mistakenly concluded that the President is not an employee of the government for purposes of the Westfall Act.  The court reached this conclusion notwithstanding the extraordinary breadth of the statutory definition and the Supreme Court's admonition that "[w]hen Congress wanted to limit the scope of immunity available under [the Westfall Act], it did so expressly[.]"  *United*

*States v. Smith*, 499 U.S. 160, 173 (1991). *See also Levin v. United States*, 568 U.S. 503, 509 (2013) (describing the Westfall Act as "[s]hielding all federal employees from personal liability without regard to agency affiliation or line of work"). The court reached its holding largely on the theory that Congress did not mean to apply the statute's comprehensive coverage to parts of the Executive Branch; that the statute applied only to "departments"; and that the White House is not a department. The court's restrictive reading proceeds from a mistaken premise that is at odds with both the statute's text and the longstanding interpretation of the statute as reflected in the historical practice of all three branches of government. The court's opinion also fails to grapple with the fact that the Westfall Act has been applied on many prior occasions not only to the President, but also to an array of other White House officials whose coverage under the statute has never before been questioned and who would be left unprotected under the district court's novel statutory interpretation. And contrary to the district court's determination, the United States did not waive entitlement to a proper construction of the statute.

Second, the district court also erred in concluding that the defamation alleged by Ms. Carroll falls outside the scope of the President's office. The court recognized that its determination that District of Columbia scope-of-employment law would not cover the conduct at issue here departed from decisions of other courts applying District of Columbia precedents in Westfall Act cases. The court simply dismissed as wrongly decided a line of cases from the D.C. Circuit applying D.C. law under closely

9

related circumstances. But the district court's own analysis of D.C. law was cursory and failed to show any error in the D.C. Circuit's decisions.

The district court also declared that the scope of employment analysis is limited to circumstances in which a servant is fulfilling duties to his master. Since the President has no master, he cannot be said to have acted within the scope of his employment. This line of reasoning is without basis in the statute's text and would also exclude from the statute's ambit other high ranking constitutional officers, including judges and Members of Congress, who are explicitly covered by the FTCA and do not act under any superior official.

The district court also raised the possibility that New York law, rather than D.C. law, should govern its inquiry. That suggestion is wrong but, in any case, the district court's analysis would fail under New York law as well.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions regarding the denial of immunity under the Westfall Act *de novo* and its factual findings for clear error. *Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017) (unpublished); *see also Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (describing standard of review in sovereign immunity cases).

10

## ARGUMENT

### I.   The Westfall Act Applies To The President

#### A.   The text and purpose of the Federal Tort Claims Act provide no basis for excluding the President of the United States from the ambit of the Westfall Act

**1.**  The FTCA provides a waiver of sovereign immunity and creates a cause of action against the United States for the allegedly wrongful acts of "any employee of the government" committed while the employee was acting within the scope of his office or employment.  28 U.S.C. § 1346(b)(1); *see id.* §§ 2671-2680.  In amending the FTCA, the Westfall Act made that statute's remedy the "exclusive" means of recovery in suits predicated on the "wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." *Id.* § 2679(b).  To effectuate this provision, the Westfall Act created a mechanism by which the United States can substitute itself as the defendant in an individual capacity suit brought against a government employee upon certification by the Attorney General or his delegate "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose[.]" *Id.* § 2679(d)(1).  If the suit was commenced in state court, the certification triggers removal to federal district court. *Id.* § 2679(d)(2).  Once the United States has been substituted as defendant, the suit proceeds against the government as the sole defendant subject to the provisions of the FTCA.

11

The FTCA defines "employee of the government" in sweeping terms. It "includes . . . officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged [in certain training or duty], and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. And "federal agency" is defined in similarly expansive terms to include all "executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States." *Id.*

It would have been difficult to draft more all-embracing definitions. Under those definitions, a qualifying "employee" includes those officers at the pinnacle of government—Members of Congress, Justices of the Supreme Court, and the generals and admirals who command our armed forces. *See, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 597-98 (6th Cir. 2020). And it extends equally to unpaid individuals temporarily acting in the service of any agency. *See* S. Rep. No. 79-1400, at 31 (1946) (expressing Congress's expectation that the FTCA would cover "all Federal officers and employees").

Broad as this enumeration is, moreover, it is not exclusive. That is clear from the text of the statute, which defines both "employee of the government" and "federal agency" as "includ[ing]" the listed categories. 28 U.S.C. § 2671; *see also*

12

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (concluding that use of the word "includes" in a definition "is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive"). Case law has accordingly recognized that the list of entities enumerated in the definition of "federal agency" is "not an exclusive definition" of the term. *McNamara v. United States*, 199 F. Supp. 879, 880 (D.D.C 1961).

All three branches of government have long treated the FTCA's coverage as sweeping beyond the specific entities listed in the statutory definitions. Although the statute did not expressly refer to the legislative or judicial branches until a clarifying amendment in 1988, *see* Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988), the statute was construed even prior to that amendment as reaching beyond the executive branch. Shortly after the FTCA was enacted, the Comptroller General explained that "while only the executive departments and independent establishments of the United States are mentioned specifically in the definition of a Federal agency, an examination of the entire act and its legislative history requires a conclusion that no agencies or employees are excluded from the operation of the act" and, thus, that the Library of Congress falls within the scope of the FTCA. *Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of Government*, 26 Comp. Gen. 891, 892 (1947). Congress apparently agreed with the Comptroller General's interpretation and appropriated funds to the Library of Congress for the payment of FTCA claims. *See, e.g.*, Pub. L. No. 80-641, ch. 467, 62 Stat. 423, 434 (1948).

13

The Senate also understood the FTCA to reach beyond the executive branch prior to the 1988 amendment, authorizing the Sergeant at Arms of the Senate, with approval of the Committee on Rules and Administration, to settle tort claims under the FTCA. *See* S. Res. 492, 97th Cong. 2d Sess. (1982), *reprinted in* S. Doc. No. 113-1, at 194-95 (2014);[2] *see also* S. Rep. No. 97-649, at 1 (1982) ("It is the opinion of the Senate Legal Counsel, the Senate Legislative Counsel, the Department of Justice, and the General Accounting Office that the Federal Tort Claims Act does include the Legislative Branch."). Similarly, "the Administrative Office of the United States Courts . . . adjudicated [FTCA] claims against employees of the judiciary" long before the 1988 amendment. *United States v. LePatourel*, 571 F.2d 405, 409 (8th Cir. 1978).

Particularly against that backdrop, the phrase "employee of the government" is most naturally read to reach the President. The President is employed by the government in a literal sense. He renders services to the United States in return for a salary and other compensation, including government-provided housing and a pension. *See* U.S. Const. art. II, § 1, cl. 8; 3 U.S.C. § 102. He has no employer other than the United States. *Cf.* U.S. Const. art. II, § 1, cl. 8. The Supreme Court has accordingly recognized the President as a salaried employee of the United States and has referred to him as such. *See United States v. Hatter*, 532 U.S. 557, 563 (2001). The

---

[2] https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf.

President is thus properly considered an employee of the government under the plain language of the FTCA.

**2.** No basis exists for inferring the exclusion of the President of the United States from the otherwise comprehensive scope of the FTCA. The Supreme Court has recognized that "[w]hen Congress wanted to limit the scope of immunity available under [the Westfall Act], it did so expressly, as it did in preserving employee liability for *Bivens* actions and for actions brought under a federal statute authorizing recovery against the individual employee." *United States v. Smith*, 499 U.S. 160, 173 (1991) (citing 28 U.S.C. § 2679(b)(2)). Congress did not include any such express exclusion for the President. *See Levin v. United States*, 568 U.S. 503, 509 (2013) (describing the Westfall Act as "[s]hielding all federal employees from personal liability without regard to agency affiliation or line of work"); *Hui v. Castaneda*, 559 U.S. 799, 810 (2010) (explaining that the Westfall Act "applies to all federal employees").

The district court believed it significant that the President is entitled to absolute immunity for his official acts, reasoning that he therefore must not need the Westfall Act's protections and, as a result, falls outside the purposes of the Act. SPA27-SPA28. As discussed below, *see infra* p. 26, that reasoning is mistaken on its own terms. But in focusing narrowly on the issue of liability, the court disregarded the important concerns, often stressed in the context of qualified immunity, raised when government officials are embroiled in litigation in connection with their official acts. As the Supreme Court has explained, the purpose of the Westfall Act is to "immunize

covered federal employees not simply from liability, but from suit." *Osborn v. Haley,* 549 U.S. 225, 238 (2007). Were the Westfall Act inapplicable, the President, unlike every other government officer or employee, would bear the burden of responding to suits in state and federal courts across the country.

It is therefore unsurprising that the substitution of the United States for the President was not questioned in any of the four cases of which we are aware in which substitution occurred. *See Saleh v. Bush,* 848 F.3d 880, 891 (9th Cir. 2017) (United States substituted for former President); *Ali Jaber v. United States,* 155 F. Supp. 3d 70, 73 n.1 (D.D.C.) (United States substituted for sitting President), *aff'd,* 861 F.3d 241 (D.C. Cir. 2016); *Klayman v. Obama,* 125 F. Supp. 3d 67, 72, 85 (D.D.C. 2015) (same); *West v. Trump,* No. 3:19-CV-2522, 2020 WL 4721291, at *3 n.6 (N.D. Tex. July 23, 2020) (same). Likewise, in at least three cases, courts of appeals have rejected contentions that Members of Congress are not government employees for purposes of the Westfall Act, *Does 1-10,* 973 F.3d at 598; *Williams v. United States,* 71 F.3d 502, 505 (5th Cir. 1995); *Operation Rescue Nat'l v. United States,* 147 F.3d 68, 70-71 (1st Cir. 1998), even though Members generally also enjoy a broad grant of absolute civil immunity under the Speech or Debate Clause, *see Gravel v. United States,* 408 U.S. 606, 615-16 (1972). Emphasizing the breadth of the statute's text, which provides a broad grant of immunity, two of those courts properly described the statute's scope as reaching "all officers, up to the president." *Does 1-10,* 973 F.3d at 598 (quoting *Operation Rescue,* 147 F.3d at 71).

**B.    The district court's contrary textual analysis is mistaken**

**1.**  The district court's contrary conclusion is based on mistaken inferences regarding the definitions of both "federal agency" and "employee of the government."

The district court concluded that Congress had excluded the President from the scope of the FTCA because, in the court's view, the statutory definition of "federal agency" was limited to the list of entities in § 2671 (*i.e.*, "the executive departments, the judicial and legislative branches, the military departments, [and] independent establishments of the United States"), and the Presidency is not on that list.  SPA18-SPA26.  But the statute says not that the term "federal agency" is *limited* to those entities, but rather that it "include[s]" them.  28 U.S.C. § 2671.  As explained above, "include" indicates that "federal agency" sweeps more broadly than the listed entities, which are merely illustrative.  *See supra* pp. 12-13; *SmithKline*, 567 U.S. at 162.

In any event, the district court's reasoning fails on its own terms, for the President is an employee of "the executive departments" within the meaning of § 2761.  Relying on "the White House's website," the court stated that the term "executive departments" in § 2671 must refer only to the "fifteen executive departments—each headed by a cabinet secretary appointed by the President." SPA24 (quoting the website) (alteration omitted).  Yet the court did not explain why a general definition on a website that is geared to be understandable to the general public and addresses a different context would be relevant to the legal interpretation

17

of § 2761's text. To the contrary, the meaning of "department" depends on context and can be broader than just the cabinet-level agencies. For Appointments Clause purposes, for example, an "inferior officer" may be appointed by the "Heads of Departments." U.S. Const. art. II, § 2. The Supreme Court has held that for purposes of this provision, "Departments" are not limited to cabinet agencies, and that the Securities and Exchange Commission is a "Department" headed collectively by its several commissioners. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 511 (2010).

The district court offered no sound basis for concluding that officers and employees of the Executive Office of the President (EOP) are not officers or employees of a "department" for purposes of the FTCA. The court may have based its conclusion on the ground that many offices in the EOP are not "agencies" for purposes of the Freedom of Information Act or the Administrative Procedure Act. *See Main St. Legal Servs., Inc. v. National Sec. Council*, 811 F.3d 542 (2d Cir. 2016). But those contexts are inapposite here in light of the FTCA's express and expansive definition of "federal agency." Indeed, many courts have allowed substitution under the Westfall Act in cases involving officers or employees of those parts of the EOP that are not "agencies" for purposes of those other statutes. *See, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (Vice President and Vice President's chief of staff); *Alexander v. Federal Bureau of Investigation*, 691 F. Supp. 2d 182, 196-97 (D.D.C. 2010) (Director of White House Office of Personal Security and White House Counsel),

18

*aff'd*, 456 F. App'x 1 (D.C. Cir. 2011); *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 82

(D.D.C. 2017) (President's Deputy National Security Advisor). Those decisions are

consistent with longstanding practice under the FTCA. Indeed, in the years

immediately following the adoption of the FTCA, at a time when FTCA claims were

paid with appropriated funds, Congress specifically appropriated funds to

establishments within the Executive Office of the President for the payment of FTCA

claims. *See, e.g.*, Pub. L. No. 80-269, ch. 359, tit. I, 61 Stat. 585, 586 (1947); Pub. L.

No. 81-206, ch. 506, tit. I, 63 Stat. 631, 632 (1949). Those appropriations would be

inexplicable if the EOP were not a "federal agency" within the meaning of the

FTCA.[3]

The district court also erred in believing that its narrow reading of the statute's

application to the Executive Branch was justified because the statute refers to the

Judicial and Legislative "branches," but only to the executive "departments." 28

U.S.C. § 2671. Surmising that "department" is narrower than "branch," the court

concluded that Congress must have wished to omit some part of the Executive

Branch from the definition of "federal agency." SPA20-SPA21. That conclusion was

unwarranted because the definition's reference to "executive departments" dates to

---

[3] Likewise, in recent years, the United States has paid several judgments and settlements based on FTCA claims arising from the EOP. *See* Judgement Fund Search Page, https://jfund.fiscal.treasury.gov/jfradSearchWeb/ JFPymtSearchAction.do (database searched using Executive Office of the President as the Defendant Agency).

19

the original enactment of the FTCA, whereas the reference to the judicial and legislative branches was not added to the definition of "federal agency" until some four decades later. *See* Pub. L. No. 79-601, ch. 753, tit. IV, § 402, 60 Stat. 812, 842 (1946) (original definition, which contains the reference to "executive departments"); Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988) (amending 28 U.S.C. § 2671 to insert words "the judicial and legislative branches" into the statutory definition of "Federal agency"). Language added to the statute in 1988 does not inform the meaning of the phrase "executive departments" in 1946.

**2.** The district court's reliance on several other statutory provisions also was misplaced.

The district court concluded, for example, that the definition of employee could not encompass the President because settlements of claims under the FTCA generally must be approved by the Attorney General. The court declared that "[i]t is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States." SPA22. But claims under the FTCA are, as the court recognized, claims against the United States, and the Attorney General, who is responsible for directing the government's litigation, is vested with responsibility for approving settlements of such claims. *See* 28 U.S.C. § 2672. There is thus no incongruity in that arrangement. Indeed, the Attorney General unquestionably may settle cases in which

20

the United States is substituted as a defendant under the Westfall Act for federal judges and Members of Congress, even though those individuals belong to independent and coequal Branches. *See id.* In any event, the court was wrong even on its own terms: the President's power to remove the Attorney General provides ample control over the latter's exercise of settlement authority in any given case (including one initially brought against the President himself). *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191-92 (2020).

