# 20-3977-cv(L), 20-3978-cv(CON)

# United States Court of Appeals

*for the*

## Second Circuit

———————

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP, in his personal capacity,

*Defendant-Appellant,*

UNITED STATES OF AMERICA,

*Movant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX**
**Volume 2 of 2 (Pages A-263 to A-423)**

JOSHUA M. SALZMAN
UNITED STATES DEPARTMENT OF JUSTICE
*Attorneys for Movant-Appellant*
950 Pennsylvania Avenue, NW,
  Room 7258
Washington, DC 20530
(202) 532-4747

MARC KASOWITZ
KASOWITZ BENSON TORRES LLP
*Attorneys for Defendant-Appellant*
1633 Broadway
New York, New York 10019
(212) 506-1700

i

# TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Notice of Motion to Substitute the United States as Defendant, dated September 8, 2020 ...................... | A-12 |
| Memorandum of Points and Authorities in Support of Motion to Substitute the United States as Defendant, dated September 8, 2020 ...................... | A-14 |
| Notice of Removal, filed September 9, 2020.............. | A-19 |
| Exhibit A to Notice of Removal – Complaint, dated November 4, 2019 ...................... | A-23 |
| Exhibit B to Notice of Removal – Certification of the Director of the Torts Branch, Civil Division, United States Department of Justice, dated September 8, 2020 ........................... | A-52 |
| Exhibit C to Notice of Removal – State Court Docket Entries ..................................... | A-55 |
| Exhibit D to Notice of Removal – Pleadings and other documents included on the state court docket (less exhibits thereto)................ | A-62 |
| Order of the Honorable Lewis A. Kaplan directing United States to file State Court Record, filed September 15, 2020 ............................................... | A-312 |
| Memorandum of Law in Opposition to Motion to Substitute the United States as Defendant, dated October 5, 2020 ...................................................... | A-314 |
| Declaration of Roberta A. Kaplan in Support of Plaintiff's Opposition to Defendant's Motion to Substitute, dated October 5, 2020........................... | A-359 |

**ii**

|  | Page |
|---|---|
| Exhibit A to Kaplan Declaration –<br>Letter from R. Kaplan to M. Kasowitz, dated<br>August 8, 2020 | A-361 |
| Exhibit B to Kaplan Declaration –<br>Letter from R. Kaplan to P. Burgo, dated<br>August 13, 2020 | A-367 |
| Exhibit C to Kaplan Declaration –<br>Letter from P. Burgo to R. Kaplan, dated<br>August 17, 2020 | A-370 |
| Exhibit D to Kaplan Declaration –<br>Letter from R. Kaplan to P. Burgo, dated<br>August 18, 2020 | A-373 |
| Exhibit E to Kaplan Declaration –<br>Letter from R. Kaplan to P. Burgo, dated<br>August 26, 2020 | A-376 |
| Exhibit F to Kaplan Declaration –<br>Letter from P. Burgo to R. Kaplan, dated<br>August 31, 2020 | A-381 |
| Exhibit G to Kaplan Declaration –<br>Letter from R. Kaplan to P. Burgo, dated<br>September 1, 2020 | A-385 |
| Exhibit H to Kaplan Declaration –<br>Letter from P. Burgo to R. Kaplan, dated<br>September 2, 2020 | A-388 |
| Order Scheduling Oral Argument, dated<br>October 9, 2020 | A-391 |
| Reply Memorandum of Points and Authorities in<br>Support of Motion to Substitute the United States<br>as Defendant, dated October 19, 2020 | A-392 |

iii

**Page**

Letter-Motion to Continue Hearing, dated
October 21, 2020 ....................................................    A-414

Transcript of October 21, 2020 Proceedings .............    A-415

Corrected Order denying Motion for Continuance,
dated October 21, 2020.........................................    A-420

Notice of Appeal, by the United States, dated
November 25, 2020 ...............................................    A-421

Notice of Appeal, by President Donald J. Trump,
dated November 25, 2020.......................................    A-423

A-263

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------

E. JEAN CARROLL,

        *Plaintiff*,

  -against-

DONALD J. TRUMP, in his personal capacity,

        *Defendant*.

------------------------------------------------------------

Index No. 160694/2019

Hon. Verna L. Saunders

Mot. Seq. No. 003

### NOTICE OF MOTION TO STRIKE AN AFFIRMATIVE DEFENSE

PLEASE TAKE NOTICE that upon the accompanying memorandum of law, dated June 15, 2020, the accompanying affirmation of Roberta A. Kaplan, dated June 15, 2010, and the exhibits annexed thereto, Plaintiff E. Jean Carroll will move this Court, at the Motion Submissions Part Courtroom, Room 130, 60 Centre Street, New York, New York 10007, on July 1, 2020, at 9:30 am, or as soon thereafter as counsel may be heard, for an order pursuant to CPLR § 3211(b) striking Defendant Donald J. Trump's ninth affirmative defense, which asserts that he is not subject to personal jurisdiction in this Court, and for such other or further relief as this Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that, in accordance with CPLR § 2214(b), Defendant's opposition to this motion shall be served at least seven days before July 1, 2020, and Plaintiff's reply shall be served at least one day before such time.

A-264

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM   INDEX NO. 160694/2019
NYSCEF DOC. NO. 82                                    RECEIVED NYSCEF: 06/15/2020

Dated: New York, New York
       June 15, 2020

_____
Roberta A. Kaplan
Joshua Matz
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

2

A-265

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM

NYSCEF DOC. NO. 83

INDEX NO. 160694/2019

RECEIVED NYSCEF: 06/15/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------

E. JEAN CARROLL,

                  *Plaintiff*,

  -against-

DONALD J. TRUMP, in his personal capacity,

                  *Defendant*.

------------------------------------------------------------

Index No. 160694/2019

Hon. Verna L. Saunders

Mot. Seq. No. 003

### AFFIRMATION OF ROBERTA A. KAPLAN IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE AN AFFIRMATIVE DEFENSE

Roberta A. Kaplan, an attorney admitted to practice before the courts of the State of New York, authorized by law to practice in the State of New York, and not a party to this action, hereby affirms the following to be true under penalty of perjury pursuant to CPLR § 2106:

1. I am a partner with the law firm of Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll in the above-captioned action. I am familiar with the facts of this case. I submit this affirmation in support of Carroll's motion to strike an affirmative defense.

2. Attached as Exhibit A is a true and correct copy of the logo used in connection with the television program, *The Apprentice*.

3. Attached as Exhibit B is a true and correct copy of the entity information page for The Trump Corporation maintained by the New York Department of State, Division of Corporations.

4. Attached as Exhibit C is a true and correct copy of the entity information page for The Trump Organization, Inc. maintained by the New York Department of State, Division of Corporations.

A-266

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM
NYSCEF DOC. NO. 83

INDEX NO. 160694/2019

RECEIVED NYSCEF: 06/15/2020

5.      Attached as Exhibit D is a true and correct copy of a Federal Election Commission filing by Donald J. Trump for President, Inc., dated May 20, 2020.

6.      Attached as Exhibit E are true and correct copies are three Department of Homeland Security reports titled *Expenditures Pursuant to the Presidential Protection Assistance Act of 1976*, dated August 2, 2019, November 20, 2019, and February 7, 2020. These reports were released by the Department of Homeland Security to governmentattic.org on May 11, 2020, pursuant to a Freedom of Information Act request, File Number 20190427.

7.      Attached as Exhibit F is a certified transcript of a telephone call involving Defendant Donald J. Trump and U.S. Governors on June 1, 2020. The audio of the call is in the public domain and is available at, *inter alia*, https://www.thedailybeast.com/listen-to-trumps-unhinged-rant-to-guvs.

8.      Attached as Exhibit G are true and correct copies of Florida Voter Registration Applications signed by Defendant, which were obtained by the Washington Post via a public records request.

9.      Attached as Exhibit H is a true and correct copy of the Declaration of Use Agreement between the Town of Palm Beach, the Mar-a-Lago Club, Inc., and Donald J. Trump, which was obtained by the Washington Post from the public files of Palm Beach, Florida.

Dated: New York, New York
    June 15, 2020

By: _____
Roberta A. Kaplan
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

2

A-267

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM
NYSCEF DOC. NO. 92
INDEX NO. 160694/2019
RECEIVED NYSCEF: 06/15/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

E. JEAN CARROLL,

      *Plaintiff*,

 -against-

DONALD J. TRUMP, in his personal capacity,

      *Defendant*.

---

Index No. 160694/2019

Hon. Verna L. Saunders

Mot. Seq. No. 003

 

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO STRIKE AN AFFIRMATIVE DEFENSE**

Roberta A. Kaplan
Joshua Matz
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com
*Counsel for Plaintiff E. Jean Carroll*

A-268

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM

NYSCEF DOC. NO. 92

INDEX NO. 160694/2019

RECEIVED NYSCEF: 06/15/2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

RELEVANT FACTUAL & PROCEDURAL BACKGROUND ................................................... 2

ARGUMENT ................................................................................................................................. 6

    I.   TRUMP'S PERSONAL JURISDICTION DEFENSE CONSISTS OF NOTHING
        MORE THAN AN BARE LEGAL CONCLUSION ........................................................... 7

    II.  TRUMP'S PERSONAL JURISDICTION DEFENSE FAILS AS A FACTUAL
        MATTER AS WELL ......................................................................................................... 8

CONCLUSION ............................................................................................................................ 13

A-269

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM   INDEX NO. 160694/2019
NYSCEF DOC. NO. 92   Case 1:20-cv-07311-LAK   Document 6-5   Filed 09/09/20   Page 7 of 25   RECEIVED NYSCEF: 06/15/2020

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*,
   78 A.D.3d 746 (2d Dep't 2010) ...................................................................... 7

*Chen v. Guo Liang Lu*,
   144 A.D.3d 735 (2d Dep't 2016) .................................................................... 9

*Commissioners of the State Ins. Fund v. Ramos*,
   63 A.D.3d 453 (1st Dep't 2009) ..................................................................... 7

*Deer Consumer Prods., Inc. v. Little*,
   35 Misc. 3d 374 (Sup. Ct., N.Y. Cty. 2012) ................................................... 7

*Hosley v. Curry*,
   85 N.Y.2d 447 (1995) ............................................................................ *passim*

*In re Gelarie's Estate*,
   75 N.Y.S.2d 594 (Sur. Ct., Westchester Cty. 1947) ..................................... 12

*In re Hall's Estate*,
   120 N.Y.S.2d 886 (Sur. Ct., N.Y. Cty. 1953) ................................................ 8

*In re Lynch's Estate*,
   170 Misc. 966 (Sur. Ct., N.Y. Cty. 1939) ..................................................... 10

*In re Newcomb's Estate*,
   192 N.Y. 238 (1908) ................................................................................ 2, 11

*Laufer v. Hauge*,
   140 A.D.2d 671 (2d Dep't 1988) .................................................................... 9

*Mississippi Band of Choctaw Indians v. Holyfield*,
   490 U.S. 30 (1989) ....................................................................................... 11

*People v. Settles*,
   46 N.Y.2d 154 (1978) ..................................................................................... 9

*Reed v. McCord*,
   160 N.Y. 330 (1899) ....................................................................................... 9

*Robbins v. Growney*,
   229 A.D.2d 356 (1st Dep't 1996) ................................................................ 7, 8

*Wilke v. Wilke*,
   73 A.D.2d 915 (1980) ................................................................................... 11

ii

A-270

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 92     Case 1:20-cv-07311-LAK   Document 6-5   Filed 09/09/20   Page 8 of 25   RECEIVED NYSCEF: 06/15/2020

**Constitution and Statutes**

U.S. Const. amend. XXII, § 1 ................................................................................ 10

18 U.S.C. § 3056................................................................................................... 3

**Rules**

CPLR § 301............................................................................................................ 5

CPLR § 308............................................................................................................ 4

CPLR § 3211....................................................................................................*passim*

**Other Authorities**

Aamer Madhani & Darlene Superville, *As Trump Resumes Travel, Staff Takes Risks to Prepare Trip,* AP (May 5, 2020) ............................................................................ 11

*Celebrity Apprentice Intro / Credits*, YouTube. ................................................. 3

Donald J. Trump (@realDonaldTrump)*,* Twitter (Oct. 31, 2019, 9:32 PM) ................................ 10

Donald J. Trump, The Trump Organization ......................................................... 2, 3

Peter Baker & Maggie Haberman, *As Protests and Violence Spill Over, Trump Shrinks Back*, N.Y. Times (May 31, 2020)...................................................................... 11

Scott Neuman*, Governors Push Back On Trump's Threat To Deploy Federal Troops To Quell Unrest,* NPR (June 2, 2020). ........................................................................ 5, 6

*See the Paperwork: Trump Changes Residence to Florida*, N.Y. Times (Oct. 31, 2019)............ 10

*The Apprentice 1 Official Intro*, YouTube...................................................... 3

Transcript, *Trump: The Reality TV Years*, NPR (Mar. 3, 2016).................................... 2

Maggie Haberman*, Trump, Lifelong New Yorker, Declares Himself a Resident of Florida,* N.Y. Times (Oct. 31, 2019) ...................................................................... 10

A-271

### PRELIMINARY STATEMENT

For better or for worse, depending upon how you look at it, New York has always been part of Defendant Donald Trump's story. Trump built his brand on the claim that he had conquered the New York real estate market; he prominently featured the Manhattan skyline, the Brooklyn Bridge, and Flushing Meadows–Corona Park in the introductions of his television shows, *The Apprentice* and *The Celebrity Apprentice*; he celebrated his election as President at the New York Hilton; and he put the headquarters of his reelection campaign at Trump Tower in Manhattan, just below his spacious penthouse apartment. Even as he temporarily resides at the White House, a permanent Secret Service presence, funded by U.S. taxpayers, protects Trump Tower for whenever Trump is in New York City. In other words, Trump's lifelong connection to New York is as strong as ever.

But as darker chapters of his story have begun catching up with him, Trump has worked hard to distance himself from New York. This case is one example of that retreat. Plaintiff E. Jean Carroll alleges that Trump sexually assaulted her at Bergdorf Goodman, a department store a couple of blocks away from Trump Tower, and then defamed her when she spoke out about her experience last year. In response to Carroll's particularized and credible allegations, Trump has done everything possible to try to stop discovery from moving forward. His tactics have ranged from attempting to avoid service to making meritless arguments for a stay. Although his argument that this case should be stayed because he cannot be sued while serving as President was heard by this Court on March 4, 2020, he has also asserted that this Court lacks jurisdiction altogether because he cannot be sued in New York. This motion is directed at that second (meritless) argument, which Trump now asserts as an affirmative defense.

1

A-272

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM

NYSCEF DOC. NO. 92

INDEX NO. 160694/2019

RECEIVED NYSCEF: 06/15/2020

In light of recent events, it's now time for the door to Trump's jurisdictional defense to be shut permanently. Two weeks ago, on a nearly hour-long phone call, Trump told a large group of U.S. Governors that they would "look like a bunch of jerks" if they didn't "dominate" the people protesting against racism and police misconduct, and he promised to do "something that people haven't seen before" in order to achieve "total domination." Of particular relevance here, during that same call, Trump openly admitted that he continues to "live in Manhattan." In addition, other new revelations have further confirmed that New York continues to be Trump's domicile and that no other jurisdiction (including Washington, D.C. or Florida) could possibly satisfy the strict standard that applies when a New Yorker wants to establish a new domicile outside of New York under New York law.

As the Court of Appeals recognized long ago, in order to effect such a change of domicile, "[r]esidence without intention, or intention without residence, is of no avail." *In re Newcomb's Estate*, 192 N.Y. 238, 250 (1908). Trump may reside now in Washington, D.C., but he has disavowed any intention of staying there after his Presidency. And while he may intend to move to Florida at some point in the future, there can be no question that he does not reside there now. Accordingly, Trump remains subject to jurisdiction in New York, and the Court should grant this motion to strike Trump's personal jurisdiction defense pursuant to CPLR § 3211(b).

**RELEVANT FACTUAL & PROCEDURAL BACKGROUND**

"New York, my city," Donald Trump proudly declared on the very first episode of his famed television program, *The Apprentice*. Transcript, *Trump: The Reality TV Years*, NPR (Mar. 3, 2016).[1] And in that respect, he was telling the truth. Trump was born in Queens 74 years ago and has been associated with New York City his entire life. *See Donald J. Trump*, The Trump

---

[1] https://www.npr.org/transcripts/468560204?storyId=468560204?storyId=46856020.

2

A-273

Organization (last visited June 8, 2020).[2] The opening credits of both *The Apprentice* and *The Celebrity Apprentice* highlighted the City, featuring skyline views, the Brooklyn Bridge, and the Unisphere in Flushing Meadows–Corona Park. *See The Apprentice 1 Official Intro*, YouTube[3]; *Celebrity Apprentice Intro / Credits*, YouTube.[4] Moreover, the logo for *The Apprentice* depicted Trump with the City behind him:



Ex. A.[5]

For decades, Trump has maintained his home in the penthouse of Trump Tower in Manhattan. Both the Trump Organization and Trump's presidential reelection campaign are headquartered there, and Trump designated Trump Tower as the single residence to be "fully secured by the Secret Service on a permanent basis" under Section 3 of the Presidential Protection Assistance Act of 1976, 18 U.S.C. § 3056 note. *See* Exs. B–E; Doc. No. 6 ¶¶ 7–12.

In fact, it was due to the permanent Secret Service presence at Trump Tower that Carroll had such difficulty effecting service of process at the start of this action. A process server went to

---

[2] https://www.trump.com/leadership/donald-j-trump-biography.
[3] https://www.youtube.com/watch?v=9paNJJqMn3c.
[4] https://www.youtube.com/playlist?list=PL1iX0GymYlpbAEdGi2MK68etZxZl75UUy.
[5] All "Ex." references are to those exhibits attached to the Affirmation of Roberta A. Kaplan in Support of Plaintiff's Motion to Strike an Affirmative Defense.

3

A-274

Case 1:20-cv-07311-LAK   Document 6-5   Filed 09/09/20   Page 12 of 25

Trump Tower on four different occasions, at different times, and each time, Secret Service agents and building staff blocked the process server. Doc. No. 6 ¶¶ 7–12. On one occasion, a Secret Service agent informed the process server that they "had been instructed not to allow process servers" to effect service. *Id.* ¶ 9. Another process server was warned that if he tried to leave papers with the Trump Tower concierge, he would not be permitted to leave the building. *Id.* ¶¶ 11.

Because the Secret Service had rendered service at Trump Tower "impracticable," Carroll filed a motion for an order permitting an alternative method of service pursuant to CPLR § 308(5). In support of her motion, Carroll submitted a copy of Trump's then-active New York voter registration dated November 4, 2019, which listed the Trump Tower penthouse as his home. Doc. No. 8. She sought leave to serve Trump by mail at Trump Tower, with copies of the Summons and Complaint to be sent to the White House and to six attorneys representing Trump in other ongoing personal capacity actions in New York. Doc. No. 6 ¶ 27. The Court granted that motion, and Trump eventually appeared in this action. Doc. Nos. 15, 19.

Once Trump had been properly served, however, his efforts to delay this case only intensified. Trump requested, and Carroll acquiesced in, a significant extension of time to file a motion to dismiss. Doc. No. 20; Doc. No. 24 ¶ 10; Doc No. 34 ¶ 6. Yet, well before that deadline, on the same day that discovery was set to commence, Trump filed a motion to dismiss focused exclusively on the argument that he was no longer subject to personal jurisdiction in New York because he had resided in the White House for the past three years. Doc. No. 33. Trump accompanied that motion to dismiss with an affirmation from his attorney that did not even purport to address the basis for Trump's personal jurisdiction defense, and requested that the Court stay all discovery deadlines pending a decision on the motion. Doc. Nos. 28, 29.

4

A-275

Carroll opposed Trump's initial stay request, arguing that Trump was subject to general jurisdiction in New York under CPLR § 301 because, despite his temporary residence in Washington, D.C., he remained domiciled in New York City. Doc. No. 34. The Court (Ling-Cohan, J.) agreed, denying Trump's motion to dismiss and holding that Trump had provided no evidence demonstrating that he was no longer subject to jurisdiction in New York. In her opinion, Justice Ling-Cohan emphasized that "there is not even a tweet, much less an affidavit by defendant Trump in support of his motion." Doc. No. 36 at 1.

From there, Trump seemed to pivot to another delay tactic, arguing next that he is immune from suit in state court while he serves as President and asking that the Court stay this action pending the Court of Appeals' consideration of that issue in *Zervos v. Trump*. Doc. No. 43. The parties briefed that second stay motion, and the Court entered a temporary stay of discovery deadlines pending its decision. Doc. Nos. 39, 50.[6] In the course of briefing that motion, however, Trump filed his Answer to Carroll's Complaint. Doc. No. 68. As his ninth and final affirmative defense, Trump claimed, once again, that he is not subject to personal jurisdiction in this Court. Doc. No. 68 ¶ 155.

While Trump's second stay motion remains *sub judice*, recent events have shed additional light on the deficiencies of Trump's personal jurisdiction defense. More specifically, on June 1, 2020, Trump spoke with a large group of U.S. Governors (including Jared Polis of Colorado, Phil Murphy of New Jersey, Andrew Cuomo of New York, J.B. Pritzker of Illinois, Janet Mills of Maine, Charlie Baker of Massachusetts, Gretchen Whitmer of Michigan, Tim Walz of Minnesota, and Jay Inslee of Washington) about the protests against racial injustice and police misconduct sweeping the Nation. Ex. F; *see also* Scott Neuman, *Governors Push Back On Trump's Threat To*

---

[6] As noted above, oral argument on that motion took place on March 4, 2020.

5

A-276

*Deploy Federal Troops To Quell Unrest*, NPR (June 2, 2020).[7] Trump spoke at length on that call, chastising the states whose response to the protestors (whom he characterized as "terrorists") had not been forceful enough: "You have to dominate. If you don't dominate, you're wasting your time. They're going to run all over you and you'll look like a bunch of jerks. You have to dominate." Ex. F at 1. Trump promised that the impending federal action would be forceful: "We're going to do something that people haven't seen before. But we're going to have total domination." *Id.* at 2.

Of relevance to this case, in commenting on the response of the New York City police during that call, Trump stated as follows:

> Now what happened in New York, I have to tell you, *I live in Manhattan*. What's going on in Manhattan, I have no idea. New York's finest, they've got be allowed. They need to do their jobs. I don't know what's happening in Manhattan, but it's terrible. And because it's New York, because it's Manhattan it gets a lot of press. So they really spend a lot of time on it. But New York is going to have to toughen up and we'll send you National Guard if you want.

*Id.* at 3 (emphasis added).

Based on that statement concerning his current residency, as well as the other undisputed facts and points of law set forth below, Carroll now files this motion to strike Trump's affirmative defense that he is not subject to jurisdiction in New York.

### ARGUMENT

Under CPLR § 3211(b), a plaintiff may "move for judgment dismissing one or more defenses, on the ground that a defense is not stated or has no merit." CPLR § 3211(b) was made for a case like this since *both* reasons for striking a defense are fully applicable here. Trump has "not stated" the affirmative defense of personal jurisdiction because his Answer asserts nothing

---

[7]https://www.npr.org/2020/06/02/867565338/governors-push-back-on-trumps-threat-to-deploy-federal-troops-to-quell-unrest.

6

A-277

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM
NYSCEF DOC. NO. 92

INDEX NO. 160694/2019
RECEIVED NYSCEF: 06/15/2020

but a bare, and thus insufficient, conclusion of law. Trump's personal jurisdiction defense also has "no merit" because it is foreclosed by his own recent admission that he continues to "live in Manhattan" and by the patent insufficiency of any alternative domicile he might assert. For each of these independent reasons, the Court should grant Carroll's motion to strike.

## I.   TRUMP'S PERSONAL JURISDICTION DEFENSE CONSISTS OF NOTHING MORE THAN AN BARE LEGAL CONCLUSION

Trump's affirmative defense of lack of personal jurisdiction should be stricken for the simple reason that Trump has not pleaded a single fact to support it.

Although a court must construe the pleadings in favor of the nonmoving party, "[b]are legal conclusions are insufficient to raise an affirmative defense." *Robbins v. Growney*, 229 A.D.2d 356, 358 (1st Dep't 1996). Where "affirmative defenses merely plead conclusions of law without any supporting facts, the affirmative defenses should be dismissed pursuant to CPLR 3211(b)." *Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*, 78 A.D.3d 746, 750 (2d Dep't 2010) (internal quotation marks omitted) (dismissing affirmatives defenses of equitable estoppel, laches, waiver, unclean hands, and culpable conduct on this basis); *see Comm'rs of the State Ins. Fund v. Ramos*, 63 A.D.3d 453, 453 (1st Dep't 2009) (dismissing affirmative defense on same ground).

With respect to the Court's purported lack of personal jurisdiction, a bare legal conclusion is all that Trump has asserted here. His ninth affirmative defense states, in full, that "[t]he Court lacks personal jurisdiction over President Trump." Doc. No. 68 ¶ 155. Trump does not even plead that Trump is no longer domiciled in New York and has established domicile somewhere else, let alone plead any facts that would allow the Court to reach such a conclusion. *See, e.g., Deer Consumer Prods., Inc. v. Little*, 35 Misc. 3d 374, 381 (Sup. Ct., N.Y. Cty. 2012).

7

A-278

Trump's wholly insufficient pleading is even more egregious given that, as outlined above, it came weeks *after* Justice Ling-Cohan had already put Trump on notice that his personal jurisdiction defense was devoid of any reliable factual foundation. In denying Trump's motion to dismiss for lack of jurisdiction, she emphasized that there was "not even a tweet, much less an affidavit by defendant Trump in support of his motion," and that "even the defendant's attorney affirmation does not assert a basis (evidentiary or otherwise) for dismissal." Doc. No. 36 at 1–2.

Yet Trump has done nothing to bolster his defense since that ruling. Trump could not prove any facts then, and he does not plead any facts now. On this basis alone, the Court should grant Carroll's motion and strike the affirmative defense of personal jurisdiction. *See Robbins*, 229 A.D.2d at 358.

## II.   TRUMP'S PERSONAL JURISDICTION DEFENSE FAILS AS A FACTUAL MATTER AS WELL

Trump's personal jurisdiction defense should be also stricken for the additional reason that Trump could not support his bare legal conclusion with the requisite facts even if he tried. In other words, not only has Trump "not stated" the affirmative defense of personal jurisdiction, but that defense also has "has no merit." CPLR § 3211(b).

Because the issue comes up most often in the context of individuals seeking to avoid paying their taxes, the burden for a party to establish a new domicile outside of New York is understandably a heavy one. *See, e.g.*, *In re Hall's Estate*, 120 N.Y.S.2d 886, 889 (Sur. Ct., N.Y. Cty. 1953) (rejecting charge of domicile argument where the statements of the deceased that "were declarative of an intent to establish a Florida domicile were prompted by a purpose to avoid tax liabilities"). "For a change to a new domicile to be effected, there must be a union of residence in fact and an 'absolute and fixed intention' to abandon the former and make the new locality a fixed and permanent home." *Hosley v. Curry*, 85 N.Y.2d 447, 451 (1995). The party claiming a change

8

A-279

in domicile "has the burden to prove the change by clear and convincing evidence," *id.*, and "until a clear intention to change is established," the "residence established earlier in time remains the individual's domicile," *Laufer v. Hauge*, 140 A.D.2d 671, 673 (2d Dep't 1988). Moreover, for purposes of personal jurisdiction, the relevant inquiry is where the defendant was domiciled at the time the complaint was filed. *Chen v. Guo Liang Lu*, 144 A.D.3d 735, 737 (2d Dep't 2016).

The simplest reason why Trump cannot meet this demanding standard is that he recently admitted to a large group of the nation's Governors that he "live[s] in Manhattan." Ex. F at 3. That statement, which is indisputably admissible as a party statement against interest, *see, e.g.*, *People v. Settles*, 46 N.Y.2d 154, 167 (1978); *Reed v. McCord*, 160 N.Y. 330, 341 (1899), cannot be reconciled with the notion that Trump has established a residence elsewhere and intends to remain there permanently. And Trump certainly cannot prove by "clear and convincing evidence" that he has abandoned New York while he continues to hold himself out as a Manhattanite, especially when so much of his life—his business, his campaign, his permanent Secret Service protection—centers on a single address in Midtown. *Hosley*, 85 N.Y.2d at 451.

Even without Trump's recent admission, any claim to a changed domicile under New York law would fail because there is no alternative location that would allow Trump to satisfy the dual requirements of "residence in fact" and an "absolute and fixed intention to . . . make the new locality a fixed and permanent home." *Id.* at 451. As noted above, without the "union" of these two elements, Trump's domicile remains unchanged. *Id.*.

Although Trump's answer does not identify another state where he can properly be sued, his original motion to dismiss papers implied Washington, D.C., arguing that there was no general personal jurisdiction in New York because Trump "has resided in the White House for the past three years." Doc. No. 33 at 2. We obviously do not dispute that Trump currently resides at the

9

A-280

White House in Washington, D.C. But Trump's time at the White House is, as a matter of constitutional law, temporary. *See* U.S. Const. amend. XXII, § 1 ("No person shall be elected to the office of the President more than twice, and no person who has held the office of President, or acted as President, for more than two years of a term to which some other person was elected President shall be elected to the office of President more than once."). Without "an absolute and fixed intention" to make a temporary home "permanent," the "[m]ere change of residence *although continued for a long time* does not effect a change of domicile." *Hosley*, 85 N.Y.2d at 451.

It is possible that Trump might argue that his new domicile is Florida, especially since Trump has tweeted that although he "will stay for, hopefully, five more years" at the White House, he and his family "*will be making* Palm Beach, Florida, [their] Permanent Residence." Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2019, 9:32 PM), https://twitter.com/realdonaldtrump/ status/1190079191355670529 (emphasis added). Trump also purported to formalize that decision by filing a "Declaration of Domicile" that proclaimed Florida his "predominant and principal home." *See the Paperwork: Trump Changes Residence to Florida*, N.Y. Times (Oct. 31, 2019).[8]

Those acts in themselves, however, are irrelevant under New York law. Declaring that he "will" someday become a Florida permanent resident doesn't establish a new domicile; to the contrary, it confirms a *failure* to do so, since expressing a "prospective" intention of changing domicile is not enough to effect an actual change. *In re Lynch's Estate*, 170 Misc. 966, 967 (Sur. Ct., N.Y. Cty. 1939). Nor does a formal declaration suffice: given the eagerness of New Yorkers to avoid paying their taxes,[9] "[s]o-called 'formal declarations' of domicile . . . have lost their

---

[8] https://www.nytimes.com/interactive/2019/10/31/us/trump-residence-documents.html

[9] Indeed, at the time that Trump issued the above tweet, "a person close to the president said the reasons were primarily for tax purposes." Maggie Haberman, *Trump, Lifelong New Yorker, Declares Himself a Resident of Florida*, N.Y.

