# 20-3977-cv(L), 20-3978-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

E. JEAN CARROLL,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP, in his personal capacity,

*Defendant-Appellant,*

UNITED STATES OF AMERICA,

*Movant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MARC KASOWITZ
KASOWITZ BENSON TORRES LLP
*Attorneys for Defendant-Appellant*
1633 Broadway
New York, New York 10019
(212) 506-1700

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................2

      A.    Nature of Case and Procedural History................................3

      B.    Factual Background...............................................................3

SUMMARY OF ARGUMENT ................................................................5

      A.    The Westfall Act Applies to the President ...........................5

      B.    The President Acted Within the "Scope of Employment."..................8

ARGUMENT ........................................................................................14

I.     STANDARD OF REVIEW ...........................................................14

II.    THE WESTFALL ACT APPLIES TO THE PRESIDENT OF THE
      UNITED STATES ........................................................................15

      A.    The Expansive Definition of Employee Includes the President .........15

      B.    The Westfall Act's Failure to Exclude the President Establishes
              that the President is Included in the Definition .................................19

      C.    The Legislative History Makes Clear That Congress Intended to
              Include the President .......................................................................23

      D.    The President is Part of the Executive Departments as That
              Term is Used in the Westfall Act.......................................................23

      E.    The Administrative Requirements in the Westfall Act Do Not
              Preclude it From Applying to the President.......................................29

III.   THE PRESIDENT'S STATEMENTS AT THE WHITE HOUSE
      WERE MADE "WITHIN THE SCOPE OF HIS OFFICE OR
      EMPLOYMENT"...........................................................................32

A.    The President's Statements to The Press At The White House
      Were Made "Within the Scope of His Office or Employment" ......... 32

      1.    Speaking to the Press is "Of the Kind" a President is
            Employed to Perform. ................................................................ 36

      2.    The Statements Were Substantially Within An
            Authorized Time and Place. ....................................................... 38

      3.    The Statements Were Actuated in Part by a Purpose to
            Serve the Master ......................................................................... 39

B.    The District Court's Complaints with Ballenger Are Unfounded ...... 43

C.    The Master-Servant Test is Irrelevant But Satisfied .......................... 47

      1.    The Master-Servant Test is Irrelevant Here .............................. 47

      2.    A Master-Servant Relationship Exists ...................................... 50

CONCLUSION ........................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Nat'l Sec. Agency,*
925 F.3d 576 (2d Cir. 2019) ................................................................4

*Ali Jaber v. United States,*
155 F. Supp. 3d 70 (D.D.C. 2016) ...................................................16

*Ali v. Rumsfeld,*
649 F.3d 762 (D.C. Cir. 2011) ..........................................................37

*Azar v. Alina Health Servs.,*
139 S. Ct. 1804 (2019) ......................................................................46

*B & A Marine Co. v. Am. Foreign Shipping Co.,*
23 F.3d 709 (2d Cir. 1994) ...........................................12, 30, 46, 49

*Barr v. Matteo,*
360 U.S. 564 (1959) .................................................................8, 34, 47

*Bello v. United States,*
93 F. App'x 288 (2d Cir. 2004) ........................................................14

*Blair v. District of Columbia,*
190 A.3d 212 (D.C. 2018) ...........................................40, 41, 42, 43

*Bowles v. United States,*
685 F. App'x 21 (2d Cir. 2017) .................................................*passim*

*Bradley v. Nat'l Collegiate Athletic Ass'n,*
249 F. Supp. 3d 149 (D.D.C. 2017) .................................................48

*Brown v. Argenbright Sec., Inc.,*
782 A.2d 752 (D.C. 2001) ................................................................42

*Carroll v. Trump,*
--- F. Supp. 3d ----, No. 20-CV-7311 (LAK), 2020 WL 6277814
(S.D.N.Y. Oct. 27, 2020) ....................................................................3

*Chapman v. Rahall*,
    399 F. Supp. 2d 711 (W.D. Va. 2005) ................................................................ 33

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ...................................................................................... 17, 18

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................... *passim*

*Conyers v Westphal*,
    235 F. Supp. 3d 72 (D.D.C 2017) ......................................................................... 32

*Council on Am. Islamic Relations v. Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) ........................................................................ *passim*

*Davila v. United States*,
    247 F. Supp. 3d 650 (W.D. Pa. 2017) ............................................................... 18

*District of Columbia v. Bamidele*,
    103 A.3d 516 (D.C. 2014) ............................................................................. 41, 42

*Does 1-10 v. Haaland*,
    973 F.3d 591 (6th Cir. 2020) ............................................................... 16, 33, 53

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
    314 U.S. 95 (1941) ..................................................................................... 17, 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .............................................................................. 7, 21, 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ....................................................................................... 53

*Guadagni v. New York City Transit Auth.*,
    387 F. App'x 124 (2d Cir. 2010) ........................................................................ 14

*Gutierrez de Martinez v. Lamagno*,
    515 U.S. 417 (1994) ..................................................................................... 18, 28

*Harbury v. Hayden*,
    522 F.3d 413 (D.C. Cir. 2008) ................................................................. 10, 32, 44

iv

*Hechinger Co. v. Johnson*,
    761 A.2d 15 (D.C. 2000) ...................................................................45

*Hui v. Castaneda*,
    559 U.S. 799 (2010) ...........................................................................17

*Jacobs v. Vrobel*,
    724 F.3d 217 (D.C. Cir. 2013) .............................................10, 32, 37

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) .................................................................45

*Klayman v. Obama*,
    125 F. Supp. 3d 67 (D.D.C. 2015) ....................................................16

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
    928 F.3d 226 (2d Cir. 2019) .........................................................37, 39

*Levin v. United States*,
    568 U.S. 503 (2013) ...........................................................................17

*Littlejohn v. Obama*,
    No. CA 7:14-812-JMC-KFM, 2014 WL 8266142 (D.S.C. Mar. 18,
    2014) ...................................................................................................16

*Littlejohn v. South Carolina*,
    No. CA6:100940RBHWMC, 2010 WL 1791419 (D.S.C. Apr. 16,
    2010) ...................................................................................................31

*Littlejohn v. United States*,
    No. CA 6:13-870-JMC-KFM, 2013 WL 1840050 (D.S.C. Apr. 9,
    2013) ...................................................................................................15

*McNamara v. United States*,
    199 F. Supp. 879 (D.D.C. 1961) ...........................................18, 24, 25

*Ex parte Milligan*,
    71 U.S. (4 Wall.) 2 (1866) .................................................................53

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) .............................................22, 23, 27, 39

*Operation Rescue Nat'l v. United States*,
 147 F.3d 68 (1st Cir. 1998)....................................................16, 28, 54

*Osborn v. Haley*,
 549 U.S. 225 (2007).........................................................................2

*Palmer v. Flaggman*,
 93 F.3d 196 (5th Cir. 1996) ...........................................................48

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.*,
 175 F.3d 132 (2d Cir. 1999) ...........................................................15

*Richards v. United States*,
 369 U.S. 1 (1962)...........................................................................32

*Saleh v. Bush*,
 848 F.3d 880 (9th Cir. 2017) ..........................................................16

*SAS Institute, Inc. v. Iancu*,
 138 S. Ct. 1348 (2018)....................................................................16

*Smith v. Clinton*,
 886 F.3d 122 (D.C. Cir. 2018)...................................................28, 36

*Sniado v. Bank Austria AG*,
 378 F.3d 210 (2d Cir. 2004) ...........................................................15

*Sullivan v. United States*,
 21 F.3d 198 (7th Cir. 1994) ............................................................49

*Trump v. Hawaii*,
 138 S. Ct. 2392 (2018)....................................................................37

*Trump v. Mazars USA, LLP*,
 140 S. Ct. 2019 (2020)...............................................................38, 45

*Trump v. Vance*,
 140 S. Ct. 2412 (2020)......................................................11, 15, 39

*United States v. Hatter*,
 532 U.S. 557 (2001).......................................................................19

*United States v. LePatourel,*
571 F. 2d 405 (8th Cir. 1978) ........................................................20, 21, 50, 54

*United States v. United States Fidelity and Guaranty Co.,*
309 U.S. 506 (1940)........................................................................................15

*Velez-Diaz v Vega-Irizarry,*
421 F.3d 71 (1st Cir 2005)................................................................................2

*Weinberg v. Johnson,*
518 A.2d 985 (D.C. 1986) ..............................................................................42

*West v. Trump,*
No. 3:19-CV-2522-K-BH, 2020 WL 4721291 (N.D. Tex. July 23,
2020) ........................................................................................................16, 30

*Westfall v. Erwin,*
484 U.S. 292 (1988)..........................................................................26, 27, 31

*Williams v. United States,*
71 F.3d 502 (5th Cir. 1995) ......................................................................33, 54

*Wilson v. Libby,*
535 F.3d 697 (D.C. Cir. 2008)..................................................................*passim*

*Wuterich v. Murtha,*
562 F.3d 375 (D.C. Cir. 2009)..................................................................*passim*

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952)....................................................................................6, 53

**Statutes**

3 U.S.C. § 102 ............................................................................................19, 51

5 U.S.C. § 7322 ................................................................................................21

28 U.S.C. § 451 ..............................................................................................8, 24

28 U.S.C. § 516 ................................................................................................29

28 U.S.C. § 519 ................................................................................................29

28 U.S.C. § 1291 ................................................................................................2

28 U.S.C. § 1346(b)(1)......................................................5, 16

28 U.S.C. § 2679.........................................................5, 16, 29

28 U.S.C. § 2671...........................................................*passim*

28 U.S.C. § 2672..................................................................29

28 U.S.C. § 2673..................................................................30

28 U.S.C. § 2675...........................................................31, 49

28 U.S.C. § 2674...........................................................*passim*

28 U.S.C. § 2680...........................................................23, 46

42 U.S.C. § 410(a) ...............................................................19

Act of June 25, 1948, ch. 646, § 451, 62 Stat. 869, 907 ........................24

**Other Authorities**

H.R. Rep. 100-700 (June 14, 1988) .........................................6, 8, 23, 26

*Hearings on S. 2690 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 3d Sess. 9 (1940) (memorandum to the Att'y Gen. from Special Ass't Alexander Holtzoff dated June 7, 1939) .........................................................................24

Restatement (Second) of Agency.................................................*passim*

Restatement (Third) of Agency 6 (2006)...........................................50, 51

U.S. Const. art. II, § 1 ......................................................6, 19, 51

Defendant-appellant President Donald J. Trump respectfully submits this memorandum of law in support of his appeal from the October 27, 2020 Opinion and Order ("Order") (SPA-1)[1] of the United States District Court for the Southern District of New York, the Honorable Lewis A. Kaplan, denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute the United States as defendant in place of President Trump.[2]

## JURISDICTIONAL STATEMENT

Plaintiff-appellee E. Jean Carroll filed this action on November 4, 2019 against President Trump in New York State Supreme Court, New York County, alleging that he defamed her in June 2019 when he denied, in a White House Press Office statement and two responses to questions from the press, her accusation that he had sexually assaulted her in a Bergdorf Goodman dressing area 24 years earlier.

Pursuant to the Westfall Act, codified at 28 U.S.C. §§ 2671, 2674 and 2679, the United States Department of Justice certified that President Trump "was acting within the scope of his office as the President of the United States at the time of the alleged conduct," and the United States removed the action to the District Court

---

[1] References to the Joint Appendix are to "JA-__" and to the Special Appendix are to "SPA-__." Citations to "ECF" refer to the District Court docket.

[2] Pursuant to Fed. R. App. P. 28(i), President Trump joins in the opening brief of the United States.

pursuant to Section 2679(d)(2), which is the basis for the District Court's subject-matter jurisdiction.

Also pursuant to Section 2679(d)(2), the United States moved in the District Court to substitute the United States for President Trump as the defendant. (JA-19; JA-12). On October 27, 2020, the District Court entered the Order denying the motion to substitute (SPA-1).

The Order is immediately appealable as a collateral order, and this Court has jurisdiction to review the Order pursuant to 28 U.S.C. § 1291. *Osborn v. Haley*, 549 U.S. 225, 238 (2007).

On November 25, 2020, the United States and President Trump filed timely notices of appeal from the Order. (JA-421; JA-423.)[3]

## ISSUES PRESENTED FOR REVIEW

1. Whether the President of the United States is an employee of the Government within the meaning of the Westfall Act.

2. Whether the President of the United States is acting within the scope of his or her office or employment within the meaning of the Westfall Act, when he or she communicates with the press.

---

[3] Both the United States and President Trump have standing to appeal. *Velez-Diaz v Vega-Irizarry*, 421 F.3d 71, 75-76 (1st Cir 2005) (holding "the United States has standing to appeal the denial of Westfall Act substitution along with the individual defendants"); *see Bowles v. United States*, 685 F. App'x 21, 22 (2d Cir. 2017) (appeal taken by both the United States and employee defendant).

## A.  **Nature of Case and Procedural History.**

Ms. Carroll commenced this action in New York State Supreme Court, New York County, asserting a single claim for defamation against President Trump, allegedly arising out of his denials in June 2019 of her accusation that he sexually assaulted her in a Bergdorf Goodman dressing area 24 years earlier.  (JA-24.)

On September 8, 2020, the United States, pursuant to the Westfall Act, removed this action to the United States District Court for the Southern District of New York and filed a motion in that court to substitute the United States as defendant.  (JA-12; JA-19.)  On October 27, 2020, Judge Lewis A. Kaplan denied the motion to substitute, holding that, as a matter of law, the Westfall Act does not apply to the President of the United States and the alleged conduct was not within the President's scope of employment.  *Carroll v. Trump*, --- F. Supp. 3d ----, No. 20-CV-7311 (LAK), 2020 WL 6277814 (S.D.N.Y. Oct. 27, 2020).

This appeal and the United States' appeal followed.

## B.  **Factual Background.**

Ms. Carroll's defamation claim arises out of three statements in June 2019 denying her accusation that the President had assaulted her:

(1) A statement emailed by the Deputy White House Press Secretary to the press denied the accusation, compared it to accusations against Supreme Court Justice Kavanaugh, commented that false accusations "diminish the severity of real

assault," and solicited "information that the Democratic Party was working with Ms. Carroll or New York Magazine."  (JA-78 ¶ 82; JA-403.)  The statement was published by the Office of the Federal Register, National Archives and Records Administration, in its Compilation of Presidential Documents under "Budget and Presidential Materials."[4]

(2)  In responding to reporters' wide-ranging questions while on the South Lawn of the White House on his way to the Presidential Helicopter, Marine One, including questions concerning the economy, foreign affairs, potential reactions to Iran's targeting a U.S. drone, immigration issues and Ms. Carroll's accusation, the President denied the accusation, compared it to those against Justice Kavanaugh, and commented on the role of the media.[5]

(3)  In responding to questions from reporters from *The Hill* during a 45-minute wide-ranging interview in the Oval Office concerning the Federal Reserve, the Supreme Court, taxes and trade, the presidential election campaign, the

---

[4] JA-327; JA-403 (citing *Statement on the Assault Allegation by E. Jean Carroll*, Daily Comp. Pres. Docs., 2019 DCPD No. 00410 (June 21, 2019), https://www.govinfo.gov/app/details/DCPD-201900410.)  This Court may take judicial notice of government publications.  *See ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 599 n.126 (2d Cir. 2019) ("[T]he Government's . . . public statements are precisely the sort of materials of which we may take judicial notice.").

[5] JA-80-81 ¶ 91; JA-81 n.11 (citing *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019)); *Remarks in an Exchange With Reporters Prior to Departure for Camp David, Maryland*, Daily Comp. Pres. Docs., 2019 DCPD No. 00414 (June 22, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900414/pdf/DCPD-201900414.pdf, at 3-4.  *See ACLU*, 925 F.3d at 599 n.126.

President's authority to take military action against Iran and Ms. Carroll's accusation, the President denied the accusation.[6]

## SUMMARY OF ARGUMENT

### A. The Westfall Act Applies to the President.

Until this case, it had not been doubted that the Westfall Act -- which provides all federal employees with immunity from state tort law claims arising from conduct within the scope of their employment -- applies to the President. The Act has been applied by federal courts to the President at least five times -- in a case against President Clinton, a case against President George W. Bush, three cases against President Obama and, not counting this case, a case against President Trump.

The District Court's erroneous holding below that the Westfall Act does not apply to the President is contrary not only to the established understanding evidenced by those and other cases, but it is contrary to the plain language of the Westfall Act, which by its terms applies to "any employee of the Government," 28 U.S.C. §§ 1346(b)(1), 2679(b).

---

[6] JA-42 n.13 (citing Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019)); *see also* JA-329 (noting that "Trump discussed a range of topics, including the upcoming 2020 election as well as the possibility that President Barack Obama might endorse Vice President Biden in that race."); *READ: Trump's full exclusive interview with The Hill*, HILL (June 25, 2019), https://thehill.com/homenews/administration/450229-read-trumps-full-exclusive-interview-with-the-hill.

5

Presidents plainly are employees of the Government, and Congress plainly intended Presidents to be covered by the Westfall Act -- notwithstanding the District Court's strenuous but strained and unsuccessful effort to show otherwise here. The President's duties and responsibilities are set forth in and governed by and serve the purposes of Article II of the Constitution and Congressional statutes – that is, the Government. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (President's powers derive "from an act of Congress or from the Constitution itself."). Under Article II, section 1, the President is the "President of the United States of America," holds an "Office" -- which could only be an Office of the Government -- and "receive[s] for his [or her] services, a Compensation" from the Government. U.S. Const. art. II, § 1. And, not surprisingly given these facts, both Congress and the Supreme Court have referred to the President as an employee of the Government.

And, that Congress intended to include the President under the Westfall Act is conclusively confirmed by the legislative history of Section 2674 of the Act, which allows the United States to assert as a defense any immunities or statutory defenses belonging to the employee for whom the United States substitutes as defendant -- as the legislative history puts it, "[t]he United States would also be able to continue to assert other functional immunities, "*such as Presidential . . . immunity*, recognized in the constitution and judicial decisions." H.R. Rep. No.

6

100-700, at 5 (1988) (emphasis added), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5948. Congress enacted Section 2674 with the President specifically in mind, and it is therefore clear that Congress intended to include the President in the Westfall Act's protections.

The District Court nonetheless erroneously reasoned that the Westfall Act's failure to explicitly include the President evidences that Congress intended to exclude the President. But as the Westfall Act itself and other statutes make clear, when Congress intends to exclude the President or anyone else, it *explicitly* excludes them. Moreover, the Supreme Court has made clear that statutory silence should be read to afford the President, not exclude the President from, the protection of a statute. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President" to review under the Administrative Procedures Act.).

Equally erroneous are the District Court's other justifications for its novel finding that the President is not an employee of the Government covered by the Westfall Act. The District Court found support for its conclusion in its claim that the Westfall Act defines the term "employees of the Government" as "includ[ing] the executive departments," 28 U.S.C. § 2671, but not the "executive branch." (SPA-19-21.) But the District Court's reading runs contrary to the governing

7

definition of "department" in 28 U.S.C. § 451 ("'*department*' means one of the executive departments…unless the context shows that such term was intended to describe the executive, legislative, or judicial *branches* of the government"), as well as statutory rules of construction established by the Supreme Court whereby what follows the term "including" is not an exclusive list and the legislative history showing that Congress repeatedly referred to the Westfall Act as applying to the "Executive Branch."  It is plain that the use of the term "departments" was in no way an expression of a Congressional intent to exclude the President, but was a carry-over from the original enactment in 1946 of the FTCA, the statute the Westfall Act amended in 1988.  *See, e.g.*, H.R. Rep. No. 100-700, at 5.