The district court also noted that under the FTCA, claims must first be presented to the relevant agency. 28 U.S.C. § 2675. The court declared that "[t]his would make little sense if it were applied to the president" and that "the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit." SPA23. But courts have held that claims against the President must be administratively presented as required by Section 2675(a). *See, e.g.*, *West v. Trump,* 2020 WL 4721291, at *4. The district court apparently found it implausible that the President would personally review an administrative claim under the FTCA, but administrative claims are often reviewed by subordinate officials rather than the agency head. In suits against members of the judiciary, for example, claims are reviewed by the Administrative Office of the Courts, not the Chief Justice. *See Wilson v. United States Gov't*, 735 F. App'x 50, 52 (3d Cir. 2018). Applying the FTCA to

21

the President would not necessitate the President's personal involvement in reviewing claims.

The district court was equally wide of the mark in concluding that a congressional reporting requirement for FTCA settlements, *see* 28 U.S.C. § 2673, was unlikely to apply to the President and therefore indicated that the President was not subject to the FTCA. SPA23. The reporting requirement was repealed in 1965. *See* Pub. L. No. 89-348, 79 Stat. 1310, 1310 (1965). But, in any case, the court cited no basis for concluding that a reporting provision could not apply to the White House. Indeed, prior to the provision's repeal, entities within the Executive Office of the President did report to Congress following the payment of FTCA claims. *See* 105 Cong. Rec. 27 (1959); 106 Cong. Rec. 16,460 (1960). Nor did the district court explain why applying such a requirement to the White House would be more incongruous than applying it to members of the legislative and judicial branches.

## C. The United States did not waive entitlement to have the statute properly construed

In rejecting the government's arguments, including those based on the plain text of the Act, the district court stated that the United States waived the argument that the list of entities enumerated in the statutory definition of "federal agency" is illustrative rather than exhaustive when it agreed to be bound by the "time-honored principle that new arguments raised for the first time in a reply brief will not be considered." A418, SPA19 n.48.

The district court's ruling was incorrect because the government did not violate that principle. In its opening motion papers, the United States sought substitution under the Westfall Act on the basis of the certification completed by the Attorney General's delegate. A18 (arguing that substitution should be granted because "the Attorney General's delegate has certified that President Trump was acting within the scope of his office as President of the United States at the time of the incidents out of which the Plaintiff's defamation claim arose"); *see Osborn v. Haley,* 549 U.S. 225, 230 (2007) ("Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee."); *cf. Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017) (recognizing the certification is prima facie evidence that substitution is appropriate). The government had no reason to anticipate either that plaintiff would assert that the President is not an employee of the government for purposes of the FTCA and the Westfall Act, or that the district court would be the first court ever to adopt such arguments.

That issue first surfaced in plaintiff's opposition to the motion. A332-A342. Thus, until its reply brief, when the United States had to respond to this objection, the government had no reason to argue that the statute's use of the word "includes" helps confirm that the President is covered by the Westfall Act. This was not a new argument, but rather simply a response to an argument raised in the opposition brief. The rule against raising new arguments in a reply brief does not pertain to this

23

scenario.  *See, e.g., Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 295 n.2 (5th Cir. 2019), (distinguishing because "a rebuttal" and a new argument for purposes of forfeiture because it would be unreasonable to "require a litigant to anticipatorily rebut all potential arguments his adversary may raise"); *see also Holmes v. Spencer*, 685 F.3d 51, 66 (1st Cir. 2012) (recognizing that forfeiture does not apply to points first made in the reply brief when the reply is "the earliest point when it was logical" to raise the issue); *United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008) ("To be sure, an appellant may use his reply brief to respond to a contention made by the appellee.").

In any event, as the Supreme Court has long recognized, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).  Here, the relevant claim is that the United States should properly be substituted for President Trump pursuant to the Westfall Act.  The United States is entitled to rely on the text of that statute in support of its claim that substitution is appropriate.  Indeed, courts should independently "identify and apply the proper construction of governing law" regardless of the parties' legal theories and arguments.  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991).  The district court thus misapplied waiver principles in rejecting the United States' textual argument.

**D.** **Reading the FTCA to cover the President is consistent with both the President's immunity and *Franklin v. Massachusetts***

The district court also relied on two non-textual bases for concluding that the President is not subject to the Westfall Act. Neither rationale withstands scrutiny.

**1.** The district court reasoned that Congress would not have included the President within the coverage of the Westfall Act because prior to the adoption of the Westfall Act, the Supreme Court had already held in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), that the President is entitled to absolute immunity from damages liability predicated on his official acts (and thus had no need for Westfall Act immunity). SPA26-SPA28. There are three principal flaws in this reasoning.

*First*, the relevant portions of the definitions of "employee of the government" and "federal agency" trace back to the original enactment of the FTCA. *See* Pub. L. No. 79-601, § 402, 60 Stat. at 842-43. The definitions thus long pre-date both the Westfall Act and *Nixon*, and the district court erred in treating Congress's constructive knowledge of *Nixon* as relevant to the interpretation of those definitions.

*Second*, the Supreme Court has already squarely rejected the argument that the Westfall Act should be construed narrowly to exclude employees with pre-existing immunities. *See United States v. Smith*, 499 U.S. 160, 173 (1991) (recognizing that the Westfall Act's "plain language makes no distinction between employees who are covered under pre-Act immunity statutes and those who are not"). And the Westfall Act indisputably covers other categories of employees with broad pre-existing

25

absolute immunities including prosecutors, *see Imbler v. Pachtman*, 424 U.S. 409, 421-24 (1976), judges, *see Butz v. Economou*, 438 U.S. 478, 508 (1978), and Members of Congress, *see Gravel*, 408 U.S. at 615-16.

*Third*, the district court was not correct that "there was no need to extend the protections of the Westfall Act to the president." SPA27. As noted, the Westfall Act provides not only an immunity from liability, but also creates an immunity from suit and tasks the Attorney General with defending suits alleging misconduct that falls within the statute's scope. *See* 28 U.S.C. § 2679(c). And through the certification procedures, *id.* § 2679(d), the Westfall Act creates a mechanism that allows for the substitution of government counsel in cases where a plaintiff pursues an individual-capacity suit. In *Nixon*, by contrast, former-President Nixon was represented by private counsel, not the Department of Justice. The possibility of substitution is valuable independent of the immunity it provides. Thus, the Westfall Act extends protections and benefits to the President beyond those already available under *Nixon*. Nor is the scope of immunity available to the President under the Westfall Act wholly duplicative of his immunity under *Nixon*. *Cf. Jamison v. Wiley*, 14 F.3d 222, 227 n.2 (4th Cir. 1994) (suggesting the potential for differences under the respective tests, which look to different bodies of law).

**2.** The district court went similarly astray in concluding that under the logic of *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Westfall Act should not be read to cover the President. SPA28-SPA33. In *Franklin*, the Supreme Court held that the

26

President's actions are not reviewable under the Administrative Procedure Act, reasoning that in the absence of a clear legislative statement, it would be wrong to assume that Congress would invite judicial scrutiny of whether the President abused his discretion in the performance of his official duties. *Franklin*, 505 U.S. at 801. From this holding, the district court presumed that the Westfall Act should not cover the President in the absence of a clear statement.

The district court's analysis overlooks crucial distinctions between the APA and the FTCA. The APA specifically tasks courts with determining whether government action was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). Thus, a holding that the President is subject to the APA necessarily would require assuming that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." *Franklin*, 505 U.S. at 801.

The FTCA, by contrast, precludes the imposition of liability "based upon the exercise or performance or the failure to exercise or perform a discretionary function . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court has explained that the discretionary function exception to the FTCA "prevent[s] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991). In fact, this Court has previously applied the discretionary function exception to bar a tort suit that ultimately sought to attack a policy decision made by the President. *See In re "Agent*

27

*Orange" Prod. Liab. Litig.*, 818 F.2d 194, 198-99 (2d Cir. 1987) (holding that 28 U.S.C. § 2680(a) barred claims for injuries resulting from exposure to chemical defoliant during Vietnam War given that "ultimate policy decision to use Agent Orange was made by President Kennedy"). Because the discretionary function exception would shield the President's discretionary exercise of his official powers from judicial second-guessing, applying the FTCA and the Westfall Act to the President does not give rise to the concerns that *Franklin* identified would result from applying the APA to the President.

If anything, applying the FTCA and the Westfall Act to the President would further the principle underlying *Franklin*: that the President's exercise of discretion in the discharge of his official duties generally should be immune from judicial scrutiny. The district court's ruling turns *Franklin* on its head; for rather than shield the President from having to personally defend tort suits, it exposes him to such suits— including in state courts. The district court acknowledged that the "poles in some sense are reversed" here from the circumstances in *Franklin*. SPA31. That "revers[al]" should have led it to conclude that *Franklin* supports, not undermines, the applicability of the Westfall Act here.

28

**II.** **The District Court Was Wrong To Reject The Attorney General's Certification That The President Was Acting Within The Scope Of His Duties**

>**A.** **The President was acting within the scope of his office when he responded to Ms. Carroll's allegations**

Because the President is an "employee of the government" for purposes of the Westfall Act, the "exclusive" remedy for a "negligent or wrongful act or omission" by the President is a suit against the United States under the FTCA, as long as the President was "acting within the scope of his office." 28 U.S.C. § 2679(b)(1). Here, the Attorney General's delegate correctly certified that the President was acting within the scope of his employment when making the statements giving rise to this suit. The district court thus erred in rejecting that certification.

**1.** Whether a governmental employee was acting within the scope of his employment under the FTCA is determined by the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b)(1); *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016). Here, as the district court recognized, all of the allegedly defamatory statements were made in the District of Columbia and, thus, D.C. law applies. SPA36-SPA37.

The district court nevertheless posited (but did not hold) that New York defamation law might apply pursuant to District of Columbia choice of law principles. SPA37. But whatever the merit of that contention, it does not answer the separate question of which jurisdiction's scope-of-employment law should be controlling.

29

That distinct legal issue must be analyzed separately from the question of which jurisdiction's substantive tort law applies. *See Bailey v. J & B Trucking Servs., Inc.*, 590 F. Supp. 2d 4, 10 (D.D.C. 2008) (applying D.C. choice of law principles and concluding that the *respondeat superior* analysis was governed by a different body of law from the negligence analysis); *see also Barimany v. Urban Pace LLC*, 73 A.3d 964, 967 (D.C. 2013) (holding that "choice of law analyses are properly conducted, as necessary, on an even finer basis [than claim by claim] and should be considered issue by issue").

The District of Columbia's interest in the application of its own substantive law here easily outstrips any interest of New York because the employment relationship between the President and the United States is centered in D.C. (which is also the place where all of the allegedly defamatory statements were made). Thus, D.C. scope-of-employment principles control. *See Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) ("In determining whether an employee acted within the scope of his employment [under the Westfall Act], we consider the substantive law of the jurisdiction where the employment relationship exists—here, the law of the District of Columbia."); *Bailey*, 590 F. Supp. 2d at 10 (concluding that under D.C. choice-of-law principles, *respondeat superior* inquiry is governed by the law of the jurisdiction where the employment relationship was centered, not the site of the alleged tort).

**2.** Under D.C. law, the President was acting within the scope of his employment when he made the three statements that plaintiff alleges are defamatory. To be clear, the question here is not whether a decades-old assault would fall within

30

the scope of the performance of Presidential duties. Nor is the issue whether the President's statements were in fact defamatory. Rather, the scope of employment inquiry asks only whether the President committed the alleged *defamation* while acting within the scope of his employment. In the specific context of defamation claims, D.C.'s definition of "scope of employment" is broad—generally a *plaintiff*-friendly approach, for it expands the circumstances in which the employer is held responsible if the plaintiff ultimately prevails. *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (explaining that the scope of employment inquiry addresses not whether the plaintiff's job responsibilities include the commission of defamation, but rather, whether the alleged defamation occurred within a broader conversation that was within the scope of the official's employment); *see also Bowles*, 685 F. App'x at 23 (holding Westfall Act applies so long as the "allegedly defamatory statements were made on duty at the time and place of an 'incident' alleged in a complaint" without regard to the "truth or falsity" of the allegedly defamatory statements) (quotation marks omitted). Plaintiff herself describes D.C.'s approach as "expansive." A354.

Under that expansive approach, an office holder responsible to the electorate is acting within the scope of his office when he responds to accusations and attendant media inquiries that call into question his fitness to hold the public trust. Office holders generally, and the President in particular, must be able to respond under those circumstances. In *Ballenger*, for example, the D.C. Circuit recognized that such

31

responses fall within the scope of an office holder's work under the Westfall Act, and thus held that a congressman acted within the scope of his duties in making an allegedly defamatory statement when he responded to an inquiry from a reporter regarding his personal life. 444 F.3d at 665-66. The court explained that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" because a "Member's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 664-65. In responding to the question, the congressman acted at least in part to defuse an issue that could impair his ability to advance his legislative agenda. *Id.* at 665. As a result, "there was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665-66.

The D.C. Circuit applied the principles from *Ballenger* in *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009), to conclude that another congressman acted within the scope of his employment in allegedly committing defamation in responding to a question from a reporter. *Id.* at 384-85. And the D.C. Circuit also drew on *Ballenger* in recognizing that for high-ranking executive branch employees, "discredit[ing] public critics of the Executive Branch" falls within the scope of their employment, even when the officials acted in ways that were alleged to be unlawful and contrary to the national security of the United States. *Wilson*, 535 F.3d at 712. *See also Smith v. Clinton*,

32

886 F.3d 122, 126 (D.C. Cir. 2018) (collecting cases demonstrating that "[e]xtensive precedent makes clear that alleging a federal employee violated policy or even laws in the course of her employment—including specific allegations of defamation or of potentially criminal activities—does not take that conduct outside the scope of employment"); *Does 1-10*, 973 F.3d at 600 (finding "unsolicited comments by elected officials on an event of widespread public interest" within scope); *Williams*, 71 F.3d at 507 (finding statements made during press interview within scope).

Under these precedents, the conduct alleged by Ms. Carroll falls comfortably within the scope of the President's office or employment. The President, no less than the members of Congress in *Ballenger* and *Wuterich*, is expected to respond to questions from the media on matters of public concern. He thus acts within the scope of his office when, in this context, he seeks to defuse personal issues that threaten to impair his ability to achieve his agenda. Likewise, the President, no less than the other high ranking executive branch officials sued in *Wilson*, acts within the scope of his office when he responds to public critics.

The holdings in *Ballenger*, *Wuterich*, and *Wilson* are particularly significant because in each of those cases, the D.C. Circuit applied District of Columbia law, which also governs the scope of employment inquiry here. The district court identified no respect in which the present case is meaningfully distinguishable from *Ballenger*. Rather, the district court was of the view that the D.C. Circuit's decisions, particularly *Ballenger*, misstated D.C. law. SPA51; *see also* SPA52-SPA53 & n.145

33

(faulting *Wuterich* for failing to limit *Ballenger* to its facts); *but cf. Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988) ("We have a settled and firm policy of deferring to regional courts of appeals in matters that involve the construction of state law."). But the district court cited no statement from a D.C. court disapproving of *Ballenger*. And, in fact, the D.C. Court of Appeals has on at least one occasion cited *Ballenger* with apparent approval. *See District of Columbia v. Jones*, 919 A.2d 604, 608-09 (D.C. 2007).