10

A-281

importance . . . as courts have recognized their self-serving nature." *Wilke v. Wilke*, 73 A.D.2d 915, 917 (1980); *see also In re Newcomb's Estate*, 192 N.Y. at 252 ("If she had made the most formal declaration of intention for the purpose of creating evidence of an apparent change, with no intention of making an actual change, it would have been a fraud and of no effect.").

Most fundamentally, however, a person cannot change his domicile to a state where he doesn't currently reside—and Trump doesn't *currently* reside in Florida. *See Hosley*, 85 N.Y.2d at 451 (domicile requires "residence in fact"); *In re Newcomb's Estate*, 192 N.Y. at 250 ("Residence is necessary, for there can be no domicile without it . . . ."); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (domicile requires "physical presence"). As noted above, Trump previously told this Court in this case that he "has resided *in the White House* for the past three years," Doc. No. 33 at 2 (emphasis added), and any attempt to backtrack from this prior position would not only be inconsistent with the facts, but also reflect the type of gamesmanship that courts as a general rule do not tolerate.[10] Thus, Trump fails to satisfy one of the single most important criteria for a change of domicile: actually moving to a new state.

But that is not all. Trump's efforts to register to vote in Florida further prove his lack of a permanent residence in that state. As noted above, at the time this lawsuit began, Trump maintained an active New York voter registration. Doc. No. 8. When he registered to vote in Florida (where he voted by mail in the March primary election), his first Florida voter registration application listed the White House as his place of residence. Ex. G. Although Trump later completed another

---

Times (Oct. 31, 2019), https://www.nytimes.com/2019/10/31/us/politics/trump-new-york-florida-primary-residence.html.

[10] Indeed, since the outbreak of Covid-19 in early spring, followed by the recent protests against racism and police brutality, Trump has understandably remained in the White House for longer periods of time than ever before during his Presidency. *See* Aamer Madhani & Darlene Superville, *As Trump Resumes Travel, Staff Takes Risks to Prepare Trip*, AP (May 5, 2020), https://apnews.com/fd846eb2c00ef1bb288699d1ee583aef; Peter Baker & Maggie Haberman, *As Protests and Violence Spill Over, Trump Shrinks Back*, N.Y. Times (May 31, 2020), https://www.nytimes.com/2020/05/31/us/politics/trump-protests-george-floyd.html.

11

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 92          RECEIVED NYSCEF: 06/15/2020

Florida voter registration application that changed the address to the Trump Organization's Mar-a-Lago Club in Palm Beach, Florida, *id.*, that address doesn't work either, since residing permanently at Mar-a-Lago is forbidden under Florida law. The land use agreement with Palm Beach County that permitted Trump to establish Mar-a-Lago in the first place makes this clear. That agreement explicitly limits the use of the rooms at Mar-a-Lago to "a maximum of three (3) non-consecutive seven (7) day periods by any one member during the year," and "any [other] usages not specifically" approved are prohibited. Ex. H at 2.[11] With this 21-day limitation, Mar-a-Lago cannot possibly qualify as Trump's "fixed and permanent home"—and until another such home is actually established, Trump cannot be domiciled in Florida. *Hosley*, 85 N.Y.2d at 451; *see also In re Gelarie's Estate*, 75 N.Y.S.2d 594, 595 (Sur. Ct., Westchester Cty. 1947) ("Therefore his residence at the hotel was only temporary and he never abandoned the residence he had established in Westchester County. It is well established that a domicile continues until it is superseded by a new one and the abandonment of an established domicile is a necessary prerequisite to the acquisition of a new one.").

Because Trump does not intend to reside permanently in Washington, D.C., and does not reside in Florida at all, he "lives in Manhattan" for purposes of personal jurisdiction under New York law. Any argument that he should be deemed domiciled elsewhere "has no merit," and his personal jurisdiction defense should be dismissed pursuant to CPLR § 3211(b).[12]

---

[11] Counsel express no opinion as to whether Trump's purported voter registration in Florida was valid—and whether he lawfully may vote in Florida in the upcoming Presidential election.

[12] Given the complete lack of merit to Trump's jurisdictional defense as well as the lack of any supporting evidence in the wake of Justice Ling-Cohan's prior ruling, Carroll reserves the right to seek an appropriate award of costs and fees in connection with this motion since Trump's personal jurisdictional defense is "completely without merit in law" and was made "primarily to delay or prolong the resolution of the litigation." Rules of the Chief Administrative Judge, Subpart 130-1.1(c)(1), (2).

12

A-283

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 92 RECEIVED NYSCEF: 06/15/2020

Case 1:20-cv-07311-LAK   Document 6-5   Filed 09/09/20   Page 21 of 25

**CONCLUSION**

For the reasons set forth above, the Court should grant Carroll's motion and strike

Trump's ninth affirmative defense.

Dated: New York, New York
June 15, 2020

_____
Roberta A. Kaplan
Joshua Matz
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
E. JEAN CARROLL,

                              Index No.:  160694/19

                Plaintiff,

            -against-                    **Motion Seq. No. 003**

DONALD J. TRUMP, in his personal capacity,

                Defendant.
-------------------------------------------------------------------X

### NOTICE OF VOLUNTARY
### WITHDRAWAL OF AFFIRMATIVE DEFENSE

PLEASE TAKE NOTICE that defendant hereby voluntarily withdraws the ninth affirmative defense asserted in his Answer.

PLEASE TAKE FURTHER NOTICE that the undersigned attorneys submitted a stipulation to plaintiff's attorneys proposing to withdraw the ninth affirmative defense asserted in defendant's Answer, but plaintiff's attorneys have refused to sign this stipulation.

Dated: New York, New York
      June 29, 2020

                            **LAROCCA HORNIK ROSEN
                            & GREENBERG LLP**

                            */s/ Patrick McPartland*
                            _____

                            Patrick McPartland
                            Jared E. Blumetti
                            40 Wall Street, 32nd Floor
                            New York, New York  10005
                            T:  (212) 530-4837; 4831
                            E:  pmcpartland@lhrgb.com
                                jblumetti@lhrgb.com

                            *Attorneys for defendant*
                            *Donald J. Trump*

To:    All counsel of record (*via ECF*)

A-285

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

June 29, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

   *Re:*  *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

  We write on behalf of Plaintiff E. Jean Carroll in response to the Notice of Voluntary Withdrawal of Affirmative Defense that Defendant Donald J. Trump filed earlier today. *See* Doc. No. 93. In his Notice, Trump withdraws his affirmative defense of lack of personal jurisdiction and states that his withdrawal moots Carroll's pending motion to strike. *Id.* Carroll does not oppose Trump's decision to withdraw that meritless defense, and she acknowledges that such a withdrawal, assuming it is with prejudice, moots Carroll's motion to strike. But Trump's Notice also states that "plaintiff's attorneys have refused to sign" a stipulation to facilitate Trump's withdrawal. Because that statement is misleading and inaccurate, we write to correct the record. *Id.*

  As Your Honor is aware, Trump first moved to dismiss this action on personal jurisdiction grounds on January 3, 2020. Doc. No. 33. In response, Carroll argued that Trump remained domiciled in New York and reserved her right to seek sanctions for frivolous conduct intended to delay proceedings. Doc. No. 34 at 6 n.2. The Court (Ling-Cohan, J.) agreed that Trump's motion to dismiss was baseless, holding that there was "not even a tweet, much less an affidavit by defendant Trump in support of his motion." Doc. No. 36 at 1.

  Weeks later, Trump reasserted personal jurisdiction as an affirmative defense in his Answer. Doc. No. 68 ¶ 155. Tellingly, although Trump necessarily has, and has always had, full knowledge of the facts relevant to his domicile, Trump made no effort to address any of the deficiencies of that defense that the Court had identified. And after Trump admitted to a group of U.S. governors that he "lives in Manhattan," enough was enough. Carroll moved to strike Trump's personal jurisdiction defense pursuant to CPLR § 3211(b). Doc. No. 82. Carroll again reserved the right to seek recovery of costs and fees in connection with the motion. Doc. No. 92 at 12 n.12.

# KAPLAN HECKER & FINK LLP

2

On the eve of Trump's opposition deadline, his attorney revealed that Trump did not intend to oppose the motion to strike. The next day, his attorney proposed a stipulation that would recognize Trump's withdrawal of his personal jurisdiction defense. As reflected in the communications between counsel attached as Exhibit A, Carroll was amenable to such a stipulation. Our only request was that the stipulation acknowledge that Carroll was reserving her right to seek costs and fees in connection with the motion to strike. After Trump resisted that acknowledgment, we offered on multiple occasions to make the reservation of rights mutual, such that Trump would reserve his right to oppose any motion for costs and fees that Carroll might make.

Accordingly, any suggestion that Carroll "refused" to sign a stipulation is false. Although Carroll was not willing to sign the stipulation in the exact form that Trump had drafted, stipulations in judicial proceedings are not take-it-or-leave-contracts that the more powerful party may hold over the other. Trump may have balked at a stipulation that would acknowledge the potential consequences of pushing a frivolous defense, but it was hardly inappropriate for Carroll's counsel to ensure that Carroll's rights were protected in any stipulation bearing her name.

Respectfully submitted,

Roberta A. Kaplan

cc:      Counsel of Record (via NYSCEF)

A-287

FILED: NEW YORK COUNTY CLERK 07/02/2020 09:16 AM
NYSCEF DOC. NO. 96

INDEX NO. 160694/2019
RECEIVED NYSCEF: 07/01/2020

Case 1:20-cv-07311-LAK   Document 6-5   Filed 09/09/20   Page 25 of 25

## SUPREME COURT OF THE STATE OF NEW YORK
### NEW YORK COUNTY

| | |
|---|---|
| PRESENT: **HON. VERNA L. SAUNDERS** | PART IAS MOTION 36 |
| _Justice_ | |

-----------------------------------------------------------------X

E. JEAN CARROLL,

        Plaintiff,

    - v -

DONALD J. TRUMP, in his personal capacity,

        Defendant.

-----------------------------------------------------------------X

INDEX NO.    160694/2019

MOTION SEQ. NO.    003

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95

were read on this motion to/for          **DISMISS DEFENSE** .

Pursuant to defendant's Notice of Voluntary Withdrawal of Affirmative Defense dated June 29, 2020 and annexed hereto, plaintiff's motion seeking to dismiss defendant's ninth affirmative defense is denied as moot.

_____June 30, 2020_____

HON. VERNA L. SAUNDERS, JSC

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED ☒ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.
Motion No. 003

Page 1 of 1

FILED: NEW YORK COUNTY CLERK 07/02/2020 09:16 AM
NYSCEF DOC. NO. 96
INDEX NO. 160694/2019
RECEIVED NYSCEF: 07/01/2020

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 1 of 24

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X

E. JEAN CARROLL,

                Plaintiff,

-against-

DONALD J. TRUMP, in his personal capacity,

                Defendant.
--------------------------------------------------------------------X

Index No.: 160694/19

**Motion Seq. No. 003**

### NOTICE OF VOLUNTARY
### WITHDRAWAL OF AFFIRMATIVE DEFENSE

PLEASE TAKE NOTICE that defendant hereby voluntarily withdraws the ninth affirmative defense asserted in his Answer.

PLEASE TAKE FURTHER NOTICE that the undersigned attorneys submitted a stipulation to plaintiff's attorneys proposing to withdraw the ninth affirmative defense asserted in defendant's Answer, but plaintiff's attorneys have refused to sign this stipulation.

Dated: New York, New York
       June 29, 2020

                **LAROCCA HORNIK ROSEN
                & GREENBERG LLP**

                */s/ Patrick McPartland*
                _____

                Patrick McPartland
                Jared E. Blumetti
                40 Wall Street, 32nd Floor
                New York, New York 10005
                T: (212) 530-4837; 4831
                E: pmcpartland@lhrgb.com
                   jblumetti@lhrgb.com

                *Attorneys for defendant
                Donald J. Trump*

To:    All counsel of record (*via ECF*)

A-289

# KAPLAN HECKER & FINK LLP

**350 FIFTH AVENUE | SUITE 7110**
**NEW YORK, NEW YORK 10118**
**TEL (212) 763-0883 | FAX (212) 564-0883**
**WWW.KAPLANHECKER.COM**

DIRECT DIAL    212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

July 10, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

   *Re:*  *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

  We write on behalf of Plaintiff E. Jean Carroll to provide notice of supplemental authority confirming that Defendant Donald J. Trump's presidential immunity claim in this action, the sole basis for his motion for a stay, *see* Doc. No. 49, lacks any merit whatsoever. As Your Honor may recall, Trump has moved to stay this action pending the New York Court of Appeals' decision in *Zervos v. Trump*. In that motion, Trump asserted that the Supremacy Clause provides presidential immunity for personal conduct actions pending in state court, even though the Supreme Court has already held that there is no such immunity for identical actions in federal court. *See* Doc. No. 49 at 6–7; Doc. No. 70 at 16–17. In other words, Trump argued that state and federal courts are completely different for purposes of assessing presidential immunity. However, the United States Supreme Court resoundingly rejected the central premises of that argument yesterday by a vote of 7-2 in *Trump v. Vance* (2020) (attached as Exhibit A and cited as "Slip op."). It follows directly from *Vance* that Trump's assertions of immunity in this case, as well as his purported arguments for a stay, are completely baseless.

  *Vance* involved a New York grand jury subpoena issued by the Manhattan District Attorney seeking "financial records relating to the President and business organizations affiliated with [Trump]." Slip op. 2. Although there was a nearly 200-year history of the President being subject to *federal* judicial process, the Supreme Court noted that the subpoena at issue was "the first *state* criminal subpoena directed to a President." *Id.* at 1.

  Trump's arguments here and in *Vance* are exactly the same—and fail for the same reasons.

A-290

KAPLAN HECKER & FINK LLP                                                    2

Here, Trump has argued that there is a "critical difference" in terms of presidential immunity between proceedings in state and federal court. Doc. No. 70 at 16. In *Vance*, Trump argued that the "distinction [between state and federal proceedings] makes all the difference" for purposes of such immunity. Slip op. at 10.

Here, Trump has asserted that the Supremacy Clause affords him absolute immunity because "subjecting the President to a state trial court's jurisdiction imposes upon him a degree of control by the State of New York that interferes with his ability to carry out his constitutional duty of executing the laws of the United States." Doc. No. 49 at 7 (internal quotation marks omitted). In *Vance*, Trump asserted that "the Supremacy Clause gives a sitting President absolute immunity from state criminal subpoenas because compliance with those subpoenas would categorically impair a President's performance of his Article II functions." Slip op. at 10.

And here, Trump has contended that the mere pendency of this case serves as an "unnecessary distraction of the President from his public duties." Doc. No. 49 at 12. In *Vance*, Trump contended that a state court subpoena unrelated to his official functions as President remained an intolerable "diversion" from his official duties. Slip op. at 12.

Indeed, the parallels between *Vance* and the presidential immunity issue here are so great that Trump himself sought to use the Supreme Court's grant of a writ of certiorari in *Vance* to his advantage in the New York state courts. Specifically, in opposing Zervos's request for expedited proceedings at the New York Court of Appeals, Trump argued that the case should proceed on a lengthier schedule because doing so "may well provide [the] Court with the benefit of the U.S. Supreme Court's decision in *Trump v. Vance* . . . in which the President is challenging a state prosecutor's subpoena on, among others, Supremacy Clause grounds." Doc. No. 62 at 3.

The Supreme Court has now spoken, and it has rejected the supposed state-federal distinction that Trump has pressed in *Vance*, *Zervos*, and this case. Slip op. at 12–14. In the same breath, the Supreme Court has also rejected the policy arguments Trump has advanced here for treating him as immune from suit in state court. While denying Trump's claim of presidential immunity from state legal process, the Supreme Court in *Vance* applied the very separation of powers precedents that we cite in our opposition, Doc. No. 54 at 17–20 (and that Trump has deemed irrelevant), to explain that the Supremacy Clause does not confer immunity on the President simply because civil litigation might prove a "distraction." *Id.* at 12. Instead, as the Supreme Court explained yesterday, absolute immunity for a President is limited to litigation relating to official conduct because *only* official conduct actions stand to distort the Executive's "decisionmaking process." *Id.* Here, of course, there was nothing "official" about Trump's false statements defaming E. Jean Carroll after she spoke out about a sexual assault Trump committed in the mid-1990s.

Accordingly, the meritless arguments that Trump has used to delay this action should now be put to rest, and Trump's motion for a stay should be denied. Although *Zervos* nominally remains pending before the Court of Appeals, the Supreme Court's decision in *Vance* leaves no question that the Court of Appeal must affirm the decision of the Appellate Division, First Department, refusing to stay that case during Trump's Presidency since Trump is not immune from personal conduct actions in New York state court. As a result, there is certainly no "just" basis for a stay of this action pursuant to CPLR § 2201.

A-291

KAPLAN HECKER & FINK LLP                                                3

   The Supreme Court reminded us yesterday that "[i]n our system of government, as this Court has often stated, no one is above the law. That principle applies, of course, to a President." Slip op. (Kavanaugh, J., concurring) at 1. Trump has no special right to defame those who have accused him of sexual misconduct and then avoid the consequences of his actions. Carroll should be permitted to resume discovery so that she can obtain justice for the defamation of her good name and character.

                 Respectfully submitted,

                 Roberta A. Kaplan

cc:  Counsel of Record (via NYSCEF)

A-292

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

Marc E. Kasowitz
Direct Dial: (212) 506-1710
Direct Fax: (212) 835-5010
MKasowitz@Kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

July 14, 2020

VIA NYSCEF

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

Re:   *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

We write on behalf of defendant President Donald J. Trump to respond to plaintiff's July 10, 2020 letter to the Court ("Pl. Letter"), in which she asserts that the U.S. Supreme Court's decision last week in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), means that the President's motion to stay this case pending the now fully briefed appeal to the Court of Appeals from *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't 2019), should be denied.

Plaintiff's assertion is incorrect. *Vance* does *not* hold that a civil action in state court against a sitting President like *Zervos* and this action may proceed. The Supreme Court itself made this clear on the same day it handed down *Vance*. In *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which concerned the ability of Congress to issue a subpoena to the President, the Supreme Court explicitly noted that the holding in *Vance* was limited to criminal proceedings:

> Two hundred years ago, it was established that Presidents may be subpoenaed during a federal criminal proceeding, and earlier today we extended that ruling to **state criminal proceedings**, *Trump v. Vance*, ante, p. ___.

*Id.* at *4 (emphasis added) (citation omitted). The Supreme Court also confirmed in *Mazars* that its *Clinton v. Jones*, 520 U.S. 681 (1997), ruling was limited to civil actions against a sitting President in federal, not state, court:

> [M]ore recently we ruled that a private litigant could subject a President to a damages suit and appropriate discovery obligations **in federal court**, *Clinton v. Jones*, 520 U.S. 681 (1997).

KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 14, 2020
Page 2

*Mazars*, 2020 WL 3848061, at *4 (emphasis added).

In fact, as outlined below, and contrary to plaintiff's arguments, *Vance* confirms the reasons *Clinton v. Jones*, which upheld federal court jurisdiction over civil actions against a sitting President, should not be extended to state court. In any event, the Court of Appeals itself will soon decide this issue on the pending *Zervos* appeal. Staying this action would not only allow the Court of Appeals to decide this threshold constitutional issue, but would extend the "judicial deference and restraint" the courts owe the President under the United States Constitution. *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). (*See also* NYSCEF Doc. No. 49 at 9 (collecting cases).)

### A. The Reasoning in *Vance* and *Mazars* Supports the Conclusion That State Courts Lack Jurisdiction Over the President in Civil Actions.

While *Vance* neither addressed nor decided whether state courts may exercise jurisdiction over the President in civil actions, its reasoning supports the conclusion that the First Department's decision in *Zervos* that they may do so was erroneous.

First, in *Clinton v. Jones*, the Supreme Court decided that the federal district court there could exercise jurisdiction over President Clinton in a sexual harassment case arising from his alleged unofficial conduct precisely because, under the Separation of Powers doctrine, federal courts may exercise jurisdiction -- i.e., control -- over the President's official conduct.[1] However, state courts, under the Supremacy Clause, may not exercise any jurisdiction or control over the President's official conduct. *Vance* reaffirms this principle. *See Vance*, 2020 WL 3848062, at *8 (because "'States have no power … to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress[,]' [i]t follows that States also lack the power to impede the President's execution of those laws." (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 436 (1819))). Accordingly, the Supreme Court's justification in *Clinton v. Jones* has no application to state court jurisdiction.

Second, *Mazars* also reaffirms that the principal basis for the First Department's decision in *Zervos* -- that *Clinton v. Jones* "unequivocally demonstrates that the presidency and the President are indeed separable," 171 A.D.3d at 124 -- was erroneous:

> The interbranch conflict here does not vanish simply . . . because the President sued in his personal capacity. ***The President is the only person who alone composes a branch of government.*** As a result, there is not always a clear line between his personal and official affairs. "The interest of the man" is often "connected with the

---

[1]      *See* Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1 ("*Zervos* App. Br."), at 13-18

A-294

KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 14, 2020
Page 3

> constitutional rights of the place." Given the close connection between the Office of the President and its occupant, congressional demands for the President's papers can implicate the relationship between the branches regardless [*sic*] whether those papers are personal or official.

*Mazars*, 2020 WL 3848061, at \*11 (emphasis added) (citation omitted). In other words, *Mazars* confirms that, because "[t]he President is the only person who alone composes a branch of government," state courts may not exercise direct control over the President, "simply . . . because the President [is] sued in his personal capacity." *Id.*

Finally, plaintiff again attempts to reduce the President's Supremacy Clause argument in *Zervos* to a claim that this action constitutes an impermissible "distraction" of the President, an argument *Vance* rejected in the criminal context. (Pl. Letter at 2.) However, distraction is not the basis for the President's argument in *Zervos*. Rather, as noted (NYSCEF Doc. No. 78), the dispositive constitutional issue in *Zervos* turns not on the distraction to the President, but on state courts' inability, under the Supremacy Clause, to control the President in a civil action in the first place -- an issue that was neither addressed nor decided by *Vance*. The President argued distraction only as an additional reason why the balance of the equities favors staying this action pending the appeal in *Zervos*. (*See* NYSCEF No. 49 at 12.)

**B.  The Supreme Court's Holding in *Vance* Was Limited to the Criminal Context.**

The Supreme Court's holding in *Vance*, as noted, was limited to the criminal context, and its reasoning does not extend to civil actions.

First, the Supreme Court has repeatedly recognized that the heightened public interest in criminal actions justifies intrusions on the Executive Branch that would be impermissible in other contexts. *See Nixon v. Fitzgerald*, 457 U.S. at 754 n.37 ("The Court has recognized before there is a lesser public interest in actions for civil damages than . . . in criminal prosecutions."). In fact, the Supreme Court applied that principle in *Mazars*, in which it held that while *criminal* subpoenas may issue against the President because "'the very integrity of the judicial system' would be undermined without 'full disclosure of all the facts,'" Congress's "interests are not sufficiently powerful to justify access to the President's personal papers when other sources could provide Congress the information it needs." 2020 WL 3848061, at \*12 (quoting *United States v. Nixon*, 418 U.S. 683, 709 (1974)). Here, as in *Zervos*, the interest in pursuing a civil action now, as opposed to when the President is no longer in office, is plainly much less powerful than the Congressional interest the Court held was insufficient. Unlike criminal proceedings, there is no pressing need for a state court to exercise control over a sitting President in a civil action, particularly because the action can be stayed until the President is no longer in office.

A-295

KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 14, 2020
Page 4

     Second, in *Vance*, the cornerstone of the Supreme Court's decision was that, if state criminal proceedings threatened the independence or effectiveness of the Executive, the President would "be entitled to the protection of federal courts," by availing himself of 42 U.S.C. § 1983. *Id.* However, that avenue is not available to the President in civil actions.[2] *Compare Peters v. Noonan*, No. 12-CV-234-FPG, 2020 WL 1322573, at *1 (W.D.N.Y. Mar. 20, 2020) ("The Second Circuit has read [section 1983] to preclude both injunctive and declaratory relief against a judicial officer." (citation omitted)) *with Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (prosecutors do not enjoy absolute immunity from declaratory and injunctive relief claims under § 1983).  Therefore, because the President does not have recourse in federal courts from undue influence in civil actions, state courts may not exercise jurisdiction over a sitting President in civil actions.

     Plaintiff cites to Justice Kavanaugh's concurrence in *Vance*, which stated that the President is not "above the law." (Pl. Letter at 3.)  She omits that Justice Kavanaugh went on to say: "[a]t the same time, in light of Article II of the Constitution, this Court has repeatedly declared -- and the Court indicates again today -- that a court may not proceed against a President as it would against an ordinary litigant." *Vance*, 2020 WL 3848062, at *13 (Kavanaugh, J., concurring).  In any event, as the Supreme Court noted in *Clinton v. Jones*, "a postponement of the judicial proceedings" during the Presidency does not place "the occupant of the Office of the President . . . 'above the law.'" *Clinton v. Jones*, 520 U.S. at 697. (*See generally Zervos* App. Br. at 28-29.)

Respectfully submitted,

*[signature]*

Marc E. Kasowitz

cc:    Counsel of Record

---

[2]    *See* 42 U.S.C. § 1983 ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.")

A-296

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110

NEW YORK, NEW YORK 10118

TEL (212) 763-0883  |  FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884

DIRECT EMAIL  rkaplan@kaplanhecker.com

July 15, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

> Re:     *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

We write on behalf of Plaintiff E. Jean Carroll in response to Defendant Donald J. Trump's letter of yesterday's date. In that letter, President Trump asserts that his recent, historic defeats at the Supreme Court somehow advance his position here. This argument is as desperate as it is unconvincing—particularly when these rulings are set in the broader context, as discussed below.

Presidents have long argued that they are immune from accountability in state and federal court, but these arguments have failed time and again, except in the special case of civil damages suits seeking to impose liability on Presidents for their official conduct. *See Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982). They failed when President Nixon asserted immunity from federal criminal subpoenas. *See United States v. Nixon*, 418 U. S. 683 (1974). They failed when President Clinton asserted immunity from civil claims filed in federal court arising from private conduct. *See Clinton v. Jones*, 520 U. S. 681 (1997). They failed when President Trump asserted immunity from state criminal subpoenas. *See Trump v. Vance*, No. 19-635 (U.S. July 9, 2020). And they failed when President Trump asserted effective immunity from Congressional subpoenas concerning his private conduct. *See Trump v. Mazars USA LLP*, No. 19-715 (U.S. July 9, 2020).

There is a clear message here. Presidents lose when they argue that they are above the law. They lose when they argue that state courts are categorically inferior than federal courts and can't be trusted to decide sensitive questions. They lose when they argue that they are too important, or too busy, to answer for private misconduct or to provide information in connection with an investigation into whether crimes were committed. And they lose when they invent novel theories—never embraced by the Supreme Court—to assert that the Constitution forbids ordinary Americans like Ms. Carroll from seeking justice.

KAPLAN HECKER & FINK LLP                                                                    2

In their July 14 letter, Messrs. Trump and Kasowitz ignore all of that. Instead, they try to unnecessarily complicate things and kick up a cloud of dust by pointing to irrelevant or incorrect distinctions between *Vance*, *Mazars*, and this case. Their arguments not only lack merit, but are clearly intended to distract the Court from the key principles at issue.

*Vance* rejected President Trump's sweeping assertion that state and federal courts should be treated differently when it comes to issuing criminal subpoenas to the President. In so doing, *Vance* rejected virtually every argument that President Trump has asserted here for treating state courts as incapable of hearing civil claims—like Ms. Carroll's claim—that could unquestionably be heard in federal court under *Clinton v. Jones*. *See* Doc. No. 98 at 10–14. In *Mazars*, the Supreme Court recognized that some suits involving the President's private affairs might also implicate his official duties. But it squarely rejected the President's blunderbuss argument that his private papers should therefore be treated the same as his official papers, explaining that "[s]uch a categorical approach would represent a significant departure from the longstanding way of doing business between the branches." Ex. A at 14 (*Trump v. Mazars* opinion). Like *Nixon*, *Clinton*, and *Vance*, *Mazars* thus confirms that suits involving the President's private conduct are different than those involving his official conduct—and thereby precludes the President's absolutist position.

President Trump wants to make the arguments here appear to be complicated. They aren't. The distinctions he has drawn to escape accountability are irrelevant. That has always been true, and the Supreme Court confirmed the point again in *Vance* and *Mazars* last week. President Trump's extreme position failed there, and it should fail here, too.

As a result, there is no reason to stay this case. Ms. Carroll should be permitted to resume discovery and obtain justice for President Trump's defamation of her good name and character.

Respectfully submitted,

Roberta A. Kaplan

cc:     Joshua Matz, Counsel of Record (via NYSCEF)

A-298

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY<br>
NEW YORK, NEW YORK 10019<br>
(212) 506-1700<br>
FAX: (212) 506-1800

Marc E. Kasowitz
Direct Dial: (212) 506-1710
Direct Fax: (212) 835-5010
MKasowitz@Kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

July 16, 2020

VIA NYSCEF

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

     Re:    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

I write on behalf of defendant President Donald J. Trump to correct certain assertions in plaintiff's July 15, 2020 letter ("PL") to the Court.

First, plaintiff asserts that the President's argument is based on a contention that state courts are "inferior" or "incapable" (PL at 1, 2). That is not so. The President's argument -- that under Article II and the Supremacy Clause, a President is temporarily immune while in office from being sued in state court -- is based on the federal structure of the Constitution, which every state ratified and by which every state is bound.[1] Ironically, it is plaintiff, not the President, who seems to believe that the Court could be "distract[ed]" by legal arguments. (PL at 2.)

Second, plaintiff asserts that the President's argument is "desperate," "novel," and "extreme." (PL at 1, 2.) Even allowing for rhetorical flourish, that characterization is completely off base: the President's argument was raised in 1997 by the Supreme Court itself in *Clinton v. Jones* -- where the Supreme Court characterized that supposedly "desperate," "novel" and "extreme" argument as an "important constitutional issue[]," which it recognized could "present a more compelling case for immunity" than a "comparable claim" in federal court. 520 U.S. 681, 690-91, 691 n.13 (1997). And not only did nothing in the Supreme Court's decision in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), address that issue, but the

---

[1]    Under plaintiff's "logic," the U.S. Supreme Court's holding in *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which vacated orders upholding Congressional subpoenas, must have been based on the Supreme Court's view that Congress is inferior to or less capable than the state prosecutor in its *Vance* decision, which affirmed an order upholding the prosecutor's criminal subpoena to the President. Such a conclusion would, of course, be as baseless as plaintiff's assertion concerning the President's argument here. *See also* Reply Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1, at 1 ("No one questions the capability of state courts.").

KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 2

Supreme Court the same day, in *Mazars*, made sure not to include the issue of state court civil cases in its description of its Presidential immunity jurisprudence -- it plainly did so because the important constitutional issue has not yet been decided. (*See* Defendant's July 14, 2020 Letter to the Court ("DL") at 1-2 (quoting *Mazars*, 2020 WL 3848061, at *4).)