## B.     The President Acted Within the "Scope of Employment."

Until this case, the courts uniformly have held that speaking to the press is within the scope of employment of policy-making public officials. As the Supreme Court observed in *Barr v. Matteo*, 360 U.S. 564 (1959), which involved allegedly defamatory statements by an acting agency director, "[i]t would be an unduly restrictive view of the scope of the duties of a policymaking executive official to hold that that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty." *Id.* at 575.  *A fortiori,* it is within the "scope of duties of the President to make public statements on "matters of wide public interest and concern," and Ms. Carroll's accusation is

8

without question such a matter. *See Clinton v. Jones,* 520 U.S. 681, 686 (1997) (President Clinton's agents' allegedly defamatory denials to the press of sexual harassment accusations against him were "arguably…within the outer perimeter of the President's official responsibilities."); *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (allegedly defamatory statements to the press were within the scope of Congressman's employment for Westfall Act purposes); *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (extending *Ballenger* to executive branch officials).

As the *Ballenger* and *Libby* courts found, District of Columbia law compels this result. In *Ballenger*, a Congressman was sued for allegedly defamatory statements during a telephone interview concerning his personal life. The court, applying District of Columbia law, held that this conduct fell within the scope of his employment for purposes of the Westfall Act, noting that "[t]he appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform," and that "speaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's authorized duties." *Id.* at 664.

In *Libby*, the D.C. Circuit extended *Ballenger* to Executive Branch officials. *Libby* concerned an invasion of privacy suit against Vice President Cheney and his

Chief of Staff for allegedly revealing to the media the identity of a covert CIA agent critical of the administration. The court upheld the Attorney General's Westfall Act certification because "[o]f course, the defendants may discredit public critics of the Executive Branch." *Id*. at 711. In so holding, the D.C. Circuit also reaffirmed that "D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)" requires courts "'to look beyond alleged intentional torts themselves' to the underlying conduct in determining whether that conduct was within the scope of employment." *Id.*

Under District of Columbia law, courts, in determining whether conduct falls within the scope of employment, examine whether the conduct: (a) is "of the kind" an employee is "employed to perform;" (b) "occurs substantially within the authorized time and space limits;" and (c) is "actuated, at least in part, by a purpose to serve the master." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009) (citing Restatement § 228(1) (1958)). *See also Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) (Kavanaugh, J.) (Courts "apply the scope-of-employment test very expansively," to ask "whether the defendant merely was on duty or on the job when committing the alleged tort.'")

In determining whether the conduct is "of the kind" the defendant is employed to perform, courts examine the context of the allegedly actionable conduct, not the content of the conduct. *See Ballenger*, 444 F.3d at 664; *Jacobs v.*

10

*Vrobel*, 724 F.3d 217, 222 (D.C. Cir. 2013) ("District law requires that we focus on the type of act [defendant] took that allegedly gave rise to the tort, not the wrongful character of that act."). The President speaking with the press is plainly "of the kind" of conduct, the President is "employed to perform."

As for the second prong of the test -- whether the statements were made within authorized time and space limits -- the President, who must "be always in function," *Trump v. Vance*, 140 S. Ct. 2412, 2423 (2020) (quoting Letter from T. Jefferson to G. Hay (June 17, 1807), in 10 Works of Thomas Jefferson 400-401, n. (P. Ford ed. 1905)), is authorized, indeed required, to carry out his or her duties no matter where he is or when.

The statements also satisfy the third prong because they were actuated, at least in part, by a purpose to serve the master -- here the Government.  The District Court erred in finding that "a slight purpose to serve the master is not enough." (SPA-48.)  Under applicable law, conduct is outside the scope of employment only if it was done *solely* for the accomplishment of a personal goal.  Here, the President's statements to the press were at "least in part," *Wuterich*, *supra,* done to serve the Government, because they addressed a matter of undoubted public concern.  *See Ballenger*, 444 F.3d at 665 (elected official's "remarks, made to the media to ensure his effectiveness as a legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a

11

legislator." (citing *Chapman v. Rahall*, 399 F. Supp. 2d 711, 714 (W.D. Va. 2005)).

The District Court, recognizing that *Ballenger*'s reasoning would compel upholding certification here, found it "wanting." (SPA-51), essentially because it "would mean that a president is free to defame anyone who criticizes his conduct or impugns his character -- without adverse consequences to that president." (SPA-54.)  However, as this Court has recognized, it precisely "was the intention of Congress" in enacting the Westfall Act to leave the plaintiff who brings a defamation claim "without any remedy." *B & A Marine Co. v. Am. Foreign Shipping Co.*, 23 F.3d 709, 715 (2d Cir. 1994).

The District Court also applied an incorrect test for scope of employment -- whether under state *respondeat superior* law there is a master-servant relationship. The court, relying on its incorrect conclusion that the President has no "master" -- as shown below, the President, according to the Supreme Court, is subject to the partial control of the other branches -- incorrectly held that therefore the statements here were not within the scope.  But for purposes of the Westfall Act, courts look only to the other prong of state *respondeat superior* law -- scope of employment -- to determine scope of employment.  Whether there is a master-servant relationship is irrelevant, because the Westfall Act replaces that inquiry with whether the defendant is an "employee of the Government."  Courts apply the master-servant

12

test for purposes of the Westfall Act only when they look to federal common law to determine whether the defendant is an "independent contractor." Moreover, even if the master-servant relationship were relevant, it was inappropriate for the District Court look to the Restatement of Agency for guidance in this instance, because the Restatement "does not state the special rules applicable to public officers . . . ." Restatement (Second) of Agency ("Restatement") Scope Note (1958).

In any event, the District Court erred in finding that the President does not satisfy the master-servant test by taking an overly restrictive view of whether the master "controls" the servant that is not even borne out by the Restatement. Because the District Court could not point to a person that controls the President, it found that there can be no master-servant relationship. However, the Restatement is clear that the master-servant relationship may exist, for example, for officers of corporations, who have no "master" but "give their time to their employers" -- just as Presidents "give their time" to the Government. Restatement § 2 cmt. c. Moreover, contrary to the District Court's conclusion, the President can in fact be controlled by other co-equal branches of Government.

Accordingly, the District Court's Order should be reversed.

13

# ARGUMENT

## I.   STANDARD OF REVIEW.

On appeal from a ruling on a motion for substitution pursuant to the Westfall Act, this Court reviews "the district court's factual findings for clear error and its legal conclusions *de novo*." *Bello v. United States*, 93 F. App'x 288, 290 (2d Cir. 2004). Here, the District Court's rulings were legal conclusions, *see* SPA-42 n.103 (scope of employment "is decided appropriately as a legal question of law in this case"), and this Court's review is therefore *de novo*.

On review, this Court may also consider arguments raised by the United States below which the District Court erroneously held were waived (SPA-19 n.48). Those arguments were appropriately raised by the United States on reply in response to arguments Ms. Carroll raised in opposing the motion to substitute on which she has the burden.[7] *See Guadagni v. New York City Transit Auth.*, 387 F. App'x 124, 125-26 (2d Cir. 2010). In any event, this Court has discretion to consider arguments raised for the first time on appeal "where necessary to avoid a manifest injustice" or "where [as here] the argument presents a question of law and

---

[7] The Westfall Act provides that on review by the courts, the Attorney's General certification that a federal employee's conduct was within the scope of employment is "*prima facie* evidence that the employee was acting within the scope of his [or her] employment," *Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017)(quoting *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009), and to rebut the certification, it is plaintiff's burden to "allege sufficient facts that, taken as true, would establish that the defendant's actions exceeded the scope of his employment." *Wuterich*, 562 F.3d at 381 (citation omitted).

there is no need for additional fact-finding." *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004). And, as the Supreme Court has held, where the appeal involves the President, "'appellate review … should be particularly meticulous.'" *Trump v. Vance*, 140 S. Ct. at 2430 (quoting *Nixon v. Fitzgerald,* 457 U.S. 731 (1982)).[8]

## II. THE WESTFALL ACT APPLIES TO THE PRESIDENT OF THE UNITED STATES.

The District Court erred in holding that the Westfall Act does not apply to the President of the United States.

### A. The Expansive Definition of Employee Includes the President.

Until this case, it had not been doubted that the Westfall Act applies to the President. The Act has been applied by federal courts in a case against President Clinton, a case against President George W. Bush, three cases against President Obama and, not counting this case, a case against President Trump. *See Littlejohn v. United States*, No. CA 6:13-870-JMC-KFM, 2013 WL 1840050, at *2 (D.S.C. Apr. 9, 2013), *report and recommendation adopted*, No. 6:13-CV-00870-JMC, 2013 WL 1840025 (D.S.C. Apr. 30, 2013) (United States substituted for President

---

[8] Moreover, a "responsible official," here the Department of Justice, may not waive sovereign immunity by failing to raise an objection. *See United States v. United States Fidelity and Guaranty Co.*, 309 U.S. 506, 513 (1940); *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 140 (2d Cir. 1999) (no official is empowered to consent to suit against the United States and any such waiver acceded to by an official is beyond the scope of his or her authority).

Clinton); *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 n.1 (D.D.C. 2016)*, aff'd*, 861 F.3d 241 (D.C. Cir. 2017); *Klayman v. Obama*, 125 F. Supp. 3d 67, 84-85 (D.D.C. 2015); *Littlejohn v. Obama*, No. CA 7:14-812-JMC-KFM, 2014 WL 8266142, at *2 (D.S.C. Mar. 18, 2014), *report and recommendation adopted*, No. CIV.A. 7:14-812-BHH, 2015 WL 1275346 (D.S.C. Mar. 18, 2015), *aff'd*, 615 F. App'x 121 (4th Cir. 2015); *West v. Trump*, No. 3:19-CV-2522-K-BH, 2020 WL 4721291, at *3 (N.D. Tex. July 23, 2020). Several courts, emphasizing the expansive reach of the Westfall Act, have also noted that it applies "to all officers, up to the president." *See Does 1-10 v. Haaland*, 973 F.3d 591, 598 (6th Cir. 2020); *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 70-71 (1st Cir. 1998) (same).

The District Court's erroneous holding below that the Westfall Act does not apply to the President is contrary not only to the established understanding evidenced by those cases, but is contrary to the expansive language of the Westfall Act, which by its terms applies to "*any* employee of the Government," 28 U.S.C. §§ 1346(b)(1), 2679(b) (emphasis added). "When used (as here) with a 'singular noun in affirmative contexts,' the word 'any' ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] *every* member of the class or group.'" *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'any' naturally carries 'an expansive

meaning.'").  Thus, as the Supreme Court has repeatedly noted, the Westfall Act applies to "all federal employees."  *Levin v. United States*, 568 U.S. 503, 509 (2013); *Hui v. Castaneda*, 559 U.S. 799, 809-10 (2010) (same).

The Westfall Act defines "employee of the Government" in 28 U.S.C. § 2671, by setting forth illustrative, non-exclusive examples.  That provision provides, in relevant part, that "employee of the government *includes* officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."  28 U.S.C. § 2671 (emphasis added).  "Federal agency," in turn, is defined to "*include*[] the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include* any contractor with the United States."  *Id.* (emphasis added).

These definitions are "introduced with the verb 'includes,'" which "makes clear that the examples enumerated . . . are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (interpreting Fair Labor Standards Act ("FLSA")); *see also Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application

of the general principle."); *Davila v. United States*, 247 F. Supp. 3d 650, 661 n.18 (W.D. Pa. 2017) ("The use of the word 'includes' [in the Westfall Act] . . . suggests that persons not clearly within the scope of these [enumerated] categories may nonetheless be covered." (citation omitted)); *McNamara v. United States*, 199 F. Supp. 879, 880 (D.D.C. 1961) (definition of "federal agency" in FTCA is "not an exclusive definition.").  When Congress sought to limit the definitions of terms in the Westfall Act to specifically enumerated categories, it used the words "means" instead of "includes."[9]  *See Christopher*, 567 U.S. at 162 ("Congress used the narrower word 'means'" in the same and "other provisions of the FLSA when it wanted to cabin a definition.").

 In other words, the only question is whether, under the expansive definition intended to cover "the entire Federal workforce," *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425-26 (1994) (citation omitted), Presidents are "employee[s] of the Government" -- with the definitions in 28 U.S.C. § 2671 providing only illustrations of "employee."

 Presidents plainly are employees of the Government, and Congress plainly

---

[9] *See* 28 U.S.C. § 2671 ("'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States or a member of the National Guard . . . *means* acting in line of duty." (emphasis added)); *id.* § 2680 ("'[I]nvestigative or law enforcement officer *means* any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." (emphasis added)).

18

intended Presidents to be covered by the Westfall Act -- notwithstanding the District Court's strenuous but strained and unsuccessful effort to show otherwise here. Under Article II, section 1, the President is the "President of the United States of America," holds an "Office" of the Government and "receive[s] for his [or her] services, a Compensation" from the Government. *See* U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); 3 U.S.C. § 102 (setting Presidential compensation including expense allowance to defray costs of performing "official duties").

Not surprisingly given these facts, both Congress and the Supreme Court have referred to the President as an employee of the Government. In *United States v. Hatter*, 532 U.S. 557, 563 (2001), in discussing a Congressional statute concerning the participation of governmental employees in the social security program, the Supreme Court expressly referred to the President as included in a "class of current federal employees." And in that statute, Congress itself referred to "service performed as the President" as a category of "[s]ervice performed in the employ of the United States." 42 U.S.C. § 410(a)(5)(C).

Accordingly, by the plain understanding of the term, the President is an employee of the Government.

### B.     The Westfall Act's Failure to Exclude the President Establishes that the President is Included in the Definition.

The District Court erroneously held "that the failure to mention the president

should be understood as *excluding* him from the scope of the Westfall Act and Section 2671." (SPA-28 (emphasis in original)). But as the Westfall Act itself and other statutes make clear, when Congress intends to exclude the President or anyone else, it *explicitly* excludes them.

Thus, the Westfall Act excludes from its coverage one potential class of employee: "any contractor with the United States," 28 U.S.C. § 2671. As the Supreme Court noted in *United States v. Smith*: "if Congress had intended to limit the protection under the [Westfall] Act to employees not covered . . . it would have said as much." 499 U.S. 160, 173 (1991); *cf. Fed. Land Bank*, 314 U.S. at 100 ("If the broad exemption accorded to 'every Federal land bank' were limited to the specific illustrations mentioned in the participial phrase introduced by 'including', there would have been no necessity to except from the purview of section 26 the real estate held by the land banks.").

Accordingly, Congress's failure to exclude the President specifically -- as it did with independent contractors -- confirms that the Westfall Act covers the President. Other courts have also interpreted the FTCA in this manner. For example, in *LePatourel*, the Eighth Circuit interpreted the definition of "any government employee" in the pre-Westfall Act version of the FTCA to include federal judges, even though "federal agency" was then only defined to "include[] the executive departments, the military departments, independent establishments of

20

the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *United States v. LePatourel*, 571 F. 2d 405, 408 (8th Cir. 1978). The court noted that, as here, "[w]here Congress wished to limit the Act's coverage, as in the case of independent contractors, the language employed conferred a clear and specific exemption." *Id.* Thus, because Congress "chose to define 'employees of the government' . . . inclusively rather than exclusively," the FTCA applied to federal judges. *Id.* Under the same reasoning, the Westfall Act includes the President.

In other circumstances, when Congress intended to *exclude* the President from its definition of federal employees it has so specified. For example, the Hatch Act's prohibition against federal employees engaging in certain political activities defined "employee" as "any individual, other than the President and the Vice President . . . ." *See* 5 U.S.C. § 7322.

Moreover, the Supreme Court has made clear that statutory silence should be read to afford the President, not exclude the President from, the protection of a statute. In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court held that the Administrative Procedures Act ("APA"), which provides for judicial review of final agency actions, does not allow review of Presidential actions, notwithstanding the fact that the APA did not explicitly exclude the President. The

21

Supreme Court held that "out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA." *Id.* at 800-01 (citing *Nixon v. Fitzgerald,* 457 U.S. at 748, n. 27). Similarly, as the Supreme Court recognized in *Franklin*, in *Nixon v. Fitzgerald*, 457 U.S. at 748 n.27, the Court noted that it would take "express legislative action to *subject* the President" to damages claims, while reserving decision on whether that would be constitutionally permissible.

Notwithstanding *Franklin*'s clear import, the District Court read *Franklin* to support the proposition that, by excluding the President from the protections of the FTCA, it was, in fact following the direction in *Franklin* to avoid expanding Presidential liability. (SPA-29-32.) Specifically, the District Court reasoned that reading the FTCA to apply to the President would *authorize* private actions reviewing the President's official conduct. That concern is easily disposed of by 28 U.S.C. § 2674, which allows the United States to assert any pre-existing immunities possessed by the individual defendant, which, under these circumstances, would include the President's immunity from civil damages suits under *Fitzgerald*.[10] In any event, the FTCA does not permit review of

---

[10] 28 U.S.C. § 2674 provides, in relevant part, that "the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been

22

discretionary acts, as the District Court feared.  28 U.S.C. § 2680(a).

**C.    The Legislative History Makes Clear That Congress Intended to Include the President.**

If there are any lingering doubts as to the intent of Congress to include the President in the Westfall Act's coverage, it is removed by the legislative history of 28 U.S.C. § 2674.  Congress enacted this section with the President, specifically, in mind, intending that when the United States is substituted as a defendant, "[t]he United States would also be able to continue to assert other functional immunities, ***such as Presidential*** and prosecutorial ***immunity***, recognized in the constitution and judicial decisions."  H.R. Rep. 100-700, at 5 (emphasis added), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5948.

**D.    The President is Part of the Executive Departments as That Term is Used in the Westfall Act.**

The District Court also erred in drawing a distinction between "executive departments" and the "Executive Branch," finding that because the Westfall Act defines "employees of the Government" as "includ[ing] the executive *departments*," 28 U.S.C. § 2671 (emphasis added), it does not include the President, whom the District Court found occupies the "executive *branch*." (SPA-19-21 (emphasis added).)

---

available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled."

First, statutory rules of construction established by the Supreme Court establish that the definition is not limited to the specific categories of "employees of the Government" set forth in Section 2671. *See supra* Section II. A, B.

Second, the District Court's reading runs contrary to the governing definition of "department" in 28 U.S.C. § 451, as "describ[ing] the executive, legislative, or judicial *branches* of the government" where "the context shows that such term was intended."[11] As numerous courts have concluded, the "context" of the Westfall Act and its predecessor FTCA makes clear its definitions were intended to be expansive and include "the entire Federal workforce," including the executive branch. *See supra* Section II. A. Indeed, in *McNamara v. United States*, Judge Holtzoff, who, as a member of the Justice Department assisted with drafting the final version of the original FTCA,[12] held not only that "the phraseology of the statute . . . is not limited to the *Executive Branch*," but that "the statute applies to *all three branches* of the Government." 199 F. Supp. at 880-81. And in *Wilson v.*

---

[11] Act of June 25, 1948, ch. 646, § 451, 62 Stat. 869, 907 (emphasis added) (current version at 28 U.S.C. § 451), *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf. The 1948 version of Title 28, which the District Court cites (SPA-16 n.42), provided that "the term- 'Federal agency' includes the executive departments and independent establishment of the United States . . . but does not include any contractor with the United States."

[12] *See*, *e.g.*, *Tort Claims Against the United States: Hearings on S. 2690 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 3d Sess. 9, at 11-13 (1940) (memorandum to the Att'y Gen. from Special Ass't Alexander Holtzoff dated June 7, 1939); *id.* at 33-53 (statement of Alexander Holtzoff).

24

*Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008), the D.C. Circuit Court of Appeals upheld Westfall Act certification for the Vice President and three senior executive officials related to claims arising out of their purported invasion of privacy by disclosing the identity of a cover agent.

Other contemporaneous judicial decisions also confirm that the term "department" would have applied to the "Executive Branch." For example, in *Shaughnessy v. United States ex rel. Mezei*, the Supreme Court referred to "the Government's political *departments*" to mean "Congress" and "the President." 345 U.S. 206, 210 (1953) (emphasis added). Accordingly, "executive department" as used in the Westfall Act does mean the executive branch.