The district court here did not examine D.C. precedent, but relied on the principle—which is also stated in *Ballenger* itself—that an employee will not be acting within the scope of his employment when he is "too little actuated by a purpose to serve the master." SPA48, SPA52, SPA54 (quoting *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014)); *see also Ballenger*, 444 F.3d at 663. The court concluded that in responding to Ms. Carroll's accusation, President Trump was not sufficiently actuated by a desire to fulfill the duties of his office to receive the protection of the Westfall Act. But the court did not explain how any precedent from D.C. courts would support application of that limitation on the scope of employment test here.

The district court expressed a policy concern that under *Ballenger*, "virtually any remarks that Members of Congress make to the press would constitute conduct within the scope of their employment." SPA52. But as *Ballenger* itself makes clear, its holding does not immunize federal employees for all cases of alleged defamation or slander. 444 F.3d at 666. Moreover, Ms. Carroll's suit does not implicate the extreme scenarios that the district court worried would follow from an overbroad reading of

34

*Ballenger.* For present purposes, all this Court need draw from *Ballenger* is the principle that an elected official acts within the scope of his office when he publicly addresses an issue that threatens to impair that official's ability to perform his duties effectively. In any event, the district court's policy concerns should not have overridden faithful application of District of Columbia precedent.

Finally, the district court erred in concluding that the United States had waived the argument that an elected official's statements refuting allegations that call into question his fitness for office are within the scope of employment because the statements further his ability to govern effectively. SPA54. This waiver holding suffers from the same defects as the court's conclusion that the United States waived the right to a proper construction of the term "employee of the government." *See supra* Part I.C. The United States argued in its opening motion papers that the President acted within the scope of his office and even cited *Ballenger* and *Wuterich* as support (among other cases). A17. Ms. Carroll understood the United States to be relying on precedents recognizing that elected officials may need to comment on their private lives in order to perform their jobs effectively, and she responded to that argument in her opposition brief. A355. In its reply brief, the United States expanded on its argument in rebutting Ms. Carroll's objections, but did not raise any new arguments. Regardless, this Court can and should apply District of Columbia law consistent with D.C. Circuit precedent to conclude that the President acted within the scope of his office with regard to the actions alleged in the complaint.

35

**B.    The district court's "master-servant" analysis proceeds from an erroneous premise and is, in any case, mistaken**

In rejecting the straightforward conclusion under District of Columbia law that the President's statements were made within the scope of his employment, the district court also opined that the scope of employment analysis is dependent on the existence of a master, and a President has none.  SPA43-SPA47.

The district court erred by injecting into the "scope of employment" test a novel "master-servant" requirement that is contrary to both precedent and statutory text.  By its terms, the Westfall Act applies so long as only two requirements are satisfied:  the alleged tortfeasor must (1) be "an employee of the Government" and (2) have been "acting within the scope of his office or employment."  28 U.S.C. § 2679(b).  There is no additional requirement that a master-servant relationship exist. The only required relationship between the alleged tortfeasor and the United States is that the tortfeasor must be an "employee of the government."  As we explained in Part I, *supra*, that requirement is satisfied here.

The district court misconstrued case law holding that in evaluating whether an employee was acting within the scope of his employment, courts look to the *respondeat superior* law of the jurisdiction where the tort occurred.  SPA35-SPA36 (citing *Fountain*, 838 F.3d at 135).  The court noted that under D.C. law, *respondeat superior* liability requires showing both that (1) a master-servant relationship existed between the employer and the employee, and (2) the incident at issue occurred while the workers

36

or contractors were acting within the scope of their employment. SPA42-SPA43. The district court thus concluded that the United States would be required to show both of the elements of *respondent superior* liability under D.C. law.

That conclusion was mistaken. As this Court has explained, the scope of employment requirement is interpreted "in accordance" with the *respondeat superior* law of the jurisdiction where the tort occurred, *Fountain*, 838 F.3d at 135; but that does not mean the FTCA incorporates the entirety of the jurisdiction's *respondeat superior* law. Instead, state law is relevant in this context only to assess whether the employee was acting within the scope of his employment (*i.e.*, the second of the two elements of the D.C. *respondeat superior* test). *See Palmer v. Flaggman*, 93 F.3d 196, 202 (5th Cir. 1996) (recognizing that while "it is true that we are required to apply [state] *respondeat superior* law to determine [the federal employee's] scope of employment, we are not required to apply the entire body of *respondeat superior* law, but only that portion of the law that resolves the scope of employment issue" and not any separate requirement that the employer "control" the employee's actions).

The first element of the D.C. *respondeat superior* test—the existence of a master-servant relationship—is irrelevant under the FTCA, which expressly establishes a *different* test to determine the universe of individuals for whom the United States will accept responsibility: namely, whether that individual is an "employee of the government," a defined term in the Act. *See* 28 U.S.C. § 2671. That is a question of federal statutory law, not state *respondeat superior* law. *See Leone v. United States*, 910 F.2d

37

46, 49 (2d Cir. 1990) ("Whether a person is a government employee . . . is a question of federal law."). Imposing a separate "master-servant" requirement would thus override Congress's judgment that the FTCA and the Westfall Act should apply to all government officials and employees as defined in those statutes, without any requirement of a master-servant relationship.

Indeed, were the district court correct that the scope-of-employment test under the FTCA includes a master-servant requirement, it not only would categorically exclude the President from the protections of the Westfall Act, but would also likely exclude other constitutional officers that are not subject to the direct control of any superior official or master—such as judges and Members of Congress. Yet Congress did not leave these officials unprotected. *See Sullivan v. United States*, 21 F.3d 198, 203 & n.8 (7th Cir. 1994) (recognizing that that "the plain language of the Act must trump any 'control test'" imposed by state law and noting that a control requirement would be incompatible with the Westfall's Act's undisputed coverage of federal judges), *abrogated on other grounds as recognized in Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012).

Finally, the district court's reasoning is questionable even on its own terms. While executive power is extensive, it is not boundless, and the President's authority is subject to various constitutional and statutory limits. *E.g.*, U.S. Const. art. II, § 2, cl. 2 (appointment power and treaty power limited by Senate consent requirement); *see also* U.S. Const. art. II, § 3 (specifying that the President is to take care that the laws of the

United States are faithfully executed). The President is also subject to checks imposed by two co-equal branches of government, and by an array of formal and informal checks. *See Nixon*, 457 U.S. at 757. Indeed, the President ultimately is responsible to the American public, whom he has sworn to serve and from whose fisc he is paid. *See* U.S. Const. art. II, § 1, cls. 8-9; 3 U.S.C. § 102.

**C.      Even if New York law were applicable, the district court's holding would be incorrect**

The district court's reliance on New York law (SPA59-SPA61) was misplaced. Even if it were proper to consider New York law, *but see supra* pp. 29-30, the court's holding would still be incorrect. The court wrongly assumed that Ms. Carroll's allegations "have no relationship to the official business of the United States" and so the President's statements denying the allegations were not made within the scope of his employment. SPA60-SPA61. For the reasons explained previously, that assumption is mistaken no matter what State's law applies.

The district court apparently thought it relevant that "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives" and thus do not give rise to *respondeat superior* liability. SPA60 (quoting *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998)). But the tort at issue here is not the alleged sexual assault from the 1990s, but rather, the alleged defamation that occurred in 2019. And *respondeat superior* "doctrine's application to suits for defamation has been long established." *Rausman v. Baugh*, 248

39

A.D.2d 8, 11 (N.Y. App. Div. 1998).  Under New York doctrine, an "employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment."  *Rivera v. State*, 142 N.E.3d 641, 645 (N.Y. 2019) (quotation marks omitted).  For the reasons already discussed, the allegations here fall within the scope of that test because the allegedly tortious conduct here is a natural outgrowth of the President's public response to allegations challenging his fitness for office.

Other courts, applying the laws of an array of jurisdictions, likewise have concluded that high ranking elected officials acted within the scope of their offices when they allegedly committed defamation in responding to media inquiries or were speaking on matters of public concern.  *See Ballenger*, 444 F.3d at 665 (D.C. law); *Does 1-10*, 973 F.3d at 602 (Kentucky law); *Williams*, 71 F.3d at 507 (Texas law); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 107 (D. Mass. 1997), *aff'd*, 147 F.3d 68 (1st Cir. 1998) (Massachusetts law); *Chapman v. Rahall*, 399 F. Supp. 2d 711, 714 (W.D. Va. 2005) (West Virginia law).  There is no reason to believe that New York would depart from the consensus governing that unique context.  *Cf. Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (describing *respondeat superior* liability as "elastic" and dependent on the specific factual circumstances of the case).

40

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JENNIFER B. DICKEY
*Acting Assistant Attorney General*

SOPAN JOSHI
*Senior Counsel to the Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
*s/ Joshua M. Salzman*

JOSHUA M. SALZMAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4747*
*joshua.m.salzman@usdoj.gov*

January 2021

41

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,410 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Joshua M. Salzman_
JOSHUA M. SALZMAN

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Lewis A.
    Kaplan, filed October 27, 2020, Appealed From ...    SPA-1

28 U.S.C. § 2671 ........................................................... SPA-62

28 U.S.C. § 2679 ........................................................... SPA-64

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                    Plaintiff,

             -against-                              20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

> Roberta A. Kaplan
> Joshua A. Matz
> KAPLAN HECKER & FINK LLP
> *Attorneys for Plaintiff*
>
> Stephen R. Terrell
> William K. Lane III
> James G. Touhey, Jr.
> Director, Torts Branch, Civil Division
> JEFFREY BOSSERT CLARK
> ACTING ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
> *Attorneys for Movant*
>
> John A. Kolar
> *Attorney for Amicus Curiae Government Accountability Project, Inc.*

SPA-2

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Statutory Context – The FTCA and the Westfall Act. . . . . . . . . . . . . . . . . . . . . . . . . . 4
    The Events Giving Rise to This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    I.      Whether the President Is an "Employee" Under the Westfall Act . . . . . . . . . . . . 14
        A.     The Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B. .    The Legislative History – The *Westfall* Decision and the Westfall Act
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        C.     *Franklin v. Massachusetts* and Lack of Clear Statement to Include the
            President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        D.     Decisions of Other Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    II.    Scope of Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        A.     Choice of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        B.     Scope of Employment Under D.C. Law . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           1.     Master-Servant Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . 41
           2.     Scope of Employment Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        C.     Scope of Employment Under New York Law . . . . . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

LEWIS A. KAPLAN, *District Judge.*

The plaintiff in this case, E. Jean Carroll, published a book excerpt in 2019 in which she wrote that, in the 1990s, businessman Donald J. Trump, as he then was, raped her in a dressing room of a New York City department store.  Almost immediately after publication of Ms. Carroll's excerpt, Mr. Trump – who by then was president – told the press that Ms. Carroll had made up the rape story.  In substance, he called Ms. Carroll a liar and stated that he never met her.  So Ms. Carroll sued him in New York State court.  She claims that his statements accusing her of lying about the alleged rape were false, that they injured her reputation, and that she is entitled to damages from him.  The legal terms are that Ms. Carroll asserts that President Trump's statements were defamatory – libelous and slanderous.

The question whether Mr. Trump in fact raped Ms. Carroll appears to be at the heart of her lawsuit.  That is so because the truth or falsity of a defendant's alleged defamatory statements can be dispositive of any defamation case.  Although the Court eventually may need to resolve this issue, this opinion concerns a threshold question.  To make the significance of that question clear, we must digress into some technical detail.

Ms.  Carroll sued the president in his individual (or personal) capacity, as distinguished from suing him as the president (*i.e.*, in his official capacity).  In other words, she claims that the president personally harmed her and that he, not the U.S. government, should pay any damages to which she may be entitled.

For nearly a year, this lawsuit proceeded in state court as an ordinary defamation case between Ms. Carroll and President Trump.  The president defended the case as a private individual.  He was represented by his personal lawyers, not by the U.S. Department of Justice ("DOJ") or other government lawyers.  And although he claimed that he could not be sued

SPA-4

2

because he currently is president, the state court rejected that argument and denied a stay of further proceedings, which would have included pretrial discovery.[1]

It was at that point that the U.S. government inserted itself into the case.  It "removed" the case from the state court to this one – that is, it filed a paper certifying that a designee of the Attorney General had determined that the president's statements to the press were part of his job as president and that this case therefore could be moved into federal court. For reasons that will appear, that certificate – whether it is right or wrong – conclusively authorized the removal of the case, and no one claims otherwise.  But the DOJ did something else too, and that is what now is before the Court.

The government moves to substitute the United States for President Trump as the defendant.  It does so in essence on the theory that this is not truly a lawsuit against President Trump as a private individual.  Instead, the government argues, this is really a lawsuit against the United States because Ms. Carroll has sued an "employee" of the United States of America for actions within the scope of his employment.  The government thus asserts that this case is virtually identical in principle to a lawsuit against a Postal Service driver for causing a car accident while delivering the mail.  But the word "virtually" in the last sentence is necessary because there is an important difference between this case and the case of the hypothetical mail driver.  Here is the catch.

---

[1]      Dkt. 14-111.

3

The United States of America is a sovereign nation. It therefore shares with other nations what is called sovereign immunity. This means that it cannot be sued for money damages except to the extent that it explicitly has agreed to being sued.[2]

Within certain limits, the United States has so agreed in a statute called the Federal Tort Claims Act (the "FTCA"). The FTCA authorizes damages claims for negligence and certain other civil wrongs committed by government employees within the scope of their employment. The postal driver hypothetical is a classic example of a case that generally would be covered by the statute. But the FTCA specifically excepts libel and slander cases from the United States's consent to be sued. Thus, if this really is a suit against the United States, it is one to which the United States seemingly has not waived its sovereign immunity. So if President Trump is an "employee of the Government" within the meaning of the FTCA, and if his statements about Ms. Carroll were within "the scope of his employment," it could well be argued that this case must be dismissed because the United States has sovereign immunity.[3] In that

---

[2]  Sovereign immunity derives from the principle that "the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . . Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power . . . ." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 234-235 (1765) (quoted in *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

[3]  This point has been made in the media. *E.g.*, Barbara McQuade, *Barr's Defense of Trump in E. Jean Carroll's Suit Could Give Presidents Carte Blanche,* (Oct. 21, 2020), https://www.nbcnews.com/opinion/barr-s-defense-trump-e-jean-carroll-s-suit-could-n12 44088; James D. Zirin, *The Strange Case of 'Carroll v. Trump' – An Adventure in Wonderland* (Sept. 11, 2020), https://billmoyers.com/story/the-strange-case-of-carroll-v-trump-an-adventure-in-wonde rland/. The Court expresses no opinion on this question, which is not now before it.

4

event, Ms. Carroll would be left with no remedy, even if the president's statements were false and defamatory.

This is the nutshell version of this case.  But for the present purpose of deciding the government's motion to substitute, the dispositive questions are two:

- Is the president an "employee of the Government" within the meaning of the FTCA?

- Even if the president is an "employee of the Government" as the FTCA defines that term, were his statements concerning Ms. Carroll within the scope of his "employment" under the law of the relevant jurisdiction?

The answer to both questions is "no." While the president possesses all of the executive power of the United States, he is not an "employee" within the meaning of the FTCA. The FTCA's definition of that term does not include presidents.  And even if the president were an employee under that statute, his statements concerning Ms. Carroll were not within the scope of his employment under the law of the relevant jurisdiction, which for reasons explained below is Washington, D.C.