Third, plaintiff grossly mischaracterizes the Supreme Court Presidential immunity cases she cites. (PL at 1.) Rather than dismiss or downplay, as plaintiff does, the unique status of the President under the Constitution, every case cited by plaintiff reaffirms that status. In *United States v. Nixon*, while the Supreme Court rejected an "absolute privilege of confidentiality for all Presidential communications," it adopted a "presumptive privilege for Presidential communications." 418 U.S. 683, 703, 708 (1974). In *Clinton v. Jones*, while the Supreme Court allowed civil damages suits against a President in federal courts, it specifically left unresolved not only the issue at stake here, but also whether any court -- state or federal -- "may compel the attendance of the President at a specific time or place," 520 U.S. at 690-91, and reaffirmed that courts may not "proceed against the President as against an ordinary individual." *Id.* at 704 n.39 (citation omitted).[2]

And, in *Mazars*, the Supreme Court in fact granted the President's appeal and -- after having earlier stayed the proceedings, *see Mazars*, 2020 WL 3848061, at *6 -- vacated the decisions below upholding the Congressional subpoenas, *id.* at *12. The Court agreed with the President that, because of the "President's unique constitutional position," Congressional subpoenas to the President "implicate special concerns" not applicable to other citizens -- regardless of whether the information sought is "personal or official." *Id.* at *11-12. Thus, contrary to plaintiff's assertion, *Mazars* did not reject the President's "argument that his private papers should . . . be treated the same as his official papers." (PL at 2.) In fact, the Supreme Court specifically pointed out that "a subpoena for personal papers may pose a heightened risk of . . . impermissible purposes," such as harassment. *Mazars*, 2020 WL 3848061, at *11.

Although the Supreme Court in *Mazars* did find, with respect to the Congressional subpoenas at issue, that "a categorical approach" to assessing the "distinctions between [among other things] official and personal information," was inappropriate, it did so because such an approach "would represent a significant departure from the longstanding way of doing business between the branches.'" *Mazars*, 2020 WL 3848061, at *9. However, there is no "longstanding way of doing business" between state courts and the President. Rather, as shown (DL at 2),

_____

[2]      *See also Mazars*, 2020 WL 3848061, at *11 ("The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."); *Vance*, 2020 WL 3848062, at *7 (the "President 'occupies a unique position in the constitutional scheme'" and "Article II guarantees the independence of the Executive Branch" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982))); *Clinton v. Jones*, 520 U.S. at 697-98 (the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties"); *Nixon v. Fitzgerald*, 457 U.S. at 749 ("immunity [is] a functionally mandated incident of the President's unique office"); *United States v. Nixon*, 418 U.S. at 710, 715 ("courts have traditionally shown the utmost deference to Presidential responsibilities" and the President has a "singularly unique role under Art. II").

A-300

## KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 3

while Congress, like the federal judiciary, is a coequal branch of government and may therefore exercise "*partial agency* in, or [] *controul* over," the Executive Branch, *Clinton v. Jones*, 520 U.S. at 702-03 (emphasis in original) (citation omitted), state courts, as *Vance* confirmed, are not coequal branches and may not do so. *See Vance*, 2020 WL 3848062, at *8.

Finally, no one is seeking to "escape accountability" here (PL at 2). Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" (*id.* at 1) does not make it so, and has been squarely rejected by the Supreme Court (DL at 4).[3]

\*     \*     \*

The bottom line is that the issue of temporary Presidential immunity has not yet been decided by the Court of Appeals in *Zervos* -- which itself is stayed pending that decision -- or by the U.S. Supreme Court. Under these circumstances, there is every reason to stay this case, which raises the identical issue, as well.

Respectfully submitted,

Marc E. Kasowitz

cc:     Counsel of Record

---

[3]     That the Supremacy Clause mandates that civil cases in state court be postponed, does not make the President "above the law" any more than, say, the automatic stay granted bankruptcy debtors places them "above the law."

A-301

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

July 17, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

> Re:   *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

We write on behalf of Plaintiff E. Jean Carroll to provide the Court with notice of the submission that Summer Zervos made yesterday to the New York Court of Appeals in *Zervos v. Trump*. A copy is attached as Exhibit A. In her submission, Zervos makes clear why *Vance* forecloses Trump's claim to absolute immunity in her case, just as *Vance* forecloses Trump's claim to absolute immunity here.

We will refrain from responding to the letter that Defendant Donald J. Trump filed in this case yesterday. Although there is much in that letter for us to take issue with, our prior letters explain the ways in which *Vance* rejected the core premises of Trump's claim that he is absolutely immune from civil proceedings in state court, *see* Doc. Nos. 97, 101, and we don't want to further burden the Court with what is starting to look like an endless exchange of correspondence.

Respectfully submitted,

Roberta A. Kaplan

cc:   Counsel of Record (via NYSCEF)

A-302

## KASOWITZ BENSON TORRES LLP

<table>
<tr><td></td><td>1633 BROADWAY</td><td>ATLANTA</td></tr>
<tr><td></td><td>NEW YORK, NEW YORK 10019</td><td>HOUSTON</td></tr>
<tr><td>Marc E. Kasowitz</td><td></td><td>LOS ANGELES</td></tr>
<tr><td>Direct Dial: (212) 506-1710</td><td>(212) 506-1700</td><td>MIAMI</td></tr>
<tr><td>Direct Fax: (212) 835-5010</td><td>FAX: (212) 506-1800</td><td>NEWARK</td></tr>
<tr><td>MKasowitz@Kasowitz.com</td><td></td><td>SAN FRANCISCO</td></tr>
<tr><td></td><td></td><td>SILICON VALLEY</td></tr>
<tr><td></td><td></td><td>WASHINGTON DC</td></tr>
</table>

July 28, 2020

VIA NYSCEF

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

  Re: *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

  I write on behalf of defendant President Donald J. Trump to provide the Court with the President's response to the July 16, 2020 letter to the Court of Appeals from the plaintiff in *Zervos v. Trump*.

            Respectfully submitted,

            Marc E. Kasowitz

cc: Counsel of Record

A-303

FILED: NEW YORK COUNTY CLERK 08/07/2020 09:41 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 110 RECEIVED NYSCEF: 08/06/2020

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 16 of 24

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:** | **HON. VERNA L. SAUNDERS** | **PART** | **IAS MOTION 36** |

*Justice*

-----------------------------------------------------------------X

E. JEAN CARROLL,

         Plaintiff,

    - v -

DONALD TRUMP,

         Defendant.

-----------------------------------------------------------------X

**INDEX NO.**     160694/2019

**MOTION SEQ. NO.**     002

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 97, 98, 101, 102, 105, 106

were read on this motion to/for             **STAY**            .

Plaintiff, E. Jean Carroll, commenced this defamation action seeking damages stemming from defendant Donald Trump's alleged defamatory statements made in connection with plaintiff's allegations of sexual assault at the hands of defendant.

Defendant, who is currently serving as President of the United States, moves the court pursuant to CPLR § 2201 seeking a stay of the proceedings pending the decision of the Court of Appeals on defendant's appeal from *Zervos v Trump*, 171 AD3d 110 ( 1st Dept 2019) wherein the Appellate Division, First Department affirmed an order of the Supreme Court, New York County denying defendant's motion seeking a dismissal of the defamation action. In the alternative, defendant seeks a stay of the action on the ground that he is currently sitting as President of the United States.

Defendant, in sum and substance, argues that this action will not lie if it is barred by the Supremacy Clause of the United States Constitution prohibiting state court subject matter jurisdiction over a sitting United States President. Defendant asserts that this very issue is pending before the Court of Appeals in the *Zervos* action and that when granting leave to appeal, the First Department also granted a stay of those proceedings.[1] Defendant thus claims a stay of the instant proceeding is warranted as the outcome of the *Zervos* action will determine whether this court has jurisdiction over defendant while he is in office. Defendant further argues that New York courts often grant stays pending appeals in other actions where the decision on those appeals resolve a

---

[1] *Zervos v Trump*, 2020 WL 63397, 2020 NY Slip Op 60193(U).

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.
Motion No. 002

Page 1 of 4

FILED: NEW YORK COUNTY CLERK 08/07/2020 09:41 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 110                                       RECEIVED NYSCEF: 08/06/2020

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 17 of 24

dispositive issue, as is the case here. Defendant contends that due to the unique role of the President under Article II of the Constitution, deference is required, and a stay mandated.

In opposition, plaintiff argues that defendant's motion serves as a further delaying tactic and that stays are reserved for extraordinary circumstances. Plaintiff asserts that no such circumstances exist here where there is binding appellate precedent and the determination of the pending appeal is not imminent. Furthermore, plaintiff contends that defendant's reliance upon case law where a stay was granted pending an appeal in the same action is misplaced. Moreover, plaintiff argues that the constitutional immunity afforded to the President applies to official conduct, not personal or unofficial conduct as is alleged in this case. Plaintiff avers that defendant's engagement in other personal litigation during his presidency undermines the argument that a stay in this action is necessary.

In support of plaintiff's primary contention that a stay is inappropriate where binding appellate authority exists, plaintiff cites to *Miller v Miller*, 109 Misc 2d 982 [Sup Ct, Suffolk County 1981], wherein the court declined to issue a stay pending the Court of Appeals decision as it was bound by the Appellate Court decision and the Court of Appeals decision was not imminent. Plaintiff contends that the cases cited by defendant in support of a stay are easily distinguishable from this action as those matters either involved identical issues and parties; were fully briefed and awaiting oral argument at the time a stay was requested; or, there was no binding appellate authority on point.

In reply, defendant reiterates the arguments advanced in the moving papers and adds that as the *Zervos* appeal will be fully briefed by May 11, 2020 a stay of this action pending the appeal of the *Zervos* case is warranted as its decision will inform jurisdiction of this action.

In the *Zervos* case, this court held that:

"[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action… [T]here is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States. Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control . . . over the President." (*Zervos v Trump*, 59 Misc 3d 790 [Sup Ct, NY County 2018], internal citations omitted).

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.                    Page 2 of 4
Motion No.  002

A-305

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 18 of 24

On appeal, the Appellate Division, First Department noted that the *Zervos* action presented a constitutional issue of first impression: "whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end." (*Zervos,* supra). Ultimately, the Appellate Division's decision to affirm the Supreme Court's ruling unequivocally resolved this issue holding that pursuant to the United States Supreme Court's decision in *Clinton v Jones,* 520 US 681 [1997] "the presidency and the President are indeed separable" and thus, "the President is presumptively subject to civil liability for conduct that has taken place in his private capacity." (*Zervos,* supra at 124).

At issue here is whether this action should be stayed pending a decision from the Court of Appeals regarding the First Department's decision to affirm this court's ruling on *Zervos*.

Pursuant to CPLR § 2201, which authorizes the granting of a stay "in a proper case, upon such terms as may be just," stays are in the sound discretion of the trial court. However, the First Department has ruled that stays should be exercised "sparingly and only when other remedies are inadequate and the equities invoked apparent and strong." (See generally, *Croker v NY Trust Co.,* 206 AD 11 [1st Dept 1923]). Nevertheless, it is axiomatic that this court is bound by the decisions of the Appellate Division, First Department unless same has been overturned by the Court of Appeals.

In this instance, defendant implores the court to stay this action until the Court of Appeals has ruled on a separate action, arguing that the appeal is fully briefed and thus, imminent. Conversely, plaintiff objects avowing that there is no immediate date set for arguments or likelihood that a decision is imminent and thus, the court is bound by the binding appellate precedent which specifically addresses the issue in contention. While the arguments advanced by both parties are compelling, they have been rendered moot in light of the recent United States Supreme Court decision in *Trump v Vance*, 591 U.S. __, __, 140 S Ct 2412 [2020]. In *Trump v Vance*, the U.S. Supreme Court held that "Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President." (Slip Op at 1.) The *Vance* Court reasoned that as the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, absolute immunity is not necessary or appropriate under Article II or the Supremacy Clause as state courts and prosecutors are expected to observe constitutional limitations and, if they fail to

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.                      Page 3 of 4
Motion No.  002

Case 20-3977, Document 47, 01/15/2021, 3015316, Page48 of 165

A-306

FILED: NEW YORK COUNTY CLERK 08/07/2020 09:41 AM        INDEX NO. 160694/2019

NYSCEF DOC. NO. 110        Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 19 of 24        RECEIVED NYSCEF: 08/06/2020

do so, federal law allows a President to challenge any constitutional influence. (Slip Op at 17.) While the *Vance* Court's decision permits the issuance of a criminal subpoena to a sitting President, it's analysis and conclusions address the same issues and questions raised by defendant in this action, as well as, the *Zervos* action: whether the Supremacy Clause of the Constitution bars a state court from exercising jurisdiction over a sitting President of the United States during his term. No, it does not. Further, the holding in *Vance* is not limited solely to criminal proceedings. In fact, the *Vance* Court concluded,

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[ ] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. (Slip Op at 21, internal citations omitted.)

This court construes the holding in *Vance* applicable to all state court proceedings in which a sitting President is involved, including those involving his or her unofficial/personal conduct. Accordingly, the application for a stay is denied and it is hereby

ORDERED, defendant's motion is denied in accordance with the foregoing; and it is further

ORDERED, that the parties are to appear for a telephonic compliance conference on September 30, 2020 at 11:00 AM; and it is further

ORDERED, that any requested relief not expressly addressed herein has been considered and is hereby denied.

This constitutes the decision and order of the court.

_____August 3, 2020_____        _____
                                      HON. VERNA L. SAUNDERS, JSC

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | X | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.        Page 4 of 4
Motion No.  002

4 of 4

A-307

FILED: NEW YORK COUNTY CLERK 08/08/2020 10:25 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 111                                                           RECEIVED NYSCEF: 08/08/2020

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 20 of 24

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

E. JEAN CARROLL,

        *Plaintiff*,

  -against-

DONALD J. TRUMP, in his personal capacity,

        *Defendant*.

---

Index No. 160694/2019
Hon. Verna L. Saunders

### <u>NOTICE OF ENTRY</u>

Please take notice that within is a true and correct copy of the Decision and Order on Motion of Justice Verna L. Saunders dated August 3, 2020, which was entered in the office of the Clerk of the County of New York on August 7, 2020.

Dated:  New York, New York
       August 8, 2020

Respectfully submitted,

_____
Roberta A. Kaplan
Joshua Matz
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

To: Counsel of Record (by NYSCEF)

A-308

FILED: NEW YORK COUNTY CLERK 08/08/2020 09:25 AM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 110 Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 21 of 24 RECEIVED NYSCEF: 08/06/2020

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | | |
|---|---|---|---|
| **PRESENT:** | **HON. VERNA L. SAUNDERS** | **PART** | **IAS MOTION 36** |
| | *Justice* | | |

-------------------------------------------------------------------X

**INDEX NO.** _____160694/2019_____

E. JEAN CARROLL,

              Plaintiff,

**MOTION SEQ. NO.** _____002_____

      - v -

DONALD TRUMP,

              Defendant.

**DECISION + ORDER ON
MOTION**

-------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 97, 98, 101, 102, 105, 106

were read on this motion to/for                    **STAY**              .

       Plaintiff, E. Jean Carroll, commenced this defamation action seeking damages stemming from defendant Donald Trump's alleged defamatory statements made in connection with plaintiff's allegations of sexual assault at the hands of defendant.

       Defendant, who is currently serving as President of the United States, moves the court pursuant to CPLR § 2201 seeking a stay of the proceedings pending the decision of the Court of Appeals on defendant's appeal from *Zervos v Trump*, 171 AD3d 110 ( 1st Dept 2019) wherein the Appellate Division, First Department affirmed an order of the Supreme Court, New York County denying defendant's motion seeking a dismissal of the defamation action. In the alternative, defendant seeks a stay of the action on the ground that he is currently sitting as President of the United States.

       Defendant, in sum and substance, argues that this action will not lie if it is barred by the Supremacy Clause of the United States Constitution prohibiting state court subject matter jurisdiction over a sitting United States President. Defendant asserts that this very issue is pending before the Court of Appeals in the *Zervos* action and that when granting leave to appeal, the First Department also granted a stay of those proceedings.[1] Defendant thus claims a stay of the instant proceeding is warranted as the outcome of the *Zervos* action will determine whether this court has jurisdiction over defendant while he is in office. Defendant further argues that New York courts often grant stays pending appeals in other actions where the decision on those appeals resolve a

---

[1] *Zervos v Trump*, 2020 WL 63397, 2020 NY Slip Op 60193(U).

**160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.**
**Motion No.  002**

**Page 1 of 4**

FILED: NEW YORK COUNTY CLERK 08/08/2020 09:25 AM
NYSCEF DOC. NO. 110

Case 1:20-cv-07311-LAK   Document 6-6   Filed 09/09/20   Page 22 of 24

INDEX NO. 160694/2019

RECEIVED NYSCEF: 08/06/2020

dispositive issue, as is the case here. Defendant contends that due to the unique role of the President under Article II of the Constitution, deference is required, and a stay mandated.

In opposition, plaintiff argues that defendant's motion serves as a further delaying tactic and that stays are reserved for extraordinary circumstances. Plaintiff asserts that no such circumstances exist here where there is binding appellate precedent and the determination of the pending appeal is not imminent. Furthermore, plaintiff contends that defendant's reliance upon case law where a stay was granted pending an appeal in the same action is misplaced. Moreover, plaintiff argues that the constitutional immunity afforded to the President applies to official conduct, not personal or unofficial conduct as is alleged in this case. Plaintiff avers that defendant's engagement in other personal litigation during his presidency undermines the argument that a stay in this action is necessary.

In support of plaintiff's primary contention that a stay is inappropriate where binding appellate authority exists, plaintiff cites to *Miller v Miller*, 109 Misc 2d 982 [Sup Ct, Suffolk County 1981], wherein the court declined to issue a stay pending the Court of Appeals decision as it was bound by the Appellate Court decision and the Court of Appeals decision was not imminent. Plaintiff contends that the cases cited by defendant in support of a stay are easily distinguishable from this action as those matters either involved identical issues and parties; were fully briefed and awaiting oral argument at the time a stay was requested; or, there was no binding appellate authority on point.

In reply, defendant reiterates the arguments advanced in the moving papers and adds that as the *Zervos* appeal will be fully briefed by May 11, 2020 a stay of this action pending the appeal of the *Zervos* case is warranted as its decision will inform jurisdiction of this action.

In the *Zervos* case, this court held that:

"[n]othing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action… [T]here is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States. Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control . . . over the President." (*Zervos v Trump*, 59 Misc 3d 790 [Sup Ct, NY County 2018], internal citations omitted).

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.                     **Page 2 of 4**
Motion No.  002

FILED: NEW YORK COUNTY CLERK 08/08/2020 09:25 AM          INDEX NO. 160694/2019

NYSCEF DOC. NO. 110          Case 1:20-cv-07311-LAK    Document 6-6    Filed 09/09/20    Page 23 of 24    RECEIVED NYSCEF: 08/06/2020

On appeal, the Appellate Division, First Department noted that the *Zervos* action presented a constitutional issue of first impression: "whether the Supremacy Clause of the United States Constitution requires a state court to defer litigation of a defamation action against a sitting President until his terms end." (*Zervos,* supra). Ultimately, the Appellate Division's decision to affirm the Supreme Court's ruling unequivocally resolved this issue holding that pursuant to the United States Supreme Court's decision in *Clinton v Jones,* 520 US 681 [1997] "the presidency and the President are indeed separable" and thus, "the President is presumptively subject to civil liability for conduct that has taken place in his private capacity." (*Zervos,* supra at 124).

At issue here is whether this action should be stayed pending a decision from the Court of Appeals regarding the First Department's decision to affirm this court's ruling on *Zervos*.

Pursuant to CPLR § 2201, which authorizes the granting of a stay "in a proper case, upon such terms as may be just," stays are in the sound discretion of the trial court. However, the First Department has ruled that stays should be exercised "sparingly and only when other remedies are inadequate and the equities invoked apparent and strong." (See generally, *Croker v NY Trust Co.,* 206 AD 11 [1st Dept 1923]). Nevertheless, it is axiomatic that this court is bound by the decisions of the Appellate Division, First Department unless same has been overturned by the Court of Appeals.

In this instance, defendant implores the court to stay this action until the Court of Appeals has ruled on a separate action, arguing that the appeal is fully briefed and thus, imminent. Conversely, plaintiff objects avowing that there is no immediate date set for arguments or likelihood that a decision is imminent and thus, the court is bound by the binding appellate precedent which specifically addresses the issue in contention. While the arguments advanced by both parties are compelling, they have been rendered moot in light of the recent United States Supreme Court decision in *Trump v Vance*, 591 U.S. __, __, 140 S Ct 2412 [2020]. In *Trump v Vance*, the U.S. Supreme Court held that "Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President." (Slip Op at 1.) The *Vance* Court reasoned that as the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, absolute immunity is not necessary or appropriate under Article II or the Supremacy Clause as state courts and prosecutors are expected to observe constitutional limitations and, if they fail to

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.          Page 3 of 4
Motion No. 002

A-311

FILED: NEW YORK COUNTY CLERK 08/08/2020 09:25 AM INDEX NO. 160694/2019

NYSCEF DOC. NO. 110 Case 1:20-cv-07311-LAK Document 6-6 Filed 09/09/20 Page 24 of 24 RECEIVED NYSCEF: 08/06/2020

do so, federal law allows a President to challenge any constitutional influence. (Slip Op at 17.) While the *Vance* Court's decision permits the issuance of a criminal subpoena to a sitting President, it's analysis and conclusions address the same issues and questions raised by defendant in this action, as well as, the *Zervos* action: whether the Supremacy Clause of the Constitution bars a state court from exercising jurisdiction over a sitting President of the United States during his term. No, it does not. Further, the holding in *Vance* is not limited solely to criminal proceedings. In fact, the *Vance* Court concluded,

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[ ] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. (Slip Op at 21, internal citations omitted.)

This court construes the holding in *Vance* applicable to all state court proceedings in which a sitting President is involved, including those involving his or her unofficial/personal conduct. Accordingly, the application for a stay is denied and it is hereby

ORDERED, defendant's motion is denied in accordance with the foregoing; and it is further

ORDERED, that the parties are to appear for a telephonic compliance conference on September 30, 2020 at 11:00 AM; and it is further

ORDERED, that any requested relief not expressly addressed herein has been considered and is hereby denied.

This constitutes the decision and order of the court.

_____August 3, 2020_____    _____

HON. VERNA L. SAUNDERS, JSC

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | X | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

160694/2019  CARROLL, E. JEAN vs. TRUMP, DONALD J.                    Page 4 of 4
Motion No.  002

A-312

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                Plaintiff,

      -against-                            20-cv-7311 (LAK)

DONALD J. TRUMP in his personal capacity,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

On September 8, 2020, the United States of America (1) purported to remove this action from the Supreme Court of the State of New York pursuant to the Westfall Act, and (2) filed a motion to substitute itself for Donald J. Trump in his personal capacity as the defendant.

When a defendant removes an action from a state court, the defendant is obliged to attach to the notice of removal that the defendant must file in the federal court "a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a). The United States' notice of removal attached as exhibits papers from the state court but omitted all exhibits to those papers while promising that it would lodge the entire state court record separately. Notice of removal [Dkt. 1, ¶ 6 & n. 1]

Today the United States filed a notice of the lodging of the entire state court record as of the time of removal. [Dkt. 12] Attached to that notice are 820 pages that comprise 12 attachments. These are described as follows:

| Attachment | Description | | |
|---|---|---|---|
| 1 | Process, Pleadings, and Orders Part 1 | 114 pages | 5.7 mb |
| 2 | Process, Pleadings, and Orders Part 2 | 159 pages | 7.3 mb |
| 3 | Process, Pleadings, and Orders Part 3 | 7 pages | 2.6 mb |
| 4 | Process, Pleadings, and Orders Part 4 | 6 pages | 9.3 mb |
| 5 | Process, Pleadings, and Orders Part 5 | 13 pages | 6.0 mb |
| 6 | Process, Pleadings, and Orders Part 6 | 149 pages | 6.4 mb |
| 7 | Process, Pleadings, and Orders Part 7 | 38 pages | 6.0 mb |
| 8 | Process, Pleadings, and Orders Part 8 | 35 pages | 7.9 mb |

A-313

| 9 | Process, Pleases [*sic*] and Orders Part 9 | 75 pages | 6.4 mb |
| 10 | Process, Pleadings, and Orders Part 10 | 113 pages | 8.6 mb |
| 11 | Process, Pleadings, and Orders Part 11 | 85 pages | 7.1 mb |
| 12 | Process, Pleadings, and Orders Part 12 | 24 pages | 7.0 mb |
| | | 820 pages | 80.4 mb |

Section 5.1 of the ECF. Rules & Instructions of this Court provides:

"Filing Users must submit in electronic form all documents referenced as exhibits or attachments, unless the Court permits paper filing.   Exhibits must be filed as attachments to the main document.   *Each attachment must be clearly titled so the subject of the exhibit is clear.* The filing of exhibits in text searchable format is encouraged, but not required." (Emphasis added)

Accordingly, the United States, on or before September 18, 2020, shall file the entire state court record as of the time of removal.  Each separate paper shall be filed as a separate numbered attachment, shall be clearly titled so that the subject of the attachment is clear, and shall show the date of the attachment.  Attachments shall be listed in chronological order.

SO ORDERED.

Dated:        September 14, 2020

_____
Lewis A. Kaplan
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| E. JEAN CARROLL,<br><br>           Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP,<br>in his individual capacity,<br><br>           Defendant. | **ORAL ARGUMENT REQUESTED**<br><br>Case No. 1:20-cv-7311 (LAK) |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTION TO SUBSTITUTE THE UNITED STATES AS DEFENDANT**

Roberta A. Kaplan
Joshua Matz
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Plaintiff E. Jean Carroll*

A-315

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 2

    I.    Factual Background ................................................................................................ 2

        A.    Trump Sexually Assaults Carroll ................................................................ 2

        B.    Carroll Publicly Reveals that Trump Sexually Assaulted Her ................... 3

        C.    Trump Slanders Carroll on Three Separate Occasions ............................. 4

            1.    June 21, 2019 Statement ................................................................. 4

            2.    June 22, 2019 Statement ................................................................. 5

            3.    June 24, 2019 Statement ................................................................. 6

    II.    Procedural History ................................................................................................ 7

        A.    Carroll Files Suit Against Trump in State Court ....................................... 7

        B.    Trump Defends the Proceedings in State Court ........................................ 7

        C.    The Department of Justice Files a Motion to Substitute ........................... 8

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    The FTCA Does Not Cover the President ............................................................ 10

        A.    The President is Not an Officer or Employee of an Executive Department .......... 11

        B.    The President is Not an Officer or Employee of an Independent Establishment of the United States .......... 15

        C.    Interpretive and Immunity Principles Confirm This Reading of the FTCA .......... 19

    II.    Trump Was Not Acting Within the Scope of His Job as President When He Defamed Carroll For Revealing That He Sexually Assaulted Her .......... 21

ii

A-316

A.   New York Law Governs the Scope of Employment Inquiry ................................. 21

B.   Under New York Law, A Person Acts Outside the Scope of Their Employment When They Act for Personal Reasons to Obtain a Personal Benefit ..................... 22

C.   Trump Acted Outside the Scope of His Employment in Defaming Carroll .......... 26

  1.   Notwithstanding the Breadth of their Official Duties, Presidents May Unquestionably Engage in Personal Conduct Causing Private Wrongs .......... 26

  2.   Trump Acted for Personal Reasons in Defaming Carroll ............................... 28

D.   The Justice Department's Position Is Meritless ..................................................... 31

III.  If the Court Concludes That There Is A Factual Dispute Bearing on Whether Trump is Covered by the FTCA, It Should Order Discovery or Hold a Hearing ........................ 34

CONCLUSION ................................................................................................................. 36

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adelson v. Harris*,
 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ..................................................................... 21

*Allstate Ins. Co. v. Quick*,
 254 F. Supp. 2d 706 (S.D. Ohio 2002) .................................................................... 35

*BedRoc Ltd., LLC v. United States*,
 541 U.S. 176, 124 S. Ct. 1587 (2004) ..................................................................... 10

*Bello v. United States*,
 93 F. App'x 288 (2d Cir. 2004) ............................................................................... 10

*Bergeron v. Henderson*,
 47 F. Supp. 2d 61 (D. Me. 1999) ............................................................................ 35

*Bostock v. Clayton Cty.*,
 140 S. Ct. 1731 (2020) ............................................................................................ 12

*Bowles v. United States*,
 685 F. App'x 21 (2d Cir. 2017) ........................................................................... 9, 21

*Cheatum v. Wehle*,
 5 N.Y.2d 585 (1959) ............................................................................................... 31

*Clark v. McGee*,
 49 N.Y.2d 613 (1980) .................................................................................. 2, 3, 4, 31

*Clinton v. Jones*,
 520 U.S. 681, 117 S. Ct. 1636 (1997) .................................................. 26, 27, 30, 34

*Cooke v. United States*,
 918 F.3d 77 (2d Cir. 2019) ..................................................................................... 10

*Council on American Islamic Relations v. Ballenger*,
 444 F.3d 659 (D.C. Cir. 2006) .......................................................................... 32, 33

*CREW v. Trump*,
 953 F.3d 178 (2d Cir. 2019) .............................................................................. 27, 28

*Dalehite v. United States*,
 346 U.S. 15, 73 S. Ct. 956 (1953) ........................................................................... 20

*Davila v. Lang*,
   343 F. Supp. 3d 254 (S.D.N.Y. 2018)............................................................... 10, 28

*Demas v. Levitsky*,
   291 A.D.2d 653 (3rd Dept. 2002) ............................................................ 23, 25, 32

*Does 1-10 v. Haaland*,
   No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020) ...................... 10, 22, 32, 33

*Dowd v. Calabrese*,
   589 F. Supp. 1206 (D.D.C. 1984) ............................................................................. 22

*Dumas v. President of U.S.*,
   554 F. Supp. 10 (D. Conn. 1982) .............................................................................. 10

*Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian,
   Inc.*, 566 F.2d 289 (D.C. Cir. 1977) ........................................................................ 19

*Foretich v. CBS, Inc.*,
   619 A.2d 48 (D.C. 1993) ........................................................................................... 22

*Franklin v. Massachusetts*,
   505 U.S. 788, 112 S. Ct. 2767 (1992)....................................................................... 20

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
   561 U.S. 477, 130 S. Ct. 3138 (2010)....................................................................... 13

*Freytag v. Commissioner*,
   501 U.S. 868, 111 S. Ct. 2631 (1991)....................................................................... 12

*Glacken v. Village of Freeport*,
   No. 09 Civ. 4832, 2014 WL 1836143 (E.D.N.Y. May 8, 2014)........................ 31, 32

*Greaney v. Ferrer*,
   278 A.D.2d 154 (1st Dep't 2000) .............................................................................. 31

*Gutierrez de Martinez v. Lamagno*,
   515 U.S. 417, 115 S. Ct. 2227 (1995)................................................................... 9, 34

*Haddon v. United States*,
   68 F.3d 1420 (D.C. Cir. 1995) ................................................................................... 18