Third, it is irrelevant that the White House website "draw[s] a clear distinction between 'the executive branch,' 'the executive departments,' and 'federal agencies,'" as the District Court noted. (SPA-24.) The relevant inquiry is the intent of Congress when it enacted the Westfall Act, not the drafters of the White House website.

Fourth, the legislative history shows that Congress repeatedly referred to the Act as applying to the "Executive Branch," notwithstanding the use of the term "departments" carried over from the original enactment of the FTCA. Congress enacted the Westfall Act in response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988) -- which limited federal employees' ability to assert

25

immunity to actions arising out of their discretionary conduct -- intending to "remedy[] an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the *entire Federal workforce*." § 2(a)(5), 102 Stat. 4563 (emphasis added).

Congress recognized that "[t]he potential increase in liability from the Westfall decision affects officers and employees of *all three branches* of government." H.R. Rep. No. 100-700, at 3, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5947 (emphasis added); *see also id.* at 5 ("[t]he FTCA currently covers employees of the *Executive Branch* only." (emphasis added)). Congress increased the scope of the FTCA "by inserting after 'executive departments,'" the phrase "'the judicial and legislative branches.'" Westfall Act, Pub. L. No. 100-694 (HR 4612) at § 3. In this way, Congress intended "*to make explicit* that employees of the judicial and legislative branches are included within the coverage of the [FTCA] . . . in the same way as employees of the *Executive Branch*." H.R. Rep. 100-700, at 8, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5952 (emphasis added); *see also id.* at 11 ("Judicial and Legislative Branch employees, as well as *Executive Branch* employees, are covered by the FTCA." (cost estimate statement of James Blum, Cong. Budget Office Acting Director) (emphasis added)).

Accordingly, it is irrelevant, as the District Court noted, that the Westfall Act refers to the "executive *departments*" and the "legislative and judicial

*branches*," where Congress had understood "executive departments" to refer to the Executive Branch when it enacted the Westfall Act and was merely tacking on an additional phrase some forty years after the FTCA's enactment.

The District Court, however, misread the legislative history, focusing on the Supreme Court's statement that Congress had "one purpose firmly in mind" when enacting the Westfall Act, which was "to return Federal employees to the status they held prior to the *Westfall* decision." (SPA-27-28 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The District Court noted that, at the time of *Westfall v. Erwin*, the President already had immunity from suit for conduct falling within the outer perimeter of his or her official duties as a result of the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Accordingly, the District Court reasoned that: (1) because the President has immunity from *Nixon v. Fitzgerald* that *Westfall v. Erwin* did not alter, (2) the Westfall Act did not need to "return" the President to any pre-*Westfall* status and, therefore, (3) the President was not encompassed by the "one purpose" of the Westfall Act. (SPA-27.)

That conclusion does not follow. The District Court places undue emphasis on an out-of-context statement by the Supreme Court. Congress had several purposes in mind, including explicitly expanding the scope of the Westfall Act to include the other branches of Government and creating a certification mechanism and a removal process. *See Operation Rescue Nat'l*, 147 F.3d at 69 (not only did

27

the Westfall Act remove the discretionary requirement, but it also increased "increased the scope of the FTCA by adding employees of the judicial and legislative branches to those of the *executive branch*." (emphasis added)).[13]

Indeed, in *Smith*, the Supreme Court expressly rejected this very argument that the Westfall Act "was meant to apply solely to those Government employees not already protected from tort liability . . . by a pre-existing federal immunity." 499 U.S. at 172. The Supreme Court noted that Congress was clearly aware of "pre-Act immunity" and its "enactment of . . . express limitations of immunity . . . indicates that if it intended to limit the Act's protection to employees not covered under . . . pre-Act immunity . . ., it would have said this expressly." *Id.* at 173.

Finally, as shown (*supra* Section II. C), Congress expressly intended that the United States would be able to "continue" to assert pre-existing immunities, including "Presidential," under 28 U.S.C. § 2674.

---

[13] In the portion of *Gutierrez de Martinez* quoted by the District Court, the Supreme Court was merely addressing whether the Attorney General's certification was conclusive on the issue of scope of employment. (SPA-27 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The Supreme Court reasoned that by returning Federal employees to their pre-*Westfall* status, Congress was not making the Attorney General the sole arbiter of scope-of-employment, but returning to a scheme in which the courts would make that determination. *Gutierrez de Martinez*, 515 U.S. at 425-26. Thus, the Supreme Court's focus was simply on Congress's purpose of returning federal employees to their pre-*Westfall* immunity.

28

**E.    The Administrative Requirements in the Westfall Act Do Not Preclude it From Applying to the President.**

The District Court also erroneously concluded that the Westfall Act cannot apply to the President based on the phrasing of certain administrative claim submission requirements clearly intended to apply to the vast majority of the entire federal workforce that routinely avails itself of the Westfall Act.  Those administrative requirements do not provide a basis to prevent the President from availing him or herself from the Westfall Act's important protections.

First, the District Court found it significant that, under 28 U.S.C. § 2672 of the Westfall Act, a defendant must seek the "prior written approval of the Attorney General" to settle claims "in excess of $25,000," because the court could not "imagine that Congress intended . . . to require the president to seek the approval of the Attorney General."  (SPA-22.)  However, the Attorney General and the Department of Justice have presumptive responsibility for all litigation involving the United States and its agencies.  *See* 28 U.S.C. §§ 516, 519.  Furthermore, the Attorney General is specifically charged by the Westfall Act with defending "any civil action or proceeding . . . against any employee of the Government . . . for any such damage or injury" 28 U.S.C. § 2679(c), "arising or resulting from the . . . wrongful act . . . of any employee of the Government while acting within the scope of his office or employment," *id.* § 2679(b)(1).  It is therefore entirely conceivable

29

that the Westfall Act requires settlement of all claims, including against the President, to be submitted to the Attorney General.

Moreover, any claims for damages brought against the United States are permitted solely by virtue of Congress's waiver of sovereign immunity for certain claims in the FTCA. *See B & A Marine*, 23 F.3d at 712 ("The FTCA is a limited waiver of sovereign immunity . . . ."); *West v. Trump*, 2020 WL 4721291, at *3 ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)). It is thus entirely appropriate for Congress to have delegated authority to make settlement determinations for payment of funds for which it waived sovereign immunity to anyone it pleased, including the Attorney General.

Second, the District Court found that, because the President has not submitted any claims to Congress, which heads of agencies are required to do under 28 U.S.C. § 2673 of the Westfall Act, the President cannot be the head of an agency, and therefore does not fall within the definition of "officers or employees of any federal agency," 28 U.S.C. § 2671. However, as shown, the President is covered by the more expansive definition of "any Government employee" as well as the definition of "executive departments" and need not be the head of a "federal agency."

30

Third, the District Court was concerned that the requirement, under 28 U.S.C. § 2675 of the Westfall Act, that a plaintiff who wishes to sue under the FTCA shall "first present a claim to the appropriate Federal agency," would not make sense if a claimant had to present a claim to the President. (SPA-23.) However, this claim makes no less sense than when applied to Members of Congress, who are also at the apex of their branch.[14] In any event, courts have recognized that if a claim is brought against the President, the claimant may simply "first submit notice of a claim to the Department of Justice or other appropriate agency." *See, e.g.*, *Littlejohn v. South Carolina*, No. CA6:100940RBHWMC, 2010 WL 1791419, at *3 (D.S.C. Apr. 16, 2010) ("Since the complaint does not show that the plaintiff has submitted a Standard Form 95 to the appropriate federal agency or to the United States Department of Justice, this case should be dismissed for failure to exhaust federal administrative remedies."), *report and recommendation adopted*, No. 6:10-CV-00940-RBH, 2010 WL 1791416 (D.S.C. May 4, 2010).

---

[14] The Senate has in fact promulgated rules that "the Sergeant at Arms of the Senate, in accordance with regulations prescribed by the Attorney General . . . may consider and ascertain and . . . determine, compromise, adjust and settle" claims against any Senator under the FTCA. *See* S. Res. 492, 97th Cong. (1982), *as reprinted in* S. Manual § 109, 113th Cong., *available at* https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf (last visited Jan. 10, 2021). Notably, this resolution passed before *Westfall*, and before Congress amended the definitions provision to make "explicit" the "legislative branch," further underscoring the expansive meaning of "employee of the Government" under the Westfall Act and the FTCA. In other words, prior to the Westfall Act, Congress understood the FTCA to apply to it based on the definition of "any employee of the Government."

Therefore, based on the plain language of the statute, the legislative history,

and the "common understanding" of numerous courts, it is clear that the President

is an "employee of the Government" for purposes of the Westfall Act.

## III.   THE PRESIDENT'S STATEMENTS AT THE WHITE HOUSE WERE MADE "WITHIN THE SCOPE OF HIS OFFICE OR EMPLOYMENT"

The District Court erred in holding that the statements at issue were not

made within the scope of the President's office or employment.[15]

### A.   The President's Statements to The Press At The White House Were Made "Within the Scope of His Office or Employment"

Courts, including this Court, "apply the scope-of-employment test very

expansively," to ask "whether the defendant merely was on duty or on the job

when committing the alleged tort.'" *Harbury*, 522 F.3d at 422 n.4 (Kavanaugh, J.);

*see also Ballenger*, 444 F.3d at 664 (noting the duties test is to be "liberally

construe[d]"); *Bowles*, 685 F. App'x at 23 ("[T]he scope of employment inquiry

addresses whether [the employee's] allegedly defamatory statements were made

---

[15] The District Court properly "agreed with the Government" that the alleged tort occurred in the District of Columbia. (SPA-36); *see also Richards v. United States*, 369 U.S. 1, 9 (1962) (under the FTCA, the Court applies "the law of the place where the act or omission occurred" not the law of the state where the alleged tort had its operative effect"). As a result, D.C. law applies, including its choice of law principles. *Id.* at 11. While the District Court questioned whether the substantive law or the choice of law principles of District of Columbia would apply (SPA-37), that inquiry is irrelevant. Under those choice of law principles, courts look to "the substantive law of the jurisdiction where the employment relationship exists," *Vrobel*, 724 F.3d at 221, which here is the District of Columbia; *Conyers v Westphal*, 235 F. Supp. 3d 72, 77 (D.D.C 2017).

'on duty at the time and place of an "incident" alleged in a complaint.'") (quoting *Osborn*, 549 U.S. at 247).

Until this case, the courts uniformly have held that speaking to the press is within the scope of employment of public officials and, therefore, *a fortiori* of the President. *See, e.g.*, *Does 1-10*, 973 F.3d at 600 ("unsolicited comments by elected officials on an event of widespread public interest" within the scope); *Wuterich*, 562 F.3d at 384 (holding that a Congressman's statement, at his campaign office, that a Marine committed atrocities were within the scope of his office); *Libby*, 535 F.3d at 712 (upholding Westfall Act certification for Vice President and three senior executive officials because "[o]f course, the defendants may discredit public critics of the Executive Branch"); *Ballenger*, 444 F.3d at 664-66 (holding allegedly defamatory comments made by Congressman, at his office, during telephone interview with reporter about his marital status, were within scope of office); *Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (statements in press interview within scope of employment); *see also Rahall*, 399 F. Supp. 2d at 713-15 (holding Congressman was acting within the scope of office under West Virginia law when he allegedly defamed a commentator by calling him a "bigoted, right wing, redneck, racist wacko").

This is so because a "primary obligation of" elected officials "in a representative democracy is to serve and respond to his or her constituents." *See*

*Wuterich*, 562 F.3d at 385 (quoting *Williams*, 71 F.3d at 507) (referring to Members of Congress).  Moreover, an elected official's "ability to do his job" or to govern "effectively is tied . . . to the [official's] relationship with the public and in particular his constituents and colleagues . . . ." *Ballenger*, 444 F.3d at 665; *see also Barr*, 360 U.S. at 575 ("[i]t would be an unduly restrictive view of the scope of the duties of a policymaking executive official to hold that that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty.").

    *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) is dispositive.  *Ballenger* involved a defamation claim against a Congressman arising out of statements made during a telephone interview, from his office, with a reporter.  In response to a question about his separation from his wife, the Congressman stated that his wife had moved because she did not want to live across the street from the offices of the plaintiff, the Council on American Islamic Relations, which, he stated, was the "fund-raising arm for Hezbollah." *Id.* at 662.  The D.C. Circuit Court of Appeals found that the conduct fell within the scope of employment noting that "[t]he appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform," and that

"[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* at 664.

Similarly, in *Wilson v. Libby*, the D.C. Circuit extended *Ballenger* to Executive Branch officials. 535 F.3d at 712. *Libby* concerned an invasion of privacy suit against Vice President Cheney and President George W. Bush's senior advisors for allegedly revealing to the media the identity of a covert CIA agent critical of the administration. The court upheld the Westfall Act certification because "[o]f course, the defendants may discredit public critics of the Executive Branch." *Id.* In so holding, the D.C. Circuit also reaffirmed that "D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)" requires courts "'to look beyond alleged intentional torts themselves' to the underlying conduct in determining whether that conduct was within the scope of employment." *Id.* at 711 (quoting *Ballenger*, 444 F.3d at 664). *See also Bowles*, 685 F. App'x at 25 (conduct is not "outside the scope of employment simply because, if proved, it would constitute an intentional tort."); Restatement § 231 ("An act may be within the scope of employment although consciously criminal or tortious.")).

Under each of the factors examined by D.C. Courts, the President's conduct falls within the scope of employment. Courts look to the Restatement (Second) of Agency, which examines whether the conduct: (a) is "of the kind" an employee is "employed to perform;" (b) occurs substantially within the authorized time and

space limits;" and (c) is "actuated, at least in part, by a purpose to serve the master." *See Wuterich*, 562 F.3d at 383 (citing Restatement § 228(1)). The President speaking to the press here plainly satisfies each element.

### 1. Speaking to the Press is "Of the Kind" a President is Employed to Perform.

Speaking to the press and communicating with the public is clearly conduct "of the kind [a President] is employed to perform." Restatement § 228(1).

Under D.C. law, "this prong is 'liberally construe[d].'" *Ballenger*, 444 F.3d at 664 (citation omitted). In determining whether the conduct is "of the kind" the defendant is employed to perform, courts examine the context of the allegedly actionable conduct, not the content of the conduct. *See id.* ("The appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform."); *see also*, *e.g.*, *Smith v. Clinton*, 886 F.3d 122, 126-27 (D.C. Cir. 2018) (wrongful death action allegedly arising from Secretary of State Hillary Clinton's use of a private email server was subject to the Westfall Act because her use of emails concerning government operations was within the context of her office); *Vrobel*, 724 F.3d at, 222 (examining whether "responding to a prospective employer's request for a reference" is the "*type of act"* that defendant was employed to perform in defamation claim arising out of that conversation (emphasis in original)); *Ali v. Rumsfeld*, 649 F.3d 762, 774-75 (D.C. Cir. 2011)

(plaintiffs' alleged torture and illegal detention by Secretary of Defense Donald Rumsfeld and high-ranking Army officers were within the scope of their offices under the Westfall Act).

Here, because speaking and responding to the media is of the "type of act," *Vrobel*, 724 F.3d at 222, that the President is expected to perform, this prong is satisfied.

As in *Ballenger* and *Libby*, here, when making the statements, the President was fulfilling his duties to address the press and respond to critics on matters of public concern. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens."); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019) (President "acts in an official capacity when he tweets").  Indeed, as the Supreme Court has explicitly found, because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020).  Rather, "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'"  *Id.* (quoting THE FEDERALIST No. 51).

That the conduct is within the President's scope of employment is also supported by the Supreme Court's holding in *Clinton v. Jones*.  There, the plaintiff,

Paula Jones sued President Clinton for alleged sexual misconduct prior to the

President taking office.  President Clinton asserted that he was immune from suit

in federal court for that unofficial conduct.  One of Jones's claims, however, was

that President Clinton defamed her while he was in office by denying her

accusations. The Supreme Court expressly noted that this defamation claim

"arguably may involve conduct within the outer perimeter of the President's

official responsibilities," qualifying the President for immunity under *Nixon v.*

*Fitzgerald*.  *Clinton v. Jones*, 520 U.S. at 686.  Thus, the Supreme Court

recognized that responding to accusations of misconduct are at least "arguably"

within the President's official responsibilities.[16]  *Id.*

### 2.    The Statements Were Substantially Within An Authorized Time and Place.

The statements at issue also satisfy the second prong of the Restatement test

because they occurred "substantially within the authorized time and space limits."

Restatement § 228(1); *see also Ballenger*, 444 F.3d at 317 (noting Congressman

---

[16] The District Court erroneously read this *dicta* as supporting the premise that President Trump's conduct here falls *outside* the scope of employment, reasoning that the Supreme Court meant that "at most" the President's conduct fell within the "outer perimeter" of the President's official duties.  (SPA-55-56.)  However, the Supreme Court was not addressing where on a spectrum between "outer perimeter" and "scope of employment" the President's conduct fell, as the District Court interpreted that statement, because the Supreme Court was not addressing the Westfall Act.  The Supreme Court's assertion concerned only whether the President's conduct was within the "outer perimeter of the President's official responsibilities" – the immunity test set forth by the Supreme Court in *Nixon v. Fitzgerald*.  That the Court found that the President's conduct "arguably" did, only supports that the conduct is also within the scope of employment.

called a reporter "from his congressional office during regular business hours"). The statements were all made at the White House. *See supra* Section III. A. Moreover, because the President must "be always in function," the "authorized time" limits do not apply. *Trump v. Vance*, 140 S. Ct. at 2423 (citation omitted); *Clinton v. Jones*, 520 U.S. at 717 (Breyer, J., concurring) (same). However, in fact the statements all were within "regular business hours." *See supra* Section III. A. Finally, the first two statements were published by the "Office of the Federal Register, National Archives and Records Administration" in the "Compilation of Presidential Documents" under "Budget and Presidential Materials."[17] *Cf. Knight*, 928 F.3d at 239 ("[T]he President's initial tweets (meaning those that he produces himself) are government speech.").

### 3. The Statements Were Actuated in Part by a Purpose to Serve the Master.

Finally, the President's statements satisfy the third prong of the Restatement test because they were "actuated, at least in part, by a purpose to serve the master." Restatement § 228(1). As the Court in *Ballenger* noted, "even a *partial* desire to serve the master is sufficient." *Ballenger*, 444 F.3d at 665. Thus, speaking to the press to "maintain the 'continued trust and respect of . . . constituents' in order to preserve [the] 'ability to carry out' governmental duties" is sufficient, because an

---

[17] *See* JA-327; JA-403 (citing DCPD-201900410 - Statement on the Assault Allegation by E. Jean Carroll, *available at* https://www.govinfo.gov/app/details/DCPD-201900410.)

elected official's "ability to do his job . . . effectively is tied . . . to the [official's] relationship with the public and in particular his constituents and colleagues." *Id.*

The District Court asserted that *Ballenger* misstated D.C. law, because, the District Court claimed, "a slight purpose to serve the master is not enough." (SPA-48 (citing *Blair v. District of Columbia,* 190 A.3d 212, 226 (D.C. 2018); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001).) To the contrary, the D.C. Circuit's decision in *Ballenger* faithfully apply the longstanding law of the District of Columbia.

As the District of Columbia Court of Appeals in *Blair*, cited by the District Court, recently reaffirmed, "an employee's conduct will be outside th[e] scope [of employment] *only if* the employee's actions are *entirely disconnected* from the work of the master, or the actions . . . were done *solely* for the accomplishment of the independent . . . mischievous purpose of the servant." *Blair*, 190 A.3d at 228 (emphasis added).