*Facts*

Before turning to the details of this dispute, the Court places them in context by reviewing the constitutional and statutory framework in which this motion is situated.


*Statutory Context – The FTCA and the Westfall Act*

We already have introduced the principle of sovereign immunity.  It remains to mention a closely related principle, namely that federal employees and the president long

5

enjoyed absolute official immunity with respect to lawsuits in federal courts charging them with liability for performance of their official functions.[4]

In 1946, Congress enacted the FTCA. The statute was a major step to provide compensation to victims of certain torts – *i.e.*, civil wrongs such as negligence – committed by federal employees. As relevant here, the FTCA provides that the district courts of the United States

> "have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[5]

Although the FTCA's precise workings are complicated, its basic function is simple. With numerous qualifications and exceptions, the statute allows a person injured by an "employee of the Government" who is "acting within the scope of his office or employment" to sue the United States for tort damages, notwithstanding its sovereign immunity, if the United States would be liable as an employer under the law of the state where the act or omission occurred. Thus, Congress adopted the view that (1) a suit for damages against a federal employee acting within the scope of his or her employment in substance is a suit against the United States, (2) in such a case the United States would be substituted as the defendant for the individual employee, and (3) the United States is responsible for defending such lawsuits in the

---

[4] *See, e.g., Barr v. Matteo,* 360 U.S. 564, 597 (1959).

[5] 28 U.S.C. § 1346(b)(1).

SPA-8

6

name of the United States and for paying any damages awarded. The individual employee sued in his or her official capacity is not a proper defendant in such a case.

The FTCA does not authorize suits against government employees in their individual or personal capacities. But state law often does. Thus, even after the FTCA was enacted, federal employees were exposed to tort actions against them in their individual capacities in some states.

In 1988, the Supreme Court held in *Westfall v. Erwin*[6] that federal government employees are not absolutely immune from state tort claims based on conduct performed within the scope of their employment except in certain circumstances.[7] This decision opened the door to individual liability for federal employees wider than previously had been understood.

Congress moved promptly to close that door. In 1988, it enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988, more commonly known as the Westfall Act.[8] The statute's "core purpose . . . is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders."[9] Pursuant to the Westfall Act:

> "The remedy against the United States provided by sections 1346(b) [the FTCA] and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[6] 484 U.S. 292 (1988).

[7] *Id.* at 299.

[8] The statute as amended is codified at 28 U.S.C. § 2679.

[9] *Osborn v. Haley*, 549 U.S. 225, 252 (2007).

SPA-9

7

employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."[10]

In essence, the quoted provision bars tort claims against government employees acting within the scope of their employment.   But it provides plaintiffs with a different remedy: a lawsuit against the United States under the FTCA.  Under subsection (c) of the Westfall Act, "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any [of the above described] damage or injury."[11]

Because the Westfall Act operates where a lawsuit could have been brought against the United States under the FTCA, the statutes share the same threshold requirements. Thus, in order for the Westfall Act to apply, the defendant must be an "employee of the Government" who was acting within the scope of his or her employment.  Under Subsection (d) of the Westfall Act, the Attorney General makes an initial determination as to both issues:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[12]

---

[10] 28 U.S.C. § 2679(b)(1).

[11] *Id.* § 2679(c).

[12] *Id.* § 2679(d)(1).

SPA-10

8

If the Attorney General issues a certification and the action is pending in state court, the Westfall Act requires that the action be removed to federal court.[13]  If the Attorney General declines to issue a certification, "the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."[14]  Either way, if the court is satisfied that the threshold requirements are met, the action "shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA]."[15]

The Attorney General's certification is conclusive only "*for purposes of removal*"[16] – that is to say, only for purposes of whether the action shall continue in federal rather than state court.  As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee."[17]  "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification . . . ."[18]  Hence, the federal court to which the action has been removed must determine for itself whether the

---

[13]     *Id.* § 2679(d)(2).

[14]     *Id.* § 2679(d)(3).

[15]     *Id.* § 2679(d)(4).

[16]     *Osborn*, 549 U.S. at 242 (emphasis in original) (quoting 28 U.S.C. § 2697(d)(2)).

[17]     *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995).

[18]     *Id.* at 436-37.

SPA-11

9

individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

*The Events Giving Rise to This Lawsuit*

According to the complaint, Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.[19] Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.[20] The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.[21] Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.[22] She claims that she pushed Mr. Trump away and laughed at him, and that

---

[19] Dkt. 3-3 at 5.

[20] *Id.*

[21] *Id.* at 6.

[22] *Id.*

SPA-12

10

he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store.[23]

Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.[24]  She did not, however, make the allegations public at that time.[25]  They remained private for many years.

In 2017, the plaintiff began drafting a book about twenty-one men who had left ugly marks on her life.[26]  One of those men was Donald Trump.[27]  On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.[28]  The book was published on July 2, 2019.[29]

Roughly two hours after the excerpt was published in *New York* magazine, the president issued a public statement to media outlets.  It said:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago.  I've never met this person in my life.  She is trying to sell a new book – that should indicate her motivation.  It should be sold

---

[23] *Id.* at 6-7.

[24] *Id.* at 7.

[25] *Id.* at 8.

[26] *Id.* at 13.

[27] *Id.*

[28] *Id.* at 14.

[29] *Id.*

SPA-13

11

in the fiction section.  Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh.  It's just as bad for people to believe it, particularly when there is zero evidence.  Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures?  No surveillance?  No video?  No reports?  No sales attendants around??  I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault.  All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible.  The world should know what's really going on.  It is a disgrace and people should pay dearly for such false accusations."[30]

The next day, June 22, 2019, a reporter at the White House confronted President Trump about the story.[31]  They had the following exchange:

[Reporter:] Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's —

[President Trump:] I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married — as I read; I have no idea who she is — but she was married to a, actually, nice guy, Johnson — a newscaster.

[Reporter:] You were in a photograph with her.

[President Trump:] Standing with [my] coat on in a line – give me a break – with my back to the camera.  I have no idea who she is.  What she did is – it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

---

[30] *Id.* at 15.

[31] *Id.* at 17.

SPA-14

12

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that – and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things – that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[32]

President Trump commented on the story a third time on June 24, 2019, when he gave an interview to *The Hill*. As relevant here, he stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[33]

*Procedural Background*

On November 4, 2019, the plaintiff filed this lawsuit in the New York Supreme

---

[32]     *Id.* at 17-18.

[33]     *Id.* at 19.

SPA-15

13

Court, New York County, against President Trump in his personal capacity.[34]  On the basis of the June 21, June 22, and June 24 statements, she alleged that the president defamed her under New York law.[35]

The lawsuit proceeded in state court for ten months during which time the court resolved, among other things, a motion to dismiss and several motions to stay.[36]  On September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General "on the basis of the information now available with respect to the incidents alleged in the [plaintiff's] complaint, that Defendant Donald J. Trump was acting within the scope of his office as the President of the United States at the time of the alleged conduct."[37]  Shortly after, the government filed in this Court a notice of removal.[38]  It filed also a motion, pursuant to the Westfall Act, to substitute itself in place of President Trump as the defendant.[39]  It is that motion that now is ripe for decision.

---

[34] *Id.* at 1.

[35] *Id.* at 26-27.

[36] *See, e.g.*, Dkts. 14-36, 14-111.

[37] Dkt. 3-4.

[38] Dkt. 6.

[39] Dkt. 3.

14

*Discussion*

The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct.  As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.[40]

I.      *Whether the President Is an "Employee" Under the Westfall Act*

As noted above, the Westfall Act applies to any "employee of the Government."[41] That phrase is defined in 28 U.S.C. § 2671, a provision enacted by the Act of June 25, 1948 as part of a "Tort Claims Procedure" package.  The statute reads:

> "As used in this chapter and sections 1346(b) [the FTCA] and 2401(b) of this title, the term [[42]] * * *

---

[40]

For reasons explained below, D.C. law applies to this issue.

[41]

28 U.S.C. § 2679(b)(1).

[42]

The Act of June 25, 1948 contains an em dash in this location, signifying that the "As used in this chapter" clause applies to all three of the definitions that follow.  *See* Act of June 25, 1948, ch. 646, 62 Stat. 982, *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf.  In 1962, Congress amended the definition of "federal agency," the first defined term.  In doing so, it omitted the em dash and combined the "As used in this chapter" clause with the paragraph defining "federal agency." *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307, *available at* https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg306.pdf.  The failure to retain the em dash appears to have been a scrivener's error.  For one thing, the term "federal agency" is not used in Section 1346(b).  And taking Congress literally would require a belief that, in updating the definition of "federal agency," it silently chose to un-define "employee of the Government" as that term is used in the chapter where it is found

15

> "'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18."[43]

The term "federal agency" also is defined by Section 2671:

> "'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[44]

These definitions apply to both the Westfall Act provisions codified in 28 U.S.C. § 2679 and the

FTCA provisions codified in 28 U.S.C. § 1346(b).[45]

Neither Ms. Carroll nor the government has cited any case addressing the

question whether the President of the United States is an "employee of the Government" under

---

and in Section 1346(b) while inexplicably keeping it in the definition section. Whatever the case may be, the Supreme Court has stated that both definitions apply to Section 1346(b). *See Logue v. United States*, 412 U.S. 521, 525-26 (1973).

[43] 28 U.S.C. § 2671.

[44] *Id.*

[45] Section 2679, where the Westfall Act provisions are codified, is part of the chapter in which the definition is contained. *See also* note 42, *supra*.

SPA-18

16

Section 2671 specifically or the Westfall Act or FTCA more generally.  And the Court is aware of none.  We therefore begin the search for an answer to this question with the statutory text.[46]

 

     *A.*      *The Plain Language*

Section 2671's definition of "employee of the Government" says that the term "includes" five categories of government personnel:

1.      "officers or employees of any federal agency,"

2.      "members of the military . . . ,"

3.      "members of the National Guard [in certain circumstances],"

4.      "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States," and

5.      "any officer or employee of a Federal public defender organization."

Categories 2, 3 and 5 obviously do not apply to the president.  Nor does category 4, which "is designed to cover special situations such as government officials who serve without pay, or an employee of one government agency who is loaned to and works under the direct supervision of another government agency."[47]   Thus, the remaining question is whether

---

[46]

      *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[47]

      *Leone v. United States*, 910 F.2d 46, 51 (2d Cir. 1990); *see also Logue*, 412 U.S. at 531 (noting that the legislative history of the provision suggests that "the language is designed to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement").

17

presidents are "officers or employees of any federal agency."[48]   Unfortunately, the terms "officers" and "employees" are not defined.[49]

The president is a *constitutional* officer.  He occupies the highest office in our nation, which is created by Article II of the Constitution.  But that is not what Section 2671 requires.  It speaks only of "officers . . . *of any federal agency*," not officers of the United States within the meaning of the Constitution.  So we turn to the question whether the president is an

---

[48]

The government argues for the first time in its reply brief that the use of the word "includes" indicates that the five categories that follow it are exemplary, not exclusive.  In other words, the use of the word "includes" invites courts to rewrite Section 2671 by expanding "employees of the Government" to include categories of individuals that Congress did not see fit to identify.  This contention fails.

As an initial matter, counsel for the government at oral argument waived on the record all arguments raised for the first time in the government's reply brief.  *See* Tr. at 4:13-24 (Oct. 21, 2020) (agreeing, in exchange for precluding the plaintiff from filing a surreply, "to invoke the time-honored principle that new arguments raised for the first time in a reply brief will not be considered").  This argument therefore is waived.  *See also Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

In any case, the Court would reject this argument.  "[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  As discussed below, if Congress had intended to include an individual as significant and obvious as the president in this statute, it would have done so clearly.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992).  Moreover, and also discussed below, there are compelling reasons to conclude that Congress did not intend the major expansion of federal tort exposure that would arise if the FTCA applied to the president's conduct.

[49]

The original definition of "employee of the Government" does not shed any additional light on this question.  It reads:

"'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Act of June 25, 1948, c. 646, 62 Stat. 982.

18

officer "of any federal agency" within the meaning of Section 2671.  As noted above, Section

2671 states that the term "federal agency" "includes the executive departments, the judicial and

legislative branches, the military departments, independent establishments of the United States,

and corporations primarily acting as instrumentalities or agencies of the United States."[50]

At the outset, it is apparent that this definition does not include the entire

executive branch.  Although Congress referred to "the executive departments," the fact that the

phrase is plural makes clear that Congress did not mean "the executive branch."  Congress knew

how to refer to an entire branch of government, as evidenced by the fact that the very next words

of the statute are "the judicial and legislative branches."[51]  The plain meaning of this language is

---

[50]

The 1948 version of the statute, which since has been amended, stated:

> "[T]he term- 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States."  *Id.*

The singular "independent establishment" appears to have been a typographical error.  It was changed to "independent establishments" in the 1966 amendment.  *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307.

[51]

The Supreme Court drew the same inference with regard to a related section of the same statute, the Act of June 25, 1948.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("It is difficult to reconcile the Government's . . . reading with the fact that two of the Act's other exceptions specifically reference an 'act or omission.'  *See* 28 U.S.C. § 2680(a).  The Government's request that we read that phrase into the [FTCA's] foreign country exception, when it is clear that Congress knew how to specify 'act or omission' when it wanted to, runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th rev. ed. 2000))).

Although the original statute did not refer to the judicial and legislative branches, this fact does not offer any reason to conclude that Congress's use of "executive departments" in 1948 was intended as a reference to the executive branch as a whole.  The phrase "executive

19

that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency." But the entire executive branch is not. Only those parts of the executive branch that fall within the other terms of the definition are included.

Here, the arguably relevant parts of the "federal agency" definition are "the executive departments" and "independent establishments." The governing statutes do not define either term. Although the government asserts that the president is covered by the Westfall Act, its five page memorandum in support of its motion neither cites to Section 2671 nor argues that either of the plausibly relevant terms applies to the president.[52]

Of course, one of the best ways to understand what Congress meant by "federal agency" is to examine how it used that term. The definition applies to Sections 1346(b) and 2401(b), to which it refers specifically, as well as the remaining sections of the Act of June 25, 1948, which are codified as amended at 28 U.S.C. §§ 2672-2680. Six of these eleven statutory sections use the term "federal agency." And four of them[53] suggest strongly that the term applies to what one ordinarily thinks of as a federal agency or executive department: a unit of government housed within the executive branch, such as the Department of Defense, the Department of State, or the Central Intelligence Agency,[54] and not a single constitutional officer,

departments" did not mean "executive branch" in 1948. And the fact that Congress added the phrase "judicial and legislative branches" immediately following "executive departments" demonstrates that it was aware of the difference and employed it intentionally. *See id.*

[52] *See* Dkt. 3-1.

[53] The other provisions, 28 U.S.C. §§ 2679 and 2680, shed no additional light on this issue.

[54] *Cf. Executive Agency*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An executive-branch department whose activities are subject to statute and whose contracts are

SPA-22

20

the president.  The statutes likewise make clear in several ways that "federal agency" does not refer to the executive branch as a whole or to any particular unit of the executive branch of which the president is an "officer," if any such unit existed.