*Haddon v. Walters*,
   43 F.3d 1488 (D.C. Cir. 1995) ...................................................................... 12, 17, 18

*Heindel v. Bowery Sav. Bank*,
   138 A.D.2d 787 (3rd Dept. 1988)....................................................................... 23, 24

*Ierardi v. Sisco*,
119 F.3d 183 (2d Cir. 1997)...................................................................................... 23, 24

*Indian Towing Co. v. United States*,
350 U.S. 61, 76 S. Ct. 122 (1955)...................................................................................... 20

*Jones v. Clinton*,
72 F.3d 1354 (8th Cir. 1996) ............................................................................................ 30

*Kirkman by Kirkman v. Astoria Gen. Hosp.*,
204 A.D.2d 401 (2nd Dept. 1994) ................................................................................... 23

*Klayman v. Obama*,
125 F. Supp. 3d 67 (D.D.C. 2015) ................................................................................... 10

*Knight First Amendment Institute v. Trump*,
928 F.3d 226 (2d Cir. 2019)............................................................................................. 27

*Lee v. Bankers Tr. Co.*,
166 F.3d 540 (2d Cir. 1999).............................................................................................. 21

*N.X. v. Cabrini Med. Ctr.*,
97 N.Y.2d 247 (2002) .................................................................................................. 23, 24

*Nicollette T. v. Hosp. for Joint Diseases/Orthopaedic Inst.*,
198 A.D.2d 54 (1st Dept. 1993)........................................................................................ 23

*Nixon v. Fitzgerald*,
457 U.S. 731, 102 S. Ct. 2690 (1982)................................................................. 20, 26, 27, 34

*Operation Rescue Nat. v. United States*,
147 F.3d 68 (1st Cir. 1998).............................................................................................. 10

*Operation Rescue Nat'l v. United States*,
975 F. Supp. 92 (D. Mass. 1997) ..................................................................................... 32

*Osborn v. Haley*,
549 U.S. 225, 127 S. Ct. 881 (2007).................................................................................... 9

*Overton v. Ebert*,
180 A.D.2d 955 (3rd Dept. 1992)...................................................................... 24, 26, 29, 34

*Perks v. Town of Huntington*,
251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ....................................................................... passim

*Polcari v. John F. Kennedy Center for Performing Arts*,
712 F. Supp. 230 (D.D.C. 1989) ...................................................................................... 19

*Public Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440, 109 S. Ct. 2558 (1989)..................................................................................... 20

*Rausman v. Baugh*,
  248 A.D.2d 8 (2nd Dept. 1998) ....................................................................................... passim

*Reeves v. Am. Broad. Companies, Inc.*,
  719 F.2d 602 (2d Cir. 1983)................................................................................................ 21

*Reeves v. Am. Broadcasting Cos.*,
  580 F. Supp. 84 (S.D.N.Y. 1983)......................................................................................... 22

*Rivera v. State*,
  34 N.Y.3d 383 (2019) ..................................................................................................... 22, 23

*Riviello v. Waldron*,
  47 N.Y.2d 297 (1979) ............................................................................................... 23, 30, 35

*Ross v. Mitsui Fudosan, Inc.*,
  2 F. Supp. 2d 522 (S.D.N.Y. 1998)................................................................................. 24, 26

*Saleh v. Bush*,
  848 F.3d 880 (9th Cir. 2017) ............................................................................................... 10

*Seila Law LLC v. C.F.P.B.*,
  140 S. Ct. 2183 (2020)................................................................................................... 13, 26

*Stokes v. Cross*,
  327 F.3d 1210 (D.C. Cir. 2003) ...................................................................................... 31, 35

*Swarna v. Al-Awadi*,
  622 F.3d 123 (2d Cir. 2010)................................................................................................ 23

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
  No. 06 Civ. 11407, 2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007)................................... 21, 22

*Thompson v. United States*,
  795 F. App'x 15 (2d Cir. 2019) ........................................................................................... 19

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)........................................................................................................ 26

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020)........................................................................................................ 11

*Trump v. Vance*,
  140 S. Ct. 2412 (2020)..................................................................................................... 8, 27

*United States v. Burr*,
  25 F. Cas. 30 (C.C.D. Va. 1807) ........................................................................ 27

*United States v. Germaine*,
  99 U.S. 508 (1878) ............................................................................................ 12

*Weeks v. Oswald*,
  No. 1:12 Civ. 82, 2012 WL 3012640 (D. Idaho July 23, 2012) ....................... 35

*Weyrich v. New Republic, Ins. Co.*,
  235 F.3d 617 (D.C. Cir. 2001) .......................................................................... 22

*Williams v. United States*,
  71 F.3d 502 (5th Cir. 1995) .............................................................................. 32

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) .......................................................................... 10

*Wuterich v. Murtha*,
  562 F.3d 375 (D.C. Cir. 2009) ..................................................................... 32, 35

**Statutes**

3 U.S.C. § 112 .................................................................................................... 17

5 U.S.C. § 101 ................................................................................................ 12, 13

5 U.S.C. § 104 ................................................................................................ 17, 18

5 U.S.C. § 1101 .................................................................................................. 18

5 U.S.C. § 3110 .................................................................................................. 18

5 U.S.C. § 3347 .................................................................................................. 14

15 U.S.C. § 9054(a)(3) ....................................................................................... 15

15 U.S.C. §§ 1501, 1503a, 1503b, 1505, 1506, 1507, 1507b, 1507c, 1508 ............... 14

20 U.S.C. §§ 3411, 3412 ..................................................................................... 14

24 U.S.C. § 411 .................................................................................................. 18

28 U.S.C. § 2671 .......................................................................................... passim

28 U.S.C. § 2679(b) ............................................................................................. 1

28 U.S.C. § 2679(d) .......................................................................................... 1, 9

28 U.S.C. §§ 1346(b)(1) .................................................................................... 10

28 U.S.C. §§ 1346, 2671 .................................................................................... 1

39 U.S.C. § 201 ................................................................................................ 18

42 U.S.C. §§ 3532(a), 3533 ............................................................................. 14

42 U.S.C. §§ 7131, 7132 .................................................................................. 14

43 U.S.C. §§ 1451-1456 ................................................................................... 14

44 U.S.C. § 1501 .............................................................................................. 15

46 U.S.C. § 301 ................................................................................................ 18

49 U.S.C. § 1111 .............................................................................................. 18

49 U.S.C. § 1301 .............................................................................................. 18

Pub. L. No. 89-554, 80 Stat. 378 (1966) ......................................................... 17

Pub. L. No. 100-694, 102 Stat. 4563 (1988) ................................................... 20

**Other Authorities**

4 Fed. Reg. 3864 (Sept. 12, 1939) .................................................................. 16

Debates on the Federal Constitution 480 (2d ed. 1863) (James Wilson) ...................................... 26

*Gillian Metzger, The Constitutional Duty to Supervise*,
   124 Yale L.J. 1836 (2015) ........................................................................... 13

Exec. Order No. 8248 ....................................................................................... 16

H.R. Rep. No. 203 ............................................................................................ 12

*Operation of the Twenty-Fifth Amendment Respecting Presidential Succession*,
   9 Op. O.L.C. 65, 1985 WL 185391 (1985) ................................................. 13

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
   Op. O.L.C., 2019 WL 2315338 (May 20, 2019) .............................................. 15, 16

**Constitutional Provisions**

U.S. CONST. art. II, § 2 ...................................................................................... 13

U.S. CONST. art. II, § 1 ...................................................................................... 26

## PRELIMINARY STATEMENT

There is not a single person in the United States—not the President and not anyone else—whose job description includes slandering women they sexually assaulted. That should not be a controversial proposition. Remarkably, however, the Justice Department seeks to prove it wrong. At the behest of the White House, and following a certification from the Attorney General pursuant to the Westfall Act, 28 U.S.C. § 2679(d), federal lawyers have moved to substitute the United States of America as the defendant in this action. They assert that Defendant Donald J. Trump was acting within the scope of his employment as President when he defamed Plaintiff E. Jean Carroll, a woman he sexually assaulted over twenty years ago, as retaliation for revealing his misconduct. Trump's defamatory lies included assertions that Carroll had falsely accused other men of rape; that she was lying about him as part of a secret political conspiracy; that she had fabricated her accusation to sell books; and that he had never met her (despite a photograph of them together). Trump also remarked, "she's not my type." Compl. ¶ 97. These are the statements that the Justice Department asks the Court to find that Trump uttered within the scope of his duties as President.

The Justice Department's motion should be rejected for two reasons. First, the statute cited in support of the Attorney General's certification—namely, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.*, as amended by the Westfall Act, 28 U.S.C. § 2679(b)—does not apply to the President. This is clear from the plain text of the statute, which encompasses a wide range of federal employees yet conspicuously offers no basis for covering the President. That textual conclusion is confirmed by a host of constitutional, statutory, legislative, judicial, and executive branch authorities. The bottom line is that the President enjoys absolute immunity from damages claims based on conduct within the outer perimeter of his official responsibilities, but is not shielded by the FTCA for tortious acts committed within the scope of his employment.

In any event, there is no merit to the Justice Department's certification that Trump acted within the scope of his employment as President in defaming Carroll. Under New York law (which controls), and as confirmed by the Complaint (which must be taken as true), Trump acted for decidedly personal reasons unrelated to furthering any interests of the United States. Moreover, it is inconceivable that Trump's employers—*a.k.a.*, the American people—expect his job to include viciously defaming a woman he sexually assaulted. In asserting otherwise, the Justice Department opines that elected officials *always* act within the scope of their office when speaking with the press, even about personal matters. *See* ECF No. 3-1 at 4. But the cases that the Justice Department cites do not support that categorical claim. No legal authority holds that elected officials may— within the scope of their federal employment—defame anyone, at any time, for any reason, no matter how personal their motives or statements, so long as a journalist overhears them.

"Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members." *Clark v. McGee*, 49 N.Y.2d 613, 618-19 (1980). If accepted, the Justice Department's extreme position would distort the law and dishonor the Office of the Presidency. This Court should therefore deny the motion to substitute.

## BACKGROUND

I.      **Factual Background**

A.      **Trump Sexually Assaults Carroll**

One evening between the fall of 1995 and spring of 1996, Carroll went to shop at the Bergdorf Goodman department store in Manhattan after work. Compl. ¶ 22. As she exited through the revolving glass doors on the north side of the building, Trump entered through the same doors from 58th Street (across from the Plaza Hotel). *Id.* at ¶ 23. Recognizing Carroll—they had met at least once before, they traveled in similar circles, and Carroll was then a frequent guest on the *Today* show as well as the host of the *Ask E. Jean* show—Trump put his hand up to stop Carroll,

2

saying: "Hey, you're that advice lady!" *Id.* at ¶¶ 24-25. Trump told Carroll that he was at Bergdorf's to buy a present "for a girl" and asked Carroll to advise him. *Id.* at ¶ 26. Surprised, but anticipating the funny stories she might later tell, Carroll agreed to help Trump shop for a gift. *Id.*

After first considering other items, Trump decided to buy lingerie. *Id.* at ¶¶ 27-29. When he and Carroll arrived at the lingerie department, it was uncharacteristically empty, with no sales attendant in sight. *Id.* at ¶ 30. Trump snatched a see-through bodysuit and insisted that Carroll try it on. *Id.* at ¶ 31. Bemused, Carroll responded that he should try it on himself. *Id.* Trump and Carroll then went back and forth, teasing each other about who should try on the bodysuit. *Id.*

Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on." *Id.* at ¶ 32. Trump maneuvered Carroll into a dressing room, shut the door, and lunged at her—knocking her head against the wall. *Id.* at ¶¶ 33-36. He then forcibly put his mouth on her lips. *Id.* at ¶ 36. Shocked by Trump's behavior, Carroll shoved him back and burst out in awkward laughter, hoping that he would retreat. *Id.* at ¶ 37. But Trump did no such thing: he seized both of Carroll's arms and pushed her up against the wall again. *Id.* at ¶ 38. Trump then jammed his hand under her coatdress and pulled down her tights. *Id.* He opened his overcoat, unzipped his pants, pushed his fingers around Carroll's genitals, and forced his penis inside of her. *Id.* at ¶ 39. Carroll resisted, struggling to break free. She tried to stomp Trump's foot with her high heels. She tried to push him away. Finally, she raised a knee up high enough to push him off of her. *Id*. at ¶ 40. Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue. *Id.* at ¶ 41.

**B.      Carroll Publicly Reveals that Trump Sexually Assaulted Her**

Immediately after Trump attacked her, Carroll told two close friends. *See id.* at ¶¶ 43, 47. One urged her to report the crime, but the other warned her that Trump would ruin her life if she did. *See id.* at ¶¶ 44-48. Carroll chose silence. She knew how brutal Trump could be and was convinced that nobody would believe her. Like so many other survivors of sexual assault, Carroll

3

also blamed herself. *Id.* at ¶ 50. Carroll did not mention the assault to another soul for over twenty years—not wanting to be perceived or to see herself as a victim of rape. *Id.* at ¶ 53.

For the next two decades, Carroll pursued her career as a writer and advice columnist while concealing her own trauma. *Id.* at ¶ 59-60. During the last month of the 2016 election, several women publicly revealed that Trump had engaged in sexual misconduct. *Id.* at ¶ 61. Carroll saw Trump savage their reputations on the national stage. *Id.* During this period, though, Carroll was focused on attending to her mother, who was then in hospice care. *Id.* at ¶ 62. Carroll feared that speaking up would cause a media storm and destroy her mother's remaining time. *Id.* It was only after her mother died and the #MeToo movement empowered survivors of sexual assault to come forward that Carroll finally decided to reveal the truth. *Id.* at ¶¶ 65-73. A writer to her core, and determined to tell her story on her own terms, Carroll described Trump's attack in a book released on July 2, 2019. *Id.* at ¶¶ 77, 80. On June 21, 2019, *New York* magazine published a pre-publication excerpt from Carroll's book detailing Trump's attack. *Id.* at ¶ 79.

### C.   Trump Slanders Carroll on Three Separate Occasions

Trump responded to Carroll's account with a slew of lies. He denied the rape. He even went so far as to insult her physical appearance, saying "she's not my type." *Id.* at ¶ 97. But he did not stop there: he also denied ever having met Carroll or knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. *Id.* at ¶ 11. He also implied that she had falsely accused other men of rape. Trump made these false and defamatory statements, detailed below, from June 21 to 24, 2019.

#### 1.   June 21, 2019 Statement

On June 21, 2019, a Bloomberg reporter, Laura Litvan, tweeted a statement from Trump concerning Carroll (*see below*). According to Trump's initial disclosures here, Deputy White

4

House Press Secretary Judd Deere sent this statement to Litvan. It does not appear this statement was provided on White House letterhead or with any other signs of official process:



### 2.     June 22, 2019 Statement

The next day, while departing the White House, Trump made the following statement in response to a question from a reporter:

5

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

Compl. ¶ 91; *see id.* at ¶ 110 (photo of Carroll, Trump, and their then-spouses at a social event).

### 3. June 24, 2019 Statement

Two days later, during an interview with reporters from *The Hill* and in response to an inquiry about Carroll's accusation, Trump stated, "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened." *Id.* at ¶ 97. During the June 24

interview, Trump discussed a range of topics, including the upcoming 2020 election as well as the

possibility that President Barack Obama might endorse Vice President Biden in that race.[1]

II.     **Procedural History**

A.      **Carroll Files Suit Against Trump in State Court**

On November 4, 2019, Carroll filed this action in New York State Supreme Court to redress

the injuries Trump's defamation caused and to vindicate her reputation through a public airing of

the truth. In her Complaint, Carroll alleged one claim of defamation—and unquestionably alleged

the elements of that claim. *First*, she identified eleven specific false and defamatory statements

contained within the President's June 21, 22, and 24 remarks. *See* Compl. at ¶¶ 85-90, 93-96, 100.

*Second*, she set forth comprehensive, detailed allegations demonstrating that Trump made each of

these statements with actual malice. *See id.* at ¶¶ 106-128. *Third*, the Complaint alleged concrete

reputational and financial harm resulting from Trump's defamatory statements. *See id.* at ¶¶ 129-

136. In short, Carroll alleged a strong defamation claim against Trump for his demeaning, false,

and barbaric response to her accusation that he attacked her two decades earlier.

B.      **Trump Defends the Proceedings in State Court**

From the very start of this action, Trump has done everything in his power to stop the truth

from coming out. He first refused to accept service of the Complaint, forcing Carroll to seek leave

of court to serve him through alternative means. NYSECF Doc. No. 15. Trump next filed a motion

to dismiss the Complaint based on his spurious assertion that he was no longer subject to personal

jurisdiction in New York. NYSECF Doc. No. 33. That too was rejected. NYSECF Doc. No. 36.

When those efforts failed, Trump filed a motion to stay this action pending a decision by

the New York Court of Appeals in *Zervos v. Trump*—a case involving another woman who had

---

[1] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, THE HILL (June 24, 2019).

accused Trump of sexual assault. (Trump had previously claimed Zervos's case was so different from Carroll's case that the two should not be assigned to the same judge. NYSECF Docs. No. 25, 43.) In his stay motion, Trump argued that he was entitled to absolute immunity and that resolution of Carroll's case should await a decision in *Zervos*. Notably, this motion was filed just six days after Carroll served discovery requests on Trump, including one seeking a cheek swab for DNA to be compared against unidentified male DNA that experts had taken from the Donna Karan dress that Carroll was wearing that day at Bergdorf's. On August 6, 2020, shortly after the United States Supreme Court decided *Trump v. Vance*, 140 S. Ct. 2412 (2020), the New York trial judge (Saunders, J.), relying on *Vance*, denied Trump's motion to stay, thereby restarting the clock for the pending discovery deadlines.[2] NYSECF Doc. No. 110.

Following the denial of his stay motion, Trump and his lawyers spent the next four weeks stonewalling Carroll's efforts to resume discovery. During this period, his private counsel consistently communicated his intent to litigate Carroll's claims in state court, including by taking an interlocutory appeal as of right to the Appellate Division from the denial of Trump's stay motion. *See* Kaplan Affidavit Ex. A-H. But even as Trump's private counsel in New York made those statements, his client was hard at work in Washington, D.C. devising another stratagem to avoid accountability for slandering a woman he had sexually assaulted.

**C.**     **The Department of Justice Files a Motion to Substitute**

On September 8, 2020—the deadline for Trump to appeal the denial of his stay motion to the Appellate Division—the Justice Department removed this case to federal district court and filed a motion to substitute the United States as defendant. As the Attorney General later

---

[2] After the stay was lifted, the date for Trump to respond to Carroll's Second Set of Document Requests became August 14, 2020. *See* Kaplan Affidavit Ex. A. Following a meet and confer, Carroll agreed to extend that deadline to August 21. *See* Kaplan Affidavit Ex. B. Nevertheless, Trump refused to produce a single document.

acknowledged, the Justice Department took that step in response to a request from the White House. *See* Katie Brenner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. TIMES (Sept. 9, 2020). It does not appear that the White House directed the Justice Department to intercede in response to any new facts in this case, which had been pending for over ten months in state court without any suggestion that it was somehow a case against the United States. Rather, the Justice Department intervened to shield Trump from legal accountability only after his state court stall tactics, procedural gambits, and assertions of immunity were all rejected. This highly irregular maneuver prompted widespread condemnation from public officials and legal experts—in part because it forced the American people to pay for Trump's legal defense in a suit about his private sexual misconduct.[3]

## STANDARD OF REVIEW

This case was removed to federal court upon the Attorney General's certification under the Westfall Act that a federal employee was acting within the scope of his office or employment at the time of the tortious conduct alleged in the complaint. *See* 28 U.S.C. § 2679(d). The Attorney General's certification is conclusive of this Court's removal jurisdiction. *See Osborn v. Haley*, 549 U.S. 225, 233-34, 127 S. Ct. 881, 889-90 (2007). But his scope of employment determination under the Westfall Act is judicially reviewable in the posture of a motion to substitute the United States as defendant. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420, 115 S. Ct. 2227, 2229 (1995). In assessing the Justice Department's motion to substitute, "[t]he certification is subject to *de novo* judicial review." *Bowles v. United States*, 685 F. App'x 21, 23 (2d Cir. 2017).

---

[3] *See, e.g.*, Leah Litman, *The Justice Department Says Defaming Women is Part of Trump's Job. Literally.*, WASH. POST (September 10, 2020) (expressing doubt "that the Federal Tort Claims Act . . . applies to the President"); Noah Bookbinder, *Now Trump Wants Americans to Pay for his Defense in a Rape-Related Defamation Case*, USA TODAY (September 14, 2020) ("The DOJ move was shocking because it went well beyond the legal standard to argue that the president's statements about Carroll were official actions.").

9

In undertaking that *de novo* review, this Court must view "the tortious conduct in the light most favorable to plaintiff" and may consider evidence outside the pleadings to make "findings of fact with respect to the scope of the tortfeasor's employment." *Davila v. Lang*, 343 F. Supp. 3d 254, 270-71 (S.D.N.Y. 2018); *Bello v. United States*, 93 F. App'x 288, 289-90 (2d Cir. 2004).

ARGUMENT

The Justice Department's motion should be denied for two reasons: (1) the FTCA does not cover the President; and (2) even if it does, the President was not acting within the scope of his employment when he made the eleven defamatory statements alleged in the Complaint.

## I.    The FTCA Does Not Cover the President

Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S. Ct. 1587, 1593 (2004). It is particularly vital to respect that principle in construing waivers of sovereign immunity such as the FTCA. *See Cooke v. United States*, 918 F.3d 77, 82 (2d Cir. 2019). While several courts have assumed (without analysis) or suggested (in dicta) that the FTCA covers the President, none offered any reasons—textual or otherwise—to support that proposition (which does not appear to have been briefed in those litigations).[4] The Second Circuit has not addressed the question.

The FTCA is a limited waiver of sovereign immunity that covers "any employee of the Government." 28 U.S.C. § 1346(b)(1). That broad phrase, however, is given a narrower definition in 28 U.S.C. § 2671:  it covers "officers or employees of any federal agency," as well as several

---

[4] *See, e.g.*, *Does 1-10 v. Haaland*, No. 19-6347, 2020 WL 5242402, at *4 (6th Cir. Sept. 3, 2020); *Saleh v. Bush*, 848 F.3d 880, 889-92 (9th Cir. 2017); *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008); *Klayman v. Obama*, 125 F. Supp. 3d 67, 85 (D.D.C. 2015); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998); *Dumas v. President of U.S.*, 554 F. Supp. 10, 15 (D. Conn. 1982). Mindful of this Court's page limitations, we are not providing discussion of these cases, but would be happy to do so if the Court determines it would be helpful.

10

other categories not applicable here.[5] The phrase "federal agency," in turn, is defined by the FTCA as including "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States . . . ." 28 U.S.C. § 2671.

Reading these provisions together, the relevant question in this case is whether the President is an "officer[] or employee[]" of any enumerated "federal agency." Since he obviously is not an officer or employee of "the judicial and legislative branches," "the military departments," or "corporations primarily acting as instrumentalities or agencies of the United States," that leaves as possibilities only "the executive departments" and "independent establishments of the United States."[6] But, as we demonstrate below, those terms have well-understood meanings that are not consistent with treating the President as covered by the FTCA. This conclusion is supported by a negative implication from the statutory text:  whereas the FTCA *does* cover "the judicial and legislative branches," it explicitly *does not* cover "the executive branch." *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) ("The President is the only person who alone composes a branch of government."). Instead, it applies only to entities—executive departments and independent establishments—that have long been understood as distinct from the Presidency itself.

A.      The President is Not an Officer or Employee of an Executive Department

The phrase "executive departments" has a settled meaning under federal law: it refers to Cabinet-level agencies. This is confirmed by a host of sources. Most notably, Title 5 of the U.S.

[5] Those other categories also include: "members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . ., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," and "any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18." 28 U.S.C. § 2671.

[6] To the extent the Justice Department argues that the FTCA might elsewhere cover the President as an officer of "the military departments," it is implausible that he was acting within the scope of his employment *as an officer of the military* when he defamed Carroll. Even if that provision might apply in some cases, this is clearly not one of them.

11

A-334

Code—entitled "Government Organization and Employees"—defines "executive departments" as the fifteen Cabinet-level agencies: the Departments of State, Treasury, Defense, Justice, Interior, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, Energy, Education, Veterans Affairs, and Homeland Security. 5 U.S.C. § 101; *see also Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995) (describing 5 U.S.C. § 101 as setting forth an "exclusive list of Executive departments"). While there were fewer Cabinet departments when the FTCA was enacted in 1946, the U.S. Code set forth an analogous definition of "executive departments" at that time. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) (looking to time of enactment). And that straightforward definition of the phrase traces all the way back to the work of the First Congress, which created the "Executive department[s]" of Foreign Affairs and War—and directed that they be led by a "principal officer." Act of July 27, 1789, ch. 4, 1st Cong. 28-29 (Foreign Affairs); Act of Aug. 7, 1789, ch. 8, 1st Cong. 49-50 (War).

All three branches of government have recognized this understanding of "executive departments." For example, in *United States v. Germaine*, the Supreme Court held that the phrase "executive Departments" in the Opinions Clause of the Constitution—which authorizes the President to "require the opinion, in writing, of the principal Officer in each of the executive Departments"—referred only to Cabinet members. *See* 99 U.S. 508, 511 (1878). Over a century later, in *Freytag v. Commissioner*, the Supreme Court observed that the phrase "executive departments" in Section 4 of the Twenty-Fifth Amendment was intended and understood by Congress to refer only to Cabinet-level entities. *See* 501 U.S. 868, 887, 111 S. Ct. 2631, 2643 (1991) (discussing H.R. Rep. No. 203, 89th Cong., 1st Sess., 3 (1965)). The Office of Legal Counsel (OLC) later embraced this interpretation of "executive departments" in the Twenty-Fifth

12

Amendment—and cited 5 U.S.C. § 101 to support its view. *See Operation of the Twenty-Fifth Amendment Respecting Presidential Succession*, 9 Op. O.L.C. 65, 69, 1985 WL 185391 (1985).[7]

Giving "executive departments" its settled meaning, the FTCA covers the President on this basis only if he is an officer or employee of the Cabinet-level agencies. But he is neither of those things. While American law books are littered with countless theories of the relation between Presidents and executive departments, nowhere is the President considered to be an officer or employee of the Department of Commerce. Instead, he maintains a general supervisory power—anchored in the Vesting, Take Care, and Appointments Clauses—over the executive departments, each of which has its own employees and is headed by a distinct principal officer subject to Senate confirmation and statutory limitations. *See Seila Law LLC v. C.F.P.B.*, 140 S. Ct. 2183, 2197-2205 (2020); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836 (2015).

This understanding is supported by a wide range of sources. Returning to the Opinions Clause in Article II, it would make no sense to say that the President "may require the opinion . . . of the principal officer in each of the executive Departments" if he is also, in fact, an officer of those departments. Nor would it make sense to describe someone else as the "principal officer" of a department if the President is also an officer there. Indeed, Article II, Section 2 elsewhere authorizes the appointment of "inferior Officers" by *either* "the President alone, in the Courts of Law, *or* in the Heads of Departments," U.S. CONST. art. II, § 2 (emphasis added)—a rule which presumes a distinction in identity between "the President" and "the Heads of Departments."

---

[7] In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court ever so slightly broadened its interpretation of "Departmen[t]" for purposes of the Appointments Clause of the Constitution, extending it to cover principal agencies such as the Securities and Exchange Commission. 561 U.S. 477, 510–11, 130 S. Ct. 3138, 3162-63 (2010). In so doing, it did not alter the settled meaning of "executive departments" and, in all events, it adhered to an understanding of the phrase "Departmen[t]" that confines it to principal agencies such as the SEC.

13

That distinction runs consistently through federal law. Most notably, it is reflected in the statutes that create the executive departments and define their personnel—including the specification of "officer" positions at each agency, none of which defines the President as himself an "officer." *See, e.g.*, 43 U.S.C. §§ 1451-1456 (Interior); 15 U.S.C. §§ 1501, 1503a, 1503b, 1505, 1506, 1507, 1507b, 1507c, 1508 (Commerce); 42 U.S.C. §§ 3532(a), 3533 (HUD); 42 U.S.C. §§ 7131, 7132 (Energy); 20 U.S.C. §§ 3411, 3412 (Education). The organizational plan defined by those statutes is reflected on the websites of the executive departments, all of which list their officers and none of which list the President among that group.[8] This reading is also consistent with the definitive *Federal Government Manual* from 1946, which shows the President as the sole officer under "executive" and no appearance by the President in any of the charts for the individual executive departments or other agencies. *See U.S. Government Manual* 570, 576-602 (1946).

In addition, countless statutes use disjunctive language—"or"—to refer to the President and the executive departments as distinct. The Federal Vacancies Reform Act, for example, allows "the President, a court, or the head of an Executive department" to designate a temporary acting officer. 5 U.S.C. § 3347. The Coronavirus Economic Stabilization Act similarly limits certain transactions by "the President, the Vice President, the head of an Executive department, or a

---

[8] Department of State, Organizational Chart (Feb. 2020), https://www.state.gov/wp-content/uploads/2020/02/Dept-Org-Chart-Feb-2020-508.pdf; Department of the Treasury, Organizational Chart, https://home.treasury.gov/about/general-information/organizational-chart; Department of Defense, Our Leaders, https://www.defense.gov/Our-Story/Meet-the-Team/; Department of Justice, Organizational Chart (Feb. 2018), https://www.justice.gov/agencies/chart; Department of the Interior, Interior Leadership, https://www.doi.gov/interior-leadership; Department of Agriculture, Organization Chart (Aug. 2020), https://www.usda.gov/sites/default/files/documents/usda-organization-chart.pdf; Department of Commerce, Leadership, https://www.commerce.gov/about/leadership; Department of Labor, Leadership Team, https://www.dol.gov/general/contact/contact-phonekeypersonnel; Department of Health and Human Services, Organizational Chart, https://www.hhs.gov/about/agencies/orgchart/index.html; Department of Housing and Urban Development, Leadership, https://www.hud.gov/about/leadership; Department of Transportation, Government Officials at the U.S. Department of Transportation, https://www.transportation.gov/mission/meet-key-officials; Department of Energy, Leadership, https://www.energy.gov/leadership; Department of Education, Operating Structure, https://www2.ed.gov/about/offices/or/index.html; Department of Veterans Affairs, Functional Organization Manual Version 5.0 at 3-5, https://www.va.gov/FOM-5-Final-July-2019.pdf; Department of Homeland Security, Organizational Chart, https://www.dhs.gov/sites/default/files/publications/19_1205_dhs-organizational-chart.pdf.

14

Member of Congress." 15 U.S.C. § 9054(a)(3). And "Federal agency" is defined for purposes of the chapter about the Federal Register to mean "the President of the United States, *or* an executive department." 44 U.S.C. § 1501 (emphasis added). And so on.