*Blair* involved an off-duty police officer who was alleged to have assaulted a patron at the bar. The District of Columbia argued that it was not vicariously liable, because the officer had been motivated by a "personal vendetta," inasmuch as he had been hit in the back of the head before entering the fight. *Id.* at 228. The Court of Appeals disagreed, reversing summary judgment and finding that the officer's "professional and personal motives for his actions . . . were significantly

40

intertwined," because, he "didn't enter the altercation[,] the altercation was thrust upon him," and he "began to react to an assault on fellow officers, as well as bouncers . . . as was his duty." *Id.* at 227-28.

By contrast, in *Balmidele*, also cited by the District Court, police "officers were off-duty, they were not in uniform, and they were at the restaurant for purely personal reasons," when one officer "beg[a]n beating [plaintiff]," another patron, in response to a harmless comment by plaintiff that did not affect any police interest. 103 A.3d at 526. As the District of Columbia Court of Appeals noted in *Blair*, the officer's conduct was thus "***in no way*** connected to, or in furtherance of, their duties as police officers." *Blair*, 190 A.3d at 227 (emphasis added). In fact, the court in *Balmidele* also recognized that "if the employee acts in part to serve his employer's interests, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." 103 A.3d at 525.

Similarly, in *Brown*, the D.C. Court of Appeals found that there was a jury question as to whether an employee who was alleged to have sexually assaulted a customer whom he suspected of shoplifting while performing a search was motivated in part to serve his master. 782 A.2d at 758-59. The relevant question, the court noted was "whether his conduct, if proven, was motivated to ***any extent***

41

by his desire to serve his employer or was *entirely* his own personal adventure . . . ." *Id.* (emphasis added).

Thus, none of the cases cited by the District Court support the proposition that a slight purpose to serve the master is insufficient. Further, in all of these cases, it was clear that the courts were examining not the content of the conduct – i.e., the assault -- but its context, i.e., intervening in a fight, as in *Blair*, or searching a shoplifter, as in *Brown*. Indeed, D.C. Courts have long treated even intentional torts as falling within the scope of employment so long as the tort was performed in the context of the employee's performance of his duties. *See, e.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991-92 (D.C. 1986) (upholding verdict that imposed respondent superior liability when laundromat employee shot customer during dispute).

Here, it is clear that the context of President Trump's conduct -- speaking to the press at the White House -- was "actuated, at least in part, by a desire to serve the [Government's] interest," particularly because it was in response to a widely reported accusation that, as in *Blair*, was "thrust upon him." Ms. Carroll herself stated that expected her article to lead to a "media storm" of attention including from "leading news sources" "around the world." (JA-350 (emphasis added); JA-74, 79, 82, 90 ¶¶ 62, 84, 98, 142 & nn.10, 14.) *See Ballenger*, 444 F.3d at 665 (elected official's "remarks, made to the media to ensure his effectiveness as a

42

legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a legislator" (quoting *Rahall*, 399 F. Supp. 2d at 715)).  Moreover, as in *Ballenger*, it is irrelevant that the specific statements at issue involved the President's personal life, because the relevant inquiry concerns the context of the President speaking with the press, not the content of specific statement at issue.  *See Ballenger*, 444 F.3d at 666.

### B. The District Court's Complaints with Ballenger Are Unfounded.

The District Court, while recognizing that *Ballenger* compels upholding certification, found its "reasoning is wanting." (SPA-51.)  None of its criticisms, however, withstand scrutiny.

First, the District Court took issue that the court found that speaking to the press fell within "the scope of a congressman's 'authorized duties'" because "[t]he court did not . . . offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters."   However, as this Court recognized, applying the Restatement, an "employer need not specifically authorize the precise action the employee took." *See Bowles*, 685 F. App'x at 25.  Moreover, inasmuch as there is no specific person who authorizes a member of Congress to do *anything*, it is difficult to imagine what allegedly tortious conduct would ever be covered by the Westfall Act.  Yet Congress specifically extended the Westfall Act's protections to the "legislative branch" (*supra* Section II. D) and courts have repeatedly applied it

43

to members of Congress (*supra* Section III. A).[18]

Second, the District Court took issue with the *Ballenger* court's reasoning that a Congressperson's statement about his personal life could be the type of statement that he was employed to perform, because "[t]he job description of a *congressperson* does not include transparency about one's personal life." (SPA-51.) By so holding, the District Court was erroneously examining the content, not the context, of the relevant conduct -- speaking to the press. *See supra* Section III. A.

Thus, courts have repeatedly found, for example, that an assault may fall within the scope of employment notwithstanding the fact that the "job description" does not include assault. *See, e.g.*, *Harbury*, 522 F.3d at 422 (CIA officers allegedly responsible for torture acted within scope of employment); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24-25 (D.C. 2000) (retail store employee who struck customer acted within the scope of employment); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (laundromat employee acted within scope of employment in shooting customer during dispute over removing clothes from washing machine).

Even if the content of the statement were relevant, however -- and it is not -- the statements still fall within the President's official duties. While the District

---

[18] This also improperly imports an element of the "master-servant relationship" test that is irrelevant to scope of employment. *See infra* Section III. C. 1.

Court narrowly construed a Congressperson's "job description," the President's job description is not so narrow.  *See Mazars*, 140 S. Ct. at 2034 ("[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." ).

In any event, the statements themselves were not simply about the President's "personal . . . affairs," but involved highly political issues, including Justice Kavanaugh's confirmation hearing and the role of the media in politics. *See supra* p. 6.  And the President's statements were made in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries.

Moreover, as the District Court acknowledged (SPA-54), the President's failing to address these accusations could affect the President's ability to govern. *See Ballenger*, 444 F.3d at 665-66 ("A [Congressperson's] ability to do his job as a legislator effectively is tied, as in this case to the [Congressperson's] relationship with the public and in particular his constituents and colleagues in the Congress.").

The District Court rejected this argument on the ground that while it is "not entirely without merit, it goes much too far."  (SPA-54.)  The District Court found that this "would mean that a president is free to defame anyone who criticizes his conduct or impugns his character -- without adverse consequences to that

45

president." (*Id.*) However, while the District Court may not have liked the consequences of the properly applied test, that is not grounds to disregard it. That is exactly the nature of sovereign immunity and effect of Congress's clear decision not to waive the Government's immunity for defamation claims. *See* 28 U.S.C. § 2680(h).

This Court has recognized the fact it "was the intention of Congress" in enacting the Westfall Act to leave the plaintiff who brings a defamation claim without a remedy. *See B & A Marine*, 23 F.3d at 715. While the District Court may not have liked the result, "courts aren't free to rewrite clear statutes under the banner of [their] own policy concerns." *Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1815 (2019).

The Supreme Court has also resolved this policy concern in the context of an executive official's absolute immunity, observing:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded [*sic*] damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565. The Supreme Court ultimately determined it "better to leave unredressed the wrongs doen [*sic*] by dishonest officers than to subject those

46

who try to do their duty to the constant dread of retaliation." *Id.* at 572. The

Supreme Court acknowledged:

> [A]s with any rule of law which attempts to reconcile
> fundamentally antagonistic social policies, there may be
> occasional instances of actual injustice which will go
> unredressed, but we think that price a necessary one to pay for
> the greater good. And there are of course other sanctions than
> civil tort suits available to deter the executive official who may
> be prone to exercise his functions in an unworthy and
> irresponsible manner.

*Id.* at 576 (holding federal official not liable for allegedly libelous statements made

in a press release about former employees).

### C. The Master-Servant Test is Irrelevant But Satisfied.

The District Court also applied an incorrect test for scope of employment by

importing an element of the state law *respondeat superior* test -- whether there is a

master-servant relationship -- that is irrelevant to scope of employment under the

Westfall Act. (SPA-35, 42-43.) In any event, while it is inappropriate to ask

whether the President is in master-servant relationship with the Government, he is.

### 1. The Master-Servant Test is Irrelevant Here.

The District Court correctly noted that, in determining whether a defendant

is acting within the scope of employment, courts look to the state law of

*respondeat superior*. However, instead of just looking to just that portion of state

law concerning scope of employment, the District Court examined whether: (1) a

master-servant relationship exists and (2) whether the defendant was acting within

the scope of employment.  (SPA-42-43.)

That circular reasoning is erroneous.  Although courts look to the state law *respondeat superior* test to determine scope of employment, they do not "apply the entire body of *respondeat superior* law, but only that portion of the law that resolves the scope of employment issue."  *See, e.g.*, *Palmer v. Flaggman*, 93 F.3d 196, 202 (5th Cir. 1996) (rejecting contention that master/servant test is relevant to scope of employment inquiry); *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 164 (D.D.C. 2017) ("District of Columbia law does not include the additional element of control over the tortfeasor's actions in determining the scope of employment.").

Whether there is a master-servant relationship is irrelevant, because the Westfall Act replaces that inquiry with whether the defendant is an "employee of the Government."  For purposes of the Westfall Act, courts look to the master-servant test, under federal common law, solely to determine whether the defendant is a "contractor with the United States" -- falling within the single exclusion to the Westfall Act's coverage -- instead of "any employee of the Government."  28 U.S.C. §§ 2671, 2675.  *See B & A Marine.*, 23 F.3d at 713 ("For purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an *employee, servant or agent* (for whose torts the Government is responsible.")

48

(emphasis added).  Neither plaintiff-appellee nor the District Court went so far as to contend that the President is an "independent contractor" for the Government.

When, as here, the defendant is not claimed to be an independent contractor, courts have held that the master-servant or "control" test is irrelevant to determining whether a defendant is an "employee of the Government."  For example, in *Sullivan v. United States*, 21 F.3d 198, 203 (7th Cir. 1994), *abrogation on other grounds recognized in Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012), the plaintiff urged the court to apply the control test to determine whether a federal public defender was covered under the Westfall Act as "any employee of the Government."  The court refused, because "the plain language of the Act must trump any 'control test' in the context of judicial branch employees.  In a sense, [plaintiff] is asking that we create a 'federal public defender exception' to the amended scope of the FTCA."  *Id.*  Similarly, the Eighth Circuit rejected an analogous argument that "the independence of the federal judiciary was said to obviate that element of governmental control necessary to bring a federal officer or employee within the coverage of the Act."  *LePatourel*, 571 F.2d at 410.  The court found that "neither the Act nor its legislative history gives any indication that employee control answers the question of governmental liability outside the independent contractor context."  *Id*.

So too here, because the President constitutes an "employee of the

Government" (*see supra* Section II. A), it is inappropriate to apply the control test relevant only to whether the President is an independent contractor.   *See supra* p. 51.

Finally, even assuming the master-servant test was somehow relevant, and it is not, the District Court erred by relying on the Restatement.  (SPA-43-44.)  The Restatement contains an express disclaimer that "it does not state the special rules applicable to public officers . . . ."  Restatement (Second) of Agency Scope Note. *See also* 1 Restatement (Third) of Agency 6 (2006) (noting that the Restatement "deals at points, but not comprehensively, with the application of common-law doctrine to agents of governmental subdivisions and entities created by government").

## 2.     A Master-Servant Relationship Exists.

Although the District Court erred in applying the Restatement's master-servant test to the scope of employment inquiry in the first place, the President nonetheless satisfies it.

Under the Restatement, the definition of servant "is one not capable of exact definition" and "cannot . . . be defined in general terms with substantial accuracy." § 220 cmt. c. Relevant, but non-exclusive, factors include, among others, whether the employment is "full time," whether the employer "supplies the instrumentalities, tools, and the place of work for the person doing the work," and

the manner of pay. *Id.* and cmt. h.

The President, who takes an oath of office, has full time or even ceaseless duties that are set forth in the Constitution, works from the White House, and takes a salary, satisfies this test. U.S. Const. art. II § 1, cl 8 (oath of office); art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); 3 U.S.C. § 102 (setting Presidential compensation including expense allowance to defray costs of performing "official duties" and entitling the President "to the use of the furniture and other effects belonging to the United States and kept in the Executive Residence at the White House."); *Clinton v. Jones*, 520 U.S. at 713, 717 (Breyer, J., concurring) (noting the President "is the sole branch which the constitution requires to be always in function" and "the President never adjourns" (citation omitted)).

The District Court made much of the purported lack of control over the President in assessing whether the President is in a master-servant relationship. (SPA-45-47.)[19]  In holding that the President is not subject to "control," the District Court adopted an overly restrictive definition of the master-servant relationship that is not supported by the Restatement.  While control is a key factor in traditional analyses of the master-servant relationship, the Restatement recognizes

---

[19] As shown (*supra* Section III. C. 1), the existence of a master/servant relationship is irrelevant to the scope of employment issue, which presumes the existence of an employment relationship.

that the right of a master to control the servant "may be very attenuated." Restatement § 220 cmt. d.  Thus, the term servant does not imply menial service, but includes, for example, "the officers of a corporation or a ship, [and] the interne in a hospital, all of whom give their time to their employers."  *Id.*  § 2 cmt. c.  The President qualifies under this definition of control.  As officers of corporations "give their time to their employer," so Presidents "give their time" to the Government.  *See Clinton v. Jones*, 520 U.S. at 698 (noting the President must be available "at all times" to perform his duties (citation omitted)).

Further, while the District Court held that any "control is absent whenever the President discharges his duties" (SPA-46-47), the Supreme Court has rejected this precise assertion.  In *Clinton v. Jones*, 520 U.S. 681, 703 (1997), the Supreme Court held that that that separation of powers doctrine does not mean that the branches "ought to have no *partial agency in*, or no *controul* over the acts of each other"; to the contrary, the judiciary could "review[] the legality of the President's official conduct, . . . direct appropriate process to the President . . ., [and] determine the legality of his unofficial conduct."  *Id.*  Thus, the President is in fact confined by the Constitution and may be controlled by coequal branches.  *See Youngstown Sheet & Tube*, 343 U.S. at 585 (President's powers are limited to those provided "from an act of Congress or from the Constitution itself.").

Nor is it true, as the District Court claimed, that the "president is no one's

servant," (SPA-47), as the Supreme Court has recognized, both Congress and the President are "servants of the people." *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (noting that Congress and the President are both "servants of the people"); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) ("The Constitution . . . makes the President accountable to the people for executing the laws . . . .").

Indeed, under the District Court's definition, members of Congress or of the federal judiciary, who are not controlled, also would not constitute servants and none of their acts could fall within the scope of employment. Yet courts routinely recognize that they are covered by the Westfall Act. *See, e.g. Haaland*, 973 F.3d at 598; *Operation Rescue Nat'l*, 147 F.3d at 70-71; *Williams*, 71 F.3d at 507; *LePatourel*, 571 F.2d at 408 (under pre-Westfall Act FTCA).

## CONCLUSION

President Trump respectfully requests that this Court reverse the District Court's Order denying the motion to substitute the United States as defendant.

Dated:    New York, New York.        Respectfully submitted,
          January 15, 2020

                                      KASOWITZ BENSON TORRES LLP


                                      By:  */s/ Marc E. Kasowitz*
                                           Marc E. Kasowitz
                                           Christine A. Montenegro
                                           Paul J. Burgo

                                      1633 Broadway
                                      New York, New York 10019
                                      T: (212) 506-1700
                                      E: mkasowitz@kasowitz.com
                                         cmontenegro@kasowitz.com
                                         pburgo@kasowitz.com

                                      *Attorneys for Defendant-Appellant,*
                                      *President Donald J. Trump*

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word, in 14 pt. font size, Times New Roman.

*/s/ Marc E. Kasowitz*

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Lewis A.
  Kaplan, filed October 27, 2020, Appealed From... SPA-1

28 U.S.C. § 2671......................................................... SPA-62

28 U.S.C. § 2679......................................................... SPA-64

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                  Plaintiff,

        -against-                             20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

                Roberta A. Kaplan
                Joshua A. Matz
                KAPLAN HECKER & FINK LLP
                *Attorneys for Plaintiff*

                Stephen R. Terrell
                William K. Lane III
                James G. Touhey, Jr.
                Director, Torts Branch, Civil Division
                JEFFREY BOSSERT CLARK
                ACTING ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
                *Attorneys for Movant*

                John A. Kolar
                *Attorney for Amicus Curiae Government Accountability Project, Inc.*

SPA-2

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
 Statutory Context – The FTCA and the Westfall Act. . . . . . . . . . . . . . . . . . . . . . . 4
 The Events Giving Rise to This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
 Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
 I.     Whether the President Is an "Employee" Under the Westfall Act . . . . . . . . . . . 14
        A.     The Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B. .   The Legislative History – The *Westfall* Decision and the Westfall Act
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        C.     *Franklin v. Massachusetts* and Lack of Clear Statement to Include the
                President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        D.     Decisions of Other Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
 II.    Scope of Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        A.     Choice of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        B.     Scope of Employment Under D.C. Law . . . . . . . . . . . . . . . . . . . . . . . 39
               1.     Master-Servant Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . 41
               2.     Scope of Employment Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        C.     Scope of Employment Under New York Law . . . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

SPA-3

LEWIS A. KAPLAN, *District Judge.*

The plaintiff in this case, E. Jean Carroll, published a book excerpt in 2019 in which she wrote that, in the 1990s, businessman Donald J. Trump, as he then was, raped her in a dressing room of a New York City department store.  Almost immediately after publication of Ms. Carroll's excerpt, Mr. Trump – who by then was president – told the press that Ms. Carroll had made up the rape story.  In substance, he called Ms. Carroll a liar and stated that he never met her.  So Ms. Carroll sued him in New York State court.  She claims that his statements accusing her of lying about the alleged rape were false, that they injured her reputation, and that she is entitled to damages from him.  The legal terms are that Ms. Carroll asserts that President Trump's statements were defamatory – libelous and slanderous.

The question whether Mr. Trump in fact raped Ms. Carroll appears to be at the heart of her lawsuit.  That is so because the truth or falsity of a defendant's alleged defamatory statements can be dispositive of any defamation case.  Although the Court eventually may need to resolve this issue, this opinion concerns a threshold question.  To make the significance of that question clear, we must digress into some technical detail.

Ms.  Carroll sued the president in his individual (or personal) capacity, as distinguished from suing him as the president (*i.e.*, in his official capacity).  In other words, she claims that the president personally harmed her and that he, not the U.S. government, should pay any damages to which she may be entitled.

For nearly a year, this lawsuit proceeded in state court as an ordinary defamation case between Ms. Carroll and President Trump.  The president defended the case as a private individual.  He was represented by his personal lawyers, not by the U.S. Department of Justice ("DOJ") or other government lawyers.  And although he claimed that he could not be sued

SPA-4

2

because he currently is president, the state court rejected that argument and denied a stay of further proceedings, which would have included pretrial discovery.[1]

It was at that point that the U.S. government inserted itself into the case. It "removed" the case from the state court to this one – that is, it filed a paper certifying that a designee of the Attorney General had determined that the president's statements to the press were part of his job as president and that this case therefore could be moved into federal court. For reasons that will appear, that certificate – whether it is right or wrong – conclusively authorized the removal of the case, and no one claims otherwise. But the DOJ did something else too, and that is what now is before the Court.

The government moves to substitute the United States for President Trump as the defendant. It does so in essence on the theory that this is not truly a lawsuit against President Trump as a private individual. Instead, the government argues, this is really a lawsuit against the United States because Ms. Carroll has sued an "employee" of the United States of America for actions within the scope of his employment. The government thus asserts that this case is virtually identical in principle to a lawsuit against a Postal Service driver for causing a car accident while delivering the mail. But the word "virtually" in the last sentence is necessary because there is an important difference between this case and the case of the hypothetical mail driver. Here is the catch.

---

[1] Dkt. 14-111.