First, under 28 U.S.C. § 2672, "[t]he head of each Federal agency or his designee" is permitted, pursuant to any regulations promulgated by the Attorney General, to settle claims for money damages against the United States caused by "any employee of the agency while acting within the scope of his office or employment" provided that any award "in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee."  In the original 1948 statute, the dollar amount was just $1,000.[55]  It is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States.  And to suggest that the president could be an "officer" of a federal agency without being its head would contravene our constitutional design, which vests in the president "the 'executive power' – all of it."[56]  The far more natural reading is that when Congress referred to "executive departments" and "federal

_____

subject to judicial review.  One example is the National Aeronautics and Space Agency."); *see also, e.g.*, *Department of Defense*, *id.* ("An executive department of the federal government . . . ."); *Department of State*, *id.* ("The cabinet-level department of the federal government responsible for advising the President in formulating and executing foreign policy."); *Central Intelligence Agency*, *id.* ("An independent federal agency that compiles intelligence information, conducts counterintelligence activities outside the United States, and advises the President and the National Security Council on matters of foreign intelligence and national security.").

[55]    Act of June 25, 1948, c. 646, 62 Stat. 982.

[56]    *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

21

agencies," it was referring to entities such as the Department of Defense and the Central Intelligence Agency.

Second, under 28 U.S.C. § 2673, Congress required that "[t]he head of each federal agency shall report annually to Congress all claims paid by it under section 2672 of this title, stating the name of each claimant, the amount claimed, the amount awarded, and a brief description of the claim." The government has presented no evidence that any president ever has authorized a payment on an FTCA claim or supplied such a report to Congress on behalf of an agency of which he is the head, if any such agency existed.

Third, 28 U.S.C. § 2675(a) provides that a plaintiff who wishes to sue under the FTCA "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This would make little sense if it were applied to the president. Certainly, the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit under the FTCA. Similar inferences may be drawn from 28 U.S.C. § 2401(b), which sets a statute of limitations for presenting tort claims to an agency and filing them in court following the agency's determination.

Because the president is at the apex of the executive branch, many think of him, in a colloquial sense, as the "head" of many federal departments, agencies, and organizations. At the very least, one might imagine that he leads some agency at the core of the executive branch. The government has not attempted to identify any such agency in its papers, but the two most obvious candidates are the Executive Office of the President ("EOP") and the president's cabinet. But neither entity fits the bill. The head of the EOP, which is a network of agencies, is

SPA-24

22

the president's chief of staff.[57]   And even if one were to call the cabinet an "executive department" or "independent establishment" – a dubious contention – the president himself is not a member of the cabinet, although the vice president is.[58]

Indeed, the basic civics lessons on the White House's website draw a clear distinction between "the executive branch," "the executive departments," and "federal agencies." Its page on "The Executive Branch" states that the Constitution vests in the president "[t]he power of the Executive Branch" and that "[f]ifteen executive departments – each led by an appointed member of the President's Cabinet – carry out the day-to-day administration of the federal government."[59]  It states also that the "executive departments" "are joined in this [effort] by other executive agencies such as the [Central Intelligence Agency] and Environmental

---

[57]

THE EXECUTIVE BRANCH, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-executive-branch/ ("The EOP, overseen by the White House Chief of Staff, has traditionally been home to many of the President's closest advisers.").

[58]

THE CABINET, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-cabinet/ ("President Donald J. Trump's Cabinet includes Vice President Mike Pence and the heads of the 15 executive departments – the Secretaries of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Labor, State, Transportation, Treasury, and Veterans Affairs, and the Attorney General.  Additionally, the Cabinet includes the White House Chief of Staff and heads of the Environmental Protection Agency, Office of Management and Budget, United States Trade Representative, Central Intelligence Agency, Office of the Director of National Intelligence, and Small Business Administration.").

[59]

THE EXECUTIVE BRANCH, WHITE HOUSE, https://www.whitehouse.gov/about-the-white-house/the-executive-branch/.

23

Protection Agency, the heads of which are not part of the Cabinet, but who are under full authority of the President."[60]

The phrase "independent establishments" does not rescue the government's argument. As Judge Sullivan once observed, "[a]lthough the Second Circuit has never definitively interpreted what 'independent establishment' means, it has suggested that independent establishments are defined by a 'substantial governmental role in funding and oversight.'"[61] The opinion to which he referred is *Johnson v. Smithsonian Institution*,[62] in which the Second Circuit cited favorably a D.C. Circuit opinion stating with respect to the Smithsonian Institution that "the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition."[63]

Although the FTCA does not define "independent establishments," Congress defined the term in 1966 when it enacted 5 U.S.C. § 104. That definition does not apply to the FTCA, but it is instructive as to how Congress understood the relevant language. It states:

"For the purpose of [Title 5], 'independent establishment' means—

"(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an

---

[60] *Id.*

[61] *U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 623 (S.D.N.Y. 2013) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)).

[62] 189 F.3d 180, 189 (2d Cir. 1999).

[63] *Id.* (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. The Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (panel opinion reprinted as appendix to opinion en banc)).

24

Executive department, military department, Government corporation, or part thereof, or part of an independent establishment; and

"(2) the Government Accountability Office."[64]

The D.C. Circuit has held that this definition does not apply to "the Executive Residence."[65] And DOJ's Office of Legal Counsel – in two different presidential administrations – took the position that the definition does not apply to the Executive Office of the President.[66]

The government has identified no component of the United States of which the president is an officer or employee that satisfies these understandings of the phrase "independent establishments." Moreover, and as will be discussed, the idea that the chief executive of the United States could be an officer or employee of an entity for which there is a "substantial governmental role in funding and oversight" makes little sense.

B. . *The Legislative History – The* Westfall *Decision and the Westfall Act*

There is still another strong reason supporting the view that president is not an "employee of the Government" within the meaning of the Westfall Act. That reason is apparent from the context in which the statute was enacted.

---

[64] 5 U.S.C. § 104.

[65] *See Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995).

[66] *See* Mem. for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 & n.15 (Sept. 17, 2009). On two earlier occasions, however, the Office of Legal Counsel took the opposite view. *See id.* at 15 n.14.

25

In 1982, the Supreme Court decided in *Nixon v. Fitzgerald*[67] that the president "*is entitled to absolute immunity* from damages liability predicated on his official acts."[68]  So when the Supreme Court decided *Westfall* just six years later and held that "federal officials *are not absolutely immune* from state-law tort liability for all actions committed within the outer perimeter of their duties," it clearly was not referring to the president.[69]  When *Westfall* referred generally to "federal officials," it merely expanded the potential amenability to suit and liability of that more limited group of individuals.

Congress was well aware of this background when it passed the Westfall Act.  As the Supreme Court later wrote, "[w]hen Congress wrote the Westfall Act, which covers federal employees generally . . . , the legislators had one purpose firmly in mind."[70]  That purpose was "to 'return Federal employees to the status they held prior to the *Westfall* decision.'"[71]  There was no need to extend the protections of the Westfall Act to the president, whom the Supreme Court evidently recognized was not a "federal employee," for the very good reason that the president already had "absolute immunity from damages liability predicated on his official acts"

---

[67]

457 U.S. 731 (1982).

[68]

*Id.* at 749 (emphasis added).

[69]

*Westfall*, 484 U.S. at 299 (emphasis added).

[70]

*Gutierrez*, 515 U.S. at 425.  Senator Grassley, the principal sponsor of the bill, explained that the purpose of the Westfall Act was to solve the "immediate crisis of personal liability exposure for the entire Federal Work force," "particularly rank-and-file civil servants," occasioned by the *Westfall* decision.  134 Cong. Rec. 14265 (June 13, 1988) (Sen. Grassley).

[71]

*Id.* (quoting H.R. REP. NO. 100-700, p. 4 (1988)).

26

by virtue of *Nixon v. Fitzgerald.*[72]

Unless one ignores *Nixon*, it is impossible to read *Westfall* as applying to the president.  Given that the "one purpose" of the Westfall Act was to "return Federal employees to the status they held prior to the *Westfall* decision," Congress presumptively was aware that neither Section 2671 nor the FTCA applied to the president.  It therefore had no reason to extend the Westfall Act to that office.

*C.*   Franklin v. Massachusetts *and Lack of Clear Statement to Include the President*

The foregoing discussion provides numerous grounds for concluding that the president is not an "employee of the Government."  At best, the government might argue the statute is silent on the issue and, on that basis, it should be read expansively to include the president.

The Court rejects the view that the statute is silent on the matter, an argument that the government in any event has waived.  But even granting the point for the sake of argument, any statutory silence would not help the government.  Instead, it would provide an additional reason to conclude that the failure to mention the president should be understood as *excluding* him from the scope of the Westfall Act and Section 2671.

---

[72]

Congress was well aware of this fact.  *See* H.R. Rep. 100-700, 100th Cong., 2d Sess. 5 (June 14, 1988) ("The United States is liable under the Federal Tort Claims Act. * * * 'under circumstances where the United States, if a private person, would be liable * * *' 28 U.S.C. 1346(b).  Thus ordinary tort defenses, such as contributory negligence, assumption of risk, estoppel, waiver, and res judicata, as applicable, continue to be available to the United States.  *The United States would also be able to continue to assert other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions*. (emphasis added)).

27

Under the Administrative Procedure Act ("APA"), plaintiffs have a cause of action to petition courts for review of "agency action."  In *Franklin v. Massachusetts*,[73] the Supreme Court considered whether "agency action" included the conduct of the president.  It held that "the President is not an agency within the meaning of the Act."[74]

*Franklin* does not resolve the question of whether the president is an employee of a federal agency under Section 2671.  But the following line of reasoning, portions of which are not limited to the APA, is directly on point:

> "The APA defines 'agency' as 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include – (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.'  The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either.  Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  *We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.  Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748, n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."[75]

*Franklin* not only prohibits courts from presuming, absent "an express statement by Congress," that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." By relying on *Nixon*, it makes clear that the same reasoning applies when a plaintiff sues the president for tort damages predicated on acts allegedly done in

---

[73] 505 U.S. 788 (1992).

[74] *Id.* at 796.

[75] *Id.* at 800-01 (emphasis added).

28

the scope of his employment – lawsuits that, by definition, challenge the president's performance of his job.  The government is asking this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president – and in fact strongly appears to exclude him – and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts.  This would run afoul of *Franklin.*

One could attempt to distinguish *Franklin* on the ground that an FTCA claim is pled against the United States, while the president himself was among the defendants in *Franklin*.  But *Franklin* itself defeats that argument.  *Franklin*'s holding – like the APA itself – is agnostic to the identity of the defendant.  The relevant question is who committed the "agency action."[76]  In fact, the Supreme Court spent several pages emphasizing this point, because its ultimate holding that the president's actions were not reviewable shielded all the defendants from suit, including the Secretary of Commerce and other lower-level officials.[77]

_____

[76]

> *See, e.g.*, *id.* at 801 ("Although the President's *actions* may still be reviewed for constitutionality, we hold that *they* are not reviewable for abuse of discretion under the APA." (emphasis added)).

[77]

> *See id.* at 796 ("The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'  5 U.S.C. § 704.  At issue in this case is whether the 'final' action that appellees have challenged is that of an 'agency' such that the federal courts may exercise their powers of review under the APA.  We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act.  Accordingly, there is no final agency action that may be reviewed under the APA standards."); *id.* at 799 ("Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge.  The President, not the Secretary, takes the final action that affects the States."); *id.* at 800 ("As enacted, 2 U.S.C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress.  That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not

29

The same focus is present here.  The function of an FTCA lawsuit is to decide whether a government employee's official conduct was tortious and, if so, to compensate one injured by that conduct.  When the employee is the president, his actions are the ones under review.  It does not matter whether his name appears in the caption of the case.  Thus, as *Franklin*'s reliance on *Nixon* makes plain, the lack of "an express statement by Congress" indicating that the president's actions are reviewable through FTCA lawsuits is decisive.

One other point about *Franklin* deserves attention.  The outcome of that case was that the president's conduct was not subject to review in an APA suit.  Here the poles in some sense are reversed.  If the Court holds that the president's conduct cannot be challenged in tort suits under the FTCA, this case most likely will move forward, albeit against President Trump in his individual or personal capacity.  But that difference does not affect the result here.

To begin, nothing in *Franklin* forbids courts from reviewing the president's official actions.  The case provides instead a rule of statutory interpretation: that a court should not assume, absent a clear statement, that *Congress* authorized such review in a *federal statute*.  Here, the plaintiff's cause of action arises under *state common law*.  *Franklin* says nothing about such claims.  And in fact, it is the government, rather than Ms. Carroll, that is arguing that a federal statute (the FTCA) authorizes review of the president's official actions, albeit in a case in which it argues the United States should be substituted for the president.

Why, then, would holding that the FTCA authorizes review of the president's official actions most likely secure the dismissal of this lawsuit?  The reason is that the FTCA's

merely ceremonial or ministerial.  Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.").

30

waiver of sovereign immunity contains an exception for libel and slander claims.[78]  For that

reason, and that reason alone, permitting FTCA lawsuits challenging the president's job

performance would close the door on this particular lawsuit.

But what would happen in cases involving the many types of torts for which the

United States *has* waived its sovereign immunity – cases in which no FTCA exception applies?

The answer, if the Court agrees with the government, is that those lawsuits could move forward

– the precise problem that *Franklin* sought to avoid.  In essence, the government is arguing that,

so long as none of the exceptions applies, the FTCA authorizes plaintiffs to sue the United States

for money damages when the president, acting within the scope of his employment, engages in

an "act or omission" that allegedly is negligent or wrongful under state law and causes them

injury.

The President of the United States wields the entire executive power of the

federal government.  Each day, he or she makes decisions that affect the lives of hundreds of

millions of Americans in countless ways.  It is difficult to fathom that Congress – without any

textual indication, and with considerable evidence to the contrary – intended for the FTCA to

authorize tort lawsuits that bring the president's official conduct into question.[79]  "Congress . . .

---

[78]

28 U.S.C. § 2680(h) (exempting from the FTCA claims arising out of, among other things, libel and slander).

[79]

One might surmise that *Nixon* would prevent such an expansion of federal tort exposure. It would not.  *Nixon* holds that *the president* is absolutely immune from suit with respect to official conduct.  The defendant in an FTCA suit is the United States.  Moreover, Congress could not have relied on this backstop when it passed the FTCA.  The FTCA and its procedural provisions were enacted in the 1940s.  *Nixon* was decided in 1982.

Nor is it sufficient to say that other legal doctrines such as the need for proximate causation might protect the government against liability in such cases.  Even if the government

31

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[80]

### D.    Decisions of Other Courts

The government relies on several cases in other circuits for the proposition that "elected officials" in general are government employees under the Westfall Act.  None of those cases so held.  And none supports the argument that the statute applies to the president.

*Council on American Islamic Relations v. Ballenger*,[81] a D.C. Circuit case discussed in more detail below on another issue, held that certain statements of a Member of Congress – not the president – had been made within the scope of his employment.  But the parties did not brief the question whether a Member of Congress (or any elected official) is an "employee of the Government," and the D.C. Circuit did not even mention the issue.[82]  *Wuterich v. Murtha*,[83] another D.C. Circuit decision concerning a Member of Congress that relied on *Ballenger*, similarly did not acknowledge the existence of the issue.

---

sometimes would prevail on these arguments, the cases would need to be defended at least to a certain point, and the president's conduct would be reviewed in the same manner as any other federal employee's.