OLC put the point clearly in a recent decision on testimonial immunity: "[A]s a function of the independence and autonomy of the President himself," the President's immediate advisors "are *constitutionally distinct* from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes." *Testimonial Immunity Before Congress of the Former Counsel to the President*, Op. O.L.C., 2019 WL 2315338, at *2 (May 20, 2019) (emphasis added). That constitutional distinction explains why the President cannot be both the President *and* an officer or employee of the "executive departments" under the FTCA.

### B.     The President is Not an Officer or Employee of an Independent Establishment of the United States

If the President is not an officer or employee of the "executive departments," that leaves only one possible textual basis for concluding that he is covered by the FTCA: namely, that he is an officer or employee of an "independent establishment[] of the United States." 28 U.S.C. § 2671. On the face of the statute, however, there is little to commend this interpretation. The text refers separately to "the executive departments" and "the judicial and legislative branches," suggesting that it does not cover the entirety of "the executive branch." And it would be strange for Congress to tuck the President within the FTCA's coverage by referring obliquely, in the fourth clause of the definitional term—between "the military departments" and "corporations primarily acting as instrumentalities or agencies of the United States"—to "independent establishments." Congress is not presumed to hide elephants in mouseholes, nor should we expect it to hide Presidents within subsidiary (and in this case quaternary) definitional terms.

15

Once again, both text and history confirm this interpretation. The Attorney General has described the White House as the referring agency for purposes of the Westfall Act certification here. Although it is conceivable that the Justice Department will also refer to the Executive Office of the President (EOP), neither office ranks as an "independent establishment[]"—and, in any event, the President is not actually designated as an officer or employee of either entity.

Starting with the plain meaning of the text, the FTCA does not define "independent establishments" (and when the Act was passed in 1946, neither did Title 5). But that year, the *U.S. Government Manual* identified 26 "independent offices and establishments" in its authoritative organizational chart of the executive branch—and EOP and the White House Office were not among them. *See U.S. Government Manual* 570 (1946). Instead, they were placed beside the President and labeled "permanent staff agencies." *Id.* This was consistent with how they had been understood since their creation in 1939—at which point they were neither ranked nor situated among other entities expressly described as "independent establishments."[9]

In 1966, Congress added a definition for "independent establishment" to Title 5, deeming it for purposes of that title to mean an "establishment in the executive department (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an

---

[9] President Franklin D. Roosevelt created the EOP and White House Office as part of a large-scale reorganization of the executive branch. *See* Exec. Order No. 8248, 4 Fed. Reg. 3864 (Sept. 12, 1939). The EOP was created to ensure that "the President will have adequate machinery for the administrative management of the Executive branch of the Government." *Id.* The White House Office was to be a "division[] of the Executive Office of the President" designed "to serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." *Id.* § II(1). His Executive Order did not describe either entity as "independent." This was a telling omission, since the very same Executive Order addressed itself directly to several "independent establishments" and announced the President's intent to rearrange them. Specifically, President Roosevelt intended to "set up a Federal Security Agency, a Federal Works Agency, and a Federal Loan Agency, and then to distribute among the 10 executive departments and these 3 new agencies, the major independent establishments in the Government." 84 Cong. Rec. 4,708, 4,710 (1939) (Reorganization Plan No. I—Message from the President). Those "major independent establishments," in turn, included the Social Security Board and the Civilian Conservation Corps. *Id.*; *see also U.S. Government Manual* 473, 475 (1939) (illustrating which independent establishments were moved into which component). Again, there was no mention of EOP or the White House Office as "independent establishments."

16

independent establishment." Pub. L. No. 89-554, 80 Stat. 378, 379 (1966) (codified at 5 U.S.C. § 104). At the same time, the *U.S. Government Manual* continued to reflect the distinction between what were then called "independent agencies" and other entities in the executive branch, including the White House and the EOP. *See Contents*, *U.S. Gov't Manual* at v-vii (1966/67).[10]

This is no coincidence. In *Haddon v. Walters*, the D.C. Circuit held that the Executive Residence at the White House does not fall within the definition of "independent establishment" in 5 U.S.C. § 104. 43 F.3d 1488, 1490 (D.C. Cir. 1995). In reasoning directly applicable to this case, *Haddon* based its conclusion mainly on 3 U.S.C. § 112, where Congress allowed "[t]he head of any department, agency, or independent establishment of the executive branch of the Government [to] detail, from time to time, employees of such department, agency, or establishment to the White House Office, the Executive Residence at the White House, the Office of the Vice President, the Domestic Policy Staff, and the Office of Administration." *Id.* As *Haddon* noted, "[t]hat Congress distinguished the Executive Residence from the independent establishments, whatever they may be, suggests that Congress does not regard the Executive Residence to be an independent establishment, as it uses that term." *Id.* Whereas *Haddon* highlighted § 112's reference to the "Executive Residence," here the notable phrase is "White House Office." But the conclusion is the same: "Congress has used the term 'independent establishment' in distinction to

---

[10] That remained true after passage of the Westfall Act in 1988: the 1988 version of the *U.S. Government Manual* dutifully separated "The President of the United States," the "Executive Office of the President," and "The White House Office," from "Executive Agencies" consisting of "Departments," "Independent Establishments and Government Corporations," "Guide to Boards, Committees, and Commissions," and "Quasi-Official Agencies" on the other. *U.S. Government Manual* at v-vii (1988/89). In fact, most recent version of the *U.S. Government Manual* draws the same distinction between the President, EOP, the White House Office, and what it now calls "Independent Agencies and Government Corporations" (but historically described as "independent establishments").

17

the [White House Office] . . . [which] suggests that Congress does not regard the [White House Office] to be an independent establishment, as it uses that term." *See id.*[11]

It is not only courts and Congress that have noted the distinction between "independent establishments" and the White House and EOP. In 2009, OLC noted that it has "espoused more recently" the view that "EOP is not an independent establishment" within the meaning of 5 U.S.C. § 104. *See* Memorandum for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 (Sept. 17, 2009). Eight years later—while addressing a definition of "Executive agency" that includes "independent establishments"—OLC concluded that "the White House Office is not an 'Executive agency' insofar as the laws on employment and compensation are concerned." *Application of the Anti-Nepotism Statute to a Presidential Appointment in the White House Office*, Op. O.L.C., 2018 WL 5653623, at *5 (Jan. 20, 2017); *see also id.* (discussing *Haddon* and observing that "the general treatment of the White House Office under title 3 instead of title 5 undergird this conclusion").

Two final points support this conclusion. First, in many other contexts, Congress has denominated entities as "independent establishments"—yet it has not does so for the White House Office or EOP.[12] And second, in construing the term "independent establishments" in the FTCA context, courts have considered only entities like the Postal Service, the Smithsonian Institution, and the Kennedy Center; the logic of these decisions does not suggest that Congress covered the

---

[11] The D.C. Circuit dismissed FTCA claims as outside the scope of employment in a related case by the same plaintiff against a White House electrician. *Haddon v. United States*, 68 F.3d 1420 (D.C. Cir. 1995). The court did not address in that case whether the employee fit within § 2671's definition in the first place—neither party raised it in their brief.

[12] For instance, the Office of Personnel Management "is an independent establishment in the executive branch." 5 U.S.C. § 1101. So are the Federal Maritime Commission, 46 U.S.C. § 301, the U.S. Postal Service, 39 U.S.C. § 201, and the Surface Transportation Board, 49 U.S.C. § 1301. The National Transportation Safety Board is also an independent establishment, 49 U.S.C. § 1111, along with the Armed Forces Retirement Home, 24 U.S.C. § 411.

18

President and the Kennedy Center in a single statutory breath. *See Thompson v. United States*, 795 F. App'x 15, 18 n.3 (2d Cir. 2019) (USPS); *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian, Inc.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (Smithsonian); *Polcari v. John F. Kennedy Center for Performing Arts*, 712 F. Supp. 230, 231-32 (D.D.C. 1989) (Kennedy Center).

In any event, the President is not covered under the FTCA's "independent establishments" language because he is not an officer or employee of the White House Office or the EOP. To start, he is plainly not an "employee" of either entity, both of which exist to support him. Nor is he an officer of the EOP or the White House Office. In fact, he is not even *part* of these offices. As the *U.S. Government Manual* confirms, the President occupies a constitutional office at the head of the executive branch: he is not an "officer" of his own support staff. The White House Office itself has acted consistent with that view: the President is not listed as an officer or employee in EOP's annual report to Congress on White House Office Personnel. *See* EOP, *Annual Report to Congress on White House Office Personnel* (June 26, 2020). The White House website says the EOP is "overseen by the White House Chief of Staff." *See* White House, *The Executive Branch*. And under the Obama Administration, too, the Plum Book—created by congressional committees based on information from the Office of Personnel Management—did not list President Obama as part of the EOP or the White House Office. *See* U.S. Senate, Committee on Homeland Security and Governmental Affairs, *Policy and Supporting Positions* 2-6 (Dec. 1, 2016).

In sum, while the President *is* the Executive Branch, he is not an officer or employee of any discrete executive department or any independent establishment within it.

C.      **Interpretive and Immunity Principles Confirm This Reading of the FTCA**

Two final considerations confirm that the President is not covered by the FTCA. *First*, the FTCA does not include an express statement that it applies to the President, even though Congress ordinarily must include such clear language in a statute that covers the President (and that may in

19

A-342

some cases constrain his ability to take charge of his own legal defense). *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-67, 109 S. Ct. 2558, 2564-65 (1989). Indeed, it was the absence of such an express statement in the APA—passed just two months before the FTCA—which later led the Supreme Court to hold that its definition of "agency" could not be applied to the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01, 112 S. Ct. 2767, 2775-76 (1992).[13]

*Second*, reading the FTCA in this manner coheres with long-settled principles of absolute immunity. The President has historically been treated as absolutely immune for damages liability based on actions within the outer perimeter of his official responsibilities. *See Nixon v. Fitzgerald*, 457 U.S. 731, 756, 102 S. Ct. 2690, 2704 (1982); *id.* at 758, 102 S. Ct. 2690 & n.1 (Burger, C.J., concurring). Given the unique nature of his office, there is likely little daylight between the scope of the President's employment for FTCA purposes and the scope of his official responsibilities for absolute immunity purposes. (Indeed, as discussed above, in this very case Carroll spent months litigating Trump's assertion of absolute immunity.) And so Congress would have had no reason— either in 1946, or in 1988 when the Westfall Act made the FTCA an exclusive remedy, Pub. L. No. 100-694, 102 Stat. 4563 (1988)—to include the President in the FTCA's coverage.[14]

---

[13] The Justice Department's Supreme Court brief in *Franklin* is consistent with the reasons given above for concluding that the President is not an officer or employee of a "federal agency" as that term is defined in 28 U.S.C. § 2671: "The term 'agency' would be a peculiar way to refer to the President in any event, since an 'agency' is generally understood as being responsible to a principal. The President, of course, is not the agent of any principal, but rather is the principal—the constitutional officer in the Executive Branch to whom the agencies in that Branch are responsible." Br. for Appellants at 30 n.16, *Franklin v. Massachusetts*, 505 U.S. 788, 112 S. Ct. 2767 (No. 91-1502).

[14] Consulting legislative history only deepens this gulf between the FTCA's purposes and the President's duties. When the FTCA was enacted, "[u]ppermost in the collective mind of Congress were the ordinary common-law torts," and "the example which is reiterated in the course of the repeated proposals for submitting the United States to tort liability is negligence in the operation of vehicles." *Dalehite v. United States*, 346 U.S. 15, 28, 73 S. Ct. 956, 964 (1953), *abrogated on other grounds*, *Indian Towing Co. v. United States*, 350 U.S. 61, 76, 76 S. Ct. 122, 130 (1955). There is no reason to believe that legislators concerned mainly with automobile accidents committed by the likes of postal workers saw any need to cover the President. Until *Bivens*, there were "fewer than a handful of damages actions" *ever* filed against the President, *Nixon*, 457 U.S. at 750 n.31, 102 S. Ct. at 2701, confirming that Congress had no particular need to apply the FTCA to the single federal official with the broadest immunity attached to his office.

20

## II.     Trump Was Not Acting Within the Scope of His Job as President When He Defamed Carroll For Revealing That He Sexually Assaulted Her

In the alternative, the Justice Department's motion should be denied because Trump was not acting within the scope of his office or employment when he defamed Carroll.

### A.     New York Law Governs the Scope of Employment Inquiry

Whether an officer or employee acted "within the scope of his or her employment for purposes of the Westfall Act is determined by reference to 'principles of *respondeat superior* of the state in which the alleged tort occurred.'" *Bowles*, 685 F. App'x at 24 (citation omitted). Here, Trump's acts of defamation "occurred" in New York. As the Second Circuit has noted, New York treats defamation as a "conduct regulating rule" and therefore the "situs of the tort" controls the choice of law analysis. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). "Because 'the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of law analysis [in a defamation action] simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'" *Adelson v. Harris*, 973 F. Supp. 2d 467, 476 (S.D.N.Y. 2013) (citation omitted); *accord Reeves v. Am. Broad. Companies, Inc.*, 719 F.2d 602, 605 (2d Cir. 1983) ("[T]he state of the plaintiff's domicile will usually have the most significant relationship to the case."); *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 Civ. 11407, 2007 WL 4820968, at *4 (S.D.N.Y. Sept. 18, 2007) ("Where the plaintiff suffered injury usually determines the locus of the tort in an action for defamation."). Carroll is domiciled in New York. That is where she suffered the greatest injury to her reputation. Therefore, the tort at issue in this case "occurred" in New York and New York law governs the inquiry into whether Trump acted within the scope of his employment. *See Bowles*, 685 F. App'x at 24.

To be sure, where a "defamatory statement is published nationally, there is only a 'presumptive' rule that the law of plaintiff's domicile applies." *Adelson*, 973 F. Supp. 2d at 477

21

(citation omitted). Yet even then, "[i]t is most often assumed that the state of plaintiff's domicile is where the greatest injury occurred, and that this is the state with the most significant interest in the litigation." *Test Masters*, 2007 WL 4820968, at *4. Here, both of those factors cut decisively in favor of concluding that Trump's acts of defamation "occurred" in New York. And so do a host of additional factors: Trump made the statements in direct response to an essay published in a New York magazine; the subject matter of his statements concerned conduct that occurred exclusively in New York; Trump himself was a New York resident when the underlying events occurred and remains a New York resident (as evidenced by his failed objections to personal jurisdiction in the state court); and this case was filed in a New York forum. *See Reeves v. Am. Broadcasting Cos.*, 580 F. Supp. 84, 90 (S.D.N.Y. 1983) (applying California law to a multistate defamation action because plaintiff was a California resident, suffered the most injury in California, and the defamatory statement focused on activities that took place in California, "notwithstanding" that the defamatory statement "was broadcast nationwide from Washington, D.C.").[15]

> **B.** **Under New York Law, A Person Acts Outside the Scope of Their Employment When They Act for Personal Reasons to Obtain a Personal Benefit**

"Under the common-law doctrine of *respondeat superior*, an employer . . . may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment." *Rivera v. State*, 34 N.Y.3d 383, 389-90 (2019). "The employer may

---

[15] The Sixth Circuit's choice of law analysis in *Does 1-10 v. Haaland* is instructive. *See* No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020). In that FTCA case, the plaintiffs filed suit in Kentucky, alleging that Senator Elizabeth Warren (Massachusetts) and Representative Debra Haaland (New Mexico) had defamed them through statements published on their official Congressional Twitter accounts. On those facts, the Sixth Circuit easily concluded that "the conduct—i.e., the allegedly defamatory tweets—occurred in Kentucky because Plaintiffs live in Kentucky and the tweets were accessible in that state." *Id.* at *5 (citations omitted). The same fundamental logic controls the analysis here: Trump's statements were aimed at a New York resident, injured that resident in New York, concerned conduct that had occurred in New York, and were accessible in New York.

To the extent relevant, the same result obtains under D.C.'s choice of law rules, where the "the law to be applied [in defamation cases] is that of the place where the plaintiff suffered injury by reason of [her] loss of reputation." *Weyrich v. New Republic Ins. Co.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (quoting *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984)); *see also Foretich v. CBS, Inc.*, 619 A.2d 48, 54 n.9 (D.C. 1993).

be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *Id.* (citation omitted). However, "[l]iability attaches 'for the tortious acts of . . . employees only if those acts were committed in furtherance of the employer's business and within the scope of employment.'" *Id.* (citation omitted); *see also Nicollette T. v. Hosp. for Joint Diseases/Orthopaedic Inst.*, 198 A.D.2d 54, 54–55 (1st Dept. 1993) ("[T]he mere fact that an employee's actions . . . occurred during the time of his employment, does not conclusively demonstrate that said actions were within the scope of his employment or that he was performing said acts in the furtherance of his employer's business." (citations omitted)).  In assessing whether a person acted within the scope of their employment, New York courts often consider "[t]he connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated." *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

As a matter of first principles, however, "there is no *respondeat superior* liability for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 788 (3rd Dept. 1988); *accord Swarna v. Al-Awadi*, 622 F.3d 123, 144–45 (2d Cir. 2010); *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002); *Demas v. Levitsky*, 291 A.D.2d 653, 661 (3rd Dept. 2002); *Kirkman by Kirkman v. Astoria Gen. Hosp.*, 204 A.D.2d 401, 402 (2nd Dept. 1994). "Under such circumstances, the conduct—although occurring during the course of his employment—is outside the scope of [his] employment." *Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir. 1997). That rule controls even if "an activity which benefits an employee personally could also have a possible benefit to the employer."

23

A-346

*Overton v. Ebert*, 180 A.D.2d 955, 957 (3rd Dept. 1992); *see also id.* (finding that an employee acted outside the scope of his employment when he "was acting for his own personal convenience and benefit and not in the furtherance of any duty owed to [his employer]").

Unsurprisingly, most applications of the "personal motives" doctrine have occurred in cases involving sexual assault, sexual harassment, or defamation claims arising from or relating to sexual misconduct. *See Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."); *see also Ierardi*, 119 F.3d at 188–89 (employee acted outside scope of employment in harassing another employee); *N.X.*, 97 N.Y.2d at 251 (surgeon acted outside scope of employment in sexually assaulting patient); *Heindel*, 138 A.D.2d at 788 (mall security guard acted outside scope of employment in sexually assaulting juvenile). In *Rausman v. Baugh*, for example, the Second Department overturned a finding that questions of fact precluded a determination of whether a hospital employee had acted "within the scope of her employment"— or instead "solely for personal motives"—in making an allegedly defamatory accusation of sexual harassment against another employee. 248 A.D.2d 8, 9-10 (2nd Dept. 1998). *Rausman* held that there was no basis for imposing liability on the employer for on "an employee's allegedly false accusation of sexual harassment," since such accusations were not made pursuant to "a duty to the employer." *Id.* at 12. *Rausman* added that making "defamatory" allegations of "alleged sexual harassment" was "certainly not a part of [the employee's] job description." *Id.* at 13.

*Perks v. Town of Huntington*, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003), further illustrates this principle. There, William Perks (Huntington's Harbor Master) alleged that Councilwoman Susan Scarpati-Reilly "maneuvered herself into a position as one of his supervisors, whereupon

24

she initiated a sexual relationship with him and—once he terminated the relationship—sexually harassed, defamed, and conspired against him." *Id.* at 1148. Among other causes of action, Perks alleged two defamation claims against Scarpati-Reilly. *See id.* at 1164-1171. On both of these claims, Perks also sought recovery from Huntington on a *respondeat superior* theory—and on both claims, Judge Young (sitting by designation) granted summary judgment for Huntington, finding that Scarpati-Reilly had acted in furtherance of personal motives. *See id.*

His reasoning as to the first defamation claim is especially instructive. That claim arose from a false police report Scarpati-Reilly filed against Perks shortly after he terminated their sexual relationship and she began retaliating against him for doing so. In holding that she acted outside her employment in filing the report—and that she had instead acted with "personal motives"— Judge Young relied on four considerations: (1) her official duties did not require her to file police reports against Town employees; (2) her official position conferred no special authority to file such reports; (3) Huntington had not instructed her to engage in such behavior; and (4) her filing of the report "did not yield any benefit for Huntington or further its interests." *Id.* at 1167. In response, Scarpati-Reilly objected that she was "always [a] Councilwoman"—an "elected official twenty-four hours a day"—and so "Everything that I do I'm acting as Councilwoman for the Town of Huntington." *Id.* But Judge Young rejected her position as "the standard for determining when to place vicarious liability upon Huntington for Scarpati-Reilly's actions." *Id.* Instead, he looked "objectively at whether a given action taken by Scarpati-Reilly" fell within her employment, concluding that this defamatory statement did not because it resulted from personal motives. *Id.*

As these cases confirm, when a person acts for private reasons, or to obtain private gain, they do not act within the scope of their employment. That rule applies in the defamation context. *E.g.*, *Demas v. Levitsky*, 291 A.D.2d 653, 661 (3rd Dept. 2002). It applies to public officials. *See*

25

*Perks*, 251 F. Supp. 2d at 1167. It applies even if the employee can identify some incidental benefit to the employer. *See Overton*, 180 A.D.2d at 957. And it applies with particular force in cases where an employee's personal motives arise from or relate to sexual misconduct. *See, e.g.*, *Perks*, 251 F. Supp. 2d. at 1164-1171; *Ross*, 2 F. Supp. 2d at 531; *Rausman*, 248 A.D.2d at 9-10.

**C.   Trump Acted Outside the Scope of His Employment in Defaming Carroll**

**1.   Notwithstanding the Breadth of their Official Duties, Presidents May Unquestionably Engage in Personal Conduct Causing Private Wrongs**

The Constitution provides that "[t]he executive power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1. "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701. These responsibilities include "enforcement of federal law," "conduct of foreign affairs," and "management of the Executive Branch." *Id.* As a matter of history and tradition—and by virtue of being held "directly accountable to the people through regular elections," *Seila Law*, 140 S. Ct. at 2203—the President also "possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). The President thus enjoys a "unique status under the Constitution." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701. He must be available, at all times, to lead the Nation. In a sense, he "never adjourns." *Clinton v. Jones*, 520 U.S. 681, 713, 117 S. Ct. 1636, 1653 (1997) (Breyer, J., concurring in the judgment).

But the President "is a person as well as an institution." Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW 631 (3d ed. 2000). While in office, "far from being above the laws, he is amenable to them in his private character as a citizen . . . ." 2 J. Elliot, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863) (James Wilson). And as Chief Justice Marshall anticipated, the demands of a President's "duties as chief magistrate" are not so "unremitting" as to consume "his

26

whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807). The Supreme Court has thus recognized that the President may engage in private acts beyond the "'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; that he remains "subject to the laws for his purely private acts," *Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645; and that he can be investigated for private criminal deeds, *see Vance*, 140 S. Ct. at 2426-27. These cases confirm that Presidents retain a personal capacity—and the ability to commit private wrongs—while in office.

Indeed, more than any other recent president, Trump has repeatedly insisted that aspects of his conduct in office are private and personal. In a pending petition for certiorari, for example, he asserts that "blocking third-party accounts from interacting with the @realDonaldTrump account *is a purely personal* action." *See Trump v. Knight First Amendment Institute*, No. 20-197, at 14 (U.S. Aug. 20, 2020) (emphasis added); *see also id.* at 10 (describing Trump's "always personal decision to block respondents from his own account"). Trump argues that his conduct in blocking Twitter users from his account is "well within the ambit of . . . personal pursuits," *see id.* at 15 (citation omitted)—and not subject to First Amendment limitations—even though he frequently uses that very same Twitter account to make momentous official announcements. *See Knight First Amendment Institute v. Trump*, 928 F.3d 226, 231-32 (2d Cir. 2019). Trump thus insists upon a broad view of his purely private, non-Presidential conduct while in office. This outlook extends to and purports to justify his choice to maintain a substantial ownership stake in the Trump Organization. *See CREW v. Trump*, 953 F.3d 178, 185 (2d Cir. 2019). In response to claims that he is thereby violating the Foreign and Domestic Emoluments Clauses, Trump has argued that he is free to engage in purely private commercial transactions with foreign governments, so long as he does not receive "compensation for services rendered . . . in an official capacity or in an

employment (or equivalent) relationship with a foreign government." Motion to Dismiss at 32, *District of Columbia v. Trump*, No. 17 Civ. 1596, ECF. 21 (Sept. 29, 2017).

Whatever the ultimate merits of Trump's position in these cases, his filings confirm that this is not a President who views his every word and deed as Presidential. By his own confession, Trump sometimes perceives himself as acting in a purely personal capacity—and as pursuing his own private purposes—while in office. Consistent with *Burr*, *Nixon*, *Clinton*, and *Vance*, there can thus be no doubt that Trump's scope of employment is not all-encompassing, and that it leaves room for purely private pursuits that may (as occurred here) result in private wrongs.

### 2. Trump Acted for Personal Reasons in Defaming Carroll

On June 21, 2019, Carroll revealed to the public that Trump had sexually assaulted her in New York City over twenty years earlier. Trump responded by denying the assault, insisting that he had never met Carroll, and saying "she's not my type." Compl. ¶¶ 97-98. He then went further, making numerous false and defamatory statements—including that Carroll had lied to (a) increase book sales; (b) carry out a political agenda; (c) advance a secret conspiracy with the Democratic Party; and (d) make money. *See id.* ¶ 11. He also defamed Carroll by pointedly implying that she had falsely accused other men of rape. *See id.* The question before the Court is whether, in making these specific statements, Trump was acting within the scope of his employment or was instead acting based on personal motives unrelated to the furtherance of the interests of the United States.

In answering that question, the Court views "the tortious conduct in the light most favorable to plaintiff" based upon the factual record before it. *See Davila*, 343 F. Supp. 3d at 270-71. Here, that record consists almost entirely of the Complaint. And significantly, the Complaint sets forth comprehensive allegations concerning Trump's motives for making these statements—all of which must be accepted as true. *See* Compl. ¶¶ 106-128. To summarize: Trump knew who Carroll was when he raped her, *id.* at ¶¶ 106-112; he knew in June 2019 that he had assaulted her and that

28

his denials were false, *id.* at ¶¶ 113-115; he deliberately lied, and spoke with no concern for the truth, in accusing Carroll of fabricating the accusation as part of a political conspiracy, a plot to increase book sales, or in exchange for payment, *id.* at ¶¶ 116-18; he deliberately lied, or spoke with no concern for the truth, in charging that Carroll had falsely accused other men of sexual assault, *id.* at ¶¶ 118-119; and he engaged in these barbaric attacks because they were familiar to him based on his prior public response to credible reports that he had assaulted women, *id.* at ¶¶ 122-127. Simply put, Trump "knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth." *Id.* at ¶ 128. Further, Trump did not lie to advance any interest of the United States or the Executive Branch; he did not consider such interests at all. He lied to protect himself from the truth and, after he knowingly lied about the sexual assault itself, "he surrounded that central lie with a swarm of related lies in an effort to explain why [Carroll] would invent an accusation of rape." *Id.* at ¶ 13.

Under New York law, these particularized allegations—which stand unrefuted and must be read in Carroll's favor—support only a single conclusion: Trump "was acting for his own personal convenience and benefit and not in furtherance of any duty owed" by virtue of his office. *See Overton*, 180 A.D.2d at 957. He was not acting within the scope of his employment.

This conclusion is bolstered by at least seven additional considerations. *First*, the substance of Trump's statements reeks of personal animus; it is inconceivable that Trump aimed to do his job as President by implying that Carroll is too unattractive for him to sexually assault her. The same is true of his eleven defamatory statements. *See Perks*, 251 F. Supp. 2d at 1171 (considering contents of statement); *Rausman*, 248 A.D.2d at 9-10 (asking whether defamer was acting pursuant to job description). *Second*, Trump's statements concern allegations of sexual assault, which New York law recognizes as especially likely to engender personal motives at odds with (or indifferent

29

to) employment interests. *See supra* at 24. *Third*, Trump was under no Presidential obligation to make these defamatory statements. *See Perks*, 251 F. Supp. 2d at 1167. And in tone and substance these statements were not of the kind "commonly done" by Presidents; there is no history of Presidents defaming citizens who report sexual assault. *See Riviello*, 47 N.Y.2d at 303.[16] *Fourth*, Trump's attacks on Carroll do not reflect anything unique to his current position, or involve any Presidential prerogative, but rather track a *modus operandi* of purely private conduct stretching back decades. *See* Compl. at ¶¶ 122-127; *see also* Cert. Petn., *Trump v. Knight*, No. 20-197, at 9-14 (arguing that continuity with Trump's pre-office use of Twitter confirms personal nature of use while in office). *Fifth*, since Trump took office, his administration has referred nearly all questions about his sexual misconduct to private lawyers or campaign counsel, thus treating these matters as personal in nature.[17] *Sixth*, the context in which Trump made some of his defamatory statements shows irregular procedures. *See Riviello*, 47 N.Y.2d at 303. The June 21 statement appears to have been hurriedly dictated by Trump and conveyed to a reporter, who tweeted the image of his statement on a page lacking any official markings. *Finally*, the conduct here is far more obviously based on personal motives—and unrelated to his job as President—than conduct he has elsewhere described as private. *See id.* at 302. Trump views his commercial dealings with Russia and China as personal, not presidential. He views blocking people from a platform on which he has fired Cabinet secretaries as personal, not presidential. Only in a world gone mad could it somehow be presidential, not personal, for Trump to slander a woman who he sexually assaulted.

---

[16] In *Clinton v. Jones*, the plaintiff alleged a defamation claim against Clinton, but this claim was based on statements by his alleged agents (including his presidential press secretary) rather than any statements by Clinton himself. *See Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). The fact that this claim involved an alleged plot between Clinton and his White House Secretary likely explains why the Supreme Court described it as potentially falling within the "outer perimeter of the President's official responsibilities." *Clinton*, 520 U.S. at 686, 117 S. Ct. at 1640.

[17] For example, when a reporter inquired about whether Trump provided "hush money" to conceal an alleged affair, Trump stated, "Michael is my attorney, and you'll have to ask Michael Cohen." *Stormy Daniels and Trump: The conflicting statements*, BBC NEWS (August 23, 2018).

30

For all these reasons, a straightforward application of New York law confirms that Trump was acting outside the scope of his employment in making each of the statements identified in the Complaint as false and defamatory. The motion to substitute must therefore be denied.[18]

**D.      The Justice Department's Position Is Meritless**

In its five-page brief, the Justice Department addresses none of the above. It does not consider New York law. It does not cite or discuss the Complaint. It does not attach any additional evidence. Instead, it rests its argument on a categorical assertion that "elected officials act within the scope of their office or employment when speaking with the press, including with respect to personal matters." *See* ECF No. 3-1 at 4. But as should now be clear, that argument is inconsistent with New York law, which holds that employees fall outside the scope of their employment if they act in pursuit of private purposes while disregarding or disrupting duties owed to their employer. There is no authority in New York for an unqualified "elected official" exception to this rule. *See, e.g.*, *Perks*, 251 F. Supp. 2d at 1167 (finding an elected official acted outside the scope of her employment while defaming the plaintiff in police reports and a newspaper advertisement); *Glacken v. Village of Freeport*, No. 09 Civ. 4832, 2014 WL 1836143, at *6 (E.D.N.Y. May 8, 2014) (finding the Mayor of Freeport acted outside the scope of his employment while defaming the plaintiff and noting "a mayor's activities *may*, depending on the circumstances, fall within the scope of his employment at any time of the day and in diverse locations" (emphasis added)).[19]

---

[18] Although New York laws governs and supplies a more restrictive rule of *respondeat superior* liability than does D.C., the ultimate outcome would be the same under D.C. law. *See Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) ("The District of Columbia's formulation of th[e scope of employment] test excludes from the scope of employment all actions committed solely for the servant's own purposes."). Since D.C. law does not apply to this case, and to comply with the Court's page limits, we have not briefed that issue, but we can submit a supplemental brief on the application of D.C. scope of employment law if the Court so desires.