SPA-5

3

The United States of America is a sovereign nation. It therefore shares with other nations what is called sovereign immunity. This means that it cannot be sued for money damages except to the extent that it explicitly has agreed to being sued.[2]

Within certain limits, the United States has so agreed in a statute called the Federal Tort Claims Act (the "FTCA"). The FTCA authorizes damages claims for negligence and certain other civil wrongs committed by government employees within the scope of their employment. The postal driver hypothetical is a classic example of a case that generally would be covered by the statute. But the FTCA specifically excepts libel and slander cases from the United States's consent to be sued. Thus, if this really is a suit against the United States, it is one to which the United States seemingly has not waived its sovereign immunity. So if President Trump is an "employee of the Government" within the meaning of the FTCA, and if his statements about Ms. Carroll were within "the scope of his employment," it could well be argued that this case must be dismissed because the United States has sovereign immunity.[3] In that

---

[2]

Sovereign immunity derives from the principle that "the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . . Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power . . . ." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 234-235 (1765) (quoted in *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

[3]

This point has been made in the media. *E.g.*, Barbara McQuade, *Barr's Defense of Trump in E. Jean Carroll's Suit Could Give Presidents Carte Blanche,* (Oct. 21, 2020), https://www.nbcnews.com/opinion/barr-s-defense-trump-e-jean-carroll-s-suit-could-n12 44088; James D. Zirin, *The Strange Case of 'Carroll v. Trump' – An Adventure in Wonderland* (Sept. 11, 2020), https://billmoyers.com/story/the-strange-case-of-carroll-v-trump-an-adventure-in-wonde rland/. The Court expresses no opinion on this question, which is not now before it.

SPA-6

4

event, Ms. Carroll would be left with no remedy, even if the president's statements were false and defamatory.

This is the nutshell version of this case.  But for the present purpose of deciding the government's motion to substitute, the dispositive questions are two:

- Is the president an "employee of the Government" within the meaning of the FTCA?

- Even if the president is an "employee of the Government" as the FTCA defines that term, were his statements concerning Ms. Carroll within the scope of his "employment" under the law of the relevant jurisdiction?

The answer to both questions is "no." While the president possesses all of the executive power of the United States, he is not an "employee" within the meaning of the FTCA. The FTCA's definition of that term does not include presidents.  And even if the president were an employee under that statute, his statements concerning Ms. Carroll were not within the scope of his employment under the law of the relevant jurisdiction, which for reasons explained below is Washington, D.C.

*Facts*

Before turning to the details of this dispute, the Court places them in context by reviewing the constitutional and statutory framework in which this motion is situated.

*Statutory Context – The FTCA and the Westfall Act*

We already have introduced the principle of sovereign immunity.  It remains to mention a closely related principle, namely that federal employees and the president long

SPA-7

5

enjoyed absolute official immunity with respect to lawsuits in federal courts charging them with

liability for performance of their official functions.[4]

In 1946, Congress enacted the FTCA. The statute was a major step to provide

compensation to victims of certain torts – *i.e.*, civil wrongs such as negligence – committed by

federal employees. As relevant here, the FTCA provides that the district courts of the United

States

> "have exclusive jurisdiction of civil actions on claims against the United States,
> for money damages, accruing on and after January 1, 1945, for injury or loss of
> property, or personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his
> office or employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place
> where the act or omission occurred."[5]

Although the FTCA's precise workings are complicated, its basic function is

simple. With numerous qualifications and exceptions, the statute allows a person injured by an

"employee of the Government" who is "acting within the scope of his office or employment" to

sue the United States for tort damages, notwithstanding its sovereign immunity, if the United

States would be liable as an employer under the law of the state where the act or omission

occurred. Thus, Congress adopted the view that (1) a suit for damages against a federal

employee acting within the scope of his or her employment in substance is a suit against the

United States, (2) in such a case the United States would be substituted as the defendant for the

individual employee, and (3) the United States is responsible for defending such lawsuits in the

---

[4]

    *See, e.g., Barr v. Matteo,* 360 U.S. 564, 597 (1959).

[5]

    28 U.S.C. § 1346(b)(1).

SPA-8

6

name of the United States and for paying any damages awarded.  The individual employee sued in his or her official capacity is not a proper defendant in such a case.

The FTCA does not authorize suits against government employees in their individual or personal capacities.  But state law often does.  Thus, even after the FTCA was enacted, federal employees were exposed to tort actions against them in their individual capacities in some states.

In 1988, the Supreme Court held in *Westfall v. Erwin*[6] that federal government employees are not absolutely immune from state tort claims based on conduct performed within the scope of their employment except in certain circumstances.[7]  This decision opened the door to individual liability for federal employees wider than previously had been understood.

Congress moved promptly to close that door.  In 1988, it enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988, more commonly known as the Westfall Act.[8]  The statute's "core purpose . . . is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders."[9]  Pursuant to the Westfall Act:

> "The remedy against the United States provided by sections 1346(b) [the FTCA] and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[6]  484 U.S. 292 (1988).

[7]  *Id.* at 299.

[8]  The statute as amended is codified at 28 U.S.C. § 2679.

[9]  *Osborn v. Haley*, 549 U.S. 225, 252 (2007).

employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."[10]

In essence, the quoted provision bars tort claims against government employees acting within the scope of their employment. But it provides plaintiffs with a different remedy: a lawsuit against the United States under the FTCA. Under subsection (c) of the Westfall Act, "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any [of the above described] damage or injury."[11]

Because the Westfall Act operates where a lawsuit could have been brought against the United States under the FTCA, the statutes share the same threshold requirements. Thus, in order for the Westfall Act to apply, the defendant must be an "employee of the Government" who was acting within the scope of his or her employment. Under Subsection (d) of the Westfall Act, the Attorney General makes an initial determination as to both issues:

"Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[12]

---

[10]

28 U.S.C. § 2679(b)(1).

[11]

*Id.* § 2679(c).

[12]

*Id.* § 2679(d)(1).

SPA-10

8

If the Attorney General issues a certification and the action is pending in state court, the Westfall Act requires that the action be removed to federal court.[13]  If the Attorney General declines to issue a certification, "the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."[14]  Either way, if the court is satisfied that the threshold requirements are met, the action "shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA]."[15]

The Attorney General's certification is conclusive only "*for purposes of removal*"[16] – that is to say, only for purposes of whether the action shall continue in federal rather than state court.  As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee."[17]  "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification . . . ."[18]  Hence, the federal court to which the action has been removed must determine for itself whether the

---

[13]     *Id.* § 2679(d)(2).

[14]     *Id.* § 2679(d)(3).

[15]     *Id.* § 2679(d)(4).

[16]     *Osborn*, 549 U.S. at 242 (emphasis in original) (quoting 28 U.S.C. § 2697(d)(2)).

[17]     *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995).

[18]     *Id.* at 436-37.

9

individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

*The Events Giving Rise to This Lawsuit*

According to the complaint, Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.[19] Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.[20] The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.[21] Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.[22] She claims that she pushed Mr. Trump away and laughed at him, and that

---

[19]    Dkt. 3-3 at 5.

[20]    *Id.*

[21]    *Id.* at 6.

[22]    *Id.*

SPA-12

10

he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store.[23]

Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.[24]  She did not, however, make the allegations public at that time.[25]  They remained private for many years.

In 2017, the plaintiff began drafting a book about twenty-one men who had left ugly marks on her life.[26]  One of those men was Donald Trump.[27]  On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.[28]  The book was published on July 2, 2019.[29]

Roughly two hours after the excerpt was published in *New York* magazine, the president issued a public statement to media outlets.  It said:

"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago.  I've never met this person in my life.  She is trying to sell a new book – that should indicate her motivation.  It should be sold

---

[23]

*Id.* at 6-7.

[24]

*Id.* at 7.

[25]

*Id.* at 8.

[26]

*Id.* at 13.

[27]

*Id.*

[28]

*Id.* at 14.

[29]

*Id.*

SPA-13

11

in the fiction section.  Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh.  It's just as bad for people to believe it, particularly when there is zero evidence.  Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures?  No surveillance?  No video?  No reports?  No sales attendants around??  I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault.  All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible.  The world should know what's really going on.  It is a disgrace and people should pay dearly for such false accusations."[30]

The next day, June 22, 2019, a reporter at the White House confronted President Trump about the story.[31]  They had the following exchange:

[Reporter:] Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's —

[President Trump:] I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married — as I read; I have no idea who she is — but she was married to a, actually, nice guy, Johnson — a newscaster.

[Reporter:] You were in a photograph with her.

[President Trump:] Standing with [my] coat on in a line – give me a break – with my back to the camera.  I have no idea who she is.  What she did is – it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

---

[30]

*Id.* at 15.

[31]

*Id.* at 17.

SPA-14

12

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that – and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things – that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[32]

President Trump commented on the story a third time on June 24, 2019, when he gave an interview to *The Hill*. As relevant here, he stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[33]

*Procedural Background*

On November 4, 2019, the plaintiff filed this lawsuit in the New York Supreme

---

[32] *Id.* at 17-18.

[33] *Id.* at 19.

SPA-15

13

Court, New York County, against President Trump in his personal capacity.[34]  On the basis of the June 21, June 22, and June 24 statements, she alleged that the president defamed her under New York law.[35]

The lawsuit proceeded in state court for ten months during which time the court resolved, among other things, a motion to dismiss and several motions to stay.[36]  On September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General "on the basis of the information now available with respect to the incidents alleged in the [plaintiff's] complaint, that Defendant Donald J. Trump was acting within the scope of his office as the President of the United States at the time of the alleged conduct."[37]  Shortly after, the government filed in this Court a notice of removal.[38]  It filed also a motion, pursuant to the Westfall Act, to substitute itself in place of President Trump as the defendant.[39]  It is that motion that now is ripe for decision.

---

[34]     *Id.* at 1.

[35]     *Id.* at 26-27.

[36]     *See, e.g.*, Dkts. 14-36, 14-111.

[37]     Dkt. 3-4.

[38]     Dkt. 6.

[39]     Dkt. 3.

SPA-16

14

*Discussion*

The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct.  As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.[40]

I.    *Whether the President Is an "Employee" Under the Westfall Act*

As noted above, the Westfall Act applies to any "employee of the Government."[41] That phrase is defined in 28 U.S.C. § 2671, a provision enacted by the Act of June 25, 1948 as part of a "Tort Claims Procedure" package.  The statute reads:

"As used in this chapter and sections 1346(b) [the FTCA] and 2401(b) of this title, the term [[42]] * * *

---

[40]

For reasons explained below, D.C. law applies to this issue.

[41]

28 U.S.C. § 2679(b)(1).

[42]

The Act of June 25, 1948 contains an em dash in this location, signifying that the "As used in this chapter" clause applies to all three of the definitions that follow.  *See* Act of June 25, 1948, ch. 646, 62 Stat. 982, *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf.  In 1962, Congress amended the definition of "federal agency," the first defined term.  In doing so, it omitted the em dash and combined the "As used in this chapter" clause with the paragraph defining "federal agency." *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307, *available at* https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg306.pdf.  The failure to retain the em dash appears to have been a scrivener's error.  For one thing, the term "federal agency" is not used in Section 1346(b).  And taking Congress literally would require a belief that, in updating the definition of "federal agency," it silently chose to un-define "employee of the Government" as that term is used in the chapter where it is found

SPA-17

15

"'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18."[43]

The term "federal agency" also is defined by Section 2671:

"'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[44]

These definitions apply to both the Westfall Act provisions codified in 28 U.S.C. § 2679 and the FTCA provisions codified in 28 U.S.C. § 1346(b).[45]

Neither Ms. Carroll nor the government has cited any case addressing the question whether the President of the United States is an "employee of the Government" under

---

and in Section 1346(b) while inexplicably keeping it in the definition section.  Whatever the case may be, the Supreme Court has stated that both definitions apply to Section 1346(b). *See Logue v. United States*, 412 U.S. 521, 525-26 (1973).

[43]  28 U.S.C. § 2671.

[44]  *Id.*

[45]  Section 2679, where the Westfall Act provisions are codified, is part of the chapter in which the definition is contained.  *See also* note 42, *supra*.

**SPA-18**

16

Section 2671 specifically or the Westfall Act or FTCA more generally. And the Court is aware of none. We therefore begin the search for an answer to this question with the statutory text.[46]

A.      *The Plain Language*

Section 2671's definition of "employee of the Government" says that the term "includes" five categories of government personnel:

1.      "officers or employees of any federal agency,"

2.      "members of the military . . . ,"

3.      "members of the National Guard [in certain circumstances],"

4.      "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States," and

5.      "any officer or employee of a Federal public defender organization."

Categories 2, 3 and 5 obviously do not apply to the president. Nor does category 4, which "is designed to cover special situations such as government officials who serve without pay, or an employee of one government agency who is loaned to and works under the direct supervision of another government agency."[47]      Thus, the remaining question is whether

---

[46]

    *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[47]

    *Leone v. United States*, 910 F.2d 46, 51 (2d Cir. 1990); *see also Logue*, 412 U.S. at 531 (noting that the legislative history of the provision suggests that "the language is designed to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement").

17

presidents are "officers or employees of any federal agency."[48]   Unfortunately, the terms

"officers" and "employees" are not defined.[49]

The president is a *constitutional* officer.  He occupies the highest office in our

nation, which is created by Article II of the Constitution.  But that is not what Section 2671

requires.  It speaks only of "officers . . . *of any federal agency*," not officers of the United States

within the meaning of the Constitution.  So we turn to the question whether the president is an

---

[48]

The government argues for the first time in its reply brief that the use of the word "includes" indicates that the five categories that follow it are exemplary, not exclusive.  In other words, the use of the word "includes" invites courts to rewrite Section 2671 by expanding "employees of the Government" to include categories of individuals that Congress did not see fit to identify.  This contention fails.

As an initial matter, counsel for the government at oral argument waived on the record all arguments raised for the first time in the government's reply brief.  *See* Tr. at 4:13-24 (Oct. 21, 2020) (agreeing, in exchange for precluding the plaintiff from filing a surreply, "to invoke the time-honored principle that new arguments raised for the first time in a reply brief will not be considered").  This argument therefore is waived.  *See also Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

In any case, the Court would reject this argument.  "[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns."  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  As discussed below, if Congress had intended to include an individual as significant and obvious as the president in this statute, it would have done so clearly.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992).  Moreover, and also discussed below, there are compelling reasons to conclude that Congress did not intend the major expansion of federal tort exposure that would arise if the FTCA applied to the president's conduct.

[49]

The original definition of "employee of the Government" does not shed any additional light on this question.  It reads:

"'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Act of June 25, 1948, c. 646, 62 Stat. 982.

SPA-20

18

officer "of any federal agency" within the meaning of Section 2671.  As noted above, Section 2671 states that the term "federal agency" "includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States."[50]

At the outset, it is apparent that this definition does not include the entire executive branch.  Although Congress referred to "the executive departments," the fact that the phrase is plural makes clear that Congress did not mean "the executive branch."  Congress knew how to refer to an entire branch of government, as evidenced by the fact that the very next words of the statute are "the judicial and legislative branches."[51]  The plain meaning of this language is

---

[50]

The 1948 version of the statute, which since has been amended, stated:

"[T]he term- 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States."  *Id.*

The singular "independent establishment" appears to have been a typographical error.  It was changed to "independent establishments" in the 1966 amendment.  *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307.

[51]

The Supreme Court drew the same inference with regard to a related section of the same statute, the Act of June 25, 1948.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("It is difficult to reconcile the Government's . . . reading with the fact that two of the Act's other exceptions specifically reference an 'act or omission.'  *See* 28 U.S.C. § 2680(a).  The Government's request that we read that phrase into the [FTCA's] foreign country exception, when it is clear that Congress knew how to specify 'act or omission' when it wanted to, runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th rev. ed. 2000))).

Although the original statute did not refer to the judicial and legislative branches, this fact does not offer any reason to conclude that Congress's use of "executive departments" in 1948 was intended as a reference to the executive branch as a whole.  The phrase "executive

19

that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency." But the entire executive branch is not. Only those parts of the executive branch that fall within the other terms of the definition are included.

Here, the arguably relevant parts of the "federal agency" definition are "the executive departments" and "independent establishments." The governing statutes do not define either term. Although the government asserts that the president is covered by the Westfall Act, its five page memorandum in support of its motion neither cites to Section 2671 nor argues that either of the plausibly relevant terms applies to the president.[52]

Of course, one of the best ways to understand what Congress meant by "federal agency" is to examine how it used that term. The definition applies to Sections 1346(b) and 2401(b), to which it refers specifically, as well as the remaining sections of the Act of June 25, 1948, which are codified as amended at 28 U.S.C. §§ 2672-2680. Six of these eleven statutory sections use the term "federal agency." And four of them[53] suggest strongly that the term applies to what one ordinarily thinks of as a federal agency or executive department: a unit of government housed within the executive branch, such as the Department of Defense, the Department of State, or the Central Intelligence Agency,[54] and not a single constitutional officer,

departments" did not mean "executive branch" in 1948. And the fact that Congress added the phrase "judicial and legislative branches" immediately following "executive departments" demonstrates that it was aware of the difference and employed it intentionally. *See id.*

[52]    *See* Dkt. 3-1.

[53]    The other provisions, 28 U.S.C. §§ 2679 and 2680, shed no additional light on this issue.

[54]    *Cf. Executive Agency*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An executive-branch department whose activities are subject to statute and whose contracts are

20

the president.  The statutes likewise make clear in several ways that "federal agency" does not refer to the executive branch as a whole or to any particular unit of the executive branch of which the president is an "officer," if any such unit existed.

First, under 28 U.S.C. § 2672, "[t]he head of each Federal agency or his designee" is permitted, pursuant to any regulations promulgated by the Attorney General, to settle claims for money damages against the United States caused by "any employee of the agency while acting within the scope of his office or employment" provided that any award "in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee."  In the original 1948 statute, the dollar amount was just $1,000.[55]  It is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States.  And to suggest that the president could be an "officer" of a federal agency without being its head would contravene our constitutional design, which vests in the president "the 'executive power' – all of it."[56]  The far more natural reading is that when Congress referred to "executive departments" and "federal

_____

subject to judicial review.  One example is the National Aeronautics and Space Agency."); *see also*, *e.g.*, *Department of Defense*, *id.* ("An executive department of the federal government . . . ."); *Department of State*, *id.* ("The cabinet-level department of the federal government responsible for advising the President in formulating and executing foreign policy."); *Central Intelligence Agency*, *id.* ("An independent federal agency that compiles intelligence information, conducts counterintelligence activities outside the United States, and advises the President and the National Security Council on matters of foreign intelligence and national security.").

[55]

Act of June 25, 1948, c. 646, 62 Stat. 982.

[56]

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

21

agencies," it was referring to entities such as the Department of Defense and the Central Intelligence Agency.

Second, under 28 U.S.C. § 2673, Congress required that "[t]he head of each federal agency shall report annually to Congress all claims paid by it under section 2672 of this title, stating the name of each claimant, the amount claimed, the amount awarded, and a brief description of the claim." The government has presented no evidence that any president ever has authorized a payment on an FTCA claim or supplied such a report to Congress on behalf of an agency of which he is the head, if any such agency existed.

Third, 28 U.S.C. § 2675(a) provides that a plaintiff who wishes to sue under the FTCA "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This would make little sense if it were applied to the president. Certainly, the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit under the FTCA. Similar inferences may be drawn from 28 U.S.C. § 2401(b), which sets a statute of limitations for presenting tort claims to an agency and filing them in court following the agency's determination.

Because the president is at the apex of the executive branch, many think of him, in a colloquial sense, as the "head" of many federal departments, agencies, and organizations. At the very least, one might imagine that he leads some agency at the core of the executive branch. The government has not attempted to identify any such agency in its papers, but the two most obvious candidates are the Executive Office of the President ("EOP") and the president's cabinet. But neither entity fits the bill. The head of the EOP, which is a network of agencies, is

SPA-24

22

the president's chief of staff.[57]   And even if one were to call the cabinet an "executive department" or "independent establishment" – a dubious contention – the president himself is not a member of the cabinet, although the vice president is.[58]

Indeed, the basic civics lessons on the White House's website draw a clear distinction between "the executive branch," "the executive departments," and "federal agencies." Its page on "The Executive Branch" states that the Constitution vests in the president "[t]he power of the Executive Branch" and that "[f]ifteen executive departments – each led by an appointed member of the President's Cabinet – carry out the day-to-day administration of the federal government."[59]   It states also that the "executive departments" "are joined in this [effort] by other executive agencies such as the [Central Intelligence Agency] and Environmental

---

[57]

THE EXECUTIVE BRANCH, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-executive-branch/ ("The EOP, overseen by the White House Chief of Staff, has traditionally been home to many of the President's closest advisers.").