[80]

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[81]

444 F.3d 659 (D.C. Cir. 2006).

[82]

*See* Brief of Appellant, *Council on Am. Islamic Relations v. Ballenger*, No. 05-5161 (D.C. Cir. Dec. 22, 2005); Brief for Appellee, *id.* (D.C. Cir. Feb. 3, 2006); Reply Brief of Appellant, *id.* (D.C. Cir. Feb. 16, 2006).

[83]

562 F.3d 375 (D.C. Cir. 2009).

32

The Sixth Circuit held recently in *Does 1-10 v. Haaland*[84] that Members of Congress are "employees of the Government" under the Westfall Act.  But its conclusion turned on the fact that Section 2671 defines "federal agency" to include "the judicial and legislative branches" and thereby "expands sovereign immunity to the entire legislative branch."[85]  As discussed above, Section 2671's definition of "federal agency" does not use the phrase "executive branch."  It refers to "the executive *departments*, [and] the judicial and legislative *branches*."[86]

Like *Does 1-10*, two older decisions from the First and Fifth Circuits held that Members of Congress are employees under the Westfall Act.  Neither contains significant reasoning, and the few points they raise are particular to Congress.[87]  The government's remaining cases neither raise nor resolve the issue.[88]

---

[84]

No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020).

[85]

*Id.* at *4.

[86]

The Sixth Circuit relied also on the fact that the Supreme Court once held "that a Representative is 'an officer acting under the authority of the United States' for purposes of a criminal statute that punishes individuals who 'falsely assume or pretend to be an officer or employee acting under the authority of the United States.'"  *Id.* at *4 (quoting *Lamar v. United States*, 241 U.S. 103, 111-12 (1916)).  This holding has no relevancy when the alleged federal employee is the president.

[87]

*See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (noting that "in 1988, Congress extended coverage under the FTCA to officers and employees of the legislative and judicial branches"); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (concluding that because no Members of Congress spoke up about their possible exclusion from the Westfall Act when they debated the statute, the Members presumably understood the statute to include them, and that holding otherwise would be irrational).

[88]

*See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017).

SPA-35

33

\* \* \*

The president is not an "employee of the Government" under the Westfall Act. The text of the Act of June 25, 1948 offers numerous strong indications that Congress did not intend for this term to apply to him.  Congress clearly held that view when it passed the Westfall Act in 1988.  And the *Franklin* decision forbids the Court from reading the president into the FTCA without a clear statement from Congress.  Moreover, holding that the president is an "employee of the Government" within the meaning of the Act could ignite a significant expansion of federal tort exposure – without any evidence of a congressional intent to do so – by authorizing lawsuits that could involve review of the president's job performance.

As the president is not an "employee of the Government" within the meaning of the Westfall Act, the Attorney General's certification was erroneous.

## II.    *Scope of Employment*

The holding that the president of the United States is not an "employee of the Government," as Congress defined that term, is sufficient to resolve the government's motion. But the parties have briefed also the question of whether, if the president is a government employee, President Trump's allegedly defamatory statements were made within the scope of his employment.  And it is appropriate to address that issue as well in order to avoid the possibility of an unnecessary remand should a higher court disagree on the "employee" question.

### A.    *Choice of Law*

Under Second Circuit law, the question of whether government employees are acting within the scope of their employment for the purposes of the FTCA is resolved "in

34

accordance with the respondeat superior law of the jurisdiction where the tort occurred."[89]  The

origin of this rule and its precise meaning are complicated issues that will be discussed

momentarily.  For present purposes, it suffices to note that the rule is derived from a provision of

the FTCA stating that the government's ultimate liability turns on "the law of the place where

the act or omission occurred."[90]

The parties disagree over which jurisdiction's law applies to the scope of

employment issue.  The government argues that because President Trump's allegedly

defamatory statements were made in the District of Columbia, the Court should apply D.C. law.

Ms. Carroll, though not disputing that the statements were made in Washington, D.C., argues

that the tort occurred where she was injured, which was New York.  Both parties, however,

assert that the outcome would be the same under the *respondeat superior* doctrine of either

jurisdiction.[91]

As to the question of where the tort occurred for FTCA purposes, the Court

agrees with the government.  The governing case law refers to the place of the tort, not the place

---

[89]
> *See, e.g.*, *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016); *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007).
>
> *Respondeat superior* is a Latin phrase meaning "let the superior make answer."  The substance of the doctrine is that an employer is liable for any injuries wrongly inflicted by its employee within the scope of the employment.  *See Respondeat Superior*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).  The doctrine applies also to principal and agent and to master and servant.

[90]
> *See Fountain*, 838 F.3d at 135 (quoting 28 U.S.C. § 1346(b)(1)).

[91]
> *See* Dkt. 16 at 31 n.18 (plaintiff arguing that "[a]lthough New York laws governs and supplies a more restrictive rule of respondeat superior liability than does D.C., the ultimate outcome would be the same under D.C. law"); Dkt. 21 at 13 (government arguing that "[t]he outcome under New York law would be no different")

SPA-37

35

of injury.  And the FTCA's reference to the "act or omission" makes the conclusion absolutely clear.

But the apparently simple question of which law applies is more nuanced than the parties acknowledge.  The complication turns on whether the Court must apply the D.C. *respondeat superior* doctrine or whether it instead must apply D.C.'s choice of law rules to determine which jurisdiction's *respondeat superior* doctrine applies.

At first blush, the FTCA appears to require the choice of law path.  The statute predicates the government's liability on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[92]  This language seems to suggest that a federal court hearing an FTCA claim should apply the same law as would a local court in the relevant jurisdiction.  In *Richards v. United States*,[93] the Supreme Court took that view by holding that the FTCA "requires application of the whole law of the [jurisdiction] where the act or omission occurred," which includes that jurisdiction's choice of law rules.[94]

The issue in *Richards* was which jurisdiction's law applied to the question of liability – not whose *respondeat superior* doctrine applied.  But nothing in the opinion distinguished between those questions or suggests that they might require a different type of

---

[92]  28 U.S.C. § 1346(b)(1).

[93]  369 U.S. 1 (1962).

[94]  *Id.* at 11; *see also Winston v. United States*, 305 F.2d 253, 272 n.20 (2d Cir. 1962) (reading *Richards* as interpreting the FTCA "language to mean the 'whole law' of that place, including its conflict of law rules").

36

analysis.  And the FTCA provides no textual basis for distinguishing between them.  It would be odd to read the statute to require that courts apply the *respondeat superior* doctrine of the place where the act or omission occurred, but they must begin with that jurisdiction's choice of law rules when determining the law applicable to liability.  Moreover, treating the *respondeat superior* issue differently may violate *Richards*.  A scope of employment finding is a necessary component of liability in a suit against an employer.

However, a separate line of cases suggests that federal courts may have developed different rules for liability and scope of employment, seemingly without considering the possible inconsistency.  In *Williams v. United States*,[95] decided seven years before *Richards*, the Supreme Court reviewed a Ninth Circuit decision that applied federal law to the scope of employment question.  In a two sentence *per curiam* opinion, the Supreme Court vacated and remanded on the ground that "[t]his case is controlled by the California doctrine of respondent superior."[96] The Court did not set forth its reasoning.

There are two plausible explanations for that result.  One is that the Court, consistent with the reading it later gave in *Richards*, looked to the whole law of California, the place where the act or omission occurred, and found that California's choice of law rules required application California *respondeat superior* doctrine.  The other is that California's *respondeat superior* doctrine applied by virtue of the FTCA itself – *i.e.*, California was where the act or omission occurred.

---

[95]     350 U.S. 857 (1955) (per curiam).

[96]     *Id.*

37

All twelve of the geographic courts of appeals have said specifically that the FTCA requires courts to apply "the *respondeat superior* law" of the jurisdiction where the act or omission occurred.[97]  But all twelve of those courts have stated also that courts must apply "the law" of the relevant jurisdiction without indicating whether they are referring to (a) that jurisdiction's "whole law," which includes its choice of law rules, or (b) the jurisdiction's

---

[97]   *See, e.g.*, *Nasuti v. Scannell*, 906 F.2d 802, 806 n.1 (1st Cir. 1990) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of respondeat superior of the state in which the negligent or wrongful conduct occurred."); *Fountain*, 838 F.3d at 135 ("We interpret the FTCA's 'scope of employment' requirement in accordance with the respondeat superior law of the jurisdiction where the tort occurred."); *McSwain v. United States*, 422 F.2d 1086, 1088 (3d Cir. 1970) ("Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred."); *Ross v. Bryan*, 309 F.3d 830, 834 (4th Cir. 2002) ("To determine whether Bryan's acts were within the scope of his employment, we must apply Virginia respondeat superior law."); *Garza v. United States*, 809 F.2d 1170, 1171 (5th Cir. 1987) ("Whether military personnel are acting within the line of duty is determined by applicable state rules of respondeat superior."); *United States v. Taylor*, 236 F.2d 649, 653 (6th Cir. 1956) ("[T]he standard of governmental liability under the Federal Tort Claims Act is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state."); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) ("[W]e have followed the Court's ruling in *Williams* and looked to state law of respondeat superior to determine whether a person was acting "in the line of duty."); *United States v. Farmer*, 400 F.2d 107, 109 (8th Cir. 1968) ("[T]he question of whether a Government employee is acting within the scope of his office or employment must be determined by the respondeat superior rule of the state where the negligent act occurred."); *United States v. McRoberts*, 409 F.2d 195, 197 (9th Cir. 1969) ("In resolving the sole issue before us, we must apply the respondeat superior principles of California, the state wherein the alleged tort was committed."); *Nichols v. United States*, 796 F.2d 361, 365 n.4 (10th Cir. 1986) ("Whether he was 'acting within the scope of his office or employment' at the time his act caused injury to Nichols is determined by reference to the respondeat superior law of the state in which the accident occurred."); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("'Line of duty,' in turn, draws its meaning from the applicable state law of respondeat superior."); *Nelson v. United States*, 838 F.2d 1280, 1282 (D.C. Cir. 1988) ("'Line of duty,' in turn, takes its meaning from the applicable state law of respondeat superior.").

38

*respondeat superior* doctrine without regard to its choice of law rules.[98]  It is not crystal clear

which of these approaches is the law, although that fact that most of the decisions in both groups

cite *Williams* and none conducts a choice of law analysis strongly suggests that the former view

controls.  Nevertheless, this Court need not and does not resolve this issue.

Although the *respondeat superior* doctrines of New York and the District of

Columbia are not identical, they dictate the same outcome on these facts, largely for the same

reasons.  As will appear, *respondeat superior* liability does not apply under the law of either

---

[98]

> *See, e.g.*, *Borrego v. United States*, 790 F.2d 5, 6 (1st Cir. 1986) ("Whether or not a particular act is within the scope of employment is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred."); *Mandelbaum v. United States*, 251 F.2d 748, 750 (2d Cir. 1958) ("Under [the FTCA] the law applicable to this case is that of New York [where the act or omission occurred].  And subsequent to the decision below the Supreme Court [in *Williams*] has made it absolutely clear that . . . the state law controls."); *Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) ("We assess whether Kotor was acting within the scope of his employment under the law of Pennsylvania, because that is where the incident occurred."); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th Cir. 1997) ("In answering [the scope of employment] question, we apply the law of the state where the conduct occurred."); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred."); *Arbour v. Jenkins*, 903 F.2d 416, 421-22 (6th Cir. 1990) ("Whether an employee's actions are within the scope of his employment for purposes of the Westfall Act is an issue that must be determined in accordance with the law of the state where the incident occurred."); *Guthrie v. United States*, 392 F.2d 858, 859 (7th Cir. 1968) (holding, because the act or omission occurred in Wisconsin, that "[t]he state law of Wisconsin is decisive on this issue"); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) ("Under the FTCA, the law of the place of the alleged tort governs the scope-of-employment question."); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("This phrase must be applied according to the law of the state where the alleged tort occurred."); *United States v. Hainline*, 315 F.2d 153, 155 (10th Cir. 1963) ("In actions brought under the Act, the scope of employment is determined by the state law."); *Green v. Hill*, 954 F.2d 694, 698 (11th Cir. 1992) ("The issue of whether an employee acted within the scope of his employment is determined by the law of the state where the alleged tort occurred."); *United States v. Baker*, 265 F.2d 123, 123 (D.C. Cir. 1959) (noting that "the law of Virginia, where the accident occurred, would control the question of 'scope of employment'").

SPA-41

39

jurisdiction unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions.[99]   Because the control factor is dispositive and would reach an identical result under either D.C. or New York law, there is no true conflict between D.C. and New York law for the purpose of D.C.'s governmental interest analysis.  In fact, and as noted at the outset, both parties assert that the outcome would be the same under New York and D.C. law.  "Since there is 'no real conflict' . . . it is unnecessary for [the Court] to engage in the choice-of-law exercise . . . ."[100]

### B.      Scope of Employment Under D.C. Law

"'*Respondeat superior* is a doctrine of vicarious liability' that imposes liability on employers for tortious and negligent 'acts of [their] employees committed within the scope of their employment.'"[101]   "Generally, 'whether an employee is acting within the scope of his

---

[99]

*Compare Fountain*, 838 F.3d at 135 ("Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" (brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 471 (1969))), *with Tolu v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) ("The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (ellipsis omitted) (quoting *Safeway Stores v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)).

[100]

*Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. 2013) (quoting *Taylor v. Canady*, 536 A.2d 93, 96 (D.C. 1988)).

[101]

*Blair v. D.C.*, 190 A.3d 212, 225 (D.C. 2018) (quoting *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006)).

40

employment is a question of fact for the jury.'"[102]  However, the issue becomes a question of law "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[103]

As to the legal question, the D.C. Court of Appeals has adopted Section 228 of the Restatement (Second) of Agency.[104]  In that court's words, D.C. law holds that "[i]n order to succeed under a *respondeat superior* theory of liability, [a party] must show [1] that a master-servant relationship existed between [the employer] and [its] workers or contractors, and

---

[102]  *Id.* (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001)).

[103]  *Id.* at 226 (quoting *Brown*, 782 A.2d at 757).

Whether the provision about sending this issue to a jury applies here is unclear.  The reason for the lack of clarity is that the scope of employment issue arises as a threshold question about the Westfall Act's applicability, rather than as an element of the plaintiff's cause of action that might be resolved at trial.  For reasons explained below, however, the Court holds that the matter is decided appropriately as a question of law in this case.

[104]  *See, e.g.*, *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987); *Wuterich*, 562 F.3d at 383.  The full provision reads:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

"(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

SPA-43

41

[2] that the incident at issue occurred while the workers or contractors were acting within the scope of their employment."[105]  The Court begins with the master-servant issue.

### 1.    *Master-Servant Relationship*

"The terms 'master' and 'servant' are defined as follows:

> "(1) A master is a principal who employs an agent to perform service in his affairs *and who controls or has the right to control the physical conduct of the other* in the performance of the service.

> "(2) A servant is an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right to control* by the master."[106]

"The decisive test [for the existence of a master-servant relationship] is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[107]  "[T]here is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no

---

[105]  *Tolu*, 945 A.2d at 601-02 (brackets omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)); *see Moorehead v. D.C.*, 747 A.2d 138, 142 (D.C. 2000) (same).

[106]  *Safeway*, 448 A.2d at 856 n.6 (quoting RESTATEMENT (SECOND) OF AGENCY § 2) (emphasis added).