[19] Consistent with this understanding, and based on deeply rooted public policy principles, New York courts have carefully restricted the scope of the absolute privilege against defamation liability afforded to elected officials for statements made in the context of performing their public duties. *See Clark v. McGee*, 49 N.Y.2d 613, 618-19 (1980); *Cheatum v. Wehle*, 5 N.Y.2d 585, 593 (1959); *Greaney v. Ferrer,* 278 A.D.2d 154, 155 (1st Dep't 2000).

The cases cited by the Justice Department do not demonstrate otherwise. To start, none of them applies New York law; they all apply law from states with a broader view of *respondeat superior*. For instance, *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006), applies D.C.'s expansive *respondeat superior* test, which is governed by cases taking a significantly narrower view of the "personal motives" exception than do New York cases. *Compare id.* at 664-65, *with cases cited supra* at 23-26. And unlike in the New York cases cited above, the D.C. cases cited in *C.A.I.R.* focus on the general activity in which the defendant was engaged (speaking to the press), rather than on the specific act alleged to remove his conduct from the scope of employment (the defamatory statement). *Compare id.* at 664-65, *with cases cited supra* at 25-26, 32.[20] The Justice Department's authorities are inapposite on these grounds alone.

Moreover, all five of its cases involve statements by Members of Congress on pending legislative matters or public events of widespread political interest. *See Does 1-10 v. v. Haaland*, 2020 WL 5242402, at *6, *8 (6th Cir. 2020) (Senator Warren and Representative Haaland "were reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall."); *Wuterich v. Murtha*, 562 F.3d 375, 385 (D.C. Cir. 2009) (statement by the Ranking Member of the House Appropriations Committee's Subcommittee on Defense regarding military killing of Iraqi civilians); *C.A.I.R.*, 444 F.3d at 662 (statement by Member of Congress that C.A.I.R. was the "fund-raising arm for Hezbollah"); *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (statement by Chairman of the House Appropriations Committee on a plaintiff's lobbying in relation to a pending appropriations bill); *Operation Rescue Nat'l v. United*

---

[20] *C.A.I.R.* also notes the defendant's interest in maintaining a positive reputation in his profession and potentially campaigning for re-election. New York courts, in contrast, have held that defendants who advanced similar interests were acting outside the scope of their employment. *See Glacken*, 2014 WL 1836143, at *6 (campaigning); *Demas*, 291 A.D.2d at 661 (scientist who sought to advance "his own reputation in the academic community").

*States*, 975 F. Supp. 92, 94–95 (D. Mass. 1997) (statement by Senator Kennedy on legislation scheduled to be considered by the Senate the next day). None of these cases involved statements remotely analogous to Trump's personal attacks on Carroll. There is a world of difference between Members of Congress making controversial comments on affairs of state and the President repeatedly slandering a private citizen to punish her for revealing that he sexually assaulted her. That is particularly true in light of the comprehensive allegations in the Complaint concerning Trump's motives for defaming Carroll. *Compare Haaland*, 2020 WL 5242402, at *6 ("[T]he Senator's employer was his constituents and he served them by fully informing them of his views and working to pass legislation he believed would benefit them."), *with* Compl. ¶ 128 ("Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her.").

The Justice Department assigns overwhelming weight to the fact that "when providing the challenged statements, the President was speaking to or responding to inquiries from the press." ECF No. 3-1 at 5. To be sure, elected officials may sometimes need to comment on their private lives to do their jobs effectively and maintain their constituents' trust. *See Haaland*, 2020 WL 5242402, at *7; *C.A.I.R.*, 444 F.3d at 665-66. But no case holds that press statements *automatically* fall within elected officials' scope of employment—and no case finds that a federal official acted within their employment by defaming a private citizen for private conduct while discussing their own private affairs. *See C.A.I.R.*, 444 F.3d at 666 (disagreeing that its holding "would immunize many federal employees for any gratuitous slander in the context of statements of a purely personal nature"). It would be startling and unprecedented to hold that federal officials act within their jobs in defaming any citizen—at any time, for any reason, no matter how personal or private their

33

A-356

slanderous statements—because doing so might incidentally improve their political or electoral position. *See Overton*, 180 A.D.2d at 957 (personal motives defeat a scope of employment finding even if the activity "could also have a possible benefit to the employer"); *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (Presidents can engage in "purely private acts"); *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704 (there is an "outer perimeter" on the President's official duties).

In fact, the Justice Department's position here bears an unnerving resemblance to the most disreputable claim advanced by President Trump's lawyers in the recent impeachment trial. There, Professor Alan Dershowitz argued that Trump can engage in official acts for personal gain—without risking loss of his job as President—so long as he believes that advancing his own personal interests in abusing power will incidentally benefit the nation by helping to keep him in office. *See* Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, WASHINGTON POST (Jan 29, 2020) ("[I]f a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachable offense]."). Here, the Justice Department implies that Trump can engage in private tortious acts for personal gain—without exceeding the scope of his employment as President—so long as he believes that advancing his own personal interests in harming other citizens will incidentally benefit the nation by improving his political standing. This reasoning has no place in any discussion of the American presidency. Rather, it calls to mind King Louis XIV's famous declaration, "*L'état, c'est moi*."

**III.   If the Court Concludes That There Is A Factual Dispute Bearing on Whether Trump is Covered by the FTCA, It Should Order Discovery or Hold a Hearing**

For the reasons set forth above, the Court can and should overturn the Attorney General's certification that Trump's tortious conduct is covered by the FTCA. *See Gutierrez*, 515 U.S. at 420, 423-437, 115 S. Ct. at 2229, 2231-37. At the very least, however, it should conclude that Carroll has "alleged sufficient facts that, taken as true, would establish that [Trump's] actions

34

exceeded the scope of [his] employment." *Stokes*, 327 F.3d at 1215. In that event, the proper course is to order "limited discovery and hold an evidentiary hearing to resolve [the] material factual dispute regarding the scope of [Trump's] employment." *See id.* at 1214 (citations omitted); *see also Wuterich*, 562 F.3d at 381; *Riviello*, 47 N.Y.2d at 303 ("[B]ecause the determination of whether a particular act was within the scope of the [worker's] employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury.").

Indeed, courts have ordered discovery in FTCA cases where plaintiffs raised material factual disputes as to whether defendants acted with personal motives—and thus outside the scope of their employment—in making defamatory statements. *See Weeks v. Oswald*, No. 1:12 Civ. 82, 2012 WL 3012640, at *8 (D. Idaho July 23, 2012); *Bergeron v. Henderson*, 47 F. Supp. 2d 61, 79 (D. Me. 1999); *see also Allstate Ins. Co. v. Quick*, 254 F. Supp. 2d 706, 708 (S.D. Ohio 2002).[21]

---

[21] Carroll approached the Justice Department about discovery shortly after this case was removed to federal court and sought to reach a consensual resolution of the issue. The Justice Department, however, took the position that it would oppose any discovery unless the Court concluded that Carroll was entitled to it under the standard set forth above.

35

A-358

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that the Government's motion to substitute the United States as defendant should be denied or, in the alternative, that the Court should hold an evidentiary hearing into whether Trump acted within the scope of his employment as President in defaming Carroll on June 21, June 22, and June 24, 2019.

Respectfully submitted,

/s/  Roberta A. Kaplan

October 5, 2020

Roberta A. Kaplan
Joshua Matz
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Plaintiff E. Jean Carroll*

36

A-359

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

E. JEAN CARROLL,

         *Plaintiff,*

    *v.*

DONALD J. TRUMP, in his personal capacity,

    Defendant.

No. 1:20-cv-07311

**DECLARATION OF ROBERTA A. KAPLAN IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO SUBSTITUTE**

I, ROBERTA A. KAPLAN, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a partner of the law firm Kaplan Hecker & Fink LLP and counsel for Plaintiff E. Jean Carroll ("Plaintiff") in the above-captioned action.

2.     I respectfully submit this Declaration in support of Plaintiff's Opposition to Defendant's Motion to Substitute.

3.     Attached hereto as **Exhibit A** is a true and correct copy of a letter sent from R. Kaplan to M. Kasowitz on August 8, 2020.

4.     Attached hereto as **Exhibit B** is a true and correct copy of a letter sent from R. Kaplan to P. Burgo on August 13, 2020.

5.     Attached hereto as **Exhibit C** is a true and correct copy of a letter sent from P. Burgo to R. Kaplan on August 17, 2020.

6.     Attached hereto as **Exhibit D** is a true and correct copy of a letter sent from R. Kaplan to P. Burgo on August 18, 2020.

7.     Attached hereto as **Exhibit E** is a true and correct copy of a letter sent from R. Kaplan to P. Burgo on August 26, 2020.

A-360

8.      Attached hereto as **Exhibit F** is a true and correct copy of a letter sent from P. Burgo to R. Kaplan on August 31, 2020.

9.      Attached hereto as **Exhibit G** is a true and correct copy of a letter sent from R. Kaplan to P. Burgo on September 1, 2020.

10.     Attached hereto as **Exhibit H** is a true and correct copy of a letter sent from P. Burgo to R. Kaplan on September 2, 2020.

Dated: October 5, 2020
       New York, New York
                             Roberta A. Kaplan

-2-

A-361

# EXHIBIT A

A-362

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

August 10, 2020

**VIA EMAIL**

Marc E. Kasowitz, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

   *Re:*  *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Marc:

   We write on behalf of Plaintiff E. Jean Carroll in the above-referenced action following the Court's decision denying Defendant's motion for a stay of proceedings pending the Court of Appeals' adjudication of *Zervos v. Trump*. *See* Doc. No. 110. As a result of that decision, the relevant deadlines in the Court's Preliminary Conference Order dated December 12, 2019 are no longer "temporarily stayed." Doc. No. 39 at 2. This letter sets forth our understanding of the current status of this case and discovery in this case as a result of the Court's recent decision.

   As you might recall, the Order and Stipulated Briefing Schedule that the Court entered on February 3, 2020, adjourned all discovery and extended the deadlines in paragraphs 1, 2, 5, and 6 of the Preliminary Conference Order "by the amount of time from January 31 to the date of the Court's decision on Defendant's motion to stay, plus five business days." Doc. No. 39 at 2. According to our calculations, the period from January 31 to August 7, 2020, represents a total of 190 days.

   As a result, Defendant's deadline to respond to Plaintiff's Second Set of Document Requests (originally January 30, 2020) is now August 14, 2020, and the date set by Plaintiff's First Notice to Submit to Physical Examination (originally March 2, 2020) is now September 15, 2020. We can be flexible with respect to the location and method for obtaining Defendant's DNA sample in order to accommodate security needs or other issues. Please let us know if you would like to discuss. The other relevant upcoming dates are as follows:

A-363

# KAPLAN HECKER & FINK LLP

2

- The parties shall furnish insurance coverage on or before August 21, 2020.

- The parties shall (a) exchange names and addresses of all eye witnesses and notice witnesses, statements of opposing parties, and photographs, or, if none, provide an affirmation to that effect on or before August 21, 2020; (b) serve demands for discovery and inspection on or before August 21, 2020, objections to which shall be stated on or before September 18, 2020.

- The parties shall serve: (a) any demand for a bill of particulars on or before August 21, 2020; and (b) any bill of particulars on or before September 18, 2020.

- A telephonic compliance conference with Judge Saunders shall be held on September 30, 2020 at 11:00 a.m.

- The parties shall complete all depositions on or before October 20, 2020.

- The end date of all pre-trial disclosure is November 9, 2020.

- Plaintiff shall file a note of issue/certificate of readiness on or before November 10, 2020.

- The parties shall make any dispositive motion(s) on or before 60 days from the filing of the note of issue.

We recognize that Defendant's prior counsel served us with a notice to take Plaintiff's deposition on January 23, 2020, with a date for her deposition of February 13, 2020. Please let us know when you would like to take Plaintiff's deposition. We assume that you would also like to take the depositions of Plaintiff's friends Lisa Birnbach and Carol Martin—in whom Plaintiff confided shortly after President Trump sexually assaulted her—and are happy to get their availability so that you do not have to issue subpoenas and send a process server to their homes during the COVID pandemic. In light of COVID, we are operating under the assumption that all depositions will be taken remotely by video. Other than the individuals mentioned above, we are not aware of any other fact witness who needs to be deposed, but are happy to discuss further if you disagree.

Given that the deadline for depositions will soon be upon us, we attach as Exhibit A Plaintiff's Notice of Deposition to Defendant Donald J. Trump. Although the deposition notice specifies September 21, 2020 as the date for Defendant's deposition, we are happy to work with you to identify a date, method, and location that accommodates Defendant's schedule. We propose that Defendant first provide us with a DNA sample, so that our experts can have an opportunity to test it before we take his deposition.[1]

To be sure, we fully recognize your client's unique position and will "accommodate the President's needs." *Clinton v. Jones*, 520 U.S. 681, 709 (1997); *see also id.* at 691-92 ("We assume

---

[1] We assume that you will want to take the deposition of someone at the Forensic Analytical Crime Lab, but since we don't want to have to do that twice, it makes sense to do so only after we have received and analyzed Defendant's DNA sample.

A-364

**KAPLAN HECKER & FINK LLP**

3

that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule."). At the same time, "several Presidents . . . have given testimony," *id.* at 709, and have "responded to written interrogatories, given depositions, and provided videotaped trial testimony," *id.* at 692 n.14. Because the United States Supreme Court has made it clear that Presidents are not exempt from giving testimony in civil cases, we fully expect that Defendant will testify in a timely manner. President Clinton made time to testify under oath about allegations of sexual harassment, and so President Trump can surely make time to testify about allegations of sexual assault and defamation. His testimony about what he did (and what he said) will strike to the very heart of the case and offer evidence that cannot be obtained from any other sources. He is obviously required to provide it.

Finally, out of an abundance of caution, we note that the parties previously stipulated that they would "meet and confer regarding the timing of [an appeal of any adverse ruling on Defendant's motion to stay] prior to taking any action before the Appellate Division, First Department." Doc. No. 39 at 2. We are hopeful that Defendant now recognizes, as did Judge Saunders, that *Trump v. Vance*, 140 S. Ct. 2412 (2020), leaves no doubt that his claim to presidential immunity necessarily fails. If you intend to appeal Judge Saunders' decision to the First Department, however, please let us know when you would like to meet and confer about such an appeal.

Very truly yours,

Roberta A. Kaplan, Esq.

cc:      Counsel of Record (via email)

A-365

# EXHIBIT A

A-366

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

E. JEAN CARROLL,

                            *Plaintiff*,

  -against-

DONALD J. TRUMP, in his personal capacity,

                        *Defendant*.

---

Index No. 160694/2019

Hon. Verna L. Saunders

**PLAINTIFF'S NOTICE OF DEPOSITION TO DEFENDANT DONALD J. TRUMP**

PLEASE TAKE NOTICE THAT, pursuant to CPLR § 3107, Defendant Donald J. Trump is required to appear for a deposition upon oral examination before a notary public or other person who is authorized by law to administer oaths. The deposition will take place on September 21, 2020, either remotely by video, at the White House, or at the offices of Kaplan Hecker & Fink LLP, 350 Fifth Avenue, Suite 7110, New York, New York 10118, or at such other location, date, and time as may be mutually agreed upon by the parties. The deposition will be recorded by stenographic means and may be recorded by video means.

Dated: New York, New York
       August 10, 2020

By: _____
    Roberta A. Kaplan
    Joshua Matz
    Matthew J. Craig
    KAPLAN HECKER & FINK LLP
    350 Fifth Avenue, Suite 7110
    New York, New York 10118
    Tel: (212) 763-0883
    Fax: (212) 564-0883
    rkaplan@kaplanhecker.com
    jmatz@kaplanhecker.com
    mcraig@kaplanhecker.com

    *Counsel for Plaintiff E. Jean Carroll*

A-367

# EXHIBIT B

A-368

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL   rkaplan@kaplanhecker.com

August 13, 2020

**VIA EMAIL**

Paul J. Burgo, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

> *Re:*   *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Paul:

We write on behalf of Plaintiff E. Jean Carroll in the above-referenced action to follow up on our telephonic meet-and-confer earlier today.

Even though your firm has been involved in this case for many months[1]—and thus you should be fully aware of the issues and discovery deadlines—you claimed during our call this morning that you are still "getting up to speed" and requested a 30-day extension of all deadlines. As a courtesy, we will agree to extend the August 14 deadline for a response to our Second Set of Document Requests to August 21, 2020. But we cannot agree to any other extensions of the existing schedule at this time. A one-week extension on your response to Plaintiff's Second Set of Document Requests seems to us to be entirely reasonable since we have never perceived this as a document-intensive case and would be surprised if responding to those requests were burdensome. (If we are somehow mistaken in this regard, please let us know by explaining why). Regardless, your client received those requests many months ago and should have no difficulty responding by August 21, 2020.

With that one exception, there is no basis at this point to extend any other discovery deadlines. You filed a motion to stay discovery on February 4, 2020. That motion was denied on August 7, 2020. Your client is not entitled to a *de facto* extension of your rejected stay motion on the ground that sophisticated lawyers at his own firm profess unfamiliarity with the issues in his case. And frankly, we are concerned that the reason why you asked for a 30-day extension may

---

[1] Specifically, you filed your notice of appearance in this case on February 4, 2020. *See* Doc. No. 42. Your partners, Marc Kasowitz and Christine Montenegro, filed notices of appearance on that same day. *See* Doc. Nos. 40, 41.

A-369

# KAPLAN HECKER & FINK LLP

2

have been to continue your client's strategy of needless delay, which has already impeded progress in this litigation for the better part of a year. As we discussed, you certainly have the right to file an appeal from Judge Saunders's order any time before September 7, 2020. You do not have the right to an automatic extension of all discovery deadlines while you decide whether to appeal, nor do you have the right to pause discovery as part of a calculated effort to obtain the maximum delay possible before appealing. Of course, separate from your assertion that you are not sufficiently "up to speed" on the issues in this case—which strikes us as surprising, given the importance of the issues and who your client is—you have not identified any reason why you are otherwise unable to comply with the existing schedule. Accordingly, we expect that you will comply with all discovery deadlines set forth in our letter dated August 10, 2020, with the one exception being that the August 14, 2020 deadline is now changed to August 21, 2020.

Very truly yours,

Roberta A. Kaplan, Esq.

cc:     Counsel of Record (via email)

A-370

# EXHIBIT C

A-371

# KASOWITZ BENSON TORRES LLP

| | 1633 BROADWAY | ATLANTA |
| | NEW YORK, NEW YORK 10019 | HOUSTON |
| Paul J. Burgo | | LOS ANGELES |
| Direct Dial: (212) 506-1865 | (212) 506-1700 | MIAMI |
| Direct Fax: (212) 835-5265 | FAX: (212) 506-1800 | NEWARK |
| PBurgo@Kasowitz.com | | SAN FRANCISCO |
| | | SILICON VALLEY |
| | | WASHINGTON DC |

August 17, 2020

BY EMAIL

Roberta A. Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY  10018
rkaplan@kaplanhecker.com

   Re: *Carroll v. Trump, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)*

Dear Robbie:

   I write in response to your August 13, 2020 letter to me.

   Your letter incorrectly characterizes our August 13th meet-and-confer.  We stated during our call that we needed a 30-day extension to respond to the discovery deadlines given that we had just taken over the case from Larocca Hornik Rosen & Greenberg LLP in late July.  While we filed a notice of appearance in the case earlier, our role was limited solely to briefing and arguing the stay of the *Carroll* action in light of the pending appeal in *Zervos v. Trump* before the Court of Appeals.  We played no role whatsoever in any discovery matters in this case, as your firm was well aware, having directed its communications concerning such matters solely to Mr. Rosen's firm.

   Your letter also fails to acknowledge that we had asked that you extend the courtesy of additional time for discovery since the expedited schedule in this case had been set prior to the COVID-19 pandemic.  As we mentioned on the call, we will let you know within the next few days whether we are appealing the Court's denial of defendant's stay motion.  In all other cases during these challenging times, including those involving the President, the parties have worked cooperatively and readily accommodated such requests.  Moreover, the President's assertion of his Constitutional immunity -- a threshold issue in this case -- and our request for a reasonable accommodation are not a "*de facto* extension of [our] stay motion" or part of a "calculated effort to obtain the maximum delay possible before appealing."  Rather, courts have recognized the need for such accommodations.  *See, e.g. Nixon v. Sirica*, 487 F.2d 700, 721 (D.C. Cir. 1973) (directing District Court to "provide a reasonable stay to allow the President an opportunity to appeal"); *see also Zervos v. Trump*, 171 A.D.3d 110, 127 (1st Dep't 2019) (noting that "we must

A-372

**KASOWITZ BENSON TORRES LLP**

Roberta A. Kaplan, Esq.
August 17, 2020
Page 2

[assume] here, that reasonable accommodations would be made with respect to the President's schedule")  And, as you know, the Supreme Court recently in *Trump v. Vance* reaffirmed that "[t]he high respect that is owed to the office of the Chief Executive … should inform the conduct of the entire proceeding, including the timing and scope of discovery."  140 S. Ct. 2412, 2430 (2020) (citing *Clinton v. Jones*, 520 U.S. 681, 707 (1997)).

You indicated the meet-and-confer that while you were not inclined to agree to a 30-day extension in the event that we are appealing the denial of the stay, you would make a proposal for us to consider.  Instead of making such a proposal, you have unilaterally and unreasonably extended the deadline by only one week and demanded that we respond by August 21 to the Plaintiff's Second Set of Document Requests, which are objectionable as, among other things, unduly burdensome and patently overbroad.  Thus, in an effort to meet and confer, we again ask that you agree to a modest extension of 21 days (assuming the President's duties allow) for all existing deadlines.  We reserve all rights.

Sincerely,



(Paul J. Burgo)

A-373

# EXHIBIT D

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

August 18, 2020

**VIA EMAIL**

Paul J. Burgo, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

   *Re:* *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Paul:

   I write in response to your letter of yesterday's date.

   For starters, we remain puzzled by your assertion that despite entering an appearance in this matter on February 4, 2020, you have not familiarized yourself sufficiently with the factual issues in this case, consulted with your client, or prepared for the possibility that your motion to stay proceedings would be denied. In fact, I distinctly remember raising discovery issues during my oral argument before Judge Saunders on your motion for a stay against your partner Christine Montenegro on March 4, 2020. As a result, there is no excuse for a lack of preparation on your part, and it certainly does not excuse satisfaction of your client's obligations.

   You further suggest in your August 17 letter that COVID-19 presents an impediment to the current schedule. We recognize that these are challenging times and for that reason, we agreed to extend the deadline for your response to our Second Set of Document Requests. However, you still fail to identify any specific discovery obligation that you are unable to comply with as a result of the pandemic. Indeed, as I am sure you are well aware given the many litigations handled by your law firm, discovery in civil cases has been proceeding apace, including both the production of documents using secure internet technology and the taking of depositions, the later of which have been happening with surprising ease via Zoom, Live Litigation, and other similar platforms. *See, e.g.*, AO/129/20, Administrative Order of the Chief Administrative Judge of the Courts in New York State (June 22, 2020) ("[C]ounsel and litigants are strongly encouraged to pursue discovery in cooperate fashion and to employ remote technology in discovery whenever possible."). As noted in my August 13 letter, we have been operating on the assumption that your client does not have a huge number of responsive documents since this case does not relate to any

KAPLAN HECKER & FINK LLP                                                                            2

of his businesses.  You did not attempt to disabuse us of that assumption in your August 17 letter. Given the resources available to you, it is implausible that you literally cannot make progress on producing documents or complying with any other discovery requests without an additional three-week extension, especially since we are willing to accept documents on a rolling basis.  If you can explain with some specificity exactly which deadlines you are unable to satisfy as a result of pandemic-related challenges, we remain happy to consider such a request.

Finally, you articulate once again your client's position that he is entitled to absolute immunity—a claim that (1) Judge Saunders has rejected, (2) was twice rejected in the *Zervos* proceedings, and (3) rests on anti-democratic premises which the Supreme Court has firmly rejected each time it has considered them (under Presidents Trump, Clinton, and Nixon). To be sure, we appreciate the importance of ensuring that "respect that is owed to the office of the Chief Executive . . . inform[s] the conduct of the entire proceeding, including the time and scope of discovery." *Trump v. Vance*, 140 S. Ct. 2412, 2430 (2020) (citation omitted).  But your client seems to have time on his hands:  it appears that he has played golf at least seven times so far this month and has also spent considerable time campaigning (which, as you know, does not qualify as an official Presidential duty). He also found time to defame our client, E. Jean Carroll, after she revealed that he had sexually assaulted her. If Donald Trump has the time to attack our client, he also has the time to answer in court for his brutality.  In any event, given that the discovery requests in this case were served seven months ago, and have been suspended only by virtue of the pendency of your own meritless stay motion, we believe we have more than sufficiently accommodated the demands on your client's time. At this point, it is his duty to follow the law—and that means complying with (or at least responding to) our discovery requests, which he and you have now had many months to consider.

Given the above, we cannot agree to an across-the-board extension of "21 days (assuming the President's duties allow)."[1] Again, if there are specific deadlines that you believe you cannot meet, please let us know what they are and explain with specificity why you cannot meet them. Otherwise, we anticipate that your client will do what every other American must do: respect the legal process and obey the law. Accordingly, your client's responses to our Second Set of Document Requests are due this Friday, August 21, 2020.

Very truly yours,

*Robbie*

Roberta A. Kaplan, Esq.

cc:      Counsel of Record (via email)

---

[1] We note that, as a practical matter, you have not really changed your position on the length of your requested extension since you made your original request for a 30-day extension on August 13.

# EXHIBIT E

A-377

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

August 26, 2020

**VIA EMAIL**

Paul J. Burgo, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

   *Re:*  *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Paul:

  I write in response to the Responses and Objections to Plaintiff's Second Set of Document Requests that Defendant Donald J. Trump served on August 21, 2020.

  As we have stated on multiple occasions, we do not expect discovery in this action to be particularly burdensome. We are operating on the assumption that your client does not have a large number of responsive documents, and you have not attempted to dissuade us of that assumption. We are also are mindful that your client's position as President will inform the "timing and scope of discovery," *Trump v. Vance*, 140 S. Ct. 2412, 2430 (2020), and thus we remain willing to meet and confer with respect to the scope of particular requests for which, it turns out, Defendant has substantial responsive documentation in his possession, custody, or control.

  But Defendant cannot unilaterally decide to forgo participation in discovery. Judge Saunders, the First Department, and the Supreme Court have already rejected Defendant's claims of presidential immunity, just like the Supreme Court rejected the immunity claims of Presidents Clinton and Nixon before him. Yet it now appears that Defendant, through the assertion of blanket and inapplicable objections and overboard claims of executive privilege, is trying to achieve *de facto* immunity—what he (unsuccessfully) tried to do by motion practice—as this case moves ahead.

  Below we identify several overarching concerns relating to Defendant's Responses and Objections. In connection with each of these concerns, we request basic information that we hope will pave the way to a productive meet-and-confer. Absent responses to the inquires we set forth,

KAPLAN HECKER & FINK LLP

2

it is difficult to see how the parties might constructively engage on Defendant's Responses and Objections without the Court's involvement.

*First*, in response to 27 of our 39 requests (Request Nos. 2-4, 6-17, 19-21, 23, 30-37), Defendant asserts a series of generalized and conclusory objections, and then takes the position that *no* responsive documents will be produced.

But the objections Defendant asserts are, by and large, inapplicable on their face. For example, Request No. 2 seeks documents concerning Plaintiff; Request No. 3 seeks documents concerning the article and book in which Plaintiff disclosed her sexual assault at the hands of Defendant; and the requests that immediately follow seek documents concerning Defendant's three defamatory statements on which this case turns. Defendant objects to each on the ground, *inter alia*, that the request "seeks documents which are neither relevant to any party's claim or defense or to the subject matter of this lawsuit."

That objection defies logic. Given the nature of the relationship between the parties, it is virtually impossible that documents concerning Plaintiff or her two publications, or documents concerning Defendant's own defamatory statements, could be considered irrelevant to this action.

And those are just a few of the deficiencies that plague Defendant's Responses and Objections. As you know, CPLR 3122(a)(1) requires that a party objecting to a request for documents state "with reasonable particularity the reasons for each objection." Your recitation of identical, conclusory, and often plainly inapplicable objections in response to each and every request violates both the text and spirit of this rule.

In order to move discussions in productive direction, no later than by August 31, 2020, please (1) identify any of the above-listed requests for which you claim no responsive documents exist, and (2) for any request for which responsive documents do exist, identify the specific objection on which you are standing to withhold those documents.

*Second*, in response to the remaining 12 requests (Request Nos. 1, 5, 18, 22, 24-29, 38-39), Defendant also asserts generalized and facially inapplicable objections, but then states some version of "[s]ubject to and without waiving the foregoing objections and the General Objections," Defendant will produce "non-privileged, responsive documents, if any, . . . at an appropriate time and place."

As with the previous set of requests, the blanket and misguided nature of Defendant's objections makes meaningful discussion of those objections impossible. By way of example, Request No. 39 seeks all documents Defendant "intend[s] to introduce into evidence at trial in this Action." Defendant declares that request "overly broad, unduly burdensome" and contends that it "seeks documents which are neither relevant to any party's claim or defense or to the subject matter of this lawsuit." It requires no explanation why that is a nonsensical position to take.

Once again, to move discussions in productive direction, by August 31, please (1) identify any requests for which you claim no responsive documents exist, (2) for any request for which the "subject to" language means you are withholding responsive documents, identify the specific objection on which you are standing to withhold those documents, and (3) for any documents you

A-379

KAPLAN HECKER & FINK LLP

3

do intend to produce, confirm whether you have somehow concluded that now is not the "appropriate time and place" to produce them.

*Third*, Defendant objects to "each and every Request to the extent that they seek documents protected by the Executive Privilege presumptively applicable to all Presidential communications. Defendant further objects to each and every Request, and in particular, Paragraph 6 of the Instructions, on the ground that the President need not 'assert executive privilege to narrow the' Requests or make a decision on executive privilege as to a 'large array of documents.'"