[58]

THE CABINET, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-cabinet/ ("President Donald J. Trump's Cabinet includes Vice President Mike Pence and the heads of the 15 executive departments – the Secretaries of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Labor, State, Transportation, Treasury, and Veterans Affairs, and the Attorney General.  Additionally, the Cabinet includes the White House Chief of Staff and heads of the Environmental Protection Agency, Office of Management and Budget, United States Trade Representative, Central Intelligence Agency, Office of the Director of National Intelligence, and Small Business Administration.").

[59]

THE EXECUTIVE BRANCH, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-executive-branch/.

23

Protection Agency, the heads of which are not part of the Cabinet, but who are under full authority of the President."[60]

The phrase "independent establishments" does not rescue the government's argument. As Judge Sullivan once observed, "[a]lthough the Second Circuit has never definitively interpreted what 'independent establishment' means, it has suggested that independent establishments are defined by a 'substantial governmental role in funding and oversight.'"[61] The opinion to which he referred is *Johnson v. Smithsonian Institution*,[62] in which the Second Circuit cited favorably a D.C. Circuit opinion stating with respect to the Smithsonian Institution that "the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition."[63]

Although the FTCA does not define "independent establishments," Congress defined the term in 1966 when it enacted 5 U.S.C. § 104. That definition does not apply to the FTCA, but it is instructive as to how Congress understood the relevant language. It states:

"For the purpose of [Title 5], 'independent establishment' means—

"(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an

---

[60]

*Id.*

[61]

*U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 623 (S.D.N.Y. 2013) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)).

[62]

189 F.3d 180, 189 (2d Cir. 1999).

[63]

*Id.* (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. The Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (panel opinion reprinted as appendix to opinion en banc)).

**SPA-26**

24

> Executive department, military department, Government corporation, or part thereof, or part of an independent establishment; and

> "(2) the Government Accountability Office."[64]

The D.C. Circuit has held that this definition does not apply to "the Executive Residence."[65]  And DOJ's Office of Legal Counsel – in two different presidential administrations – took the position that the definition does not apply to the Executive Office of the President.[66]

The government has identified no component of the United States of which the president is an officer or employee that satisfies these understandings of the phrase "independent establishments."  Moreover, and as will be discussed, the idea that the chief executive of the United States could be an officer or employee of an entity for which there is a "substantial governmental role in funding and oversight" makes little sense.

> B. .    *The Legislative History – The* Westfall *Decision and the Westfall Act*

There is still another strong reason supporting the view that president is not an "employee of the Government" within the meaning of the Westfall Act.  That reason is apparent from the context in which the statute was enacted.

---

[64]  5 U.S.C. § 104.

[65]  *See Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995).

[66]  *See* Mem. for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 & n.15 (Sept. 17, 2009).  On two earlier occasions, however, the Office of Legal Counsel took the opposite view.  *See id.* at 15 n.14.

**SPA-27**

25

In 1982, the Supreme Court decided in *Nixon v. Fitzgerald*[67] that the president "*is entitled to absolute immunity* from damages liability predicated on his official acts."[68]  So when the Supreme Court decided *Westfall* just six years later and held that "federal officials *are not absolutely immune* from state-law tort liability for all actions committed within the outer perimeter of their duties," it clearly was not referring to the president.[69]  When *Westfall* referred generally to "federal officials," it merely expanded the potential amenability to suit and liability of that more limited group of individuals.

Congress was well aware of this background when it passed the Westfall Act.  As the Supreme Court later wrote, "[w]hen Congress wrote the Westfall Act, which covers federal employees generally . . . , the legislators had one purpose firmly in mind."[70]  That purpose was "to 'return Federal employees to the status they held prior to the *Westfall* decision.'"[71]  There was no need to extend the protections of the Westfall Act to the president, whom the Supreme Court evidently recognized was not a "federal employee," for the very good reason that the president already had "absolute immunity from damages liability predicated on his official acts"

---

[67]    457 U.S. 731 (1982).

[68]    *Id.* at 749 (emphasis added).

[69]    *Westfall*, 484 U.S. at 299 (emphasis added).

[70]    *Gutierrez*, 515 U.S. at 425.  Senator Grassley, the principal sponsor of the bill, explained that the purpose of the Westfall Act was to solve the "immediate crisis of personal liability exposure for the entire Federal Work force," "particularly rank-and-file civil servants," occasioned by the *Westfall* decision.  134 Cong. Rec. 14265 (June 13, 1988) (Sen. Grassley).

[71]    *Id.* (quoting H.R. REP. NO. 100-700, p. 4 (1988)).

by virtue of *Nixon v. Fitzgerald*.[72]

Unless one ignores *Nixon*, it is impossible to read *Westfall* as applying to the president.  Given that the "one purpose" of the Westfall Act was to "return Federal employees to the status they held prior to the *Westfall* decision," Congress presumptively was aware that neither Section 2671 nor the FTCA applied to the president.  It therefore had no reason to extend the Westfall Act to that office.

C.      Franklin v. Massachusetts *and Lack of Clear Statement to Include the President*

The foregoing discussion provides numerous grounds for concluding that the president is not an "employee of the Government."   At best, the government might argue the statute is silent on the issue and, on that basis, it should be read expansively to include the president.

The Court rejects the view that the statute is silent on the matter, an argument that the government in any event has waived.  But even granting the point for the sake of argument, any statutory silence would not help the government.  Instead, it would provide an additional reason to conclude that the failure to mention the president should be understood as *excluding* him from the scope of the Westfall Act and Section 2671.

---

[72]
Congress was well aware of this fact.  *See* H.R. Rep. 100-700, 100th Cong., 2d Sess. 5 (June 14, 1988) ("The United States is liable under the Federal Tort Claims Act. * * * 'under circumstances where the United States, if a private person, would be liable * * *' 28 U.S.C. 1346(b).  Thus ordinary tort defenses, such as contributory negligence, assumption of risk, estoppel, waiver, and res judicata, as applicable, continue to be available to the United States.  *The United States would also be able to continue to assert other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions*. (emphasis added)).

**SPA-29**

27

Under the Administrative Procedure Act ("APA"), plaintiffs have a cause of action to petition courts for review of "agency action."  In *Franklin v. Massachusetts*,[73] the Supreme Court considered whether "agency action" included the conduct of the president.  It held that "the President is not an agency within the meaning of the Act."[74]

*Franklin* does not resolve the question of whether the president is an employee of a federal agency under Section 2671.  But the following line of reasoning, portions of which are not limited to the APA, is directly on point:

> "The APA defines 'agency' as 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include – (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.'  The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either.  Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  *We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion*.  Cf. *Nixon v. Fitzgerald*, 457 U.S. 731, 748, n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."[75]

*Franklin* not only prohibits courts from presuming, absent "an express statement by Congress," that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." By relying on *Nixon*, it makes clear that the same reasoning applies when a plaintiff sues the president for tort damages predicated on acts allegedly done in

---

[73] 505 U.S. 788 (1992).

[74] *Id.* at 796.

[75] *Id.* at 800-01 (emphasis added).

SPA-30

28

the scope of his employment – lawsuits that, by definition, challenge the president's performance of his job.  The government is asking this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president – and in fact strongly appears to exclude him – and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts.  This would run afoul of *Franklin.*

One could attempt to distinguish *Franklin* on the ground that an FTCA claim is pled against the United States, while the president himself was among the defendants in *Franklin*.  But *Franklin* itself defeats that argument.  *Franklin*'s holding – like the APA itself – is agnostic to the identity of the defendant.  The relevant question is who committed the "agency action."[76]  In fact, the Supreme Court spent several pages emphasizing this point, because its ultimate holding that the president's actions were not reviewable shielded all the defendants from suit, including the Secretary of Commerce and other lower-level officials.[77]

---

[76]
        *See, e.g.*, *id.* at 801 ("Although the President's *actions* may still be reviewed for constitutionality, we hold that *they* are not reviewable for abuse of discretion under the APA." (emphasis added)).

[77]
        *See id.* at 796 ("The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'  5 U.S.C. § 704.  At issue in this case is whether the 'final' action that appellees have challenged is that of an 'agency' such that the federal courts may exercise their powers of review under the APA.  We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act.  Accordingly, there is no final agency action that may be reviewed under the APA standards."); *id.* at 799 ("Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge.  The President, not the Secretary, takes the final action that affects the States."); *id.* at 800 ("As enacted, 2 U.S.C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress.  That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not

SPA-31

29

The same focus is present here.  The function of an FTCA lawsuit is to decide whether a government employee's official conduct was tortious and, if so, to compensate one injured by that conduct.  When the employee is the president, his actions are the ones under review.  It does not matter whether his name appears in the caption of the case.  Thus, as *Franklin*'s reliance on *Nixon* makes plain, the lack of "an express statement by Congress" indicating that the president's actions are reviewable through FTCA lawsuits is decisive.

One other point about *Franklin* deserves attention.  The outcome of that case was that the president's conduct was not subject to review in an APA suit.  Here the poles in some sense are reversed.  If the Court holds that the president's conduct cannot be challenged in tort suits under the FTCA, this case most likely will move forward, albeit against President Trump in his individual or personal capacity.  But that difference does not affect the result here.

To begin, nothing in *Franklin* forbids courts from reviewing the president's official actions.  The case provides instead a rule of statutory interpretation: that a court should not assume, absent a clear statement, that *Congress* authorized such review in a *federal statute*.  Here, the plaintiff's cause of action arises under *state common law*.  *Franklin* says nothing about such claims.  And in fact, it is the government, rather than Ms. Carroll, that is arguing that a federal statute (the FTCA) authorizes review of the president's official actions, albeit in a case in which it argues the United States should be substituted for the president.

Why, then, would holding that the FTCA authorizes review of the president's official actions most likely secure the dismissal of this lawsuit?  The reason is that the FTCA's

---

merely ceremonial or ministerial.  Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.").

SPA-32

30

waiver of sovereign immunity contains an exception for libel and slander claims.[78]  For that reason, and that reason alone, permitting FTCA lawsuits challenging the president's job performance would close the door on this particular lawsuit.

But what would happen in cases involving the many types of torts for which the United States *has* waived its sovereign immunity – cases in which no FTCA exception applies? The answer, if the Court agrees with the government, is that those lawsuits could move forward – the precise problem that *Franklin* sought to avoid.  In essence, the government is arguing that, so long as none of the exceptions applies, the FTCA authorizes plaintiffs to sue the United States for money damages when the president, acting within the scope of his employment, engages in an "act or omission" that allegedly is negligent or wrongful under state law and causes them injury.

The President of the United States wields the entire executive power of the federal government.  Each day, he or she makes decisions that affect the lives of hundreds of millions of Americans in countless ways.  It is difficult to fathom that Congress – without any textual indication, and with considerable evidence to the contrary – intended for the FTCA to authorize tort lawsuits that bring the president's official conduct into question.[79]  "Congress . . .

---

[78]

   28 U.S.C. § 2680(h) (exempting from the FTCA claims arising out of, among other things, libel and slander).

[79]

   One might surmise that *Nixon* would prevent such an expansion of federal tort exposure. It would not.  *Nixon* holds that *the president* is absolutely immune from suit with respect to official conduct.  The defendant in an FTCA suit is the United States.  Moreover, Congress could not have relied on this backstop when it passed the FTCA.  The FTCA and its procedural provisions were enacted in the 1940s.  *Nixon* was decided in 1982.

   Nor is it sufficient to say that other legal doctrines such as the need for proximate causation might protect the government against liability in such cases.  Even if the government

31

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[80]

### D.    Decisions of Other Courts

The government relies on several cases in other circuits for the proposition that "elected officials" in general are government employees under the Westfall Act.  None of those cases so held.  And none supports the argument that the statute applies to the president.

*Council on American Islamic Relations v. Ballenger*,[81] a D.C. Circuit case discussed in more detail below on another issue, held that certain statements of a Member of Congress – not the president – had been made within the scope of his employment.  But the parties did not brief the question whether a Member of Congress (or any elected official) is an "employee of the Government," and the D.C. Circuit did not even mention the issue.[82]  *Wuterich v. Murtha*,[83] another D.C. Circuit decision concerning a Member of Congress that relied on *Ballenger*, similarly did not acknowledge the existence of the issue.

---

sometimes would prevail on these arguments, the cases would need to be defended at least to a certain point, and the president's conduct would be reviewed in the same manner as any other federal employee's.

[80]

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[81]

444 F.3d 659 (D.C. Cir. 2006).

[82]

*See* Brief of Appellant, *Council on Am. Islamic Relations v. Ballenger*, No. 05-5161 (D.C. Cir. Dec. 22, 2005); Brief for Appellee, *id.* (D.C. Cir. Feb. 3, 2006); Reply Brief of Appellant, *id.* (D.C. Cir. Feb. 16, 2006).

[83]

562 F.3d 375 (D.C. Cir. 2009).

32

The Sixth Circuit held recently in *Does 1-10 v. Haaland*[84] that Members of Congress are "employees of the Government" under the Westfall Act. But its conclusion turned on the fact that Section 2671 defines "federal agency" to include "the judicial and legislative branches" and thereby "expands sovereign immunity to the entire legislative branch."[85]  As discussed above, Section 2671's definition of "federal agency" does not use the phrase "executive branch." It refers to "the executive *departments*, [and] the judicial and legislative *branches*."[86]

Like *Does 1-10*, two older decisions from the First and Fifth Circuits held that Members of Congress are employees under the Westfall Act. Neither contains significant reasoning, and the few points they raise are particular to Congress.[87]  The government's remaining cases neither raise nor resolve the issue.[88]

---

[84]

No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020).

[85]

*Id.* at *4.

[86]

The Sixth Circuit relied also on the fact that the Supreme Court once held "that a Representative is 'an officer acting under the authority of the United States' for purposes of a criminal statute that punishes individuals who 'falsely assume or pretend to be an officer or employee acting under the authority of the United States.'" *Id.* at *4 (quoting *Lamar v. United States*, 241 U.S. 103, 111-12 (1916)). This holding has no relevancy when the alleged federal employee is the president.

[87]

*See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (noting that "in 1988, Congress extended coverage under the FTCA to officers and employees of the legislative and judicial branches"); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (concluding that because no Members of Congress spoke up about their possible exclusion from the Westfall Act when they debated the statute, the Members presumably understood the statute to include them, and that holding otherwise would be irrational).

[88]

*See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017).

\* \* \*

The president is not an "employee of the Government" under the Westfall Act. The text of the Act of June 25, 1948 offers numerous strong indications that Congress did not intend for this term to apply to him.  Congress clearly held that view when it passed the Westfall Act in 1988.  And the *Franklin* decision forbids the Court from reading the president into the FTCA without a clear statement from Congress.  Moreover, holding that the president is an "employee of the Government" within the meaning of the Act could ignite a significant expansion of federal tort exposure – without any evidence of a congressional intent to do so – by authorizing lawsuits that could involve review of the president's job performance.

As the president is not an "employee of the Government" within the meaning of the Westfall Act, the Attorney General's certification was erroneous.

## II.    *Scope of Employment*

The holding that the president of the United States is not an "employee of the Government," as Congress defined that term, is sufficient to resolve the government's motion. But the parties have briefed also the question of whether, if the president is a government employee, President Trump's allegedly defamatory statements were made within the scope of his employment.  And it is appropriate to address that issue as well in order to avoid the possibility of an unnecessary remand should a higher court disagree on the "employee" question.

### A.    *Choice of Law*

Under Second Circuit law, the question of whether government employees are acting within the scope of their employment for the purposes of the FTCA is resolved "in

34

accordance with the respondeat superior law of the jurisdiction where the tort occurred."[89]   The origin of this rule and its precise meaning are complicated issues that will be discussed momentarily.  For present purposes, it suffices to note that the rule is derived from a provision of the FTCA stating that the government's ultimate liability turns on "the law of the place where the act or omission occurred."[90]

The parties disagree over which jurisdiction's law applies to the scope of employment issue.   The government argues that because President Trump's allegedly defamatory statements were made in the District of Columbia, the Court should apply D.C. law.  Ms. Carroll, though not disputing that the statements were made in Washington, D.C., argues that the tort occurred where she was injured, which was New York.   Both parties, however, assert that the outcome would be the same under the *respondeat superior* doctrine of either jurisdiction.[91]

As to the question of where the tort occurred for FTCA purposes, the Court agrees with the government.  The governing case law refers to the place of the tort, not the place

---

[89]

    *See, e.g.*, *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016); *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007).

    *Respondeat superior* is a Latin phrase meaning "let the superior make answer."  The substance of the doctrine is that an employer is liable for any injuries wrongly inflicted by its employee within the scope of the employment.  *See Respondeat Superior*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).  The doctrine applies also to principal and agent and to master and servant.

[90]

    *See Fountain*, 838 F.3d at 135 (quoting 28 U.S.C. § 1346(b)(1)).

[91]

    *See* Dkt. 16 at 31 n.18 (plaintiff arguing that "[a]lthough New York laws governs and supplies a more restrictive rule of respondeat superior liability than does D.C., the ultimate outcome would be the same under D.C. law"); Dkt. 21 at 13 (government arguing that "[t]he outcome under New York law would be no different")

35

of injury.  And the FTCA's reference to the "act or omission" makes the conclusion absolutely clear.

But the apparently simple question of which law applies is more nuanced than the parties acknowledge.  The complication turns on whether the Court must apply the D.C. *respondeat superior* doctrine or whether it instead must apply D.C.'s choice of law rules to determine which jurisdiction's *respondeat superior* doctrine applies.

At first blush, the FTCA appears to require the choice of law path.  The statute predicates the government's liability on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[92]  This language seems to suggest that a federal court hearing an FTCA claim should apply the same law as would a local court in the relevant jurisdiction.  In *Richards v. United States*,[93] the Supreme Court took that view by holding that the FTCA "requires application of the whole law of the [jurisdiction] where the act or omission occurred," which includes that jurisdiction's choice of law rules.[94]

The issue in *Richards* was which jurisdiction's law applied to the question of liability – not whose *respondeat superior* doctrine applied.  But nothing in the opinion distinguished between those questions or suggests that they might require a different type of

---

[92]

28 U.S.C. § 1346(b)(1).

[93]

369 U.S. 1 (1962).

[94]

*Id.* at 11; *see also Winston v. United States*, 305 F.2d 253, 272 n.20 (2d Cir. 1962) (reading *Richards* as interpreting the FTCA "language to mean the 'whole law' of that place, including its conflict of law rules").

36

analysis.  And the FTCA provides no textual basis for distinguishing between them.  It would be odd to read the statute to require that courts apply the *respondeat superior* doctrine of the place where the act or omission occurred, but they must begin with that jurisdiction's choice of law rules when determining the law applicable to liability.  Moreover, treating the *respondeat superior* issue differently may violate *Richards*.  A scope of employment finding is a necessary component of liability in a suit against an employer.

However, a separate line of cases suggests that federal courts may have developed different rules for liability and scope of employment, seemingly without considering the possible inconsistency.  In *Williams v. United States*,[95] decided seven years before *Richards*, the Supreme Court reviewed a Ninth Circuit decision that applied federal law to the scope of employment question.  In a two sentence *per curiam* opinion, the Supreme Court vacated and remanded on the ground that "[t]his case is controlled by the California doctrine of respondent superior."[96] The Court did not set forth its reasoning.