[107]  *Tolu*, 945 A.2d at 602 (ellipsis omitted) (quoting *Safeway*, 448 A.2d at 860); *cf.* RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c) (noting that "one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master"); *id.* § 220(1) (similar).  The Supreme Court has made the same observation about the "control" element's centrality to one's status as a servant.  *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.  The general definition of the term 'servant' in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master.").

42

control or right to control by the master."[108]   D.C. courts consider five factors in determining whether a master-servant relationship exists:  "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."[109]

"The President of the United States possesses an extraordinary power to speak to his fellow citizens . . . ."[110]  While he is a "public servant," holding that he is a "servant" whom a "master" "has the right to control and direct" when he speaks to reporters, or otherwise, would be absurd.

First, except for the payment of a salary, not one of the five factors relied upon by D.C. courts to determine whether a master-servant relationship exists is satisfied here.  The president is selected by the electoral college, not the executive branch or any part of it.  The government does not have the power to discharge him in any circumstances, unless one construes impeachment, or removal under the Twenty-Fifth Amendment, as forms of discharge.  And while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not.[111]

---

[108]  RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

[109]  *See, e.g.*, *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (quoting *Safeway*, 448 A.2d at 860); *Bostic v. D.C.*, 906 A.2d 327, 331 (D.C. 2006) (same) (quoting *Giles*, 487 A.2d at 611).

[110]  *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018).

[111]  Although the government waived this argument, one could contend that the president cannot meaningfully perform his job without responding to public sexual assault allegations.

SPA-45

43

The "decisive" factor, however, is the fourth and most important: control. The president is the chief executive of the United States government. No one, inside or outside of the executive branch, has "the power to control the [president's] conduct."

That conclusion is found in the first sentence of the president's job description. Under Article II of the Constitution, "[t]he executive Power shall be vested in a President of the United States of America."[112]  As Justice Scalia explained in his famous dissent in *Morrison v. Olson*,[113] "this does not mean *some of* the executive power, but *all of* the executive power."[114] "The entire 'executive Power' belongs to the President alone."[115]

Not only does the president's sole possession of the executive power place him atop the chain of command of the executive branch. "Article II confers on the President 'the general administrative *control* of those executing the laws.'"[116]  "The buck stops with the President, in Harry Truman's famous phrase."[117]

---

Because this argument is better characterized as a question of whether the president acted within the scope of his employment, rather than a question of whether he is a "servant" under the "control" of a "master," the Court addresses this theory below.

[112] U.S. Const. Art. II, § 1, cl. 1.

[113] 487 U.S. 654 (1988).

[114] *Id.* at 705.

[115] *Seila*, 140 S. Ct. at 2197.

[116] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).

[117] *Id.*

44

To hold that someone else exercises control over the president would turn the Constitution on its head.  And it would subvert the requirement that the president "shall take Care that the Laws be faithfully executed."[118]  As explained recently by the Supreme Court:

> "The . . . constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections.  In that scheme, individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision *and control* of the elected President.  Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'"[119]

Interpreting this authority, Justices Thomas and Kavanaugh have opined that components of the executive branch "that wield substantial power with no accountability to either the President or the people . . . 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'"[120]

As noted above, "there is no liability for the conduct of one who . . . is doing work as to which there is no control or right to control by the master."[121]  Such control is absent

---

[118]

U.S. Const. Art. II, § 3.

[119]

*Seila*, 140 S. Ct. at 2203 (quoting 1 Annals of Cong. 499 (J. Madison)); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 ("Without [the] power [to remove and control subordinates], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)); *id.* at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, *overseeing*, and *controlling* those who execute the laws.'" (emphasis added) (quoting 1 Annals of Cong. 463 (J. Madison))).

[120]

*Seila*, 140 S. Ct. at 2212 (Thomas, *J.*, concurring in part) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting)).

[121]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

45

whenever the president discharges his duties.  And it is non-existent when the president exercises his "extraordinary power to speak to his fellow citizens"[122] by addressing the press.  No one gives him permission to speak.  No one can require him to say, or not to say, anything at all.  No one has the authority to cut him off.  And the statements he makes, as well as the topics he discusses, are entirely of his own choosing.

These points are clearer still on the facts of this case.  No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do with the official business of government, that he raped her decades before he took office.  And no one had the ability to control him.

President Trump is not a "servant" controlled by a "master" within the meaning of the District of Columbia's scope of employment doctrine.  Thus, his allegedly defamatory statements were not "actuated, at least in part, by a purpose to further the master's business."[123] He was not acting within the scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous.[124]

### 2.    Scope of Employment Test

The president is no one's servant.  But assume, for the sake of argument, that he were an employee of the United States whose master were something vaguely described as "the

---

[122]    *Trump*, 138 S. Ct. at 2417.

[123]    *Blair*, 190 A.3d at 225.

[124]    Because the Court concludes as a matter of law that President Trump is not a servant, it concludes also that no reasonable jury could find that his actions were done within the scope of his employment.

SPA-48

46

public," which "controlled" him indirectly through its role in choosing the electoral college members[125] or in electing the Members of Congress who can impeach and remove him. Even then, the Court would hold that President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

Under D.C. law, "[t]o be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[126] The "at least in part" language demonstrates that the action need not "be wholly in furtherance of the employer's business."[127] That said, a slight purpose to serve the master is not enough. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[128] Finally, "the employee's 'tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.'"[129]

---

[125] This view is impossible to reconcile with the "control" element of D.C. law. "The public" is not an employer, and it does not have the authority to control the president's performance of his job when he makes statements to reporters or otherwise. Nor, because of the electoral college system, is the president directly elected by the public. And while our system of checks and balances gives Congress (and the judiciary) certain powers that the president lacks, no branch of government "controls" another in anything resembling the same manner that an employer controls an employee.

[126] *Blair*, 190 A.3d at 226 (quoting *Bamidele*, 103 A.3d at 525).

[127] *Id.*

[128] *See, e.g.*, *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)); *Brown*, 782 A.2d at 758 (same).

[129] *Blair*, 190 A.3d at 226 (alteration omitted) (quoting *Bamidele*, 103 A.3d at 525).

SPA-49

47

At its core, the government's argument is that speaking to reporters is part of the president's job.  Thus, it argues, whenever the president speaks to reporters – no matter the topic – he is acting within the scope of his employment.  For this proposed rule, the government relies on the D.C. Circuit's *Ballenger* decision.  A discussion of *Ballenger* will be helpful to explaining why the Court is not persuaded.

The defendant in *Ballenger* was Rep. Cass Ballenger, a Member of Congress. Ballenger's chief of staff gave an interview to a reporter who asked a question about Ballenger's recent separation from his wife.[130]  Ballenger later called the reporter "from his congressional office during regular business hours" and stated, among other things, that the separation was amicable and that his wife was uncomfortable living across the street from the plaintiff, an Islamic institution.[131]  The journalist reported this comment, and the plaintiff sued Ballenger for defamation.[132]

Shortly after the lawsuit was filed, the Department of Justice certified that Ballenger "acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement."[133]  The district court agreed and dismissed the case under the FTCA's exemption for libel and slander claims.[134]

---

[130]

*Ballenger*, 444 F.3d at 661.

[131]

*Id.* at 662.

[132]

*Id.* at 663.

[133]

*Id.*

[134]

*Islamic Council on Am. Islamic Relations, Inc. v. Ballenger*, 366 F. Supp. 2d 28, 30 (D.D.C. 2005).

48

The D.C. Circuit affirmed.  Like the district court, it did not acknowledge the question of whether a Member of Congress is an "employee of the Government" pursuant to the Westfall Act or a "servant" under a master's control.  But it nonetheless found that Ballenger acted within the scope of his employment when he made the comment at issue.

The D.C. Circuit began by rejecting the plaintiff's argument "that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."[135] Instead, it reasoned that D.C. law and the Westfall Act "direct[] courts to look beyond alleged intentional torts themselves."[136]  Finding that the "'underlying dispute or controversy' was the phone call between Ballenger and [the reporter] discussing the marital separation," it held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"[137]  The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them.  Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press.[138]  The D.C. Circuit appears to have

---

[135] *Ballenger*, 444 F.3d at 664.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 665.  Although the court quoted this standard several times, its analysis failed to engage with it.

49

overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."[139]

Even on the issues it addressed, *Ballenger*'s reasoning is wanting. Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

> "[The plaintiff] resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."[140]

There are two problems with this passage. The first is that it is unpersuasive. Gossip about a congressperson's marriage may very well be interesting to the public. But that fact does not transform it into the official business of the United States Congress. The job description of a congressperson does not include transparency about one's personal life.

In addition, *Ballenger* misstates D.C. law – and not only in the manner described above. A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern."[141] A real but insubstantial

---

[139]

> *Id.* This language tracks Section 228(1)(a) of the Restatement. But that is only one element of the definition of scope of employment. *See* RESTATEMENT (SECOND) OF AGENCY § 228(1) (listing four elements); *see also, e.g., id.* § 228(1)(c) (requiring that the conduct be "actuated, at least in part, by a purpose to serve the master").

[140]

> *Ballenger*, 444 F.3d at 665.

[141]

> *Id.* (emphasis added).

SPA-52

50

purpose to serve the master is insufficient. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[142]

The implications of *Ballenger*'s holding also are troubling. The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment. Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

*Ballenger* acknowledged this concern. But it made no attempt to assuage it. It noted merely that the case was limited to its facts.[143]

A subsequent panel of the D.C. Circuit did not accept the invitation to read *Ballenger* so narrowly. In *Wuterich*, the court held that *Ballenger* controlled where a Member of Congress was sued for defamation based on his comments about the Iraq War.[144] Unlike

---

[142]

    *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)). Although *Ballenger* includes this language when it quotes the entirety of Section 228, its analysis does not engage with it.

[143]

    *See Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts. To be sure, it involves a statement by a congressman to the press. But our *ratio decidendi* necessarily depends on the context in which the statement was made. *See* KARL LLEWELLYN, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live.'). We lack the power to render an opinion on any case or controversy not properly before us.").

[144]

    *Wuterich*, 562 F.3d at 384.

SPA-53

51

*Ballenger*, however, *Wuterich* considered the relationship between the congressperson's remarks and his official duties. It relied on the fact that "the underlying conduct – interviews with the media about the pressures on American troops in the ongoing Iraq war – is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq."[145]

The Court declines to apply a *Ballenger*-like principle to the president on the facts of this case. Perhaps the president, were he in service of a "master," would act within the scope of his employment when he comments on matters having a non-negligible nexus to his official duties. But there is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment. A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office. And the public's reasons for being interested in these comments are different as well. The president's views on the former topics are interesting because they alert the public about what the government is up to. President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government.

---

[145] *Id.* at 384-85. These facts are irrelevant under *Ballenger*'s broader holding that essentially any comment a Member of Congress makes to the press is done within the scope of his or her employment. That said, *Wuterich* did not purport to narrow *Ballenger* or limit the case to its facts.

52

The government's best argument on this point is that President Trump's statements about Ms. Carroll were within the scope of his employment in that refuting her accusation furthered his ability to govern effectively because the accusation was reported widely and charged him with the commission of a serious crime.  But there are at least three answers to that objection.

As an initial matter, the government first made the argument in its reply brief, thereby foreclosing the plaintiff from responding to it.  As previously discussed, it thereby waived the argument as its counsel agreed in open court, as previously discussed.

Second, the Court would reject the argument even if it were not waived.  While the government's position is not entirely without merit, it goes much too far.  Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns his character – without adverse consequences to that president and no matter what injury he inflicts on the person defamed.  Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office.

Finally, even if the president's comments here had some nexus to his official duties, that nexus would be too weak.  As stated several times now, "'[c]onduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[146]  That is the case here.

---

[146] *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

53

Beyond the District of Columbia precedent already discussed, support for this conclusion comes from the Supreme Court's decision in *Clinton v. Jones*.[147]  Much like in this case, a plaintiff sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office.[148]  Her theory was that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred."[149]

As relevant here, the Supreme Court held that President Clinton was not absolutely immune from suit by virtue of his office where the claims against him were based on his "*unofficial* conduct."[150]  As to most of the plaintiff's claims, the Court explained, "it is perfectly clear that the alleged misconduct of [President Clinton] was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office."[151]  The one possible exception was the alleged defamatory comments that were made while he was in office.  The Court noted that the defamation claim "arguably may involve

---

[147]   520 U.S. 681 (1997).

[148]   *Id.* at 685-86; *see also Jones v. Clinton*, 72 F.3d 1354, 1357 (8th Cir. 1996) (1997) ("Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.").

[149]   *Clinton*, 520 U.S. at 685.

[150]   *Id.* at 694 (emphasis in original); *see also id.* at 695 ("As our opinions have made clear, immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." (citation and quotation marks omitted)).

[151]   *Id.* at 686.

SPA-56

54

conduct within the outer perimeter of the President's official responsibilities."[152]   But because that issue was "not before [the Court]," it declined to consider whether the president's absolute immunity extended to these comments.[153]

Although both doctrines call for some assessment of whether the defendant was engaged in the performance of his job, the absolute immunity doctrine is different than D.C.'s scope of employment doctrine.  But as to the president's job description, *Clinton* suggests that a sitting president's comments about a sexual assault allegation fall somewhere between being outside the scope of his duties and "arguably . . . within [their] outer perimeter."  At least where D.C. law is concerned, conduct that is "too little actuated by a purpose to serve the master" does not suffice.[154]  It is difficult to see how conduct that at most is in the "outer perimeter" of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be.

In this regard, the Court notes also that all of the remaining Westfall Act defamation decisions relied upon by the government are distinguished easily from this case – and not merely because each of them concerned a Member of Congress.  Although the Sixth Circuit's *Does 1-10* case involved a defamation claim against a Senator who commented "on an event of widespread public interest," the decision applied Kentucky's scope of employment

---

[152]   *Id.*

[153]   *Id.* at 686 n.3.

[154]   *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

55

law.[155]   According to the Supreme Court of Kentucky decision relied upon by the Sixth Circuit, Kentucky's doctrine is similar to the Restatement (Third) of Agency approach.[156]   While that approach resembles in some ways Section 228 of the Restatement (Second) of Agency,[157] the drafters intentionally omitted the "too little actuated" standard discussed above:

> "Under § 228(2), conduct is not within the scope of employment if it is 'too little actuated by a purpose to serve' the employer.  Under § 235, conduct is not within the scope of employment 'if it is done with no intention' to perform an authorized service or an incidental act.  These formulations are not entirely consistent; an act motivated by *some* purpose to serve the employer could still be '*too little actuated*' to be within the scope of employment.
>
> *In contrast*, under subsection (2) of [Section 7.07 of the Restatement (Third)], an employee's conduct is outside the scope of employment when it occurs within an independent course of conduct intended to serve *no purpose* of the employer."[158]

As explained, the "too little actuated" caveat is decisive on these facts to the extent that one considers President Trump's comments to have been actuated in some small part to serve whomever one believes to be his "master."  Thus, the Sixth Circuit's interpretation of Kentucky law is of no moment here.

The government's remaining cases involve the laws of different jurisdictions or Members of Congress who commented on matters related clearly to their job duties.  *Wuterich*

---

[155] No. 19-6347, 2020 WL 5242402, at *2, 6.

[156] *Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Kentucky's approach . . . [focuses on whether the servant's] purpose, however misguided, is wholly or in part to further the master's business.").

[157] A key difference is that the Restatement (Third) abandons the foreseeability element of the Restatement (Second).  *See* RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006), cmt.

[158] *Id.* (citation omitted, emphasis added).