There is no reason to think that the executive privilege has any application here. As you know, "[t]hat privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020); *see also Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 621 (S.D.N.Y. 2018) ("The [presidential communications] privilege protects communications in performance of a President's responsibilities, of his office, and made in the process of shaping policies and making decisions." (internal quotation marks and alterations omitted)). The privilege seeks to further the public interest by allowing for "complete candor and objectivity from [presidential] advisers." *United States v. Nixon*, 418 U.S. 683, 706 (1974).

The discovery that Plaintiff has requested obviously does not involve a matter of governmental concern or relate in any way to Defendant's performance of his presidential duties. Instead, Plaintiff seeks discovery regarding Defendant's private conduct—specifically, his defamation of Plaintiff after Plaintiff accused him of sexually assaulting her in the 1990s. Any communications that Defendant may have had about Plaintiff, his assault, or his defamatory statements do not become protected "presidential" communications simply by virtue of his status of President. The Court has already rejected Defendant's claim to presidential immunity because this lawsuit concerns his private, rather than official, conduct. He cannot obtain *de facto* presidential immunity by withholding responsive documents about his private conduct on the theory that those documents concern his official duties.

Please confirm by August 31 whether you intend to stand on your assertion of executive privilege to withhold responsive documents and, if so, identify the requests to which that assertion applies.

*Fourth*, Defendant asserts a general objection to "each and every Request" on the ground that "they are not limited to a reasonable timeframe" and goes on to assert timeframe objections to certain specific requests as well (Request Nos. 25-28).

Given that it has been just over a year since Defendant defamed Plaintiff, the vast majority of Plaintiff's requests are, by their very subject matter, limited to a narrow timeframe. And in the few instances where Defendant specifically objects to a request "because it has no time limitation," the documents sought are so limited in nature that it should not be burdensome to produce documents from a multi-year period. However, please let us know if we have underestimated, for example, the number of "purchase records or sales receipts" for Defendant's purchases at Bergdorf Goodman (Request No. 26), or the number of documents reflecting "payments or offers of payments that [Defendant] made" in relation to allegations of "sexual assault or other unwanted or inappropriate sexual contact" (Request No. 35). If we have, we are willing to meet and confer on

A-380

KAPLAN HECKER & FINK LLP                                                    4

an appropriate time limitation that might alleviate the burden of producing extensive documents in response to such requests.

       Please also confirm by August 31 whether you intend to stand on your timeframe objection to withhold or refuse to search for any responsive documents and, if so, identify the requests to which that objection applies.

*    *    *

       We look forward to your response by August 31 and are hopeful that it will help facilitate a productive and focused meet-and-confer. Please let us know if you are available for such a meet-and-confer on September 1, 2, or 3. In the meantime, we reserve all rights pursuant to CPLR §§ 3124 and 3126.

Very truly yours,

Roberta A. Kaplan, Esq.

cc:     Counsel of Record (via email)

A-381

# EXHIBIT F

A-382

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

Paul J. Burgo
Direct Dial: (212) 506-1865
Direct Fax: (212) 835-5265
PBurgo@Kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

August 31, 2020

Via Email
Roberta A. Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, Ste. 7110
New York, New York 10118
rkaplan@kaplanhecker.com

> Re:   *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.).

Dear Robbie,

We write in response to your August 26, 2020 letter to me, which mischaracterizes, among other things, defendant's discovery obligations and the applicability of the executive privilege in this case.  As detailed below, we are willing to meet and confer regarding defendant's responses and objections to the Requests, but your letter provides no basis for defendant to withdraw any of his objections.

As you know all of our communications and responses are subject to and reserving all rights, under the Supremacy Clause and Article II of the United States Constitution, from a state court exercising jurisdiction over a sitting President while he or she serves as President, including the President's right to appeal the Court's denial of the stay in this action, and any other applicable rights or protections pertaining to the President.

*First*, while we are attempting to accommodate you by providing a response to your letter in the timeframe you requested, it is improper for plaintiff to unilaterally demand a response at the time most convenient to plaintiff, given "[t]he high respect that is owed to the office of the Chief Executive . . . ., [which] is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery."  *Clinton v. Jones*, 520 U.S. 681, 707 (1997).

*Second*, defendant stands by his objection that the Requests are improper because they are not limited by any timeframe whatsoever.  The purported incident alleged in plaintiff's Complaint (Compl. pp. 5-7) allegedly occurred almost twenty-five years ago, and multiple requests seek information from the beginning of time to the present.  (*See, e.g.*, Request Nos. 2 and 25-37.)  For example, Request No. 26, seeks -- without any time limitation -- all of defendant's purchase records or sales receipts at Bergdorf Goodman.  Plaintiff has not offered any explanation as to why such documents from the beginning of time are discoverable, particularly in light of the unnecessary burden such a request would impose on defendant.

**KASOWITZ BENSON TORRES LLP**

Roberta Kaplan, Esq.
August 31, 2020
Page 2

Plaintiff asserts in response only that defendant should first collect and search for documents from the beginning of time and then, after ascertaining whether responsive documents exist, meet and confer as to whether the time frame for the Requests would be unduly burdensome. That stands the correct process on its head. It is not defendant's burden to formulate reasonably limited requests for plaintiff -- the onus is "on the party seeking disclosure to demonstrate that the method of discovery sought will result in the disclosure of relevant evidence or is reasonably calculated to lead to the discovery of information bearing on the claims." *Stepping Stones Assocs., L.P. v. Scialdone*, 148 A.D.3d 855, 855 (2d Dep't 2017).

Attempting to shift the burden to the defendant in such a manner is improper in any case, but given that the requests are directed to the President, it is particularly improper. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 383, 388 (2004) (the President is not required to bear the burden of critiquing unacceptable discovery requests "line by line"). Thus, we are willing to meet and confer regarding defendant's responses provided that plaintiff first properly tailors her requests.

*Third*, you write that the executive privilege does not apply because "plaintiff seeks discovery regarding Defendant's private conduct." (Letter at 3.) That is not so. "Presidential communications are presumptively privileged." *United States v. Nixon*, 418 U.S. 683, 708 (1974). "No court has ever declined to treat executive communications as presumptively privileged on the grounds that the matters discussed involved private conduct." *See In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25 (D.D.C.), *aff'd sub nom. In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998), *and aff'd in part, rev'd in part on other grounds sub nom. In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998). Moreover, the executive privilege encompasses confidential communications concerning preparations for the President's public statements, which are precisely the communications that Requests seek here. *See New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007).[1]

Your letter baselessly claims that defendant cannot withhold documents on the basis of the executive privilege because the "Court has already rejected Defendant's claim to presidential immunity." (Letter at 3.) However, the Court's ruling denying defendant's request for a stay on

---

[1]      Your reliance upon *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) and *Nixon*, 418 U.S. 683 is misplaced. Neither of these cases held that the executive privilege is inapplicable to Presidential communications that relate to a President addressing his or her constituents. In fact, in *Nixon*, the Supreme Court assumed that the executive privilege presumptively *did* apply to the President's communications concerning the break-in at the Democratic National Committee's headquarters -- there could hardly be more conduct more "private" than the Watergate break in. The Supreme Court nonetheless held that the privilege could be overcome only by a showing of "demonstrated, specific need in a *criminal* trial." *Nixon*, 418 U.S. 683, 713 (emphasis added). This case, by contrast, involves a civil claim in which plaintiff has not even attempted to make a showing of demonstrated, specific need. And privilege played no role whatsoever in *Mazars*, given that, unlike here, the subpoena was directed to pre-Presidential records and the President "did not . . . resist the subpoenas by arguing that any of the requested records were protected by executive privilege." *Mazars*, 140 S. Ct. at 2028.

A-384

**KASOWITZ BENSON TORRES LLP**

Roberta Kaplan, Esq.
August 31, 2020
Page 3


the basis that the Supremacy Clause purportedly does not bar a state court action against a sitting President has nothing to do with the application of an evidentiary privilege, such as the executive privilege.  Thus, contrary to your assertion, the Court's ruling in no way is relevant to or, bars defendant from, asserting and withholding documents on the basis of the executive privilege.

Finally, defendant will not be available for a deposition on the unilateral date chosen by plaintiff of September 15, 2020.


Very truly yours,

Paul J Burgo

A-385

# EXHIBIT G

A-386

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

September 1, 2020

**VIA EMAIL**

Paul J. Burgo, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019

   *Re:* *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Paul:

   I write in response to your letter of yesterday's date.

   It has been nearly a month now since the Court denied your motion for a stay on August 7. Since that time, on behalf of our client E. Jean Carroll, we have been trying to get you to answer a simple question: whether your client, Donald Trump, intends to comply with that ruling, produce documents, and participate in discovery. Despite the exchange of at least five letters on these topics in the past few weeks, we still don't have a clear answer. While we are pleased to hear that you would be willing to meet and confer regarding Plaintiff's Second Set of Document Requests and we are certainly willing to discuss limiting the date ranges for certain requests, a meet and confer will not be productive if you persist in suggesting that Defendant will never actually produce any documents in response to our Requests.

   To move the conversation forward, my last letter dated August 26, 2020 asked you to identify the requests for which you claim no responsive documents exist and, for the remaining requests, asked you to identify the specific basis on which you are withholding relevant documents. As to any documents that you are not withholding on the basis of executive privilege, I asked you to confirm whether you have somehow decided that now is not the "appropriate time and place" to produce them. Unfortunately, you again have refused to do so. In response, you instead repeated a few absurdly overgeneralized objections and offered a primer on executive privilege (which we will, of course, honor if there is a sound, particularized basis for the exercise of that privilege over a discrete subset of relevant, responsive documents).

A-387

# KAPLAN HECKER & FINK LLP

2

So let me state my question once again even more directly: are you in possession of relevant, responsive materials as to which Defendant does not assert a claim of executive privilege? And if you are, do you agree that, pursuant to Judge Saunders' order, now would be the "appropriate" time for you to produce them to us?

My client, who was sexually assaulted by Donald Trump in the mid-1990's, is tired of waiting. Please respond to this letter no later than by 9:30 a.m. tomorrow so that we can ascertain whether it will be necessary to raise this issue with the Court. In the meantime, we continue to reserve all rights.

Very truly yours,

Roberta A. Kaplan, Esq.

cc:     Counsel of Record (via email)

A-388

# EXHIBIT H

A-389

## KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

Paul J. Burgo
Direct Dial: (212) 506-1865
Direct Fax: (212) 835-5265
PBurgo@Kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

September 2, 2020

Via Email
Roberta A. Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, Ste. 7110
New York, New York 10118
rkaplan@kaplanhecker.com

       Re:    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.).

Dear Robbie,

       I write in response to your September 1, 2020 letter.

       As you know, all of our communications and responses are subject to and reserving all rights, under the Supremacy Clause and Article II of the United States Constitution, from a state court exercising jurisdiction over a sitting President while he or she serves as President, including the President's right to appeal the Court's denial of the stay in this action, and any other applicable rights or protections pertaining to the President.

       As a courtesy, we are again responding within your unilateral deadline, but kindly refrain from setting such deadlines going forward.  As you know, this case is, at a minimum, governed by, in the words of the Supreme Court, the "'[h]igh respect that is owed to the office of the Chief Executive.'"  *Trump v. Vance*, 140 S. Ct. 2412, 2430 (2020) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)).  We are not in a position -- nor, of course, is the President required -- to respond to your unilaterally imposed deadlines.

       Please be advised that we will likely appeal to the First Department Judge Saunders' order denying defendant's motion for a stay, but a final decision has not yet been made.  We will let you know as soon as we can.  However, especially now that the United States Court of Appeals for the Second Circuit granted President Trump a stay yesterday in *Trump v. Vance*, No. 20-2766 (2d Cir. Sept. 1, 2020), it is highly likely that the appellate courts will likewise grant a stay if we do appeal. (*See also* NYSCEF No. 49 at 8-10 (courts grant the President stays pending appeal as a matter of deference).)  Thus, to avoid unnecessary expense and waste of judicial and party resources, we suggest, and hereby request, that you now consent to a stay pending the appeal before the Court of Appeals in *Zervos v. Trump*.

A-390

**KASOWITZ BENSON TORRES LLP**

Roberta Kaplan, Esq.
September 2, 2020
Page 2

In the meantime, we reiterate our willingness to meet and confer concerning plaintiff's improper requests, including formulating reasonable timeframes, narrowing the scope of the requests to avoid implicating the executive privilege, and entering a mutually agreeable confidentiality order.

Very truly yours,

Paul J. Burgo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

E. JEAN CARROLL,

                          Plaintiff,

           -against-                                                    20-cv-7311 (LAK)

DONALD J. TRUMP in his personal capacity,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## ORDER SCHEDULING ORAL ARGUMENT

LEWIS A. KAPLAN, *District Judge.*

           The Court will hear oral argument in the Ceremonial Courtroom on the motion of the United States to substitute the United States for President Donald J. Trump in his individual capacity on Wednesday, October 21, 2020 at 3:30 p.m. Thirty minutes are allocated to each of the plaintiff and the United States.

           Counsel for each of the plaintiff, the defendant, and the United States each shall inform the deputy clerk on or before October 16, 2020 of the number of attorneys and their assistants whom that party wishes to have present in the courtroom.

           The undersigned prohibits the bringing of any Personal Electronic Device or General Purpose Computing Device into courtrooms, witness rooms, robing rooms, jury rooms and associated spaces, and judicial chambers used by him absent written permission granted by him as provided by standing order of the Court. *See In the Matter of Personal Electronic Devices and General Purpose Computing Devices,* Standing Order M10-468 (revised), 14-mc-0047 (filed Feb. 27, 2014). That prohibition shall apply to the oral argument and any other proceedings in this case scheduled hereby notwithstanding *In re Coronavirus/COVID-19 Pandemic,* Standing Order M10-468 (revised), 20-mc-316 (filed Sept. 9, 2020).

           SO ORDERED.

Dated:        October 9, 2020

                                                        _____
                                                        Lewis A. Kaplan
                                                        United States District Judge

A-392

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:      (202) 616-5200
Email:            stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>     Plaintiff,<br><br>   -against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>     Defendant. | **ECF Case**<br><br>No. 1:20-cv-7311-LAK-JLC |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO SUBSTITUTE THE UNITED STATES AS DEFENDANT**

A-393

**TABLE OF CONTENTS**

ARGUMENT ....................................................................................................................... 1

I.    The President's Statements are Covered by the FTCA for Multiple Reasons. ........................ 1

II.   Plaintiff's Assertion that "the FTCA Does Not Cover the President" is Meritless. ................. 7

III.    While Immaterial to the Outcome, D.C. Scope of Employment Law Applies. ................... 12

IV.  Plaintiff Has Not Overcome the Prima Facie Validity of the Certification ........................... 15

CONCLUSION .................................................................................................................... 15

## TABLE OF AUTHORITIES

### Cases

*Alexander v. FBI*, 691 F. Supp. 2d 182 (D.D.C. 2010)................................................... 11

*Ali Jaber v. United States,* 155 F. Supp. 3d 70 (D.D.C. 2016), *aff'd,* 861 F.3d 241 (D.C. Cir.

   2017) ........................................................................................................................... 9

*Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69 (D.D.C. 2017) ............................................ 11

*Anderson v. Gov't of the V.I.*, 199 F. Supp. 2d 269 (D.V.I. 2002) ................................... 3

*Aryai v. Forfeiture Support Assocs.*, 25 F. Supp. 3d 376 (S.D.N.Y. 2012).................................. 13

*Bailey v. J&B Trucking Servs., Inc.*, 590 F. Supp. 2d 4 (D.D.C. 2008) ....................................... 12

*Bello v. United States*, 93 F. App'x 288 (2d Cir. 2004)........................................................... 4, 15

*Borawski v. Henderson*, 265 F. Supp. 2d 475 (D.N.J. 2003).................................................... 3

*Bowles v. United States*, 685 F. App'x 21 (2d Cir. 2017)................................................... 13

*Budik v. Ashley*, 36 F. Supp. 3d 132 (D.D.C. 2014) ....................................................... 3

*Chapman v. Rahall*, 399 F. Supp. 2d 711 (W.D. Va. 2005) ........................................... 2, 3

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S. Ct. 2156 (2012) ....................... 9

*Clark v. McGee*, 404 N.E.2d 1283 (N.Y. 1980) ............................................................. 14

*Clark v. Wells Fargo Bank*, 585 Fed. App'x 817 (3d Cir. 2014)..................................... 15

*Clinton v. Jones*, 520 U.S. 681, 117 S. Ct. 1636 (1997)................................................... 4

*Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006).................... 2, 4, 6, 13

*Cronin v. Hertz Corp.*, 818 F.2d 1064 (2d Cir. 1987) .................................................... 12

*Davric Maine Corp. v. U.S. Postal Serv.*, 238 F.3d 58 (1st Cir. 2001) .................................... 3, 15

*De Masi v. Schumer*, 608 F. Supp. 2d 516  (S.D.N.Y. 2009) .............................................. 4, 10, 15

*Does 1-10 v. Haaland*, 973 F.3d 591 (6th Cir. 2020) ........................................................ 2, 10, 14

A-395

*Ezekiel v. Michel*, 66 F.3d 894 (7th Cir. 1995) ................................................................ 15

*Fenster v. Ellis*, 71 A.D.3d. 1079 (2d Dept. 2010) ........................................................ 14

*Gibbs v. City of New York*, 714 F. Supp. 2d 419 (E.D.N.Y. 2010) ................................ 14

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 115 S. Ct. 2227 (1994) ................... 8

*Hawver v. United States*, 808 F.3d 693 (6th Cir. 2015) ................................................. 15

*Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787 (3d Dept. 1988) ................................... 14

*Hui v. Castaneda*, 559 U.S. 799, 130 S. Ct. 1845 (2010) ............................................... 8

*James v. United States*, 48 F. Supp. 3d 58 (D.D.C. 2014) .............................................. 3

*Jacobs v. Vrobel*, 724 F.3d 217 (D.C. Cir. 2013) ..................................................... 12, 14

*Khatami v. Compton*, 844 F. Supp. 2d 654 (D. Md. 2012) .............................................. 3

*Klayman v. Obama*, 125 F. Supp. 3d 67 (D.D.C. 2015) ............................................... 3, 9

*Levin v. United States*, 568 U.S. 503, 133 S. Ct. 1224 (2013) ........................................ 8

*Maldonado v. Colon*, No. 97-3966, 1998 WL 240479 (S.D.N.Y. May 12, 1998) ....... 12

*McLaurinn v. United States*, 392 F.3d 774 (5th Cir. 2004) .......................................... 15

*Meagher v. Heggemeier*, 513 F. Supp. 2d 1083 (D. Minn. 2007) ................................... 3

*Moreno v. Small Bus. Admin.*, 877 F.2d 715 (8th Cir. 1989) .......................................... 3

*Nixon v. Fitzgerald*, 457 U.S. 731, 102 S. Ct. 2690 (1982) ........................................... 8

*Operation Rescue Nat'l v. United States*,  975 F. Supp. 92 (D. Mass. 1997) ................. 3

*Osborn v. Haley*, 549 U.S. 225, 127 S. Ct. 881 (2007) .......................................... 11, 15

*Overton v. Ebert*, 180 A.D.2d 955 (3d Dept. 1992) ...................................................... 14

*Perks v. Town of Huntington*, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ......................... 14

*Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008) .............................................................. 3

*Richards v. United States*, 369 U.S. 1, 82 S. Ct. 585 (1962) .................................... 12, 13

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)........................................................................ 13

*Saleh v. Bush,* 848 F.3d 880 (9th Cir. 2017).......................................................................... 9, 11, 13

*SAS Inst., Inc. v. Iancu*, ___ U.S. ___, 138 S. Ct. 1348 (2018) ....................................................... 7

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005)

    ............................................................................................................................................... 11

*Singleton v. United States*, 277 F.3d 864 (6th Cir. 2002) .............................................................. 15

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) ........................................................................ 3, 4

*Sullivan v. United States*, 21 F.3d 198 (7th Cir. 1994) ................................................................. 15

*Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392 (2018) .................................................................. 4

*Trump v. Mazars*, ___ U.S. ___, 140 S. Ct. 2019 (2020) ................................................................. 4

*United States v. Hatter*, 532 U.S. 557, 121 S. Ct. 1782 (2001) ...................................................... 8

*United States v. Smith*, 499 U.S. 160, 111 S. Ct. 1180 (1991) ........................................................ 7

*West v. Trump,* No. 19-2522, 2020 WL 4721291 (N.D. Tex. July 23, 2020)................................. 9

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) ....................................................................... 9, 11

*Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009)................................................................. 2, 15

**Statutes**

28 U.S.C. § 1346.......................................................................................................................... 7, 12

28 U.S.C. § 2671............................................................................................................................ 8, 9

28 U.S.C. § 2679....................................................................................................................... 7, 8, 15

28 U.S.C. § 2680............................................................................................................................... 11

Pub. Law No. 100-694 ...................................................................................................................... 8

A-397

**Other Authorities**

Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of

   Government, 26 Comp. Gen. 891 (1947) ................................................................ 11

Oxford English Dictionary (3d ed., Mar. 2016)............................................................ 7

Restatement (Second) of Agency § 228...................................................................... 13

Restatement (Second) of Agency § 229...................................................................... 13

S. Rep. No. 79-1400 (1946)........................................................................................... 7

Webster's New Int'l Dictionary (2d ed. 1943) ............................................................. 8

**Constitutional Provisions**

U.S. Const., art. II, § 1 .................................................................................................. 8

Every court that has considered the issue has held that the United States may substitute itself as the defendant in a defamation lawsuit against a Federal elected official arising out of a statement made while in office on a matter of concern or interest to the official's constituents. Plaintiff cites no contrary authority, and to the United States' knowledge, there is none.  Rather, the cases uniformly recognize Federal elected officials' responsibility to communicate regarding matters of concern or interest to their constituents and the unacceptable litigation exposure that would result in the absence of this protection.  This is even clearer with respect to the defendant here—the President of the United States—and under the circumstances here, where the President addressed matters relating to his fitness for office as part of an official White House response to press inquiries.  Nonetheless, plaintiff attempts to argue, contrary to the statutory text, consistent interpretation, and established practice, that (1) the President is uniquely excluded from the Federal Tort Claims Act ("FTCA"), or (2) the result here should be different from every other case involving defamation by Federal elected officials because New York law allegedly applies and is somehow materially different than other states' laws.  Both assertions are wrong and if endorsed by this Court would have profoundly adverse consequences outside this case.  In sum, the test under the FTCA is *not* whether, as plaintiff argues, "slander" or "defamation" is part of a Federal elected official's "job description."  It is whether the official was acting within the scope of employment—e.g., making statements to the press while on duty responding to allegations of impropriety—when the alleged defamatory statement was made.  That test applies to the President just as it would any other Federal officer or employee.  Plaintiff has offered no valid basis to deny the motion, much less overcome the prima facie validity accorded the certification.

## ARGUMENT

**I.      The President's Statements are Covered by the FTCA for Multiple Reasons.**

The President's statements fall within the scope of his employment for multiple reasons.

- 1 -

A-399

*First*, plaintiff does not dispute that courts have uniformly held that Federal elected officials act within the scope of their employment when they communicate with the public about a matter of "concern" or "interest" to their constituents, including about matters that may be deemed "personal." Mot. at 4, ECF No. 3-1. As these courts have explained, "[c]omments by elected officials on an event of widespread public interest" fall within the scope of their employment for purposes of the FTCA. *Does 1-10 v. Haaland*, 973 F.3d 591, 600 (6th Cir. 2020). This includes "comments about [a Federal elected official's] personal life that would be of concern to his constituents." *Chapman v. Rahall*, 399 F. Supp. 2d 711, 713 (W.D. Va. 2005) (citing *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006)).

This rule has been applied broadly. For example, *Ballenger* arose from the claim a member of Congress defamed a Muslim advocacy organization by telling a reporter his wife was "uncomfortable" living across from the headquarters of a "fund-raising arm" of a "foreign terrorist organization." 444 F.3d at 662. The Congressman made the statement in addressing his separation from his wife, and the D.C. Circuit rejected the plaintiff's argument that these statements were "purely private" as "at odds with reality" given the "level of public interest" in the matter. *Id.* at 665–66. In *Haaland*, the Sixth Circuit affirmed substitution, holding that social media posts from members of Congress that asserted that high school students displayed "blatant hate, disrespect, and intolerance" toward a Native American veteran fell within the scope of their employment. 973 F.3d at 594. In *Wuterich v. Murtha*, the court upheld certification of a Marine's claims that a congressman falsely stated for "his own private purposes" that the Marine's squad "deliberately murdered innocent Iraqi civilians in a cold-blooded massacre" and committed "war crimes." 562 F.3d 375, 378–79 (D.C. Cir. 2009). In *Operation Rescue National v. United States*, the court upheld certification in a lawsuit alleging that a senator defamed an anti-abortion organization at a

- 2 -

A-400

fundraising luncheon, noting that "personal and public motives are often closely related" and "[i]t is natural for public officials to believe that their own success, and that of their political parties, is inextricably linked with the public interest."  975 F. Supp. 92, 108 (D. Mass. 1997).[1]  And in *Rahall*, the court upheld certification where a congressman responded to a reporter's allegations by calling him a "bigoted, right wing, redneck, racist wacko," concluding that the response "was clearly in the scope of his employment as a legislator, and was necessary to ensure his effectiveness as a legislator and maintain the support of his constituents."  399 F. Supp. 2d at 715.

Plaintiff's argument that "slandering women" is not part of the President's "job description," Opp'n at 1, ECF No. 16, is indistinguishable from the arguments of the plaintiffs in the above cases.  Indeed, "[e]xtensive precedent makes clear that alleging a federal employee violated policy or even laws in the course of her employment—including specific allegations of defamation or of potentially criminal activities—does not take the conduct outside the scope of employment."  *Smith*, 886 F.3d at 126.  That is because whether a statement is "slanderous" or otherwise "wrongful" is not the relevant test; all tort plaintiffs allege "wrongful" conduct.  Rather, it is the "type of act" at issue—in this case, a Federal elected official speaking to the press about a matter of concern to constituents—that is dispositive.  *Klayman v. Obama*, 125 F. Supp. 3d 67, 83 (D.D.C. 2015).  That is why courts have upheld certification, for example, in cases alleging that President Obama funded terrorists or the Secretary of Defense oversaw torture of prisoners held at Guantanamo Bay.  *Id.* at 73, 78; *Rasul v. Myers*, 512 F.3d 644, 658–59 (D.C. Cir. 2008); *see also*

---

[1] Indeed, the government routinely certifies, and courts routinely uphold certification in, defamation cases against employees and officials whose jobs do not require regular communication with the public.  *See Davric Maine Corp. v. U.S. Postal Serv.*, 238 F.3d 58, 67 (1st Cir. 2001) (postal worker); *Moreno v. Small Bus. Admin.*, 877 F.2d 715, 717 (8th Cir. 1989) (Small Business Administration employees); *James v. United States*, 48 F. Supp. 3d 58, 62 n.4 (D.D.C. 2014) (U.S. Marshals and FBI agent); *Budik v. Ashley*, 36 F. Supp. 3d 132, 139 (D.D.C. 2014) (medical supervisor), *aff'd sub nom. Budik v. United States*, No. 14-5102, 2014 WL 6725743 (D.C. Cir. Nov. 12, 2014); *Khatami v. Compton*, 844 F. Supp. 2d 654, 662 (D. Md. 2012) (agency director); *Meagher v. Heggemeier*, 513 F. Supp. 2d 1083, 1093 (D. Minn. 2007) (National Guard member); *Borawski v. Henderson*, 265 F. Supp. 2d 475, 483 (D.N.J. 2003) (Postmaster General); *Anderson v. Gov't of the V.I.*, 199 F. Supp. 2d 269, 277 (D.V.I. 2002) (police commissioner).

- 3 -

A-401

*Bello v. United States*, 93 F. App'x 288, 290 (2d Cir. 2004) (allegedly slanderous statements of EEOC attorney within scope of employment).

"The appropriate question, then, is whether [the] *conversation*—not the allegedly *defamatory sentence*—was the kind of conduct . . . [the President] was employed to perform." *Ballenger*, 444 F.3d at 664 (emphasis added). "What matters is whether the underlying activity itself was part of the employee's duties"—not whether the conduct was wrongful or tortious—and courts have repeatedly held that communicating with the public about matters of interest or concern to constituents falls "within the scope of employment even when defamatory." *Smith*, 886 F.3d at 127; *see also De Masi v. Schumer*, 608 F. Supp. 2d 516, 522 (S.D.N.Y. 2009) ("[M]embers of Congress engage in a wide range of legitimate '"errands' performed for constituents' including 'news releases' and 'speeches delivered outside the Congress'"; "employee's tortious acts fall within the scope of his or her employment if done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions") (citations omitted).

These principles apply with even greater force here. Given the President's position in our constitutional structure, his role in communicating with the public is especially significant. As plaintiff acknowledges, "the President . . . 'possesses an extraordinary power to speak to his fellow citizens.'" Opp'n at 26, ECF No. 16 (quoting *Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392, 2417–18 (2018)). And, due to the nature of the position, "there is not always a clear line between his personal and official affairs." *Trump v. Mazars*, ___ U.S. ___, 140 S. Ct. 2019, 2034 (2020). Indeed, as plaintiff concedes, the President "must be available, at all times, to lead the Nation" and therefore "'never adjourns.'" Opp'n at 26 (quoting *Clinton v. Jones*, 520 U.S. 681, 713, 117 S. Ct. 1636, 1653 (1997) (Breyer, J., concurring)).

Here, there can be no dispute that allegations that the President assaulted someone are a

- 4 -

matter of concern or interest to constituents.  *See*, *e.g.*, Compl. ¶ 126 (describing public accusations), ECF No. 1-1.  That is doubly true where a journalist and long-running advice columnist with a widespread audience promoting a book marketed by a major publisher made the accusations.  *Id.* ¶¶ 17, 55, 80.  Through her *New York* magazine article and the release of her book two weeks later, plaintiff sought to "reveal[] *to the public* that Trump had sexually assaulted her." Opp'n at 28 (emphasis added).  Indeed, based on the publicity surrounding prior allegations made by other women, she understood that "coming forward with her story would also cause a media storm."  Compl. ¶ 62.  And, that is precisely what happened: the complaint cites articles from "leading news sources" across the country and "around the world" that reported on plaintiff's allegations and the White House denial.  *Id.* ¶¶ 84, 98, 142 & nn.10, 14.

*Second*, the President's comments fall within the FTCA's scope because plaintiff's allegations sought to call into question the President's fitness for office and a response was necessary for the President to effectively govern.  As stated in the complaint, "[t]he rape of a woman is a violent crime," *id.* ¶ 1, and, if believed, even false allegations that the President committed such a crime could obviously impact the President's ability to effectively govern. Indeed, here, at least one member of Congress went so far as to argue that plaintiff's allegations showed that "Donald Trump is not fit to be president" and Congress should commence impeachment proceedings against him immediately.[2]  Under such circumstances, responding to these allegations was within the official duties of the President—i.e., the President's challenged statements were directly relevant to his role as President and leader of the Executive Branch—and more generally is a necessary part of a Federal elected official's job:

A member's ability to do his job as a legislator effectively is tied, as in this case, to

---

[2] Rebecca Klar, *Moulton Says New Trump Rape Accusation Furthers Need for Impeachment Proceedings*, Hill (June 24, 2019), https://thehill.com/homenews/administration/449989-2020-democrat-moulton-says-new-rape-allegations-against-trump-prove.