There are two plausible explanations for that result.  One is that the Court, consistent with the reading it later gave in *Richards*, looked to the whole law of California, the place where the act or omission occurred, and found that California's choice of law rules required application California *respondeat superior* doctrine.  The other is that California's *respondeat superior* doctrine applied by virtue of the FTCA itself – *i.e.*, California was where the act or omission occurred.

---

[95]     350 U.S. 857 (1955) (per curiam).

[96]     *Id.*

SPA-39

37

     All twelve of the geographic courts of appeals have said specifically that the FTCA requires courts to apply "the *respondeat superior* law" of the jurisdiction where the act or omission occurred.[97] But all twelve of those courts have stated also that courts must apply "the law" of the relevant jurisdiction without indicating whether they are referring to (a) that jurisdiction's "whole law," which includes its choice of law rules, or (b) the jurisdiction's

---

[97] *See, e.g.*, *Nasuti v. Scannell*, 906 F.2d 802, 806 n.1 (1st Cir. 1990) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of respondeat superior of the state in which the negligent or wrongful conduct occurred."); *Fountain*, 838 F.3d at 135 ("We interpret the FTCA's 'scope of employment' requirement in accordance with the respondeat superior law of the jurisdiction where the tort occurred."); *McSwain v. United States*, 422 F.2d 1086, 1088 (3d Cir. 1970) ("Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred."); *Ross v. Bryan*, 309 F.3d 830, 834 (4th Cir. 2002) ("To determine whether Bryan's acts were within the scope of his employment, we must apply Virginia respondeat superior law."); *Garza v. United States*, 809 F.2d 1170, 1171 (5th Cir. 1987) ("Whether military personnel are acting within the line of duty is determined by applicable state rules of respondeat superior."); *United States v. Taylor*, 236 F.2d 649, 653 (6th Cir. 1956) ("[T]he standard of governmental liability under the Federal Tort Claims Act is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state."); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) ("[W]e have followed the Court's ruling in *Williams* and looked to state law of respondeat superior to determine whether a person was acting "in the line of duty."); *United States v. Farmer*, 400 F.2d 107, 109 (8th Cir. 1968) ("[T]he question of whether a Government employee is acting within the scope of his office or employment must be determined by the respondeat superior rule of the state where the negligent act occurred."); *United States v. McRoberts*, 409 F.2d 195, 197 (9th Cir. 1969) ("In resolving the sole issue before us, we must apply the respondeat superior principles of California, the state wherein the alleged tort was committed."); *Nichols v. United States*, 796 F.2d 361, 365 n.4 (10th Cir. 1986) ("Whether he was 'acting within the scope of his office or employment' at the time his act caused injury to Nichols is determined by reference to the respondeat superior law of the state in which the accident occurred."); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("'Line of duty,' in turn, draws its meaning from the applicable state law of respondeat superior."); *Nelson v. United States*, 838 F.2d 1280, 1282 (D.C. Cir. 1988) ("'Line of duty,' in turn, takes its meaning from the applicable state law of respondeat superior.").

38

*respondeat superior* doctrine without regard to its choice of law rules.[98]  It is not crystal clear

which of these approaches is the law, although that fact that most of the decisions in both groups

cite *Williams* and none conducts a choice of law analysis strongly suggests that the former view

controls.  Nevertheless, this Court need not and does not resolve this issue.

Although the *respondeat superior* doctrines of New York and the District of

Columbia are not identical, they dictate the same outcome on these facts, largely for the same

reasons.  As will appear, *respondeat superior* liability does not apply under the law of either

---

[98]

See, e.g., *Borrego v. United States*, 790 F.2d 5, 6 (1st Cir. 1986) ("Whether or not a particular act is within the scope of employment is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred."); *Mandelbaum v. United States*, 251 F.2d 748, 750 (2d Cir. 1958) ("Under [the FTCA] the law applicable to this case is that of New York [where the act or omission occurred].  And subsequent to the decision below the Supreme Court [in *Williams*] has made it absolutely clear that . . . the state law controls."); *Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) ("We assess whether Kotor was acting within the scope of his employment under the law of Pennsylvania, because that is where the incident occurred."); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th Cir. 1997) ("In answering [the scope of employment] question, we apply the law of the state where the conduct occurred."); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred."); *Arbour v. Jenkins*, 903 F.2d 416, 421-22 (6th Cir. 1990) ("Whether an employee's actions are within the scope of his employment for purposes of the Westfall Act is an issue that must be determined in accordance with the law of the state where the incident occurred."); *Guthrie v. United States*, 392 F.2d 858, 859 (7th Cir. 1968) (holding, because the act or omission occurred in Wisconsin, that "[t]he state law of Wisconsin is decisive on this issue"); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) ("Under the FTCA, the law of the place of the alleged tort governs the scope-of-employment question."); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("This phrase must be applied according to the law of the state where the alleged tort occurred."); *United States v. Hainline*, 315 F.2d 153, 155 (10th Cir. 1963) ("In actions brought under the Act, the scope of employment is determined by the state law."); *Green v. Hill*, 954 F.2d 694, 698 (11th Cir. 1992) ("The issue of whether an employee acted within the scope of his employment is determined by the law of the state where the alleged tort occurred."); *United States v. Baker*, 265 F.2d 123, 123 (D.C. Cir. 1959) (noting that "the law of Virginia, where the accident occurred, would control the question of 'scope of employment'").

SPA-41

39

jurisdiction unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions.[99]   Because the control factor is dispositive and would reach an identical result under either D.C. or New York law, there is no true conflict between D.C. and New York law for the purpose of D.C.'s governmental interest analysis.   In fact, and as noted at the outset, both parties assert that the outcome would be the same under New York and D.C. law.   "Since there is 'no real conflict' . . . it is unnecessary for [the Court] to engage in the choice-of-law exercise . . . ."[100]

> B.      *Scope of Employment Under D.C. Law*

"'*Respondeat superior* is a doctrine of vicarious liability' that imposes liability on employers for tortious and negligent 'acts of [their] employees committed within the scope of their employment.'"[101]   "Generally, 'whether an employee is acting within the scope of his

---

[99]

   *Compare Fountain*, 838 F.3d at 135 ("Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" (brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 471 (1969))), *with Tolu v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) ("The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (ellipsis omitted) (quoting *Safeway Stores v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)).

[100]

   *Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. 2013) (quoting *Taylor v. Canady*, 536 A.2d 93, 96 (D.C. 1988)).

[101]

   *Blair v. D.C.*, 190 A.3d 212, 225 (D.C. 2018) (quoting *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006)).

SPA-42

40

employment is a question of fact for the jury.'"[102]  However, the issue becomes a question of law "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[103]

As to the legal question, the D.C. Court of Appeals has adopted Section 228 of the Restatement (Second) of Agency.[104]  In that court's words, D.C. law holds that "[i]n order to succeed under a *respondeat superior* theory of liability, [a party] must show [1] that a master-servant relationship existed between [the employer] and [its] workers or contractors, and

---

[102]

Id. (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001)).

[103]

Id. at 226 (quoting *Brown*, 782 A.2d at 757).

Whether the provision about sending this issue to a jury applies here is unclear.  The reason for the lack of clarity is that the scope of employment issue arises as a threshold question about the Westfall Act's applicability, rather than as an element of the plaintiff's cause of action that might be resolved at trial.  For reasons explained below, however, the Court holds that the matter is decided appropriately as a question of law in this case.

[104]

See, e.g., *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987); *Wuterich*, 562 F.3d at 383.  The full provision reads:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

"(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

41

[2] that the incident at issue occurred while the workers or contractors were acting within the scope of their employment."[105]  The Court begins with the master-servant issue.

### 1.     *Master-Servant Relationship*

"The terms 'master' and 'servant' are defined as follows:

> "(1) A master is a principal who employs an agent to perform service in his affairs *and who controls or has the right to control the physical conduct of the other* in the performance of the service.

> "(2) A servant is an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right to control* by the master."[106]

"The decisive test [for the existence of a master-servant relationship] is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[107]  "[T]here is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no

---

[105]

    *Tolu*, 945 A.2d at 601-02 (brackets omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)); *see Moorehead v. D.C.*, 747 A.2d 138, 142 (D.C. 2000) (same).

[106]

    *Safeway*, 448 A.2d at 856 n.6 (quoting RESTATEMENT (SECOND) OF AGENCY § 2) (emphasis added).

[107]

    *Tolu*, 945 A.2d at 602 (ellipsis omitted) (quoting *Safeway*, 448 A.2d at 860); *cf.* RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c) (noting that "one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master"); *id.* § 220(1) (similar).  The Supreme Court has made the same observation about the "control" element's centrality to one's status as a servant. *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.  The general definition of the term 'servant' in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master.").

control or right to control by the master."[108]  D.C. courts consider five factors in determining whether a master-servant relationship exists:  "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."[109]

"The President of the United States possesses an extraordinary power to speak to his fellow citizens . . . ."[110]  While he is a "public servant," holding that he is a "servant" whom a "master" "has the right to control and direct" when he speaks to reporters, or otherwise, would be absurd.

First, except for the payment of a salary, not one of the five factors relied upon by D.C. courts to determine whether a master-servant relationship exists is satisfied here.  The president is selected by the electoral college, not the executive branch or any part of it.  The government does not have the power to discharge him in any circumstances, unless one construes impeachment, or removal under the Twenty-Fifth Amendment, as forms of discharge.  And while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not.[111]

---

[108]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

[109]

See, e.g., Anthony v. Okie Dokie, Inc., 976 A.2d 901, 906 (D.C. 2009) (quoting Safeway, 448 A.2d at 860); Bostic v. D.C., 906 A.2d 327, 331 (D.C. 2006) (same) (quoting Giles, 487 A.2d at 611).

[110]

Trump v. Hawaii, 138 S. Ct. 2392, 2417-18 (2018).

[111]

Although the government waived this argument, one could contend that the president cannot meaningfully perform his job without responding to public sexual assault allegations.

SPA-45

43

The "decisive" factor, however, is the fourth and most important: control.  The president is the chief executive of the United States government.  No one, inside or outside of the executive branch, has "the power to control the [president's] conduct."

That conclusion is found in the first sentence of the president's job description. Under Article II of the Constitution, "[t]he executive Power shall be vested in a President of the United States of America."[112]  As Justice Scalia explained in his famous dissent in *Morrison v. Olson*,[113] "this does not mean *some of* the executive power, but *all of* the executive power."[114] "The entire 'executive Power' belongs to the President alone."[115]

Not only does the president's sole possession of the executive power place him atop the chain of command of the executive branch.  "Article II confers on the President 'the general administrative *control* of those executing the laws.'"[116]  "The buck stops with the President, in Harry Truman's famous phrase."[117]

---

Because this argument is better characterized as a question of whether the president acted within the scope of his employment, rather than a question of whether he is a "servant" under the "control" of a "master," the Court addresses this theory below.

[112]  U.S. Const. Art. II, § 1, cl. 1.

[113]  487 U.S. 654 (1988).

[114]  *Id.* at 705.

[115]  *Seila*, 140 S. Ct. at 2197.

[116]  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).

[117]  *Id.*

44

To hold that someone else exercises control over the president would turn the Constitution on its head.  And it would subvert the requirement that the president "shall take Care that the Laws be faithfully executed."[118]  As explained recently by the Supreme Court:

> "The . . . constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections.  In that scheme, individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision *and control* of the elected President.    Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'"[119]

Interpreting this authority, Justices Thomas and Kavanaugh have opined that components of the executive branch "that wield substantial power with no accountability to either the President or the people . . . 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'"[120]

As noted above, "there is no liability for the conduct of one who . . . is doing work as to which there is no control or right to control by the master."[121]  Such control is absent

---

[118]

U.S. Const. Art. II, § 3.

[119]

*Seila*, 140 S. Ct. at 2203 (quoting 1 Annals of Cong. 499 (J. Madison)); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 ("Without [the] power [to remove and control subordinates], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)); *id.* at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, *overseeing*, and *controlling* those who execute the laws.'" (emphasis added) (quoting 1 Annals of Cong. 463 (J. Madison))).

[120]

*Seila*, 140 S. Ct. at 2212 (Thomas, *J.*, concurring in part) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting)).

[121]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

45

whenever the president discharges his duties.  And it is non-existent when the president exercises his "extraordinary power to speak to his fellow citizens"[122] by addressing the press.  No one gives him permission to speak.  No one can require him to say, or not to say, anything at all.  No one has the authority to cut him off.  And the statements he makes, as well as the topics he discusses, are entirely of his own choosing.

These points are clearer still on the facts of this case.  No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do with the official business of government, that he raped her decades before he took office.  And no one had the ability to control him.

President Trump is not a "servant" controlled by a "master" within the meaning of the District of Columbia's scope of employment doctrine.  Thus, his allegedly defamatory statements were not "actuated, at least in part, by a purpose to further the master's business."[123] He was not acting within the scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous.[124]

2.      *Scope of Employment Test*

The president is no one's servant.  But assume, for the sake of argument, that he were an employee of the United States whose master were something vaguely described as "the

_____

[122]

*Trump*, 138 S. Ct. at 2417.

[123]

*Blair*, 190 A.3d at 225.

[124]

Because the Court concludes as a matter of law that President Trump is not a servant, it concludes also that no reasonable jury could find that his actions were done within the scope of his employment.

public," which "controlled" him indirectly through its role in choosing the electoral college members[125] or in electing the Members of Congress who can impeach and remove him.  Even then, the Court would hold that President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

Under D.C. law, "[t]o be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[126]  The "at least in part" language demonstrates that the action need not "be wholly in furtherance of the employer's business."[127]  That said, a slight purpose to serve the master is not enough.  "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[128]  Finally, "the employee's 'tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.'"[129]

---

[125]

This view is impossible to reconcile with the "control" element of D.C. law.  "The public" is not an employer, and it does not have the authority to control the president's performance of his job when he makes statements to reporters or otherwise.  Nor, because of the electoral college system, is the president directly elected by the public.  And while our system of checks and balances gives Congress (and the judiciary) certain powers that the president lacks, no branch of government "controls" another in anything resembling the same manner that an employer controls an employee.

[126]

*Blair*, 190 A.3d at 226 (quoting *Bamidele*, 103 A.3d at 525).

[127]

*Id.*

[128]

*See, e.g.*, *Bamidele*, 103 A.3d at 525 (quoting Restatement (Second) of Agency § 228(2)); *Brown*, 782 A.2d at 758 (same).

[129]

*Blair*, 190 A.3d at 226 (alteration omitted) (quoting *Bamidele*, 103 A.3d at 525).

47

At its core, the government's argument is that speaking to reporters is part of the president's job.  Thus, it argues, whenever the president speaks to reporters – no matter the topic – he is acting within the scope of his employment.  For this proposed rule, the government relies on the D.C. Circuit's *Ballenger* decision.  A discussion of *Ballenger* will be helpful to explaining why the Court is not persuaded.

The defendant in *Ballenger* was Rep. Cass Ballenger, a Member of Congress.  Ballenger's chief of staff gave an interview to a reporter who asked a question about Ballenger's recent separation from his wife.[130]  Ballenger later called the reporter "from his congressional office during regular business hours" and stated, among other things, that the separation was amicable and that his wife was uncomfortable living across the street from the plaintiff, an Islamic institution.[131]  The journalist reported this comment, and the plaintiff sued Ballenger for defamation.[132]

Shortly after the lawsuit was filed, the Department of Justice certified that Ballenger "acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement."[133]  The district court agreed and dismissed the case under the FTCA's exemption for libel and slander claims.[134]

---

[130] *Ballenger*, 444 F.3d at 661.

[131] *Id.* at 662.

[132] *Id.* at 663.

[133] *Id.*

[134] *Islamic Council on Am. Islamic Relations, Inc. v. Ballenger*, 366 F. Supp. 2d 28, 30 (D.D.C. 2005).

SPA-50

48

The D.C. Circuit affirmed.  Like the district court, it did not acknowledge the question of whether a Member of Congress is an "employee of the Government" pursuant to the Westfall Act or a "servant" under a master's control.  But it nonetheless found that Ballenger acted within the scope of his employment when he made the comment at issue.

The D.C. Circuit began by rejecting the plaintiff's argument "that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."[135] Instead, it reasoned that D.C. law and the Westfall Act "direct[] courts to look beyond alleged intentional torts themselves."[136]  Finding that the "'underlying dispute or controversy' was the phone call between Ballenger and [the reporter] discussing the marital separation," it held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"[137]  The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them.  Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press.[138]  The D.C. Circuit appears to have

---

[135]

    *Ballenger*, 444 F.3d at 664.

[136]

    *Id.*

[137]

    *Id.*

[138]

    *Id.* at 665.  Although the court quoted this standard several times, its analysis failed to engage with it.

SPA-51

49

overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."[139]

Even on the issues it addressed, *Ballenger*'s reasoning is wanting.  Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

> "[The plaintiff] resists this conclusion on two grounds.  First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern.  The circumstances of the conversation belie this suggestion.  The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation.  Given this level of public interest, we find CAIR's absolutist view at odds with reality.  Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."[140]

There are two problems with this passage.  The first is that it is unpersuasive.  Gossip about a congressperson's marriage may very well be interesting to the public.  But that fact does not transform it into the official business of the United States Congress.  The job description of a congressperson does not include transparency about one's personal life.

In addition, *Ballenger* misstates D.C. law – and not only in the manner described above.  A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern."[141]  A real but insubstantial

---

[139]

Id.  This language tracks Section 228(1)(a) of the Restatement.  But that is only one element of the definition of scope of employment.  *See* RESTATEMENT (SECOND) OF AGENCY § 228(1) (listing four elements); *see also, e.g.*, *id.* § 228(1)(c) (requiring that the conduct be "actuated, at least in part, by a purpose to serve the master").

[140]

*Ballenger*, 444 F.3d at 665.

[141]

*Id.* (emphasis added).

50

purpose to serve the master is insufficient. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[142]

The implications of *Ballenger*'s holding also are troubling.  The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment.  Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

*Ballenger* acknowledged this concern.  But it made no attempt to assuage it.  It noted merely that the case was limited to its facts.[143]

A subsequent panel of the D.C. Circuit did not accept the invitation to read *Ballenger* so narrowly.  In *Wuterich*, the court held that *Ballenger* controlled where a Member of Congress was sued for defamation based on his comments about the Iraq War.[144]  Unlike

---

[142] *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)). Although *Ballenger* includes this language when it quotes the entirety of Section 228, its analysis does not engage with it.

[143] *See Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts.  To be sure, it involves a statement by a congressman to the press.  But our *ratio decidendi* necessarily depends on the context in which the statement was made.  *See* KARL LLEWELLYN, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live.').  We lack the power to render an opinion on any case or controversy not properly before us.").

[144] *Wuterich*, 562 F.3d at 384.

**SPA-53**

51

*Ballenger*, however, *Wuterich* considered the relationship between the congressperson's remarks and his official duties.  It relied on the fact that "the underlying conduct – interviews with the media about the pressures on American troops in the ongoing Iraq war – is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq."[145]

The Court declines to apply a *Ballenger*-like principle to the president on the facts of this case.  Perhaps the president, were he in service of a "master," would act within the scope of his employment when he comments on matters having a non-negligible nexus to his official duties.  But there is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment.  A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office.  And the public's reasons for being interested in these comments are different as well.  The president's views on the former topics are interesting because they alert the public about what the government is up to.  President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government.

---

[145]    *Id.* at 384-85.  These facts are irrelevant under *Ballenger*'s broader holding that essentially any comment a Member of Congress makes to the press is done within the scope of his or her employment.  That said, *Wuterich* did not purport to narrow *Ballenger* or limit the case to its facts.

52

The government's best argument on this point is that President Trump's statements about Ms. Carroll were within the scope of his employment in that refuting her accusation furthered his ability to govern effectively because the accusation was reported widely and charged him with the commission of a serious crime.  But there are at least three answers to that objection.