56

involved D.C. law but concerned remarks that the D.C. Circuit found were "unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress."[159] *Williams v. United States*[160] involved a Texas congressperson's comments "concerning the status of an appropriations bill to restore the Battleship Texas."[161]  And the case applied Texas's scope of employment doctrine, which differs from the Restatement (Second) approach.[162]  And *Operation Rescue National v. United States*[163] did not consider whether the defendant's comments were made within the scope of his employment because the issue was not raised on appeal.  The district court did consider that issue, but it did so under Massachusetts law where the defendant, a Senator, commented on a "bill, of which he was the prime sponsor, [that] was to be debated in the Senate the following day."[164]

President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office.  Neither the media reports nor the underlying allegations have any relationship to his official duties.  And even if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not

---

[159] *Wuterich*, 562 F.3d at 384-85.

[160] 71 F.3d 502 (5th Cir. 1995).

[161] *Id.* at 504, 506.

[162] *See id.* at 506 (citing *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App. 1995)).

[163] 147 F.3d 68, 69 (1st Cir. 1998).

[164] *Id.* at 68-69.

57

enough under the District of Columbia's scope of employment doctrine.

  C.  *Scope of Employment Under New York Law*

    If the Court were to apply New York law, it would reach the same conclusion largely for the same reasons.

    "Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'"[165]  "Whether an employee acted within the scope of employment is a fact-based inquiry."[166]

    For all the reasons already outlined, any person or group that might be characterized as President Trump's employer neither controls, nor could control, his activities. And even if that were not so, the government's argument would fail also because the president's actions were not taken "in furtherance of the duties he owes to his employer," whoever or whatever that may be.

    When applying the "in furtherance" requirement, New York courts "consider, among other factors,

---

[165] *Fountain*, 838 F.3d at 135 (brackets omitted) (quoting *Hamm*, 483 F.3d at 138 (quoting *Lundberg*, 25 N.Y.2d at 471)).

[166] *Rivera v. State*, 34 N.Y.3d 383, 90 (2019).  Although it is fact heavy, "the question may be resolved on summary judgment, particularly when the material facts are undisputed."  *Id.* This language arguably does not apply here because the scope of employment question arises as a threshold issue, rather than as a merits issue on summary judgment or even a Rule 12 motion.  But in either event, the issue is resolved appropriately by the Court because the material facts are not in dispute.

58

'the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated' (i.e., whether it was foreseeable)."[167]

Conduct "committed for wholly personal motives" is not done in furtherance of any duties owed to the employer.[168]   And at least as a general matter, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."[169]   That said, "[i]nvoking respondeat superior both in defamation cases and in sexual harassment cases is not unprecedented."[170]   As in all cases, "the determination of whether a particular act was within the scope of the servant's employment is . . . heavily dependent on factual considerations."[171]

As explained above, the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue.  His comments concerned an alleged sexual assault that took place several decades before he took office, and the allegations have no relationship to the official business of

---

[167] *Rivera*, 34 N.Y.3d at 389-90 (2019) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304 (1979)); *see also Fountain*, 838 F.3d at 138 (applying these factors to the "in furtherance" inquiry).

[168] *See, e.g.*, *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[169] *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

[170] *Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 2d 1998).

[171] *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

59

the United States.  To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office.  The government has provided no support for that theory, and the Court rejects it as too expansive.

### Conclusion

The President of the United States is not an "employee of the Government" within the meaning of the relevant statutes.  Even if he were such an "employee," President Trump's allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment.  Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.

SO ORDERED.

Dated:        October 26, 2020

_____
Lewis A. Kaplan
United States District Judge

28 U.S.C.
United States Code, 2018 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 171 - TORT CLAIMS PROCEDURE
Sec. 2671 - Definitions
From the U.S. Government Publishing Office, www.gpo.gov

## §2671. Definitions

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

(June 25, 1948, ch. 646, 62 Stat. 982; May 24, 1949, ch. 139, §124, 63 Stat. 106; Pub. L. 89–506, §8, July 18, 1966, 80 Stat. 307; Pub. L. 97–124, §1, Dec. 29, 1981, 95 Stat. 1666; Pub. L. 100–694, §3, Nov. 18, 1988, 102 Stat. 4564; Pub. L. 106–398, §1 [[div. A], title VI, §665(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–169; Pub. L. 106–518, title IV, §401, Nov. 13, 2000, 114 Stat. 2421.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

Based on title 28, U.S.C., 1940 ed., §941 (Aug. 2, 1946, ch. 753, §402, 60 Stat. 842).
Changes were made in phraseology.

#### 1949 ACT

This section corrects a typographical error in section 2671 of title 28, U.S.C.

#### AMENDMENTS

**2000**—Pub. L. 106–518, in par. defining "Employee of the government", inserted "(1)" after "includes" and added cl. (2).

Pub. L. 106–398 inserted "115," after "members of the National Guard while engaged in training or duty under section" in par. defining "Employee of the government".

**1988**—Pub. L. 100–694 inserted "the judicial and legislative branches," after "departments," in first par.

**1981**—Pub. L. 97–124 inserted "members of the National Guard while engaged in training or duty under section 316, 502, 503, 504, or 505 of title 32," in definition of "Employee of the government" and "or a member of the National Guard as defined in section 101(3) of title 32" in definition of "Acting within the scope of his office or employment".

**1966**—Pub. L. 89–506 expanded definition of "Federal agency" to include military departments.

**1949**—Act May 24, 1949, corrected spelling of "office".

#### EFFECTIVE DATE OF 2000 AMENDMENT

Pub. L. 106–398, §1 [[div. A], title VI, §665(c)(2)], Oct. 30, 2000, 114 Stat. 1654, 1654A–169, provided that: "The amendment made by subsection (b) [amending this section] shall apply with respect to acts and omissions occurring before, on, or after the date of the enactment of this Act [Oct. 30, 2000]."

#### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–694 effective Nov. 18, 1988, and applicable to all claims, civil actions, and proceedings pending on, or filed on or after, Nov. 18, 1988, see section 8 of Pub. L. 100–694, set out as a note under section 2679 of this title.

#### EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–124 applicable only with respect to claims arising on or after Dec. 29, 1981, see section 4 of Pub. L. 97–124, set out as a note under section 1089 of Title 10, Armed Forces.

#### EFFECTIVE DATE OF 1966 AMENDMENT

Amendment by Pub. L. 89–506 applicable to claims accruing six months or more after July 18, 1966, see section 10 of Pub. L. 89–506, set out as a note under section 2672 of this title.

### SHORT TITLE

This chapter is popularly known as the Federal Tort Claims Act. The Federal Tort Claims Act was previously the official short title of title IV of act Aug. 2, 1946, ch. 753, 60 Stat. 842, which was classified principally to chapter 20 (§§921, 922, 931–934, 941–946) of former Title 28, Judicial Code and Judiciary. Title IV of act Aug. 2, 1946, was substantially repealed and reenacted as sections 1346(b) and 2671 et seq. of this title by act June 25, 1948, ch. 646, 62 Stat. 992, the first section of which enacted this title. For complete classification of title IV to the Code, see Tables. For distribution of former sections of Title 28 into this title, see Table at the beginning of this title.

### SEVERABILITY

Pub. L. 100–694, §7, Nov. 18, 1988, 102 Stat. 4565, provided that: "If any provision of this Act [see Short Title of 1988 Amendment note under section 1 of this title] or the amendments made by this Act or the application of the provision to any person or circumstance is held invalid, the remainder of this Act and such amendments and the application of the provision to any other person or circumstance shall not be affected by that invalidation."

### LAW ENFORCEMENT OFFICER ACTING WITHIN SCOPE OF OFFICE OR EMPLOYMENT

Pub. L. 105–277, div. A, §101(h) [title VI, §627], Oct. 21, 1998, 112 Stat. 2681–480, 2681–519, as amended by Pub. L. 106–58, title VI, §623, Sept. 29, 1999, 113 Stat. 471, provided that:

"(a) DEFINITIONS.—In this section—

"(1) the term 'crime of violence' has the meaning given that term in section 16 of title 18, United States Code; and

"(2) the term 'law enforcement officer' means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5, United States Code; and any special agent in the Diplomatic Security Service of the Department of State.

"(b) RULE OF CONSTRUCTION.—Effective on the date of the enactment of this Act [Oct. 21, 1998] and thereafter, and notwithstanding any other provision of law, for purposes of chapter 171 of title 28, United States Code, or any other provision of law relating to tort liability, a law enforcement officer shall be construed to be acting within the scope of his or her office or employment, if the officer takes reasonable action, including the use of force, to—

"(1) protect an individual in the presence of the officer from a crime of violence;

"(2) provide immediate assistance to an individual who has suffered or who is threatened with bodily harm; or

"(3) prevent the escape of any individual who the officer reasonably believes to have committed in the presence of the officer a crime of violence."

### CONGRESSIONAL FINDINGS AND PURPOSES

Pub. L. 100–694, §2, Nov. 18, 1988, 102 Stat. 4563, provided that:

"(a) FINDINGS.—The Congress finds and declares the following:

"(1) For more than 40 years the Federal Tort Claims Act [see Short Title note above] has been the legal mechanism for compensating persons injured by negligent or wrongful acts of Federal employees committed within the scope of their employment.

"(2) The United States, through the Federal Tort Claims Act, is responsible to injured persons for the common law torts of its employees in the same manner in which the common law historically has recognized the responsibility of an employer for torts committed by its employees within the scope of their employment.

"(3) Because Federal employees for many years have been protected from personal common law tort liability by a broad based immunity, the Federal Tort Claims Act has served as the sole means for compensating persons injured by the tortious conduct of Federal employees.

"(4) Recent judicial decisions, and particularly the decision of the United States Supreme Court in Westfall v. Erwin, have seriously eroded the common law tort immunity previously available to Federal employees.

"(5) This erosion of immunity of Federal employees from common law tort liability has created an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the entire Federal workforce.

"(6) The prospect of such liability will seriously undermine the morale and well being of Federal employees, impede the ability of agencies to carry out their missions, and diminish the vitality of the Federal Tort Claims Act as the proper remedy for Federal employee torts.

"(7) In its opinion in Westfall v. Erwin, the Supreme Court indicated that the Congress is in the best position to determine the extent to which Federal employees should be personally liable for common law torts, and that legislative consideration of this matter would be useful.

"(b) PURPOSE.—It is the purpose of this Act [see Short Title of 1988 Amendment note under section 1 of this title] to protect Federal employees from personal liability for common law torts committed within the scope of their employment, while providing persons injured by the common law torts of Federal employees with an appropriate remedy against the United States."

**28 U.S.C.**
United States Code, 2018 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 171 - TORT CLAIMS PROCEDURE
Sec. 2679 - Exclusiveness of remedy
From the U.S. Government Publishing Office, www.gpo.gov

## §2679. Exclusiveness of remedy

(a) The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

(b)(1) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

(2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government —

(A) which is brought for a violation of the Constitution of the United States, or

(B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

(c) The Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury. The employee against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon him or an attested true copy thereof to his immediate superior or to whomever was designated by the head of his department to receive such papers and such person shall promptly furnish copies of the pleadings and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency.

(d)(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

(2) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

(3) In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. A copy of the petition shall be served upon the United States in accordance with the provisions of Rule 4(d)(4) [1] of the Federal Rules of Civil Procedure. In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending. If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.

(4) Upon certification, any action or proceeding subject to paragraph (1), (2), or (3) shall proceed in the same manner as any action against the United States filed pursuant to section 1346(b) of this

SPA-65

title and shall be subject to the limitations and exceptions applicable to those actions.

(5) Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if—

(A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

(B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

(e) The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677, and with the same effect.

(June 25, 1948, ch. 646, 62 Stat. 984; Pub. L. 87–258, §1, Sept. 21, 1961, 75 Stat. 539; Pub. L. 89–506, §5(a), July 18, 1966, 80 Stat. 307; Pub. L. 100–694, §§5, 6, Nov. 18, 1988, 102 Stat. 4564.)

#### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §945 (Aug. 2, 1946, ch. 753, §423, 60 Stat. 846).

Changes were made in phraseology.

#### SENATE REVISION AMENDMENT

The catchline and text of this section were changed and the section was renumbered "2678" by Senate amendment. See 80th Congress Senate Report No. 1559.

#### REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (d)(3), are set out in the Appendix to this title.

#### AMENDMENTS

**1988**—Subsec. (b). Pub. L. 100–694, §5, amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property or personal injury or death, resulting from the operation by any employee of the Government of any motor vehicle while acting within the scope of his office or employment, shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim."

Subsec. (d). Pub. L. 100–694, §6, amended subsec. (d) generally. Prior to amendment, subsec. (d) read as follows: "Upon a certification by the Attorney General that the defendant employee was acting within the scope of his employment at the time of the incident out of which the suit arose, any such civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place wherein it is pending and the proceedings deemed a tort action brought against the United States under the provisions of this title and all references thereto. Should a United States district court determine on a hearing on a motion to remand held before a trial on the merits that the case so removed is one in which a remedy by suit within the meaning of subsection (b) of this section is not available against the United States, the case shall be remanded to the State court."

**1966**—Subsec. (b). Pub. L. 89–506 inserted reference to section 2672 of this title and substituted "remedy" for "remedy by suit".

**1961**—Pub. L. 87–258 designated existing provisions as subsec. (a) and added subsecs. (b) to (e).

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–694, §8, Nov. 18, 1988, 102 Stat. 4565, provided that:

"(a) GENERAL RULE.—This Act and the amendments made by this Act [enacting section 831c–2 of Title 16, Conservation, amending this section and sections 2671 and 2674 of this title, and enacting provisions set out as notes under this section and section 2671 of this title] shall take effect on the date of the enactment of this Act [Nov. 18, 1988].

"(b) APPLICABILITY TO PROCEEDINGS.—The amendments made by this Act [amending this section and sections 2671 and 2674 of this title] shall apply to all claims, civil actions, and proceedings pending on, or filed on or after, the date of the enactment of this Act.

"(c) PENDING STATE PROCEEDINGS.—With respect to any civil action or proceeding pending in a State court to which the amendments made by this Act apply, and as to which the period for removal under section 2679(d) of title 28, United States Code (as amended by section 6 of this Act), has expired, the Attorney General shall have 60 days after the date of the enactment of this Act during which to seek removal under such section 2679(d).

"(d) CLAIMS ACCRUING BEFORE ENACTMENT.—With respect to any civil action or proceeding to which the amendments made by this Act apply in which the claim accrued before the date of the enactment of this Act, the period during which the claim shall be deemed to be timely presented under section 2679(d)(5) of title 28, United States Code (as amended by section 6 of this Act) shall be that period within which the claim could have been timely filed under applicable State law, but in no event shall such period exceed two years from the date of the enactment of this Act."

#### EFFECTIVE DATE OF 1966 AMENDMENT

SPA-66

Amendment by Pub. L. 89–506 applicable to claims accruing six months or more after July 18, 1966, see section 10 of Pub. L. 89–506, set out as a note under section 2672 of this title.

**EFFECTIVE DATE OF 1961 AMENDMENT**

Pub. L. 87–258, §2, Sept. 21, 1961, 75 Stat. 539, provided that: "The amendments made by this Act [amending this section] shall be deemed to be in effect six months after the enactment hereof [Sept. 21, 1961] but any rights or liabilities then existing shall not be affected."

[1] *So in original. Probably should be a reference to Rule 4(i).*