- 5 -

A-403

> the member's relationship with the public and in particular his constituents and colleagues in the Congress. In other words, there was a clear nexus between the congressman answering a reporter's question about [his] personal life and the congressman's ability to carry out his representative responsibilities effectively.

*Ballenger*, 444 F.3d at 665–66. Elected office "is not a job like any other," as elected officials are frequently called upon to publicly address private matters that may negatively affect their ability to represent their constituents. *Id.* (citation omitted). The same is true of the President who must maintain an effective relationship with both the public and Congress in order to govern.

*Finally*, the President's statements fall within the scope of the FTCA because plaintiff's own filings make clear the statements were part of an official White House response to inquiries from the press. As reflected in plaintiff's *New York* magazine article cited in the complaint, Compl. ¶ 79, the White House issued a statement denying the allegations in response to an inquiry made before plaintiff's excerpt was even published: "Here's what the White House said: 'This is a completely false and unrealistic story surfacing 15 years after allegedly taking place and was created simply to make the President look bad.'"[3] Thus, before the President made any of the statements cited in the complaint, the excerpt published by plaintiff had already stated publicly, in a manner designed to make the allegations particularly newsworthy, that (1) the "President" sexually assaulted her (2) the "White House" denied the allegations, (3) the "White House" denial was equivalent to a denial by the "President" and (4) the official "White House" denial was false. Thus, in the June 21 statement issued by the Deputy White House Press Secretary[4] and in answering "question[s] from . . . reporter[s]" on the White House grounds, the President simply

---

[3] E. Jean Carroll, *Hideous Men Donald Trump assaulted me in a Bergdorf Goodman dressing room 23 years ago*, Cut (June 21, 2019), https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html.

[4] Daily Comp. Pres. Docs., 2019 DCPD No. 00410 (June 21, 2019), http://www.govinfo.gov/content/pkg/DCPC-201900410/pdf/DCPD-201900410.pdf. Nonetheless, such comments are within scope "whether they are freestanding or made in response to a press inquiry"; as the *Haaland* court observed in upholding certification where there was no press inquiry, "it is the act of communicating one's views to constituents and not the manner of communication that justifies application of the Westfall Act." 973 F.3d at 601.

- 6 -

was participating the formal White House response to press inquiries that followed plaintiff's publication of the allegations and the White House denial.  Opp'n at 4–7; Compl. ¶¶ 91–97.

**II.      Plaintiff's Assertion that "the FTCA Does Not Cover the President" is Meritless.**

In the face of this uniform law, plaintiff asks this Court to be the first and only court in the country to hold that the President is uniquely excluded from the FTCA.  Opp'n at 10–20.  Quite simply, there is no such exclusion.  Indeed, this argument is contrary to the statute's plain language, history, and consistent interpretation, and would have adverse consequences outside this case.

As plaintiff concedes, the FTCA contains a "broad phrase" covering "'*any* employee of the Government.'"  Opp'n at 4 (emphasis added) (quoting 28 U.S.C. § 1346(b)(1)).  As this language makes clear, the statute "states that, with respect to a tort committed by '*any* employee of the Government' within the scope of employment, the FTCA provides the exclusive remedy."  *United States v. Smith*, 499 U.S. 160, 173, 111 S. Ct. 1180, 1189 (1991) (quoting 28 U.S.C. § 2679(b)(1)).

Indeed, "the word 'any' naturally carries 'an expansive meaning.'"  *SAS Inst., Inc. v. Iancu*, ___ U.S. ___, 138 S. Ct. 1348, 1354 (2018) (citation omitted).  "When used (as here) with a 'singular noun in affirmative contexts,' the word 'any' ordinarily 'refer[s] to a member of a particular group or class *without distinction or limitation*' and in this way 'impl[ies] *every* member of the class or group.'"  *Id.* at 1354 (first emphasis added) (quoting Oxford English Dictionary (3d ed., Mar. 2016)).

The FTCA's legislative history reinforces the statute's universal coverage.  In describing the statutory definition section, the Senate report accompanying the FTCA explained:  "This section defines the terms used in the title and makes it clear that its provisions cover all Federal agencies, including Government corporations, *and all Federal officers and employees . . . .*"  S. Rep. No. 79-1400, at 31 (1946) (emphasis added).  Likewise, when Congress passed the Westfall Act, it reiterated that the statute prevented "the prospect of personal liability and the threat of

- 7 -

protracted personal tort litigation *for the entire Federal workforce*."  Pub. Law No. 100-694, § 2, 102 Stat. 4563–64, note following 28 U.S.C. § 2671 (emphasis added).

Accordingly, the Supreme Court has repeatedly observed that the Act applies to "*all federal employees.*"  *See Levin v. United States*, 568 U.S. 503, 509, 133 S. Ct. 1224, 1229–30 (2013) (Act "shield[s] all federal employees from personal liability without regard to agency affiliation or line of work"); *Hui v. Castaneda*, 559 U.S. 799, 809–10, 130 S. Ct. 1845, 1853 (2010) ("[W]e noted in *Smith* that § 2679(b) applies to all federal employees."); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425–26, 115 S. Ct. 2227, 2232 (1994) (Act overturns *Westfall* decision that "'created an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the entire Federal workforce'" (quoting § 2(a)(5), 102 Stat. 4563)).

The broad and sweeping language of the FTCA covers the President, who is fairly characterized as both an "officer" and "employee" of the government.  The Supreme Court has recognized that Article II, Section 1 of the Constitution "establishes the President as the chief constitutional officer of the Executive Branch," and indeed plaintiff acknowledges as much.  *Nixon v. Fitzgerald,* 457 U.S. 731, 750, 102 S. Ct. 2690, 2701 (1982); *see also* Opp'n at 14 (describing "President as the sole officer under 'executive'"); U.S. Const. art. II, § 1, cl. 1, 8 (discussing President's "Office").  Likewise, contemporaneous definitions of the term "employee" encompass "one who works for wages or salary in the service of an employer," which would likewise apply to the President, who receives a salary for services rendered to the United States.  *See Employee* Webster's New Int'l Dictionary (2d ed. 1943); U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); *United States v. Hatter*, 532 U.S. 557, 563, 121 S. Ct. 1782, 1788 (2001) (President falls in "class of current federal employees").

Accordingly, multiple courts have substituted the United States for the President pursuant

to the plain language in the FTCA.  *See*, *e.g.*, *Saleh v. Bush,* 848 F.3d 880, 891 (9th Cir. 2017) (United States substituted for President and Vice President); *Ali Jaber v. United States,* 155 F. Supp. 3d 70, 73 (D.D.C. 2016) (United States substituted for President), *aff'd,* 861 F.3d 241 (D.C. Cir. 2017); *Klayman*, 125 F. Supp. 3d at 85 (same); *West v. Trump,* No. 19-2522, 2020 WL 4721291, at *3 n.6 (N.D. Tex. July 23, 2020) (same); *see also Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (affirming certification as to Vice President and his chief of staff).  Accepting plaintiff's argument would be a clear split from authority from at least two other Circuits.

Despite this plain language and this settled understanding, plaintiff attempts to argue that the FTCA's definition section, 28 U.S.C. § 2671, contains a "narrower definition" of "Employee of the Government" that covers only "officers or employees of any federal agency" and defines "federal agency" to include only certain specified entities such as "the executive departments, the judicial and legislative branches, the military, [and] independent establishments of the United States."  Opp'n at 10–11 (quoting 28 U.S.C. § 2671).  However, plaintiff omits that this statutory definition lists these entities merely as illustrative examples, stating that "'[e]mployee of the government' *includes* [inter alia] . . . officers or employees of any Federal agency" as well as "persons acting on behalf of a federal agency in an official capacity" and that "[t]he term 'Federal agency' *includes* the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States."  28 U.S.C. § 2671 (emphasis added).

The use of the word "includes" in these definitions "is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162, 132 S. Ct. 2156, 2170 (2012). Accordingly, the FTCA's coverage is not limited to Federal officers or employees who work in an

A-407

"executive department," an "independent establishment," or a "federal agency."  While "employee of the Government" "includes" such individuals, the list does not purport to be exclusive.  Nor would providing an exhaustive list make sense when the drafters knew that the structure of the federal government might well change over time to include different kinds of entities.

Indeed, plaintiff concedes that "several courts" interpreting the statute have indicated that the President is in fact covered by the FTCA.  Opp'n at 10.  While plaintiff asserts without discussion that these courts have simply "assumed" or "suggested (in dicta)" that the President is covered, *id.* at 10 n.4, in fact these courts have held that that the statute provides "a universal grant of immunity . . .  to all employees [and] to all officers, up to the president.'"  *Haaland*, 973 F.3d at 598; *see also Schumer*, 608 F. Supp. 2d at 521 (affirming substitution for Senator).

Courts have consistently rejected attempts to carve out exceptions for members of congress, judges, or other officials, and in doing so have noted the broad and encompassing language covering all Federal officers and employees (including the President).  As the court in *Haaland* recently explained in rejecting a similar attempt to exclude members of Congress, this comprehensive coverage was intentional: Congress "passed *broad* legislation to extend the benefit of sovereign immunity to *all* federal employees."  973 F.3d at 597 (emphasis added).

In rejecting plaintiffs' attempt to carve out exceptions, the court observed: "'[w]hy would Congressmen vote to exclude themselves from a universal grant of immunity given to all others, to all employees below them; to all officers, up to the president, above them?'"  *Id.* at 598.  Why would the President, who signed the Westfall Act into law, similarly exclude himself from the universal grant of immunity given to all others?  As such decisions recognize, the FTCA is "universal," it applies to "all employees," to "all officers," and to "the president" in particular.  Plaintiff's position here is at odds with this consistent interpretation.

Moreover, plaintiff's position would have profoundly adverse consequences that are contrary to the intent of Congress.  If deprived of the statutory protections afforded other Federal employees and officers, a President would face a strong disincentive from answering media inquiries involving any private party.  A President could quickly be the subject of a raft of lawsuits that could consume his time and impose significant litigation costs, draining a significant share of the President's annual salary.  *See Osborn v. Haley*, 549 U.S. 225, 238–39, 127 S. Ct. 881, 893 (2007) (Westfall Act "spares" federal employees from "the burden of defending a suit").  As with judges and members of Congress, the fact that the President may assert an immunity does not save him from having to litigate the issue in court.  Indeed, plaintiff's arguments would deprive not only the President, but also the Vice President and the entire staff of Federal employees working at the White House and the Executive Office of the President of the benefit of the statute.  While plaintiff argues that courts have incorrectly assumed that White House staff such as electricians are covered by the statute, Opp'n at 18 n.11, courts have routinely upheld certifications as to such individuals,[5] and there is no basis in the text of the statute or its legislative history to conclude that Congress intended to exclude not only the President and Vice President, but the entire White House staff from the scope of the statute: in fact, the statutory text, legislative history, and the courts' and Department of Justice's longstanding interpretation is the opposite.[6]

---

[5] *See*, *e.g.*, *Wilson*, 535 F.3d at 712 (upholding certification of Vice President and his Chief of Staff); *Saleh*, 848 F.3d at 891 (certification of Vice President); *Alexander v. FBI*, 691 F. Supp. 2d 182, 196–97 (D.D.C. 2010) (Director of White House Office of Personal Security and White House Counsel), *aff'd*, 456 Fed. App'x 1 (D.C. Cir. 2011); *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 82 (D.D.C. 2017) (U.S. substituted for National Security Advisor); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 255–56 (D.D.C. 2004) (same), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005) (same).

[6] Where the drafters intended to exclude claims involving certain Federal agencies from the coverage of the statute, they said so expressly.  Accordingly, there are narrow and specific provisions carving out claims arising from the activities of certain entities—i.e., the Tennessee Valley Authority, 28 U.S.C. § 2680(l), Panama Canal Company, *id.* § 2680(m), and Federal land banks, *id.* § 2680(n).  Accordingly, as recognized at the time, "an examination of the entire act and its legislative history requires a conclusion that *no agencies or employees are excluded* from the operation of the act save in the case of the *specific exceptions enumerated* in section 421 thereof, 60 Stat. 845 [now 28 U.S.C. § 2680(l)-(n)]."  Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of Government, 26 Comp. Gen. 891, 892 (1947) (emphasis added).

### III.     While Immaterial to the Outcome, D.C. Scope of Employment Law Applies.

Plaintiff also argues that the outcome here should be different because New York, rather than D.C., law applies to the scope of employment question.  Both assertions are incorrect.

*D.C. law applies.*   As a threshold manner, plaintiff's argument is premised on a fundamental error of law.  The law is clear that, under the FTCA, the Court must apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), not the law of the state where the alleged tort had its "operative effect," *Richards v. United States*, 369 U.S. 1, 10, 82 S. Ct. 585, 591 (1962); *see also Cronin v. Hertz Corp.*, 818 F.2d 1064, 1065 (2d Cir. 1987) (FTCA "looks to 'the law of the place where the act or omission occurred'" for law governing "scope of employment"); *Maldonado v. Colon*, No. 97-3966, 1998 WL 240479, at *3 (S.D.N.Y. May 12, 1998) (law where "alleged tortious conduct occurred" applies to scope of employment).

Here, the complaint alleges that all three of the President's statements were made from the White House in Washington, D.C.  Compl. ¶¶ 81, 82, 85–91, 93–97, 100.  Accordingly, D.C. law applies—not New York—because the "acts or omissions" occurred in D.C.  While plaintiff cites diversity cases that do not involve claims under the FTCA to support her assertion that New York law applies, Opp'n at 21–22, this is a case under the FTCA, and the FTCA directs courts to look to "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).[7]  Indeed, "it would be difficult to conceive of any more precise language Congress could have used to command application of the law of the place where the negligence occurred than the words it did employ in

---

[7] Moreover, because the FTCA "requires application of the *whole* law of the States where the act or omission occurred," the court must also apply D.C.'s choice-of-law rules.  *Richards,* 369 U.S. at 11 (emphasis added).  Those rules, in turn, likewise dictate that D.C. law applies because it is "the jurisdiction where the employment relationship exists."  *See Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) ("In determining whether an employee acted within the scope of his employment [under Westfall Act], we consider the substantive law of the jurisdiction where the employment relationship exists—here, the law of the District of Columbia."); *Bailey v. J&B Trucking Servs., Inc.*, 590 F. Supp. 2d 4, 10 (D.D.C. 2008) (applying D.C. choice-of-law and concluding scope of employment is determined by law of State where allegedly negligent conduct occurred and the employment relationship was centered).

A-410

the Tort Claims Act." *Richards*, 369 U.S. at 9, 82 S. Ct. at 591.[8]

*The outcome under New York law would be no different.*   More fundamentally, as is illustrated by the cases uniformly holding that Federal elected officials' statements regarding matters of concern or interest to constituents fall within the scope of employment under various states' laws, there is no difference in state law that would be material to the outcome here.  To the contrary, "there is little indication that a different result would follow from applying the law of the District of Columbia" as opposed to that of New York, *Aryai v. Forfeiture Support Assocs.*, 25 F. Supp. 3d 376, 388 n.8 (S.D.N.Y. 2012), and indeed in a footnote, plaintiff acknowledges that "the ultimate outcome would be the same under D.C. law," Opp'n at 31 n.18.

As is evident from the uniform decisions applying various states' laws and upholding certification in cases alleging defamation by Federal elected officials, the issue does not turn on a matter of state law.  Rather, these cases are based on the recognition that part of a Federal elected official's job is to speak to the public about matters of concern or interest to constituents.

Nonetheless, while plaintiff suggests that New York law would dictate a different outcome from that in D.C. because the President was allegedly acting for "personal" reasons, Opp'n at 22–31, "[t]he Restatement's text [which both New York and D.C. have adopted] reveals that even a *partial* desire to serve the master is sufficient."  *Ballenger*, 444 F.3d at 665 (quoting Restatement § 228(1)(c)); *see also Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (citing Restatement (Second) of Agency § 229).  Accordingly, as the New York cases plaintiff cites make clear, "[a]n act is considered to be within the scope of employment if it is performed while the employee is

---

[8] Indeed, the one FTCA plaintiff cites recognizes that "[w]hether an officer or employee acted 'within the scope of his or her employment for purposes of the Westfall Act is determined by reference to principles of *respondeat superior* of the state in which the alleged tort occurred'"—not where "injury" occurred.  Opp'n at 21, quoting *Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017).  Here, that is D.C.  In fact, *Bowles* itself relied on *Saleh*, which applied D.C. law to defamatory statements made in D.C.  *Id.* (citing *Saleh*, 848 F.3d at 888).  While plaintiff also cites *Haaland*, the court there simply got the choice-of-law analysis wrong by ignoring the provisions in the FTCA, ruling in a manner contrary to the statutory text, the Supreme Court's decision in *Richards* and the Second Circuit's decision in *Bowles.*

engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or *incidental* to such employment." *Fenster v. Ellis*, 71 A.D.3d. 1079, 1080 (2d Dept. 2010). Thus, an employee does not act outside the scope of employment *unless* the employee "was acting for his own personal convenience and benefit and *not* in the furtherance of any duty owed to [his employer]," Opp'n at 24 (quoting *Overton v. Ebert*, 180 A.D.2d 955, 957 (3d Dept. 1992)), and was acting "for personal motives *unrelated* to the furtherance of the employer's business," *id.* at 23 (emphasis added) (quoting *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 788 (3d Dept. 1988)). As under D.C. law, the inquiry is an objective—not subjective—one. *Compare Gibbs v. City of New York*, 714 F. Supp. 2d 419, 422 (E.D.N.Y. 2010) *with Jacobs*, 724 F.3d at 221.

As noted above, courts have repeatedly held that Federal elected officials who issue statements to the public on matters of concern or interest to constituents are acting within the scope of employment even where the comments relate to "personal" or "private" matters. As those decisions recognize, and as plaintiff concedes, providing information to constituents is part of the "business" of an elected official and "elected officials may sometimes need to comment on their private lives to do their jobs effectively." Opp'n at 33 (citing *Haaland*, 973 F.3d at 601). Such activities certainly constitute an authorized activity that is part of their position or, at a minimum, "relate" to or are "incidental" to such an authorized activity—even where the official is talking about a personal matter such as separation from his wife (e.g., as in *Ballenger*) or decides to communicate his personal view that a reporter is a "redneck, racist wacko" (e.g., as in *Rahall*).[9]

---

[9] The cases plaintiff cites are not to the contrary. None address a Federal elected official's scope of employment. For example, *Clark v. McGee* addressed whether a town supervisor was entitled to complete immunity under New York law, not scope of employment. 404 N.E.2d 1283, 1285–87 (N.Y. 1980). The FTCA provides the President absolute immunity regardless of whether presidential immunity bars plaintiff's claims, in the same way it immunized Congress members in *Haaland* and *Williams* even though their assertions of Speech and Debate clause immunity were unsuccessful. Similarly, *Perks v. Town of Huntington* addressed vicarious liability relating to a town board member, not a Federal elected official. 251 F. Supp. 2d 1143, 1166–68 (E.D.N.Y. 2003). Moreover, unlike here, where the United States approved certification, the town denied that the board member's statement was within the scope of her employment because it "attack[ed] the Town Board itself" and was not in the town's "interest." *Id.* at 1171.

- 14 -

As courts applying New York law have observed, "an employee's tortious acts fall within the scope of his or her employment if done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions," *Schumer*, 608 F. Supp. 2d at 552, and accordingly, "commit[ing] slander" while speaking to the press does not take the employee's conduct "outside the scope of his employment." *Bello*, 93 F. App'x at 290–91.  That is particularly true of the President who, as plaintiff concedes, "must be available, at all times, to lead the Nation" and "never adjourns," Opp'n at 26, and thus is continuously performing "his master's work."[10]

**IV.     Plaintiff Has Not Overcome the Prima Facie Validity of the Certification.**

Finally, plaintiff has not, and cannot, make the requisite showing to obtain discovery.  To overcome the prima facie validity of the certification and obtain limited and targeted discovery, a plaintiff must establish facts "that, if true, would demonstrate that [the defendant] had been acting outside the scope of his employment."  *Singleton v. United States*, 277 F.3d 864, 871 (6th Cir. 2002), *overruled on other grounds by Hawver v. United States*, 808 F.3d 693, 694 (6th Cir. 2015); *Davric*, 238 F.3d at 67; *Ezekiel v. Michel*, 66 F.3d 894, 899 (7th Cir. 1995).  Plaintiff has not done so.  To the contrary, for the reasons above, the complaint demonstrates the President acted within the scope of his authority.  As the court in *Murtha* held in overturning such a discovery order, discovery in a case like this one would be tantamount to decertification and would "effectively deny" the President the absolute immunity afforded under the FTCA.  562 F.3d at 382.

**CONCLUSION**

The United States respectfully requests that the Court grant its motion.

---

[10] Nonetheless, as plaintiff notes, regardless of the Court's ruling, the certification remains "conclusive of this Court's removal jurisdiction," and the case remains in federal court.  Opp'n at 9 (citing *Osborn*, 549 U.S. at 233–34.  Likewise, while plaintiff suggests the certification's timing was "irregular" (*id.*), certification and removal may occur "at any time before trial."  28 U.S.C. § 2679(d)(2); *see also Sullivan v. United States*, 21 F.3d 198, 205-06 (7th Cir. 1994) ("at any time before trial" is the only temporal limitation on certification); *McLaurinn v. United States*, 392 F.3d 774, 778-79 & n.17 (5th Cir. 2004) (collecting cases); *Clark v. Wells Fargo Bank*, 585 Fed. App'x 817, 820 (3d Cir. 2014).

Dated: October 19, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director

 S/ Stephen R. Terrell
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:    (202) 353-1651
Facsimile:    (202) 616-5200
Email: stephen.terrell2@usdoj.gov



**U.S. Department of Justice**

Civil Division

*Torts Branch, Federal Tort Claims Office*
*P.O. Box 888*
*Washington, DC  20044*
JGT:KLW:STerrell/DJ# 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

*Telephone (202) 353-1651*
*Facsimile (202) 616-5200*

October 21, 2020

**BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      RE:    *Carroll v. Trump*, No. 1:20-cv-7311-LAK-JLC (S.D.N.Y.)

Your Honor:

      The United States of America, by its undersigned counsel, hereby respectfully moves the Court for a continuance of the argument on the pending motion to substitute the United States for President Donald Trump in the above-captioned action, which currently is scheduled to be argued today at 3:30 p.m.  As grounds for this motion, the United States respectfully submits that this morning, when the attorney for the United States who was designated to present argument in support of the motion for substitution, he was denied access to the courthouse on the grounds that he had traveled from his place of residence in the Commonwealth of Virginia, which yesterday, apparently, was added to the jurisdictions from which the State of New York bans travel.

      Sincerely,

      /s/ Stephen R. Terrell

      Stephen R. Terrell

cc:  Counsel of Record (by ECF)

A-415

KALKCARM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

E. JEAN CARROLL,

          Plaintiff,

       v.                  20 CV 7311 (LAK)

DONLD J. TRUMP, in his
personal capacity,

          Defendant.

-------------------------------x

                          New York, N.Y.
                          October 21, 2020
                          3:57 p.m.

Before:

                  HON. LEWIS A. KAPLAN,

                        District Judge

               APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
     MARCELLA COBURN
     JOSHUA ADAM MATZ

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
     Attorneys for Defendant
BY:  WILLIAM KERWIN LANE III
     STEPHEN TERRELL
     CATE CARDINALE

2

KALKCARM

(Case called)

THE DEPUTY CLERK:  Plaintiff, are you ready?  Put your appearances on the record, please.

MS. KAPLAN:  We are.  Roberta Kaplan, from Kaplan Hecker & Fink, for plaintiff.  I'm appearing with my colleagues Joshua Matz and Marcella Coburn.

THE COURT:  Good afternoon.

THE DEPUTY CLERK:  Counsel for DOJ, are you ready?

MR. LANE:  We are.  William Lane, of the Department of Justice, on behalf of the United States, with Stephen Terrell and Cate Cardinale.

THE COURT:  Good afternoon, folks.

I want to put on the record what has already been a filed order but is likely unknown to quite a number of people with an interest here in the courtroom and online.

I had an application within the last couple of hours from counsel for the United States to adjourn this argument. The reasons they put forward are in their letter, which is on the public record.

I denied the application and entered an order offering the government three options:  First, to present oral argument today by a person who is eligible, under the COVID restrictions in effect in this court, to enter the courthouse; second, to present oral argument today by an attorney for the government from a remote location by telephone; or, third, to have me take

A-417

KALKCARM

the case on submission — that is, on the papers already on file — without any oral argument and simply go ahead and decide the matter before me.

Mr. Lane, the ball is up to you. What does the government elect to do?

MR. LANE: Thank you, your Honor. We appreciate you being so accommodating.

The United States elects to submit on the briefs without any argument from any side.

THE COURT: All right. Is there any reason why I shouldn't do so?

MS. KAPLAN: Your Honor, may I be heard?

THE COURT: Yes.

MS. KAPLAN: Your Honor, Roberta Kaplan, for E. Jean Carroll, who's here in the courtroom today.

We're obviously disappointed by this turn of events. E. Jean herself drove some distance to be in court today. And, as I'm sure your Honor is aware, the motion before your Honor is effectively case-dispositive. It's essentially a motion to dismiss in the sense that if your Honor grants the government's motion, there is not a waiver of sovereign immunity with respect to an intentional tort.

So if your Honor has any questions, we would be happy to answer them. My partner, Joshua Matz, has worked very hard to be able to address any questions your Honor may have, and if

KALKCARM

that's not an option — and it sounds like it's not, your Honor — then we would suggest that, given the fact that the government's moving brief in this case was only five pages long, and we were effectively shooting against a very narrow target, we would respectfully request the opportunity to put in a surreply tomorrow, no more than five pages, addressing the new arguments that showed up in the government's opposition brief.

THE COURT:  Mr. Lane, what's your view?

MR. LANE:  Your Honor, the United States would oppose additional briefing.  We think briefing has been fulsome and both sides have had sufficient time to argue.

THE COURT:  Well, I think the fairest way to handle this — because if I allow a surreply by the plaintiff, then the government will be back asking for a surreply of its own — is simply to invoke the time-honored principle that new arguments raised for the first time in a reply brief will not be considered.

Mr. Lane, is that acceptable to the United States?

MR. LANE:  Your Honor, we would strongly prefer no additional briefing.

THE COURT:  So I take it the answer to my question is yes?

MR. LANE:  Yes, your Honor.

THE COURT:  Okay.  The matter is taken under

A-419

KALKCARM

submission.

Thank you, all, very much. I'm sorry so many people were inconvenienced.

* * *

A-420



**U.S. Department of Justice**

# MEMO ENDORSED

**(Corrected)**

*Torts Branch, Federal Tort Claims Office*
*P.O. Box 888*
*Washington, DC 20044*
JGT:KLW:STerrell/DJ# 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

*Telephone (202) 353-1651*
*Facsimile (202) 616-5200*

October 21, 2020

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/21/2020
```

**BY ECF**

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:    *Carroll v. Trump*, No. 1:20-cv-7311-LAK-JLC (S.D.N.Y.)

Your Honor:

   The United States of America, by its undersigned counsel, hereby respectfully moves the Court for a continuance of the argument on the pending motion to substitute the United States for President Donald Trump in the above-captioned action, which currently is scheduled to be argued today at 3:30 p.m. As grounds for this motion, the United States respectfully submits that this morning, when the attorney for the United States who was designated to present argument in support of the motion for substitution, he was denied access to the courthouse on the grounds that he had traveled from his place of residence in the Commonwealth of Virginia, which yesterday, apparently, was added to the jurisdictions from which the State of New York bans travel.

             Sincerely,

             /s/ Stephen R. Terrell

             Stephen R. Terrell

cc:  Counsel of Record (by ECF)

Denied. The Court will hear the government's argument (a) in person if offered by an attorney who is permitted entry to the courthouse under existing rules and orders pertaining to COVID, or (b) by telephone from outside the courthouse if offered by any attorney not eligible to enter the courthouse.
Alternatively, the Court will take the motion on submission without oral argument. The undersigned is not authorized to vary the existing restrictions on entry into the courthouse. It notes further that, contrary to the government's suggestion, it appears that Virginia was added to the list of Restricted States over a week ago. New York State, *Governor Cuomo Announces Three States Added to Travel Advisory* (Oct. 13, 2020), available at https://www.governor.ny.gov/news/governor-cuomo-announces-three-states-added-travel-advisory (last visited Oct. 21, 2020). The government shall advise the courtroom, deputy as promptly as possible what it intends to do.

SO ORDERED.

                           10/21/2020 USDJ

A-421

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director
STEPHEN R. TERRELL (CA Bar No. 210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:     (202) 616-5200
Email:          stephen.terrell2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>Plaintiff,<br><br>-against-<br><br>DONALD J. TRUMP, in his personal capacity,<br><br>Defendant. | **ECF Case**<br><br>No. 1:20-cv-7311-LAK-JLC |

**NOTICE OF APPEAL**

Notice is hereby given that the United States appeals to the United States Court of

Appeals for the Second Circuit from the Order entered in this action on October 27, 2020, ECF

No. 32.

Dated: November 25, 2020                    JEFFREY BOSSERT CLARK

Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

WILLIAM K. LANE III
Counsel

JAMES G. TOUHEY, JR.
Director

 S/ Stephen R. Terrell
STEPHEN R. TERRELL (CA Bar No.
210004)
Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC  20044
Telephone:     (202) 353-1651
Facsimile:      (202) 616-5200
Email: stephen.terrell2@usdoj.gov

A-423

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

E. JEAN CARROLL,                                             :
                                                             :
                    Plaintiff,                               :     No. 20-cv-7311 (LAK)
                                                             :
        - v -                                                :     **ECF Case**
                                                             :
DONALD J. TRUMP, in his personal capacity,                   :     **<u>NOTICE OF APPEAL</u>**
                                                             :
                    Defendant.                               :
------------------------------------------------------------- x

PLEASE TAKE NOTICE that President Donald J. Trump, by and through his

undersigned counsel, hereby appeals to the United States Court of Appeals for the Second

Circuit from the Opinion and Order of the Hon. Lewis A. Kaplan, U.S.D.J., entered October 27,

2020 (Dkt. 32), attached hereto as Exhibit A, denying the United States' Motion to Substitute the

United States as Defendant (Dkt. 3).

Dated:  New York, New York
        November 25, 2020

                                        Respectfully submitted,


                                        KASOWITZ BENSON TORRES LLP


                                        By:     */s/ Marc E. Kasowitz*
                                            Marc E. Kasowitz
                                            Christine A. Montenegro
                                            Paul J. Burgo

                                        1633 Broadway
                                        New York, New York 10019
                                        (212) 506-1700

                                        *Attorneys for Defendant Donald J. Trump*

To:     All Counsel of Record (via ECF)