As an initial matter, the government first made the argument in its reply brief, thereby foreclosing the plaintiff from responding to it.  As previously discussed, it thereby waived the argument as its counsel agreed in open court, as previously discussed.

Second, the Court would reject the argument even if it were not waived.  While the government's position is not entirely without merit, it goes much too far.  Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns his character – without adverse consequences to that president and no matter what injury he inflicts on the person defamed.  Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office.

Finally, even if the president's comments here had some nexus to his official duties, that nexus would be too weak.  As stated several times now, "'[c]onduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[146]  That is the case here.

---

[146] *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

SPA-55

53

Beyond the District of Columbia precedent already discussed, support for this conclusion comes from the Supreme Court's decision in *Clinton v. Jones*.[147]  Much like in this case, a plaintiff sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office.[148]  Her theory was that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred."[149]

As relevant here, the Supreme Court held that President Clinton was not absolutely immune from suit by virtue of his office where the claims against him were based on his "*unofficial* conduct."[150]  As to most of the plaintiff's claims, the Court explained, "it is perfectly clear that the alleged misconduct of [President Clinton] was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office."[151]  The one possible exception was the alleged defamatory comments that were made while he was in office.  The Court noted that the defamation claim "arguably may involve

---

[147]

520 U.S. 681 (1997).

[148]

*Id.* at 685-86; *see also Jones v. Clinton*, 72 F.3d 1354, 1357 (8th Cir. 1996) (1997) ("Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.").

[149]

*Clinton*, 520 U.S. at 685.

[150]

*Id.* at 694 (emphasis in original); *see also id.* at 695 ("As our opinions have made clear, immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." (citation and quotation marks omitted)).

[151]

*Id.* at 686.

54

conduct within the outer perimeter of the President's official responsibilities."[152]  But because that issue was "not before [the Court]," it declined to consider whether the president's absolute immunity extended to these comments.[153]

Although both doctrines call for some assessment of whether the defendant was engaged in the performance of his job, the absolute immunity doctrine is different than D.C.'s scope of employment doctrine.  But as to the president's job description, *Clinton* suggests that a sitting president's comments about a sexual assault allegation fall somewhere between being outside the scope of his duties and "arguably . . . within [their] outer perimeter."  At least where D.C. law is concerned, conduct that is "too little actuated by a purpose to serve the master" does not suffice.[154]  It is difficult to see how conduct that at most is in the "outer perimeter" of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be.

In this regard, the Court notes also that all of the remaining Westfall Act defamation decisions relied upon by the government are distinguished easily from this case – and not merely because each of them concerned a Member of Congress.  Although the Sixth Circuit's *Does 1-10* case involved a defamation claim against a Senator who commented "on an event of widespread public interest," the decision applied Kentucky's scope of employment

---

[152]

     *Id.*

[153]

     *Id.* at 686 n.3.

[154]

     *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)).

55

law.[155]  According to the Supreme Court of Kentucky decision relied upon by the Sixth Circuit,

Kentucky's doctrine is similar to the Restatement (Third) of Agency approach.[156]   While that

approach resembles in some ways Section 228 of the Restatement (Second) of Agency,[157] the

drafters intentionally omitted the "too little actuated" standard discussed above:

> "Under § 228(2), conduct is not within the scope of employment if it is 'too little
> actuated by a purpose to serve' the employer.  Under § 235, conduct is not within
> the scope of employment 'if it is done with no intention' to perform an authorized
> service or an incidental act.  These formulations are not entirely consistent; an act
> motivated by *some* purpose to serve the employer could still be '*too little
> actuated*' to be within the scope of employment.

> *In contrast*, under subsection (2) of [Section 7.07 of the Restatement (Third)], an
> employee's conduct is outside the scope of employment when it occurs within an
> independent course of conduct intended to serve *no purpose* of the employer."[158]

As explained, the "too little actuated" caveat is decisive on these facts to the extent that one

considers President Trump's comments to have been actuated in some small part to serve

whomever one believes to be his "master."   Thus, the Sixth Circuit's interpretation of Kentucky

law is of no moment here.

The government's remaining cases involve the laws of different jurisdictions or

Members of Congress who commented on matters related clearly to their job duties.  *Wuterich*

---

[155]

No. 19-6347, 2020 WL 5242402, at *2, 6.

[156]

*Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Kentucky's approach . . . [focuses
on whether the servant's] purpose, however misguided, is wholly or in part to further the
master's business.").

[157]

A key difference is that the Restatement (Third) abandons the foreseeability element of the
Restatement (Second).  *See* Restatement (Third) of Agency § 7.07 (2006), cmt.

[158]

*Id.* (citation omitted, emphasis added).

SPA-58

56

involved D.C. law but concerned remarks that the D.C. Circuit found were "unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress."[159] *Williams v. United States*[160] involved a Texas congressperson's comments "concerning the status of an appropriations bill to restore the Battleship Texas."[161]   And the case applied Texas's scope of employment doctrine, which differs from the Restatement (Second) approach.[162]   And *Operation Rescue National v. United States*[163] did not consider whether the defendant's comments were made within the scope of his employment because the issue was not raised on appeal.   The district court did consider that issue, but it did so under Massachusetts law where the defendant, a Senator, commented on a "bill, of which he was the prime sponsor, [that] was to be debated in the Senate the following day."[164]

President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office.   Neither the media reports nor the underlying allegations have any relationship to his official duties.   And even if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not

---

[159]   *Wuterich*, 562 F.3d at 384-85.

[160]   71 F.3d 502 (5th Cir. 1995).

[161]   *Id.* at 504, 506.

[162]   *See id.* at 506 (citing *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App. 1995)).

[163]   147 F.3d 68, 69 (1st Cir. 1998).

[164]   *Id.* at 68-69.

SPA-59

57

enough under the District of Columbia's scope of employment doctrine.

    C.    *Scope of Employment Under New York Law*

    If the Court were to apply New York law, it would reach the same conclusion largely for the same reasons.

    "Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'"[165]  "Whether an employee acted within the scope of employment is a fact-based inquiry."[166]

    For all the reasons already outlined, any person or group that might be characterized as President Trump's employer neither controls, nor could control, his activities. And even if that were not so, the government's argument would fail also because the president's actions were not taken "in furtherance of the duties he owes to his employer," whoever or whatever that may be.

    When applying the "in furtherance" requirement, New York courts "consider, among other factors,

---

[165]

    *Fountain*, 838 F.3d at 135 (brackets omitted) (quoting *Hamm*, 483 F.3d at 138 (quoting *Lundberg*, 25 N.Y.2d at 471)).

[166]

    *Rivera v. State*, 34 N.Y.3d 383, 90 (2019).  Although it is fact heavy, "the question may be resolved on summary judgment, particularly when the material facts are undisputed."  *Id.*  This language arguably does not apply here because the scope of employment question arises as a threshold issue, rather than as a merits issue on summary judgment or even a Rule 12 motion.  But in either event, the issue is resolved appropriately by the Court because the material facts are not in dispute.

'the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated' (i.e., whether it was foreseeable)."[167]

Conduct "committed for wholly personal motives" is not done in furtherance of any duties owed to the employer.[168]   And at least as a general matter, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."[169]   That said, "[i]nvoking respondeat superior both in defamation cases and in sexual harassment cases is not unprecedented."[170]   As in all cases, "the determination of whether a particular act was within the scope of the servant's employment is . . . heavily dependent on factual considerations."[171]

As explained above, the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue.   His comments concerned an alleged sexual assault that took place several decades before he took office, and the allegations have no relationship to the official business of

---

[167]
    *Rivera*, 34 N.Y.3d at 389-90 (2019) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304 (1979)); *see also Fountain*, 838 F.3d at 138 (applying these factors to the "in furtherance" inquiry).

[168]
    *See, e.g.*, *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[169]
    *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

[170]
    *Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 2d 1998).

[171]
    *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

59

the United States.  To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office.  The government has provided no support for that theory, and the Court rejects it as too expansive.

*Conclusion*

The President of the United States is not an "employee of the Government" within the meaning of the relevant statutes.  Even if he were such an "employee," President Trump's allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment.  Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.

SO ORDERED.

Dated:        October 26, 2020

Lewis A. Kaplan
United States District Judge

SPA-62

**28 U.S.C.**
United States Code, 2018 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 171 - TORT CLAIMS PROCEDURE
Sec. 2671 - Definitions
From the U.S. Government Publishing Office, www.gpo.gov

## §2671. Definitions

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

(June 25, 1948, ch. 646, 62 Stat. 982; May 24, 1949, ch. 139, §124, 63 Stat. 106; Pub. L. 89–506, §8, July 18, 1966, 80 Stat. 307; Pub. L. 97–124, §1, Dec. 29, 1981, 95 Stat. 1666; Pub. L. 100–694, §3, Nov. 18, 1988, 102 Stat. 4564; Pub. L. 106–398, §1 [[div. A], title VI, §665(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–169; Pub. L. 106–518, title IV, §401, Nov. 13, 2000, 114 Stat. 2421.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

Based on title 28, U.S.C., 1940 ed., §941 (Aug. 2, 1946, ch. 753, §402, 60 Stat. 842).

Changes were made in phraseology.

#### 1949 ACT

This section corrects a typographical error in section 2671 of title 28, U.S.C.

### AMENDMENTS

**2000**—Pub. L. 106–518, in par. defining "Employee of the government", inserted "(1)" after "includes" and added cl. (2).

Pub. L. 106–398 inserted "115," after "members of the National Guard while engaged in training or duty under section" in par. defining "Employee of the government".

**1988**—Pub. L. 100–694 inserted "the judicial and legislative branches," after "departments," in first par.

**1981**—Pub. L. 97–124 inserted "members of the National Guard while engaged in training or duty under section 316, 502, 503, 504, or 505 of title 32," in definition of "Employee of the government" and "or a member of the National Guard as defined in section 101(3) of title 32" in definition of "Acting within the scope of his office or employment".

**1966**—Pub. L. 89–506 expanded definition of "Federal agency" to include military departments.

**1949**—Act May 24, 1949, corrected spelling of "office".

### EFFECTIVE DATE OF 2000 AMENDMENT

Pub. L. 106–398, §1 [[div. A], title VI, §665(c)(2)], Oct. 30, 2000, 114 Stat. 1654, 1654A–169, provided that: "The amendment made by subsection (b) [amending this section] shall apply with respect to acts and omissions occurring before, on, or after the date of the enactment of this Act [Oct. 30, 2000]."

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–694 effective Nov. 18, 1988, and applicable to all claims, civil actions, and proceedings pending on, or filed on or after, Nov. 18, 1988, see section 8 of Pub. L. 100–694, set out as a note under section 2679 of this title.

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–124 applicable only with respect to claims arising on or after Dec. 29, 1981, see section 4 of Pub. L. 97–124, set out as a note under section 1089 of Title 10, Armed Forces.

### EFFECTIVE DATE OF 1966 AMENDMENT

SPA-63

Amendment by Pub. L. 89–506 applicable to claims accruing six months or more after July 18, 1966, see section 10 of Pub. L. 89–506, set out as a note under section 2672 of this title.

### Short Title

This chapter is popularly known as the Federal Tort Claims Act. The Federal Tort Claims Act was previously the official short title of title IV of act Aug. 2, 1946, ch. 753, 60 Stat. 842, which was classified principally to chapter 20 (§§921, 922, 931–934, 941–946) of former Title 28, Judicial Code and Judiciary. Title IV of act Aug. 2, 1946, was substantially repealed and reenacted as sections 1346(b) and 2671 et seq. of this title by act June 25, 1948, ch. 646, 62 Stat. 992, the first section of which enacted this title. For complete classification of title IV to the Code, see Tables. For distribution of former sections of Title 28 into this title, see Table at the beginning of this title.

### Severability

Pub. L. 100–694, §7, Nov. 18, 1988, 102 Stat. 4565, provided that: "If any provision of this Act [see Short Title of 1988 Amendment note under section 1 of this title] or the amendments made by this Act or the application of the provision to any person or circumstance is held invalid, the remainder of this Act and such amendments and the application of the provision to any other person or circumstance shall not be affected by that invalidation."

### Law Enforcement Officer Acting Within Scope of Office or Employment

Pub. L. 105–277, div. A, §101(h) [title VI, §627], Oct. 21, 1998, 112 Stat. 2681–480, 2681–519, as amended by Pub. L. 106–58, title VI, §623, Sept. 29, 1999, 113 Stat. 471, provided that:

"(a) Definitions.—In this section—

"(1) the term 'crime of violence' has the meaning given that term in section 16 of title 18, United States Code; and

"(2) the term 'law enforcement officer' means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5, United States Code; and any special agent in the Diplomatic Security Service of the Department of State.

"(b) Rule of Construction.—Effective on the date of the enactment of this Act [Oct. 21, 1998] and thereafter, and notwithstanding any other provision of law, for purposes of chapter 171 of title 28, United States Code, or any other provision of law relating to tort liability, a law enforcement officer shall be construed to be acting within the scope of his or her office or employment, if the officer takes reasonable action, including the use of force, to—

"(1) protect an individual in the presence of the officer from a crime of violence;

"(2) provide immediate assistance to an individual who has suffered or who is threatened with bodily harm; or

"(3) prevent the escape of any individual who the officer reasonably believes to have committed in the presence of the officer a crime of violence."

### Congressional Findings and Purposes

Pub. L. 100–694, §2, Nov. 18, 1988, 102 Stat. 4563, provided that:

"(a) Findings.—The Congress finds and declares the following:

"(1) For more than 40 years the Federal Tort Claims Act [see Short Title note above] has been the legal mechanism for compensating persons injured by negligent or wrongful acts of Federal employees committed within the scope of their employment.

"(2) The United States, through the Federal Tort Claims Act, is responsible to injured persons for the common law torts of its employees in the same manner in which the common law historically has recognized the responsibility of an employer for torts committed by its employees within the scope of their employment.

"(3) Because Federal employees for many years have been protected from personal common law tort liability by a broad based immunity, the Federal Tort Claims Act has served as the sole means for compensating persons injured by the tortious conduct of Federal employees.

"(4) Recent judicial decisions, and particularly the decision of the United States Supreme Court in Westfall v. Erwin, have seriously eroded the common law tort immunity previously available to Federal employees.

"(5) This erosion of immunity of Federal employees from common law tort liability has created an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the entire Federal workforce.

"(6) The prospect of such liability will seriously undermine the morale and well being of Federal employees, impede the ability of agencies to carry out their missions, and diminish the vitality of the Federal Tort Claims Act as the proper remedy for Federal employee torts.

"(7) In its opinion in Westfall v. Erwin, the Supreme Court indicated that the Congress is in the best position to determine the extent to which Federal employees should be personally liable for common law torts, and that legislative consideration of this matter would be useful.

"(b) Purpose.—It is the purpose of this Act [see Short Title of 1988 Amendment note under section 1 of this title] to protect Federal employees from personal liability for common law torts committed within the scope of their employment, while providing persons injured by the common law torts of Federal employees with an appropriate remedy against the United States."

SPA-64

**28 U.S.C.**
United States Code, 2018 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 171 - TORT CLAIMS PROCEDURE
Sec. 2679 - Exclusiveness of remedy
From the U.S. Government Publishing Office, www.gpo.gov

## §2679. Exclusiveness of remedy

(a) The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

(b)(1) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

(2) Paragraph (1) does not extend or apply to a civil action against an employee of the Government —

   (A) which is brought for a violation of the Constitution of the United States, or

   (B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

(c) The Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury. The employee against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon him or an attested true copy thereof to his immediate superior or to whomever was designated by the head of his department to receive such papers and such person shall promptly furnish copies of the pleadings and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency.

(d)(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

(2) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

(3) In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. A copy of the petition shall be served upon the United States in accordance with the provisions of Rule 4(d)(4) [1] of the Federal Rules of Civil Procedure. In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending. If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.

(4) Upon certification, any action or proceeding subject to paragraph (1), (2), or (3) shall proceed in the same manner as any action against the United States filed pursuant to section 1346(b) of this

title and shall be subject to the limitations and exceptions applicable to those actions.

(5) Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if—

(A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

(B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

(e) The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677, and with the same effect.

(June 25, 1948, ch. 646, 62 Stat. 984; Pub. L. 87–258, §1, Sept. 21, 1961, 75 Stat. 539; Pub. L. 89–506, §5(a), July 18, 1966, 80 Stat. 307; Pub. L. 100–694, §§5, 6, Nov. 18, 1988, 102 Stat. 4564.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §945 (Aug. 2, 1946, ch. 753, §423, 60 Stat. 846).

Changes were made in phraseology.

### SENATE REVISION AMENDMENT

The catchline and text of this section were changed and the section was renumbered "2678" by Senate amendment. See 80th Congress Senate Report No. 1559.

### REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (d)(3), are set out in the Appendix to this title.

### AMENDMENTS

**1988**—Subsec. (b). Pub. L. 100–694, §5, amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property or personal injury or death, resulting from the operation by any employee of the Government of any motor vehicle while acting within the scope of his office or employment, shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim."

Subsec. (d). Pub. L. 100–694, §6, amended subsec. (d) generally. Prior to amendment, subsec. (d) read as follows: "Upon a certification by the Attorney General that the defendant employee was acting within the scope of his employment at the time of the incident out of which the suit arose, any such civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place wherein it is pending and the proceedings deemed a tort action brought against the United States under the provisions of this title and all references thereto. Should a United States district court determine on a hearing on a motion to remand held before a trial on the merits that the case so removed is one in which a remedy by suit within the meaning of subsection (b) of this section is not available against the United States, the case shall be remanded to the State court."

**1966**—Subsec. (b). Pub. L. 89–506 inserted reference to section 2672 of this title and substituted "remedy" for "remedy by suit".

**1961**—Pub. L. 87–258 designated existing provisions as subsec. (a) and added subsecs. (b) to (e).

### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–694, §8, Nov. 18, 1988, 102 Stat. 4565, provided that:

"(a) GENERAL RULE.—This Act and the amendments made by this Act [enacting section 831c–2 of Title 16, Conservation, amending this section and sections 2671 and 2674 of this title, and enacting provisions set out as notes under this section and section 2671 of this title] shall take effect on the date of the enactment of this Act [Nov. 18, 1988].

"(b) APPLICABILITY TO PROCEEDINGS.—The amendments made by this Act [amending this section and sections 2671 and 2674 of this title] shall apply to all claims, civil actions, and proceedings pending on, or filed on or after, the date of the enactment of this Act.

"(c) PENDING STATE PROCEEDINGS.—With respect to any civil action or proceeding pending in a State court to which the amendments made by this Act apply, and as to which the period for removal under section 2679(d) of title 28, United States Code (as amended by section 6 of this Act), has expired, the Attorney General shall have 60 days after the date of the enactment of this Act during which to seek removal under such section 2679(d).

"(d) CLAIMS ACCRUING BEFORE ENACTMENT.—With respect to any civil action or proceeding to which the amendments made by this Act apply in which the claim accrued before the date of the enactment of this Act, the period during which the claim shall be deemed to be timely presented under section 2679(d)(5) of title 28, United States Code (as amended by section 6 of this Act) shall be that period within which the claim could have been timely filed under applicable State law, but in no event shall such period exceed two years from the date of the enactment of this Act."

### EFFECTIVE DATE OF 1966 AMENDMENT

SPA-66

Amendment by Pub. L. 89–506 applicable to claims accruing six months or more after July 18, 1966, see section 10 of Pub. L. 89–506, set out as a note under section 2672 of this title.

**EFFECTIVE DATE OF 1961 AMENDMENT**

Pub. L. 87–258, §2, Sept. 21, 1961, 75 Stat. 539, provided that: "The amendments made by this Act [amending this section] shall be deemed to be in effect six months after the enactment hereof [Sept. 21, 1961] but any rights or liabilities then existing shall not be affected."

_1 So in original. Probably should be a reference to Rule 4(i)._