# 20-3977(L)
## 20-3978(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Appellee,*

—v.—

DONALD J. TRUMP, in his personal capacity,

*Defendant-Appellant,*

UNITED STATES OF AMERICA,

*Movant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:20-CV-07311 (KAPLAN, J.)

---

## BRIEF FOR PLAINTIFF-APPELLEE E. JEAN CARROLL

---

LEAH LITMAN
701 South State Street
Ann Arbor, Michigan 48103
(734) 647-0549

ROBERTA A. KAPLAN
JOSHUA A. MATZ
RAYMOND P. TOLENTINO
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................... iv

INTRODUCTION ............................................................. 1

STATEMENT OF THE ISSUES ............................................... 3

STATEMENT OF THE CASE ................................................. 3

    A. Trump Sexually Assaults Carroll ................................... 3

    B. Carroll Publicly Reveals that Trump Sexually Assaulted
       Her ............................................................... 5

    C. Trump Slanders Carroll on Three Separate Occasions .......... 6

       1. June 21, 2019 Statement ..................................... 7

       2. June 22, 2019 Statement ..................................... 8

       3. June 24, 2019 Statement ..................................... 9

    D. Carroll Files Suit Against Trump in State Court ................ 9

    E. The Department of Justice Moves to Substitute ................ 10

    F. District Court Proceedings ...................................... 11

    G. The District Court's Ruling ..................................... 12

STANDARD OF REVIEW ................................................... 13

SUMMARY OF ARGUMENT ................................................ 13

ARGUMENT ................................................................ 17

    I. THE FTCA DOES NOT COVER THE PRESIDENT ............... 17

    A. The District Court Correctly Held That the President Is
       Not an Officer or Employee of the "Executive
       Departments" ................................................... 20

PAGE

1.  The Phrase "The Executive Departments" Refers Only
    to Subsidiary Components of the Executive Branch ........ 21

2.  Statutory Structure Precludes Interpreting
    "The Executive Departments" in the FTCA To
    Mean "The Executive Branch" ................................. 23

3.  The President Is Not an Officer or Employee of
    "The Executive Departments" as that Term Is Properly
    Interpreted ...................................................... 27

B.  The District Court Correctly Held that the President Is Not
    Covered by Any Other Language in the FTCA ................. 28

1.  Appellants' Proposed "Literal" Test for Employment
    Under the FTCA Cannot be Squared with the Statutory
    Language .......................................................... 29

2.  Separation-of-Powers Principles Confirm that the
    President Is Not Subject to the FTCA's Wavier of
    Sovereign Immunity ............................................. 35

II.  TRUMP WAS NOT ACTING WITHIN THE SCOPE OF HIS
     EMPLOYMENT WHEN HE WILLFULLY DEFAMED
     CARROLL FOR REVEALING THAT HE HAD SEXUALLY
     ASSAULTED HER ................................................. 40

A.  New York Law Governs the Scope of Employment
    Inquiry .......................................................... 40

B.  An Employee Acts Outside the Scope of Their
    Employment When They Act for Personal Reasons to
    Obtain a Personal Benefit ...................................... 43

C.  Trump Acted Outside the Scope of His Employment as
    President in Repeatedly Defaming and Insulting Carroll ....... 48

1.  Presidents May Unquestionably Engage in Personal
    Conduct Causing Private Wrongs ............................. 48

2.  Trump Acted for Personal Reasons in Defaming
    Carroll .......................................................... 50

PAGE

D.  Appellants' Arguments Rest on Legal and Factual Error ................................................................. 58

E.  At a Minimum, This Court Should Remand to Allow for Discovery........................................................... 69

CONCLUSION ................................................................ 70

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Ali Jaber v. United States*,
155 F. Supp. 3d 70 (D.D.C. 2016) ................................... 19

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) .................................... 37

*Armstrong v. Thompson*,
759 F. Supp. 2d 89 (D.D.C. 2011) .........................46, 47, 54, 61

*Azar v. Allina Health Servs.*,
139 S. Ct. 1804 (2019) .......................................... 31

*Bailey v. J & B Trucking Services, Inc.*,
590 F. Supp. 2d 4 (D.D.C. 2008) .................................. 43

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) .............................................. 18

*Bello v. United States*,
93 F. App'x 288 (2d Cir. 2004) .................................. 13, 52

*Bergeron v. Henderson*,
47 F. Supp. 2d 61 (D. Me. 1999) .................................. 45

*Blair v. District of Columbia*,
190 A.3d 212 (D.C. 2018) ....................................... 43, 62

*Bowles v. United States*,
685 F. App'x 21 (2d Cir. 2017) .................................. 13

*Boykin v. District of Columbia*,
484 A.2d 560 (D.C. 1984) ........................................ 56

*Burgess v. United States*,
553 U.S. 124 (2008) .............................................. 18

*Chapman v. Rahall*,
399 F. Supp. 2d 711 (W.D. Va. 2005) ............................. 65

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .............................................. 32

iv

PAGE(S)

*Clark v. McGee*,
49 N.Y.2d 613 (1980) .............................................. 2

*Clinton v. Jones*,
520 U.S. 681 (1997) ....................................... 49, 56, 57

*Cooke v. United States*,
918 F.3d 77 (2d Cir. 2019) ...................................... 18

*Corley v. United States*,
556 U.S. 303 (2009) ............................................. 30

*Council on Am.-Islamic Relations v. Ballenger*,
366 F. Supp. 2d 28 (D.D.C. 2005) ................................ 66

*Council on Am.-Islamic Relations v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) .............................. *passim*

*Cromelin v. United States*,
177 F.2d 275 (5th Cir. 1949) ................................... 31

*Davila v. Lang*,
343 F. Supp. 3d 254 (S.D.N.Y. 2018).............................. 52

*Demas v. Levitsky*,
291 A.D.2d 653 (3d Dep't 2002) ............................. 44, 47

*Devlin v. United States*,
352 F.3d 525 (2d Cir. 2003) .................................... 41

*District of Columbia v. Bamidele*,
103 A.3d 516 (D.C. 2014) ........................... 44, 46, 61, 62

*District of Columbia v. Coron*,
515 A.2d 435 (D.C. 1986) ................................... 54, 61

*Does 1-10 v. Haaland*,
973 F.3d 591 (6th Cir. 2020) ............................. 19, 43, 65

*Foretich v. CBS, Inc.*,
619 A.2d 48 (D.C. 1993) ....................................... 42

*Foster v. Bork*,
425 F. Supp. 1318 (D.D.C. 1977)................................. 32

PAGE(S)

*Fountain v. Karim*,
838 F.3d 129 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 35, 36

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Freytag v. Commissioner*,
501 U.S. 868 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*George v. N.Y.C. Transit Auth.*,
No. 04 Civ. 3263, 2008 WL 4274362 (E.D.N.Y. Sept. 17, 2008) . . . . . . 45

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Heindel v. Bowery Sav. Bank*,
138 A.D.2d 787 (3d Dep't 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Ierardi v. Sisco*,
119 F.3d 183 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Inman v. Dominguez*,
371 S.W.3d 921 (Mo. Ct. App. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Island Associated Cooperative Inc. v. Hartmann*,
118 A.D.2d 830 (2d Dep't 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Jacobs v. Vrobel*,
724 F.3d 217 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Jones v. Clinton*,
72 F.3d 1354 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Jordan v. Medley*,
711 F.2d 211 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48

*Klayman v. Obama*,
125 F. Supp. 3d 67 (D.D.C. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Littlejohn v. United States*,
No. 6:13 Civ. 870, 2013 WL 1840050 (D.S.C. Apr. 9, 2013) . . . . . . . . . 19

vi

PAGE(S)

*M.J. Uline Co. v. Cashdan,*
    171 F.2d 132 (D.C. Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*Majano v. United States,*
    469 F.3d 138 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McNamara v. United States,*
    199 F. Supp. 879 (D.D.C. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mohamad v. Palestinian Auth.,*
    566 U.S. 449 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Morissette v. United States,*
    342 U.S. 246 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*N.X. v. Cabrini Med. Ctr.,*
    97 N.Y.2d 247 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Operation Rescue Nat'l v. United States,*
    147 F.3d 68 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Operation Rescue Nat'l v. United States,*
    975 F. Supp. 92 (D. Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 70

*Overton v. Ebert,*
    180 A.D.2d 955 (3d Dep't 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48, 62

*Penn Cent. Transp. Co. v. Reddick,*
    398 A.2d 27 (D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48, 54, 61

*Perks v. Town of Huntington,*
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP,*
    68 A.3d 697 (D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Pohlman v. Village of Freeport,*
    No. 19 Civ. 5277, 2020 WL 5878257 (E.D.N.Y. Sept. 30, 2020) . . . . . . 45

*Rausman v. Baugh,*
    248 A.D.2d 8 (2d Dep't 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47, 48

PAGE(S)

*Richards v. United States*,
369 U.S. 1 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rivera v. State*,
34 N.Y.3d 383 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 60, 63

*Riviello v. Waldron*,
47 N.Y.2d 297 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Ross v. Mitsui Fudosan, Inc.*,
2 F. Supp. 2d 522 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48, 56

*Russello v. United States*,
464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*S.D. Warren Co. v. Maine Bd. of Env't Prot.*,
547 U.S. 370 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Saleh v. Bush*,
848 F.3d 880 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Samantar v. Yousuf*,
560 U.S. 305 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Seila Law LLC v. C.F.P.B.*,
140 S. Ct. 2183 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 48

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Stenberg v. Carhart*,
530 U.S. 914 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Stokes v. Cross*,
327 F.3d 1210 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Stone v. I.N.S.*,
514 U.S. 386 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Trump v. Mazars USA, LLP*,
140 S. Ct. 2019 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 39

viii

PAGE(S)

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 49

*United States v. Burr*,
   25 F. Cas. 30 (Va. Cir. Ct. 1807) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Germaine*,
   99 U.S. 508 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Jicarilla Apache Nation*,
   564 U.S. 162 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Smith*,
   499 U.S. 160 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*West v. Trump*,
   No. 19 Civ. 2522, 2020 WL 4721291 (N.D. Tex. July 23, 2020) . . . . . . 19

*Weyrich v. New Republic Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 65

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Constitutional Provisions**

U.S. Const., art. II, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S. Const., art. II, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Statutes**

5 U.S.C. § 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

5 U.S.C. § 693 (1940 ed. Supp. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PAGE(S)

5 U.S.C. § 693 (1946) ............................................... 26, 34

28 U.S.C. § 451 .................................................. 14, 21, 26

28 U.S.C. § 517 ....................................................... 39

28 U.S.C. § 1346 ............................................. 2, 10, 13, 18

28 U.S.C. § 2671 ................................................... *passim*

28 U.S.C. § 2679 ................................................... *passim*

Act of Aug. 7, 1789, ch. 8, 1st Cong. 49-50 ........................... 21

Act of July 27, 1789, ch. 4, 1st Cong. 28-29 .......................... 21

Pub. L. No. 79-404, § 2(a), 60 Stat. 237 (1946)................... 33, 35, 37

Pub. L. No. 89-506, § 8, 80 Stat. 306 (1966)........................... 30

Pub. L. No. 97-124, § 1, 95 Stat. 1666 (1981) ......................... 30

Pub. L. No. 100-694, § 3, 102 Stat. 4563 (1988)........................ 30

Pub. L. No. 106-518, § 401, 114 Stat. 2421 (2000) ..................... 30

**Executive and Legislative Authorities**

28 C.F.R. § 50.15 .................................................... 39

*Application of 28 US.C. § 458 to Presidential Appointments of*
*Federal Judges*, 19 Op. O.L.C. 350, 1995 WL 1767997 (1995) ....... 37

*Civ. Serv. Comm'n-Time of Lab.*,
22 Op. Att'y Gen. 62, 1898 WL 438 (1898) ......................... 22

*Eligibility of Mr. Mellon for the Off. of Sec'y of the Treasury*,
36 Op. Att'y Gen. 12, 1929 WL 1712 (1929) ........................ 22

*Federal Tort Claims Act—Applicability to Agencies in Other Than*
*Executive Branch of Government*, 26 Comp. Gen. 891 (1947)......... 32

H.R. Rep. No. 100-700 (1988)......................................... 30

*Matter of Claiborne Pell, U.S. Senate*,
B-199413, 1980 WL 16158 (Aug. 11, 1980) ......................... 32

*Operation of the Twenty-Fifth Amend. Respecting Presidential*
*Succession*, 9 Op. O.L.C. 65, 1985 WL 185391 (1985)............... 22

x

PAGE(S)

*Presidential Succession & Delegation in Case of Disability*,
  5 Op. O.L.C. 91, 1981 WL 30883 (1981) .............................. 22

*Rel. of the President to the Exec. Departments.*,
  7 Op. Att'y Gen. 453, 1855 WL 2328 (1855) ........................ 22

S. Rep. No. 89-1327 (1966) ........................................... 30

**Other Authorities**

2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863) ........ 49

Br. for Appellant United States, *Wilkinson v. Legal Servs. Corp.*,
  1995 WL 17204605 (D.C. Cir. 1995) ................................ 38

Br. for the Appellants, *Mironescu v. Costner*,
  2006 WL 1558336 (4th Cir. 2006) .................................. 38

Br. for the U.S. as *Amicus Curiae*, *Trump v. Mazars USA, LLP*,
  No. 19-715, 2020 WL 563912 (U.S. Feb. 3, 2020) ................... 38

Gillian Metzger, *The Constitutional Duty to Supervise*,
  124 Yale L.J. 1836 (2015) ......................................... 27

Gov't Defs. Notice of Mot. and Mot. to Dismiss and for Summ. J,
  *Jewel v. Nat'l Sec. Agency*, 2012 WL 6218080 (N.D. Cal. 2012)...... 38

Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently
  Denies E. Jean Carroll Allegation, Says "She's Not My Type,"
  The Hill* (June 24, 2019)........................................... 9

Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted
  to Oust Acting Attorney General*, N.Y. Times (Jan. 22, 2021)......... 11

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to
  Take Over Defamation Suit Against Trump, Barr Says*,
  N.Y. Times (Sept. 9, 2020) ........................................ 11

Mot. to Dismiss, *District of Columbia v. Trump*,
  No. 17 Civ. 1596, 2017 WL 7587415 (Sept. 29, 2017)................ 50

Murray Waas, *Revealed: White House Liaison Sought Derogatory Info
  on E. Jean Carroll from DOJ Official*, The Guardian
  (Jan. 14, 2021) ................................................... 11

PAGE(S)

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*,
No. 20-197 (U.S. Aug. 20, 2020) ................................... 50

Pet. Reply Br., *In re Donald J. Trump*,
No. 20-331, 2020 WL 7681471 (U.S. Sept. 2020)..................... 38

Reply Br., *Blumenthal v. Trump*,
No. 19-5237, 2019 WL 5727504 (D.C. Cir. Nov. 5, 2019) ............ 37

Restatement (Second) of Agency (1958).......................44, 45, 54, 62

## INTRODUCTION

In June 2019, E. Jean Carroll revealed that former President Donald J. Trump had sexually assaulted her decades earlier. Trump denied it, saying he did not know who Carroll was and had never met her. But he did not stop there. He launched a series of vicious, personal attacks. He implied that she was too ugly to rape; that she had falsely accused other men of sexual assault; and that she had invented her story for money, or to sell books, or to advance a political plot. None of this was true. Trump knew that he had assaulted Carroll. He knew who she was. And he knew what he was doing when he went on a defamation rampage designed to crush her—to punish and retaliate against her—for daring to reveal his decades-old crime.

Faced with this staggering onslaught, Carroll sought relief in court and sued Trump for defamation. Her case proceeded in New York state court for ten months. Trump did everything he could to stall, but his efforts ultimately failed. Just as the parties were about to engage in merits discovery, the White House prevailed upon the Department of Justice (DOJ) to intercede. Following a certification under the Westfall Act, 28 U.S.C. § 2679(d), DOJ lawyers removed the case to federal court and sought to substitute the United States as the defendant. They took the position that Trump was just doing his job—*i.e.*, that he was acting within the scope of his employment—when he repeatedly slandered a private citizen who was no longer willing to hide the fact that he had raped her long before taking office.

1

On two separate grounds, Judge Kaplan denied DOJ's motion to substitute. He first held that the statute invoked by DOJ in support of substitution—the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671, as amended by the Westfall Act—does not apply to the President. That conclusion is compelled by the FTCA's text and structure, as well as a host of constitutional, legislative, and judicial authorities, all of which confirm that the FTCA does not apply to the President. On appeal, DOJ (joined by Trump) seeks to show otherwise, but their arguments make a mess of the statute and offend settled separation-of-powers principles.

In the alternative, Judge Kaplan concluded Trump was not acting within the scope of his employment when he defamed Carroll. This commonsense conclusion follows directly from the evidence before the Court and from longstanding principles of *respondeat superior* liability. On appeal, DOJ and Trump offer no basis to disturb that finding. Indeed, there is almost nothing in their briefs that discusses the facts at all. Instead, they urge the Court to adopt a new rule that would create categorical immunity for any federal official who defames anyone while speaking to the press or responding to perceived critics. That rule is both wrong and dangerous, and this Court should reject Appellants' effort to avoid answering for Trump's conduct.

"Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members." *Clark v. McGee*, 49 N.Y.2d 613, 618-19 (1980). If accepted, Appellants' extreme position

2

would distort precedent, dishonor the Office of the Presidency, and give succor to the view that our most powerful political leaders stand entirely above the law. This Court should therefore affirm the denial of DOJ's motion to substitute.

## STATEMENT OF THE ISSUES

1.      Is the President an "employee of the government" as that term is defined in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671?

2.      Assuming the President is an "employee of the government" under the FTCA, did Donald J. Trump act within the scope of his employment when he subjected E. Jean Carroll to willful, outrageous defamatory attacks in retaliation for revealing that he had sexually assaulted her decades before he was elected President?

## STATEMENT OF THE CASE

### A.      Trump Sexually Assaults Carroll

One evening in the mid-1990s, Carroll went to shop at the Bergdorf Goodman department store in Manhattan after work. A28 ¶ 22.[1] As she was exiting through the revolving glass doors on the north side of the building, Trump entered through the same doors from 58th Street. A28 ¶ 23. Trump recognized Carroll—they had met at least once before, they traveled in similar circles, and Carroll was then a frequent guest on the *Today* show as well as the host of the *Ask E. Jean* show. A28

---

[1] Citations to "A_" are to pages of the Joint Appendix. Citations to "SPA_" are to the Special Appendix attached to DOJ's brief.

3

¶ 24. Trump put his hand up to stop Carroll, saying: "Hey, you're that advice lady!" A28 ¶ 25. Trump told Carroll that he was at Bergdorf's to buy a present "for a girl" and asked Carroll to advise him. A28 ¶ 26. Carroll was surprised by the unsolicited invitation, but thought the encounter might make for a funny story. *Id.* So she agreed to help Trump shop for a gift. *Id.*

Carroll suggested various items: first a handbag, then a hat. A28 ¶ 27. Trump decided on lingerie. A29 ¶ 29. When he and Carroll arrived at the lingerie department, it was uncharacteristically empty, with no attendant in sight. A29 ¶ 30. Trump snatched a see-through bodysuit and insisted that Carroll try it on. A29 ¶¶ 30-31. Bemused, Carroll responded that he should try it on himself. A29 ¶ 31. Trump and Carroll went back and forth, teasing each other about who should try on the bodysuit. *Id*.

Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on." A29 ¶ 32. He maneuvered Carroll into a dressing room, shut the door, and lunged at her—knocking her head against the wall. A29 ¶¶ 33-36. He then forcibly put his mouth on her lips. A29 ¶ 36. Shocked by Trump's behavior, Carroll shoved him back and burst out in awkward laughter, hoping that he would retreat. A29 ¶ 37. Instead, Trump seized both of Carroll's arms and pushed her up against the wall again. A29 ¶ 38. Trump then jammed his hand under her coatdress and pulled down her tights. *Id.* He opened his overcoat, unzipped his pants, pushed his fingers around Carroll's

4

genitals, and forced his penis inside of her. A30 ¶ 39. Carroll resisted, struggling to break free. She tried to stomp Trump's foot with her heels. She tried to push him away. Finally, she raised her knee high enough to push him off her. A30 ¶ 40. Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue. A30 ¶ 41.

## B. Carroll Publicly Reveals that Trump Sexually Assaulted Her

Immediately after Trump attacked her, Carroll told two close friends about what had happened. A30 ¶¶ 43, 47. One urged her to report the crime, but the other warned her that Trump would ruin her life if she did. A30-31 ¶¶ 44-48. Carroll chose silence. She knew how brutal Trump could be and was convinced that nobody would believe her. Like so many other survivors of sexual assault, Carroll also blamed herself. A31 ¶¶ 49-50. Carroll did not mention the assault to another soul for over twenty years—not wanting to be perceived or to see herself as a victim of rape. A31 ¶ 53.

For the next two decades, Carroll pursued her career as a writer and advice columnist while concealing her own trauma. A32 ¶ 55, A33 ¶¶ 59-60. During the last month of the 2016 election, several women publicly revealed that Trump had engaged in sexual misconduct. A33 ¶ 61. Carroll saw Trump attack his accusers, savaging their reputations on the national stage. *Id.* During this period, though, Carroll was focused on attending to her dying mother, who was then in hospice care. A33 ¶ 62. Carroll feared that speaking up would cause a media storm and destroy

5

her mother's remaining time. *Id.* It was only after her mother died and the #MeToo movement empowered survivors of sexual assault to come forward that Carroll finally decided to reveal the truth. A34-36 ¶¶ 65-73. A writer to her core, and determined to tell her story on her own terms, Carroll described Trump's attack in a book released on July 2, 2019. A37 ¶¶ 77, 80. On June 21, 2019, *New York* magazine published a pre-publication excerpt from Carroll's book detailing Trump's attack. A37 ¶ 79.

### C. Trump Slanders Carroll on Three Separate Occasions

Trump responded to Carroll's account with a slew of lies and personal attacks. He denied her accusation and insisted they had never met. A38-A42 ¶¶ 81-96. He insulted her physical appearance, implying that he could not have raped her because "she's not my type." A42 ¶ 97. He accused Carroll of lying about the rape to make money, increase book sales, or carry out a political agenda. A26 ¶ 11, A38 ¶ 82. He also pointedly implied that she had falsely accused other men of rape. A40 ¶ 91, A41 ¶ 95. Trump made each of these false and defamatory statements with actual malice: he acted with full awareness that he was lying and with depraved indifference to the truth. A44-48 ¶¶ 106-128. His goal was to hurt Carroll as punishment and retaliation for speaking up. And he succeeded.

6

### 1. June 21, 2019 Statement

On June 21, 2019, a Bloomberg reporter, Laura Litvan, tweeted a statement from Trump concerning Carroll; the statement appeared to be personally dictated and was released on a plain document lacking any indicia of government business:



A327; *see* A38 ¶¶ 82-83 & n.9.

### 2. June 22, 2019 Statement

The next day, while departing the White House, Trump made the following

statement in response to a question from a reporter:

> [Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.
>
> [Reporter]: You were in a photograph with her.
>
> [Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.
>
> And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.
>
> New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.
>
> It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.
>
> You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on

8

Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

A40-41 ¶ 91.

### 3. June 24, 2019 Statement

Two days later, during an interview with reporters from *The Hill*, Trump stated, "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" A42 ¶ 97.[2]

### D. Carroll Files Suit Against Trump in State Court

Carroll filed this action in New York State Supreme Court in November 2019 to redress the injuries caused by Trump's defamatory statements and to vindicate her reputation through a public airing of the truth. A24.

From the very start, however, Trump has done everything in his power to stop the truth from coming out. He refused to accept service of the Complaint, A99-112, then moved to dismiss based on his spurious assertion that he was no longer subject to personal jurisdiction in New York, *see* A154. When those efforts failed, Trump moved to stay the action pending a decision on his absolute immunity in *Zervos v. Trump*—a case involving another woman who had accused Trump of sexual assault.

---

[2] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type,"* The Hill (June 24, 2019).

9

*See* A171-88. Notably, Trump's motion was filed just six days after Carroll served a request seeking a cheek swab for DNA to be compared against unidentified male DNA found on the dress that Carroll was wearing when Trump sexually assaulted her. A206, A171. On August 6, 2020, the trial court held that Trump was not entitled to absolute immunity under *Trump v. Vance*, 140 S. Ct. 2412 (2020), and denied his pending stay motion on that basis. A303-06. Trump and his lawyers spent the next four weeks stonewalling Carroll's efforts to resume discovery while communicating Trump's intent to litigate Carroll's claims on appeal in state court. *See* A362-90.

### E.    The Department of Justice Moves to Substitute

On September 8, 2020—the deadline for Trump to appeal the denial of his stay motion—DOJ removed this case to federal district court and moved to substitute the United States as defendant. A12-13, A19-22. The hook for this maneuver was the FTCA, which allows the United States to be sued for money damages in federal district court for certain torts committed by an "employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). If a plaintiff sues such an employee instead of suing the United States, the United States may substitute itself for that employee upon the Attorney General's certification that the employee was "acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(2).

The Attorney General subsequently acknowledged that DOJ filed its motion in response to a request from the White House. *See* Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). No facts in the case had changed at that point. The only thing that made September 8, 2020 different from the prior ten months was that by then, all of Trump's state court stall tactics, procedural gambits, and assertions of immunity had failed. Further confirming that DOJ's decision was undertaken as a political errand to personally benefit Trump, it has since been reported that a White House liaison to DOJ "sought out derogatory information late last year from a senior justice department official regarding [Carroll]." Murray Waas, *Revealed: White House Liaison Sought Derogatory Info on E. Jean Carroll from DOJ Official*, The Guardian (Jan. 14, 2021). It has also been reported that the official who provided this irregular, late-in-the-day FTCA certification—Jeffrey Clark—schemed with Trump in late 2020 to oust the Attorney General and block the results of the presidential election. *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General*, N.Y. Times (Jan. 22, 2021).

## F. District Court Proceedings

The district court scheduled an in-person oral argument for October 21, 2020. A391. Two hours before that argument, DOJ sought an indefinite continuance because one DOJ attorney had been denied access to the Daniel Patrick Moynihan

11

courthouse, assertedly based on COVID-19 restrictions. A414. The district court promptly denied the continuance, ruling that it would hear argument by phone or by a government lawyer permitted entry to the courthouse, or that it would decide the motion on the papers. A420. The district court also noted that the relevant COVID-19 restrictions had been announced over a week earlier. *Id.*

Carroll's counsel was present in person and prepared to proceed. A417. DOJ appeared by telephone but, without explanation, declined to present argument and asked the court to rule on the papers. *Id*. When Carroll's counsel requested the opportunity to submit a sur-reply to rebut new arguments raised in DOJ's reply, DOJ objected but then expressly agreed that it would waive these new contentions. *Id.*

### G. The District Court's Ruling

Judge Kaplan denied DOJ's motion to substitute on two independent grounds. First, he held that the FTCA did not apply to Trump, since the President is not an "employee of the government" within the meaning of the FTCA, which contains detailed definitional terms. SPA16-35. Judge Kaplan reached this conclusion on the basis of a meticulous textual analysis and an application of the separation-of-powers principles articulated in *Franklin v. Massachusetts*, 505 U.S. 788 (1992).

Second, in the alternative, Judge Kaplan concluded that even if the FTCA did apply to the President, Trump had acted outside the scope of his employment in willfully and repeatedly defaming Carroll. SPA40-41, SPA59-61. As Judge Kaplan

12

explained, doctrines of *respondeat superior* liability confirm that an employee does not act within the scope of his employment when his conduct is "too little actuated by a purpose to serve the master." SPA48. And here, he elaborated, "the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue." SPA60.

Both DOJ and Trump filed notices of appeal. A421-23.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions regarding DOJ's motion to substitute *de novo* and its factual findings for clear error. *Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017). In undertaking that review, this Court must view "the tortious conduct in the light most favorable to plaintiff." *Bello v. United States*, 93 F. App'x 288, 289-90 (2d Cir. 2004).

## SUMMARY OF ARGUMENT

The district court's decision denying DOJ's motion to substitute should be affirmed for two independent reasons.

**I.** The FTCA's text and structure, as well as separation-of-powers principles, confirm that it does not cover the President. The FTCA applies only to an "employee of the Government." 28 U.S.C. § 1346(b)(1). That term is defined to "include"—among other groups—officers and employees of "any federal agency." *Id.* § 2671. And "federal agency" is defined as including "the executive departments," as well

13

as "the judicial and legislative branches." *Id.* None of these definitions state that the FTCA covers the President—a significant omission in its own right, since Congress is not presumed to pass laws that apply to the President only by indirect implication.

Appellants offer two contrary arguments. First, they assert that the FTCA covers the President expressly in its reference to "executive departments"—which, they add, refers generally to "the executive branch." But that reading of the statutory term "executive departments" is untenable. Title 28 contains a presumption that this term refers only to Cabinet-level agencies. *See* 28 U.S.C. § 451. And that presumption is not overcome here. Substantial judicial and executive branch precedent affirms that "the executive departments" include only Cabinet-level agencies and a small number of additional freestanding components of the executive branch. Further, interpreting "the executive departments" to mean "the executive branch" creates disorder, superfluity, and inconsistency within the FTCA's statutory definitions. In referring separately to "the judicial and legislative branches" and "the executive departments," the FTCA draws a distinction that controls here. Of course, history teaches that the President is not himself an officer or employee of any subsidiary component of the executive branch, and so the FTCA cannot apply to the Presidency by virtue of its express application to "the executive departments."

This leaves Appellants' claim that the President is an "employee of the Government" in a more "literal" sense: he receives money in exchange for services.

14

The basic flaw in this argument is that it renders most of the FTCA's definitional language, as well as numerous amendments to that language over the past half-century, entirely superfluous. Appellants' position also fails to respect the FTCA's text and structure, which demonstrate that the FTCA's definitional terms do real, substantive work in clarifying where the law applies, and which terms encompass subsidiary components of the executive branch while pointedly not including the President. This interpretation is confirmed—indeed, compelled—by separation-of-powers principles. As DOJ has itself emphasized elsewhere, courts require a clear, express statement by Congress before interpreting a federal law to authorize judicial review of the President's conduct. The FTCA includes no such clear statement—yet, on Appellants' view, it waives sovereign immunity and allows courts to hear claims that put the President's conduct directly at issue. For that reason, the Court should reject Appellants' atextual invitation to read the President into the FTCA.

**II.** In the alternative, the Court should affirm on the ground that Trump did not act within the scope of his employment as President of the United States when he repeatedly, willfully defamed a private citizen to punish and retaliate against her after she revealed that he had sexually assaulted her decades before he took office.

This inquiry is governed by the doctrine of *respondeat superior*. The better view is that New York doctrine controls, though the outcome is the same under either New York or D.C. law. In both jurisdictions, it is settled that an employee exceeds

15

the scope of their employment if their actions are too little actuated by a purpose to serve the master, and instead reflect principally personal or private motivations. This rule is often invoked in cases involving sexual misconduct or a desire for revenge, particularly when an employee's tortious acts are outrageous or otherwise sharply disproportionate to the needs of their position. By virtue of their willful nature, the commission of intentional torts is also a recognized sign of personal motivation.

Here, Judge Kaplan correctly concluded that Trump acted outside the scope of his employment. It is firmly established that a president can act with personal motivations, and can commit private wrongs while in office. Indeed, Trump himself insisted in numerous cases over the past several years that he had acted solely for personal rather than job-related reasons. Looking to the particularized allegations here—which must be accepted as true and read in Carroll's favor—it is clear that Trump's attack on Carroll was personal, not presidential. That conclusion follows directly from the allegations of Trump's willful, punitive, retaliatory state of mind. And it is supported by four additional considerations: *first*, the extraordinary and outrageous nature of Trump's efforts to degrade and destroy Carroll; *second*, the fact that Trump committed a multi-day spree of intentional torts in which he targeted her with willful lies; *third*, the subject matter that prompted Trump's attacks, which had nothing to do with public policy or administration and exclusively concerned private sexual misconduct committed decades ago; and *finally*, the consistency of Trump's

16

conduct here with his reaction as a private citizen to allegations of sexual assault, which confirms that he was following his own longstanding playbook when he went after Carroll, rather than pursuing official purposes or his duties as President.

Appellants say almost nothing about all this. Instead, they press a breathtaking claim: whenever an elected federal official (or indeed any senior federal official) speaks to the press or responds to critics, they must be held to have acted within the scope of their employment. In Appellants' view, this immunity is categorical and does not depend on the specific facts, circumstances or evidence of any case.

That theory is indefensible. It is inconsistent with the settled law of *respondeat superior* liability. It finds no support in precedent—if anything, it implies that the detailed, fact-sensitive analysis in many prior cases was a needless exercise. And it reflects a disturbing belief that federal officials should have free rein to destroy the reputations and livelihoods of any perceived critic—no matter how unrelated to the business of governance, and no matter how personal their motives for doing so. That has never been—and never should be—the law in the United States. Judge Kaplan rightly rejected Appellants' arguments, and this Court should affirm.

## ARGUMENT

## I.    THE FTCA DOES NOT COVER THE PRESIDENT

The threshold question in this case is whether the FTCA applies to the President. To answer that question, the Court "begins with the statutory text"—and

17

it should end there as well, because "the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Indeed, fidelity to the statutory text is especially paramount in construing a statute that waives the sovereign immunity of the United States. *Cooke v. United States*, 918 F.3d 77, 81 (2d Cir. 2019).

The FTCA's waiver of sovereign immunity is expressly limited to "any employee of the Government." 28 U.S.C. § 1346(b)(1). Congress gave that phrase a detailed definition in 28 U.S.C. § 2671. And "[w]hen a statute includes an explicit definition, [courts] must follow that definition." *Burgess v. United States*, 553 U.S. 124, 129 (2008) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)).

> For purposes of the statute, an "employee of the Government":
>
> includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . , and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

28 U.S.C. § 2671. The term "federal agency" in this definition "includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." 28 U.S.C. § 2671.

18

The President is nowhere mentioned in these definitional provisions. That is a telling omission: Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and it does not hide presidents in generic definitional terms (or in their penumbras). As Judge Kaplan observed, "it is difficult to fathom that Congress—without any textual indication, and with considerable evidence to the contrary—intended for the FTCA to authorize tort lawsuits that bring the president's official conduct into question." SPA32.

To be sure, some courts have suggested otherwise in unreasoned opinions[3] or in cases that did not actually present the question.[4] *See* DOJ Br. 16; Trump Br. 9, 15. But as Judge Kaplan concluded following an exhaustive analysis of the statute's text, structure, and history, the FTCA simply does not cover the President.

Appellants resist that conclusion on two grounds. First, they argue that the FTCA expressly covers the President by virtue of its application to officers and employees of "the executive departments." Second, they insist that the FTCA applies

---

[3] *See Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 n.1 (D.D.C. 2016), *aff'd*, 861 F.3d 241 (D.C. Cir. 2017); *Klayman v. Obama*, 125 F. Supp. 3d 67, 84-85 (D.D.C. 2015); *West v. Trump*, No. 19 Civ. 2522, 2020 WL 4721291, at *3 n.6 (N.D. Tex. July 23, 2020); *Littlejohn v. United States*, No. 6:13 Civ. 870, 2013 WL 1840050 (D.S.C. Apr. 9, 2013), *report and recommendation adopted*, 2013 WL 1840025 (D.S.C. Apr. 30, 2013).

[4] *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 70-71 (1st Cir. 1998); *Does 1-10 v. Haaland*, 973 F.3d 591, 598 (6th Cir. 2020).

19

more broadly to anyone who is an employee of the government in a literal sense (receiving money in exchange for services). Neither argument withstands scrutiny.

### A. The District Court Correctly Held That the President Is Not an Officer or Employee of the "Executive Departments"

Appellants contend that the President is expressly covered by the FTCA because he is an "officer or employee" of "the executive departments." *See* DOJ Br. 17-20; Trump Br. 23-28. In support of that position, Appellants assert that the phrase "executive departments" should be read as referring to "the executive branch" generally. *See id.* As Judge Kaplan concluded, however, this argument does not hold water. That is true for two overlapping reasons: first, the phrase "the executive departments" has long been understood as possessing a much narrower compass; and second, reading the statute as Appellants propose makes a mess of its text, history, and structure. The better reading is that the FTCA's reference to "the executive departments" extends its coverage to officers and employees of Cabinet-level agencies, and perhaps a small number of additional freestanding components within the executive branch, but not to the executive branch in its entirety. Of course, the President is not an officer or employee of any subsidiary component of the executive branch. Therefore, the reference to "the executive departments" in 28 U.S.C. § 2671 affords no basis for treating the President as covered by the FTCA.

20

### 1. The Phrase "The Executive Departments" Refers Only to Subsidiary Components of the Executive Branch

When Congress uses language rich with history and significance in our legal traditions, courts presume it knows what it is doing. *See, e.g.*, *Morissette v. United States*, 342 U.S. 246, 263 (1952). Appellants proceed with the opposite presumption. They treat the FTCA's reference to "the executive departments" as a wishy-washy, open-ended gesture referring imprecisely to the whole executive branch.

That is the wrong way to interpret statutory text. Instead, the best starting point is a careful examination of statutory language and structure. Here, this leads straight to 28 U.S.C. § 451, which creates a global presumption that whenever the word "department" appears in Title 28 of the U.S. Code, it should be given the definition set forth in 5 U.S.C. § 101. That provision, in turn, expressly defines "executive departments" as referring only to Cabinet-level agencies in the executive branch.

This understanding of "the executive departments" is deeply rooted in our legal tradition. Although there were fewer Cabinet departments when the FTCA was enacted in 1946, the U.S. Code set forth an analogous definition of "executive departments" at that time. *See* 5 U.S.C. § 1 (1946). Indeed, this usage of the term "executive departments" stretches back to the First Congress, which created the "Executive department[s]" of Foreign Affairs and War. Act of July 27, 1789, ch. 4, 1st Cong. 28-29; Act of Aug. 7, 1789, ch. 8, 1st Cong. 49-50. Consistent with that history, the Supreme Court has interpreted "executive departments" in the Opinions

21

Clause and Twenty-Fifth Amendment of the Constitution as referring solely to Cabinet-level agencies. *See Freytag v. Commissioner*, 501 U.S. 868, 886-87 (1991); *United States v. Germaine*, 99 U.S. 508, 511 (1878). DOJ itself has also understood "the executive departments" to refer to Cabinet-level agencies in a wide range of settings, and the White House website reflects that understanding. *See* SPA24-26.[5]

We have not found—and Appellants do not cite—any Supreme Court opinion defining "the executive departments" as "the executive branch." Instead, DOJ relies principally on *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) (*PCAOB*). *See* DOJ Br. 18. But *PCAOB* only confirms the need for caution when dealing with definitional terms like this one. There, the Supreme Court ever-so-slightly expanded its interpretation of the term "department" as it pertains to the Appointments Clause, extending it beyond Cabinet agencies to cover the SEC (and other so-called principal agencies). *See* 561 U.S. at 511. It did so, however, following a close study of prior practice and original understanding relating specifically to appointments—drawing from these authorities the lesson that the SEC ranks as a "department" because it is "a freestanding component of the

---

[5] *See Operation of the Twenty-Fifth Amend. Respecting Presidential Succession*, 9 Op. O.L.C. 65, 69, 1985 WL 185391 (1985); *Presidential Succession & Delegation in Case of Disability*, 5 Op. O.L.C. 91, 92, 1981 WL 30883 (1981); *Eligibility of Mr. Mellon for the Off. of Sec'y of the Treasury*, 36 Op. Att'y Gen. 12, 13, 1929 WL 1712 (1929); *Civ. Serv. Comm'n-Time of Lab.*, 22 Op. Att'y Gen. 62, 63, 1898 WL 438 (1898); *Rel. of the President to the Exec. Departments.*, 7 Op. Att'y Gen. 453, 463, 1855 WL 2328 (1855).

Executive Branch." *Id.* Further narrowing its holding, *PCAOB* pointedly separated the Appointments Clause from the Opinions Clause and the Twenty-Fifth Amendment for purposes of defining "executive departments." *See id.* at 511 n.11. The upshot of *PCAOB* is that courts tread gingerly before concluding that a reference to "the executive departments" sweeps beyond Cabinet-level agencies.

For all these reasons, the FTCA's reference to "the executive departments" is not nearly as broad as Appellants suggest. Based on statutory text and structure, as well as executive and judicial precedent, this phrase generally refers only to Cabinet-level agencies. In certain cases (like *PCAOB*), prior practice and usage may support extending the phrase slightly to cover certain freestanding components within the executive branch. But our legal traditions teach that this is the outer limit—especially where, as here, reading the phrase as impliedly encompassing the entire executive branch creates a host of intractable interpretive difficulties.

### 2. Statutory Structure Precludes Interpreting "The Executive Departments" in the FTCA To Mean "The Executive Branch"

When parties try to rewrite statutes, they often run into trouble. This case proves the point. In arguing that Congress chose its words carelessly—and that "the executive departments" is merely imprecise shorthand for "the executive branch"—Appellants provoke a host of interpretive difficulties. *See* DOJ Br. 19-20; Trump Br. 23-28. The upshot is that the FTCA's reference to "the executive departments"

23

cannot reasonably be read as encompassing the whole branch. *See* SPA20 ("[I]t is apparent that this definition does not include the entire executive branch.").

That is true for many reasons. For starters, Appellants utterly fail to grapple with the authorities that we cite above—which we also cited in the district court— to demonstrate a longstanding, limited usage of the term "executive departments." The closest Appellants come to a response is DOJ's insistence that "the meaning of 'department' depends on context and can be broader than just the cabinet-level agencies." DOJ Br. 18. But there is a world of difference between the holding in *PCAOB*, which nudged the door just enough to admit the SEC, and Appellants' position here, which blows the door off its hinges. If anything, *PCAOB*'s narrow holding—based on specific prior practice relating to appointments and accompanied by warnings against broader applicability—cuts against DOJ's suggestion that the phrase "executive departments" impliedly captures the entire executive branch.

So does the presumption against superfluity. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011). As originally enacted, the definition of "federal agency" in the FTCA included "independent establishments." *See* 60 Stat. 843. This would have been a waste of words if the FTCA's reference to "the executive departments" covered "the executive branch," since "independent establishments" were contemporaneously understood to be part of the executive branch. *See* U.S. Government Manual 570 (1946). Similarly, Congress later

24

amended the FTCA to add "the military departments"—which, like "independent establishments," exist within the executive branch. *See* U.S. Const., art. II, § 2; 28 U.S.C. § 2671. Appellants' position would thus render original statutory text and a subsequent amendment pointless, offending both the anti-superfluity canon and the related interpretive principle that "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). These principles confirm that "the executive departments" should be read more narrowly.[6]

The same conclusion follows from still another interpretive canon, which provides that when a statute uses two different terms (especially in the same statutory provision), courts should interpret them to mean two different things. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Here, in a single provision, the FTCA refers to "the executive *departments*" and the "the judicial and legislative *branches*." 28 U.S.C. § 2671 (emphasis added). To be sure, DOJ observes that the reference to "branches" was added later. *See* DOJ Br. 19-20. But so what? Congress was free at that point to modify the statute to say "executive branch." Instead, it left the phrase "executive departments" even as it added a reference to the other "branches." That

---

[6] Trump's citation to *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), does not show otherwise. *See* Trump Br. 25. That case referred offhandedly to Congress and the President as the "political departments" but said nothing about "the executive departments." *Mezei*, 345 U.S. at 210.

decision deserves respect, not a rewrite. *See* SPA20 & n.51 ("Congress knew how to refer to an entire branch of government . . . ."); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (courts "generally seek to respect Congress' decision to use different terms to describe different categories of people or things").[7]

For his part, Trump places principal reliance on 28 U.S.C. § 451. *See* Trump Br. 24. As we've already explained, however, that gets things backwards: Section 451 creates a presumption *favoring* a narrow definition of "executive departments" (namely, the definition set forth in 5 U.S.C. § 101). And for the reasons given above, Appellants fail to overcome that presumption: there is no affirmative support in relevant historical usage for reading "the executive departments" as though it said "the executive branch," and that reading makes nonsense of the statutory language.

---

[7] Notably, even as it enacted the FTCA, Congress also amended the Civil Service Retirement Act in a manner demonstrating attention to the distinction between "the executive branch" and "the executive departments." That Act had previously applied to "all officers and employees in or under the executive, judicial, and legislative branches of the United States Government . . . except elective officers and heads of executive departments." 5 U.S.C. § 693(a) (1940 ed. Supp. 1945). The 1946 amendment inserted "in the executive branch of the Government" after "elective officers," which had the effect of removing elected Members of Congress from the exception and confining its coverage to the President and Vice President. 5 U.S.C. § 693(a) (1946) (Amendments). That amendment evinced a clear congressional awareness of the longstanding distinction between "elective officers in the executive branch" and "heads of executive departments."

### 3. The President Is Not an Officer or Employee of "The Executive Departments" as that Term Is Properly Interpreted

There is a reason why Appellants would prefer the FTCA to expressly cover "the executive branch," rather than covering only "the executive departments." They know that if this language is concerned exclusively with subsidiary components of the executive branch, it cannot sensibly apply to the President.

Appellants do not contend otherwise. Nowhere in their briefs do they suggest that the President is an officer or employee of (for instance) the Department of Agriculture. Nor could they. The Constitution itself—as well as an unbroken chain of judicial, legislative, and executive authorities—rejects that proposition. *See* A335-37 (surveying sources confirming that the President is not himself an officer or employee of any subsidiary component of the executive branch). Instead, the President is understood to enjoy a general supervisory power—based in the Vesting, Take Care, and Appointments Clauses of the Constitution—over all executive departments, each of which has its own employees and is headed by its own distinct principal officer subject to Senate confirmation and statutory limitations. *See Seila Law LLC v. C.F.P.B.*, 140 S. Ct. 2183, 2197-2205 (2020); Gillian Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836 (2015).

Accordingly, it follows from text and history that the FTCA's reference to "the executive departments" cannot be read as covering the President, who is not an officer or employee of any subsidiary component within the executive branch.[8]

## B. The District Court Correctly Held that the President Is Not Covered by Any Other Language in the FTCA

Because the FTCA does not expressly apply to the President—and does not reach him through its reference to "the executive departments"—Appellants are left to contend that he is covered as an "employee of the federal government" in "a literal sense." DOJ Br. 13; *see* Trump Br. 16-19. To support this position, Appellants emphasize the FTCA's breadth, and its use of the words "any" and "include." *See id.* Although it is true that the FTCA sweeps broadly, Appellants push the text well past its breaking point—in ways that offend basic rules of statutory interpretation and settled separation-of-powers principles. As Judge Kaplan explained, "if

---

[8] This conclusion applies with full force to the Executive Office of the President (EOP). DOJ cites legislative and judicial usage and practice suggesting that EOP may rank among the "executive departments" expressly covered by the FTCA. *See* DOJ Br. 18-20; *see also supra* at 22-23 (explaining that the FTCA may extend beyond the Cabinet to cover discrete freestanding components within the executive branch). But as Judge Kaplan concluded—and DOJ does not actually contest or dispute this conclusion on appeal—the President is not an officer or employee of EOP. *See* SPA23-24 ("The head of the EOP, which is a network of agencies, is the president's chief of staff."); *see also* A338-41 (describing the history of EOP and explaining why constitutional, legislative, and executive branch authorities and precedents confirm that the President is neither an officer nor an employee of EOP). Therefore, even if EOP does count among the "executive departments," that is no basis for treating the President as covered by this language in the FTCA.

28

Congress had intended to include an individual as significant and obvious as the president in this statute, it would have done so clearly." SPA19 n.48. Because Congress did not make that choice, the President is not subject to the FTCA.

**1. Appellants' Proposed "Literal" Test for Employment Under the FTCA Cannot be Squared with the Statutory Language**

In Appellants' view, it is unnecessary to focus on the specific definition of "employee of the government" provided in the FTCA. As they see it, because that definition "includes" "officers or employees of any federal agency," the FTCA applies *very* broadly. So broadly, in fact, that it reaches anyone, anywhere who "is employed by the government in a literal sense"—*e.g.*, "renders services to the United States in return for a salary and other compensation." DOJ Br. 14.

This may have been a simpler definition, but it is not the one Congress wrote into law. Adopting it, moreover, would render superfluous huge swaths of relevant statutory language, not to mention numerous statutory amendments. Remember: the FTCA as originally enacted featured the same uses of "any" and "includes" that Appellants cite. If this language truly required a "literal" test for employment—and rendered the enumerated definitional terms merely illustrative of that test—then the statute is riddled with empty language. To start, the FTCA includes "officers" in the definitional phrase "officers or employees of any federal agency." 28 U.S.C. § 2671. Congress presumably included "officers" to make clear that the FTCA covers those who lead agencies, not only those who staff them. But every officer of a federal

agency is also an employee of the federal government in the literal sense proposed by Appellants—and so there would have been no need for Congress to include the word "officers" if Appellants' interpretation were correct. *See Corley v. United States*, 556 U.S. 303, 314-15 (2009) (applying anti-superfluity canon).

Yet that is just the tip of the iceberg. In 1946, the definition of "employee of the government" did not include "members of the National Guard while engaged in training or duty" or "any officer or employee of a Federal public defender organization." *See* 60 Stat. 843. Those terms were added in 1981 and 2000, respectively. *See* Pub. L. No. 97-124, § 1, 95 Stat. 1666 (1981); Pub. L. No. 106-518, § 401, 114 Stat. 2421 (2000). Nor did the original statutory definition of "federal agency" include "the military departments" or "the judicial and legislative branches," which were added in 1966 and 1988, respectively. *See* Pub. L. No. 89-506, § 8, 80 Stat. 306, 307 (1966); Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988).[9] If the FTCA as originally enacted—with its use of "any" and "includes"—

---

[9] When Congress added "military departments," an accompanying Senate Report explained that the reason was "to include [the military departments] in the definition." S. Rep. No. 89-1327 (1966), 1966 WL 4317. In other words, the Senate did not understand the FTCA at that point to capture everyone employed by the federal government. It instead viewed the FTCA's definitional terms as significant. Similarly, when Congress added the judicial and legislative branches in 1988, the House Committee Report opined that the FTCA previously "cover[ed] employees of the Executive Branch only." H.R. Rep. No. 100-700 at 5 (1988).

were all-encompassing from the outset, as Appellants insist, then none of these amendments would have been necessary. Indeed, if Appellants' interpretation were correct, not a single amendment to the FTCA's definitional provisions has had any concrete effect on who is covered by the statute, contravening the principle that statutory amendments are presumed to have "real and substantial effect." *Stone*, 514 U.S. at 397.

It follows that Appellants are mistaken. Since the FTCA was enacted, courts have not treated "employee of the government" as a catch-all term. They have instead paid careful attention to the specific language in its statutory definition. That is why Congress saw fit to add references to the National Guard, the Federal public defender service, the military, and the judicial and legislative branches. To be sure, Appellants insist that their catch-all view is longstanding. But DOJ itself argued on several occasions before passage of the Westfall Act that the FTCA did *not* apply to the legislative and judicial branches because they were not specifically listed in the statute—and in several of those cases, courts agreed.[10] *See Cromelin v. United*

---

Thus, whereas DOJ suggests that Congress has always viewed the FTCA as applying far beyond its language, *see* DOJ Br. 13-14 (citing legislative history), Congress's own actions—including its actions amending the FTCA's definitional provisions—show otherwise. *See also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) ("[L]egislative history is not the law.").

[10] In support of its view, DOJ cites a 1947 opinion from the Comptroller General concluding that the Library of Congress is a federal agency covered by the FTCA.

31

*States*, 177 F.2d 275, 277 (5th Cir. 1949); *Foster v. Bork*, 425 F. Supp. 1318, 1319-20 (D.D.C. 1977); *see also McNamara v. United States*, 199 F. Supp. 879, 880-81 (D.D.C. 1961) (DOJ argued that FTCA was limited; court disagreed).[11] As these sources demonstrate, the decades since the FTCA's passage gave rise to debate over who was covered by its plain text—an issue that Congress addressed several times by modifying definitional language that DOJ now treats as essentially meaningless.

The better approach is to take seriously the statutory language. A close look at the definition of "federal agency" reveals two key points.

First, in defining "employee of the federal government" and "federal agency," the FTCA uses the word "includes" in a particularized manner. This is not a statute that says "include" before providing a non-exhaustive, illustrative list of terms that naturally fall within the more general phrases being defined. *See Christopher v.*

---

DOJ Br. 13. Respectfully, that opinion was no model of clarity. *See Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of Government*, 26 Comp. Gen. 891, 892 (1947). And in 1980, another Comptroller General opinion reversed course, noting that "good arguments may be made" for the position that Members of Congress are *not* covered by the FTCA. *Matter of Claiborne Pell, U.S. Senate*, B-199413, 1980 WL 16158 (Aug. 11, 1980).

[11] Trump suggests that the district court's opinion in *McNamara* is entitled to special consideration because the judge who decided it assisted with drafting the FTCA. Trump Br. 24 & n.12. But other courts (and the House Report accompanying the Westfall Act) disagreed with that interpretation of the FTCA, and it should go without saying that a single staffer's personal views of what Congress intended cannot eclipse a statute's plain text.

*SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). Instead, it uses "includes" to specify that certain non-obvious entities fall within the general phrase. For example, "employee of the government" is defined to "include[]" unpaid temporary volunteers, *see* 28 U.S.C. § 2671, even though "employee" is generally understood (and was understood in 1946) to mean someone who works for wages or a salary. *See Employee*, Webster's New International Dictionary 839 (2d ed. 1934). "Employee of the government" is also defined to "include[]" federal defenders, "except" when defenders "perform[] professional services in the course of providing [legal] representation." Once again, this is a decidedly non-obvious definition of the general term—functioning more as a precise definition than a catch-all. The same pattern repeats in the definition of "federal agency," which is defined to "include[]" the judicial and legislative branches, even though the Judiciary and Congress do not fall within the common understanding of the term "agency." *E.g.*, Administrative Procedure Act, Pub. L. No. 79-404, § 2(a), 60 Stat. 237, 237 (1946). In these respects, the terms that Congress used in defining who is covered by the FTCA are doing real, substantive work in specifying where the law applies.

This leads to the second key point: words are known by the company they keep (*noscitur a sociis*). *See S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006). And the words in the FTCA keep a very specific sort of company: they refer either to a branch of government (Congress and Judiciary) or to *subsidiary*

33

*components* of the remaining branch. DOJ says that "it would have been difficult to draft more all-embracing definitions." DOJ Br. 12. Not so. It would have been easy for Congress to add "the President" (who is referenced in many other laws), or "elective officers in the executive branch" (a phrase enacted into law in the Civil Service Retirement Act of 1946), or "the executive branch" (which is what Appellants would prefer it said). Instead, knowing full well how to specify a branch of government, or even the elected officials of a branch, Congress has only ever added specific subsidiary components of the executive branch to the definition of "federal agency": "executive departments," "military departments," "independent establishments," "members of the military or naval forces," and "members of the National Guard." 28 U.S.C. § 2671. None of these terms applies to the President, who alone composes a branch of government that Congress did *not* include within the FTCA's plain language. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020).[12]

Because employees of subsidiary components of the executive branch are all fundamentally differently situated than the President, it would defy logic to treat § 2671 as covertly sweeping in the President. Even if § 2671's definition is merely

---

[12] Appellants cite several cases treating the President as an "employee" under other statutes. *See* DOJ Br. 13-15; Trump Br. 15-16, 19-20, 24-25. But courts "must follow" the FTCA's "explicit definition," not definitions in other statutes. *Stenberg*, 530 U.S. at 942.

34

illustrative, the statute still does not encompass the President because the "types of [employees] listed" are categorically different from—not illustrative of—that office. *See Samantar v. Yousuf*, 560 U.S. 305, 317 (2010). As Judge Kaplan reasoned, "[t]he plain meaning of this language is that members of Congress, federal judges, and the staffs of both all were included in the term 'federal agency.' But the entire executive branch is not. Only those parts of the executive branch that fall within the other terms of the definition are included." SPA20-21.[13]

### 2. Separation-of-Powers Principles Confirm that the President Is Not Subject to the FTCA's Wavier of Sovereign Immunity

Judge Kaplan's conclusion is further supported by the separation-of-powers principle articulated in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). There, the Supreme Court held that the President is not an "agency" under the Administrative Procedure Act (APA). *See id.* at 799. Noting that the APA does not expressly refer to the President, it explained that "[o]ut of respect for the separation of powers and

---

[13] DOJ resists this conclusion, invoking *United States v. Smith*, 499 U.S. 160, 173 (1991). *See* DOJ Br. 15. That reliance is misplaced. *Smith* held that the Westfall Act applied to "employees who are covered under pre-Act immunity statutes and those who are not." 499 U.S. at 173. It explained that "[w]hen Congress wanted to limit the scope of immunity available under the [Westfall Act], it did so expressly." *Id.* Citing this language out of context, DOJ contends that it requires an "express exclusion" for the FTCA not to cover the President. DOJ Br. 15. That is a patent misreading of the case: *Smith* required an express exclusion to show that somebody who otherwise enjoyed FTCA immunity could still face liability based on a separate federal statute, not to show that somebody fell within the FTCA's coverage in the first place. Here, the President does not satisfy that threshold requirement.

35

the unique constitutional position of the President . . . [w]e would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed by abuse of discretion." *Id.* at 800-01.

That principle clearly applies here. The FTCA expressly waives the sovereign immunity of the United States as to certain conduct by federal employees within the scope of their employment. In so doing, it authorizes federal courts to review the conduct of federal employees in circumstances where such review might otherwise be prohibited by sovereign immunity. It follows that if Appellants are correct and the President is indeed subject to the FTCA, then Congress subjected the President's conduct to judicial review when it enacted the FTCA in 1946. As Judge Kaplan recognized, Appellants thus ask "this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president—and in fact strongly appears to exclude him—and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts." SPA30.

Because they cannot satisfy *Franklin*'s clear-statement rule, Appellants argue that *Franklin* is inapposite. This argument rests on a carefully constructed syllogism: *Franklin* applies only to abuse-of-discretion review; there cannot be abuse-of-discretion review of presidential conduct under the FTCA due to the discretionary function exemption; therefore, *Franklin* cannot apply here. DOJ Br. 27-28.

36

But (as DOJ should well know) that argument falls apart at the very first step. *Franklin*'s clear-statement rule is not limited solely to contexts involving abuse-of-discretion review. Rather, the separation-of-powers concerns *Franklin* articulated were framed much more broadly. Thus, in holding that the President's actions are not reviewable under the APA, *Franklin* cited *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991)—specifically, the page where Judge Wald emphasized that "legislation regulating presidential action, no less than legislation altering the federal-state balance, raises 'serious' practical, political, and constitutional questions that warrant careful congressional and presidential consideration." *Id.* at 289.

In fact, less than two years ago, DOJ rejected the very proposition that it advances here: it argued that neither *Franklin* nor *Armstrong* "depended on . . . a distinction" between "abuse-of-discretion review" and the constitutional claims asserted by the plaintiffs in that case. *See* Reply Br. 16, *Blumenthal v. Trump*, No. 19-5237, 2019 WL 5727504 (D.C. Cir. Nov. 5, 2019). And that was no aberration—time and again, across administrations, DOJ has concluded that *Franklin* imposed a clear-statement requirement far beyond the limited context of abuse-of-discretion review. *See, e.g.*, *Application of 28 US.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 352, 1995 WL 1767997 (1995) (citing *Franklin* for the "well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application

would involve a possible conflict with the President's constitutional prerogatives").[14]

DOJ's sudden, convenient about-face on *Franklin* cannot be credited. As Judge Kaplan concluded, the separation-of-powers concerns articulated in *Franklin* apply in determining whether Congress waived sovereign immunity—and thereby authorized judicial review—in lawsuits challenging the President's conduct. Here, given the stark absence of any clear statement subjecting the President's conduct to judicial review under the FTCA, the Court should hold that it does not cover him.

Indeed, the separation-of-powers concerns identified in *Franklin* apply to this context with added force. Under the FTCA, courts must determine whether an

---

[14] *See, e.g.*, Pet. Reply Br. 22, *In re Donald J. Trump*, No. 20-331, 2020 WL 7681471 (U.S. Sept. 2020) (citing *Franklin* to argue that "'an express statement by Congress'" is necessary "before a generally available cause of action . . . may be applied to the President"); Br. for the United States as *Amicus Curiae* at 15, 22, *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 563912 (U.S. Feb. 3, 2020) (describing *Franklin* as "requiring an 'express statement' 'before assuming Congress intended' to regulate the President"); Br. for the Appellants at 25, *Mironescu v. Costner*, 2006 WL 1558336 (4th Cir. 2006) (arguing that a statute does not supersede a "historically-recognized power[]" of the executive branch on issue of extradition because *Franklin* and *Armstrong* would require a clear statement); Br. for Appellant United States at 16-17, *Wilkinson v. Legal Servs. Corp.*, 1995 WL 17204605 (D.C. Cir. 1995) (arguing that a statute did not abrogate the President's Recess Appointments Clause powers because *Franklin* and *Armstrong*'s "clear statement requirement should be particularly applicable"); Gov't Defs.' Notice of Mot. and Mot. to Dismiss and for Summ. J. at 29, *Jewel v. Nat'l Sec. Agency*, 2012 WL 6218080 (N.D. Cal. 2012) (citing *Franklin* to argue that "displacement of the state secrets privilege cannot be found unless Congress made clear its intent to do so").

38

employee of the government has acted within the scope of his or her employment. By its very nature, this inquiry directs judicial attention to conduct that may arise at the outer limits of a federal employee's official duties. Appellants' position thus suggests that Congress waived sovereign immunity and subjected to judicial review actions of the President at the boundary of his personal and official capacities. In light of the undoubted sensitivities that may surround such judicial review, the Court should insist that Congress speak clearly before authorizing it in a federal statute. *See Mazars*, 140 S. Ct. at 2033.

Against all this, DOJ offers little more than a policy argument: "[t]he possibility of substitution" under the Westfall Act "is valuable independent of the immunity [the Act] provides." DOJ Br. 26 (internal quotation marks omitted). But this argument is doubly flawed. First, the President already enjoys absolute immunity from suit for damages in cases concerning his official conduct—and in such litigation, even absent formal substitution mechanisms, DOJ nearly always represents the President and litigates in his stead. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *see also* 28 U.S.C. § 517; 28 C.F.R. § 50.15. Second, DOJ's policy argument is anachronistic as a basis for interpreting the FTCA: the substitution procedures that DOJ invokes were not enacted until 1988 (in the Westfall Act), and do not afford a ground on which to infer that a law enacted in 1946 applies *sub silentio* to the President.

Accordingly, ordinary tools of statutory interpretation and settled separation-of-powers principles confirm that the FTCA—which makes no mention of the President—does not apply here. The decision below should be affirmed on that basis.

## II. TRUMP WAS NOT ACTING WITHIN THE SCOPE OF HIS EMPLOYMENT WHEN HE WILLFULLY DEFAMED CARROLL FOR REVEALING THAT HE HAD SEXUALLY ASSAULTED HER

In the alternative—and independently—the Court should affirm the decision below on the ground that Trump was acting outside the scope of his employment as President of the United States when he repeatedly and willfully defamed Carroll. We first explain why New York (not D.C.) law governs that inquiry. We then describe and apply the controlling principles of *respondeat superior* jurisprudence. Finally, we demonstrate that Appellants' arguments rest on clear legal and factual error.

### A. New York Law Governs the Scope of Employment Inquiry

In the district court, the parties disagreed over whether New York or D.C. law governs the scope-of-employment inquiry. Acknowledging that disagreement, Judge Kaplan concluded that there was no true conflict, since President Trump acted outside the scope of his employment under either New York or D.C. law. *See* SPA40-41, 60. On appeal, Appellants maintain that D.C. law applies. *See* DOJ Br. 29; Trump Br. 32 n.15. Although the outcome is indeed the same either way, the Court should apply New York's well-developed body of *respondeat superior* law.

40

The starting point for this analysis is *Richards v. United States*, 369 U.S. 1 (1962), which held that courts must apply "the whole law (including choice-of-law rules)" "of the State where the act or omission occurred." *Id.* at 3, 11; *see also Devlin v. United States*, 352 F.3d 525, 532 (2d Cir. 2003). In this case, the relevant acts occurred in D.C. The Court therefore applies D.C. choice-of-law rules, which direct attention to four considerations: "the place where the injury occurred"; "the place where the conduct causing the injury occurred"; "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and "the place where the relationship is centered." *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013).

Here, the first, third, and fourth factors strongly favor New York: Carroll was injured in New York; both she and Trump were domiciled in New York when Trump committed his torts;[15] and their relationship was centered in New York. The second factor does not strongly favor either jurisdiction: although Trump was physically in D.C. when he made his defamatory statements, they were instantly broadcast nationally. Therefore, New York has the "most significant relationship to the dispute." *Id.*; *see Weyrich v. New Republic Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001)

---

[15] As noted above, Trump initially disputed his New York domicile, but lost a motion to dismiss on that basis, *see* A149, and later withdrew his affirmative defense of lack of personal jurisdiction, *see* A267-84.

41

(in defamation cases, "[t]he weight of authority considers that the law to be applied . . . is [that of] the place where the plaintiff suffered injury by reason of his loss of reputation"); *Foretich v. CBS, Inc.*, 619 A.2d 48, 54 n.9 (D.C. 1993) (same).

Strangely, Appellants do not mention D.C.'s four-factor test, much less argue that it favors applying D.C. *respondeat superior* law. Instead, they urge the application of D.C. law simply because "the employment relationship between the President and the United States is centered in D.C." DOJ Br. 30; *see* Trump Br. 32 n.15. For this proposition, Appellants cite *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013), which in turn cites *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006), which in turn cites *Kimbro v. Velten*, 30 F.3d 1501, 1506 (D.C. Cir. 1994), which in turn cites . . . nothing. In fact, *Kimbro* says nothing about choice of law and has no reasoning on the subject, let alone a discussion of *Richards* or D.C. choice-of-law principles. It appears that all three cases simply state the rule without any cited basis in D.C. doctrine; this may reflect the fact that none of these cases involved an actual choice-of-law dispute, since all three cases addressed torts committed in D.C. by a D.C.-based federal employee, resulting in harm to another D.C.-based employee. Whatever the explanation, *Jacobs* cannot support applying D.C. law here.

As a fallback, DOJ suggests that even if New York's "substantive tort law applies," the Court should undertake a "separate" analysis regarding "which jurisdiction's scope-of-employment law should be controlling." DOJ Br. 29-30. In

42

particular, DOJ takes the position that D.C. choice-of-law principles point to "the law of the jurisdiction where the employment relationship was centered, not the site of the alleged tort" as governing the *respondeat superior* question. DOJ Br. 30. In support of that proposition, they cite *Bailey v. J & B Trucking Services, Inc.*, 590 F. Supp. 2d 4 (D.D.C. 2008). But *Bailey* is an outlier. It arose from an idiosyncratic circumstance in which Maryland law "effectively disclaimed" any interest in the application of its substantive negligence law, leading to a split in jurisdictional interests that does not exist here. *Id.* at 10. For that reason, and those given above, the Court should apply New York law to the issues at hand—an outcome consistent with authorities that have similarly applied other states' *respondeat superior* law in cases involving defamation committed by D.C.-based federal officials. *E.g.*, *Does 1-10 v. Haaland*, 973, F.3d 591, 599 (6th Cir. 2020) (applying Kentucky law); *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995) (applying Texas law).

### B.     An Employee Acts Outside the Scope of Their Employment When They Act for Personal Reasons to Obtain a Personal Benefit

Under the doctrine of *respondeat superior*—as articulated in both New York and D.C. (we will address both bodies of law)—an employer may be held liable for the acts of an employee "only if those acts were committed in furtherance of the employer's business and within the scope of employment." *Rivera v. State*, 34 N.Y.3d 383, 389-90 (2019); *accord Blair v. District of Columbia*, 190 A.3d 212, 225

43

(D.C. 2018). Disputes over whether an employee acted within the scope of his employment are generally questions of fact reserved for juries. *See* SPA41-42.

It is black letter law that an employee acts outside the scope of employment if their conduct is "too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958); *see also Swarna v. Al-Awadi*, 622 F.3d 123, 144-45 (2d Cir. 2010); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002); *Demas v. Levitsky*, 291 A.D.2d 653, 661 (3d Dep't 2002); *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 788 (3d Dep't 1988). "Under such circumstances, the conduct—although occurring during the course of his employment—is outside the scope of [his] employment." *Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir. 1997). Significantly, that rule controls even if "an activity which benefits an employee personally could also have a possible benefit to the employer." *Overton v. Ebert*, 180 A.D.2d 955, 957 (3d Dep't 1992).

Unsurprisingly, many applications of the "personal motives" doctrine have occurred in cases involving sexual assault, sexual harassment, or defamation claims relating to sexual misconduct. *See Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct *and related tortious behavior* arise from personal motives and do not further an employer's business, even when committed within the employment context." (emphasis added)); *see also, e.g.*, *Ierardi*, 119 F.3d at 188-89 (sexual

44

harassment); *N.X.*, 97 N.Y.2d at 251 (sexual assault). In *Rausman v. Baugh*, for example, the Second Department ordered dismissal of a claim alleging that a hospital employee had acted "within the scope of her employment" in making an allegedly defamatory accusation of sexual harassment against another employee. 248 A.D.2d 8, 9-10, 12-13 (2d Dep't 1998) (finding she acted "solely for personal motives").

In a similar vein, courts have identified personal motives where the allegations or evidence established that an employee was driven by personal animus or a desire for revenge. *See, e.g.*, *Pohlman v. Village of Freeport*, No. 19 Civ. 5277, 2020 WL 5878257, at *6 (E.D.N.Y. Sept. 30, 2020); *George v. N.Y.C. Transit Auth.*, No. 04 Civ. 3263, 2008 WL 4274362, at *3 (E.D.N.Y. Sept. 17, 2008); *see also Bergeron v. Henderson*, 47 F. Supp. 2d 61, 79 (D. Me. 1999) (Maine law); *Inman v. Dominguez*, 371 S.W.3d 921, 926 (Mo. Ct. App. 2012) (Missouri law).

Across a wide range of settings and alleged intentional torts, courts have long recognized that "[t]he outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal." *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C. 1979) (cleaned up). In other words—to borrow from the Restatement (Second) of Agency—"the fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act." § 245 cmt. f.

45

That rule applies with particular force in suits involving "an intentional tort," which "by its nature is willful and thus more readily suggests personal motivation." *Jordan v. Medley*, 711 F.2d 211, 215 (D.C. Cir. 1983) (Scalia, J.); *see also Majano*, 469 F.3d at 142 ("The nature of the attack also informs the intent analysis."); *Bamidele*, 103 A.3d at 525-26. Of course, defamation is an intentional tort: in cases involving a public figure, the plaintiff must allege that the defamatory statements were published with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see also Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011) (concluding in an FTCA case that a federal employee acted for personal motives, and thus outside the scope of her employment, in making defamatory statements).

Many of these principles came into play in *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003), which offers a helpful illustration. There, William Perks (Huntington's Harbor Master) alleged that Councilwoman Susan Scarpati-Reilly "maneuvered herself into a position as one of his supervisors, whereupon she initiated a sexual relationship with him and—once he terminated the relationship—sexually harassed, defamed, and conspired against him." *Id.* at 1148. Among other causes of action, Perks alleged two defamation claims against Scarpati-Reilly. *See id.* at 1164-71. On both of these claims, Perks also sought recovery from Huntington on a *respondeat superior* theory—and on both claims, Judge Young

46

(sitting by designation) granted summary judgment for Huntington, finding that Scarpati-Reilly had acted on the basis of her own personal motives. *See id.*

The *Perks* Court's reasoning as to the first defamation claim is instructive. That claim arose from a false police report that Scarpati-Reilly filed against Perks shortly after he terminated their sexual relationship. In holding that Scarpati-Reilly acted outside her employment in filing the report—and that she had instead acted with "personal motives"—Judge Young relied on four considerations: (1) her official duties did not require her to file police reports against Town employees; (2) her official position conferred no special authority to file such reports; (3) Huntington had not instructed her to engage in such behavior; and (4) her filing of the report did not "yield any benefit for Huntington or further its interests." *Id.* at 1167. In response, Scarpati-Reilly objected that she was "always [a] Councilwoman"—an "elected official twenty-four hours a day"—and "[e]verything that I do I'm acting as Councilwoman for the Town of Huntington." *Id.* Judge Young, however, rejected her position, concluding that her defamatory statement did not fall within her employment because it resulted from personal motives. *Id.*

As *Perks* demonstrates—and as many other precedents confirm—when an employee acts for personal reasons, their conduct falls outside the scope of their employment. That rule applies in the defamation context. *E.g.*, *Armstrong*, 759 F. Supp. 2d at 95; *Rausman*, 248 A.D.2d at 9-10, 12-13; *Demas*, 291 A.D.2d at 661. It

47

applies to public officials. *See Perks*, 251 F. Supp. 2d at 1167. It applies even if an employee can identify some incidental benefit to the employer. *See Overton*, 180 A.D.2d at 957. It applies most forcefully when an employee commits an intentional tort, *Jordan*, 711 F.2d at 215, engages in conduct out of proportion to the needs of their position, *Penn Cent.*, 398 A.2d at 31, or acts based on motives relating to their own sexual misconduct, *see, e.g.*, *Perks*, 251 F. Supp. 2d. at 1164-71; *Ross*, 2 F. Supp. 2d at 531; *Rausman*, 248 A.D.2d at 9-10, 12-13. And as Judge Kaplan found, it most certainly applies to Trump's conduct here, which had nothing to do with the Presidency and amounted to a deliberate, degrading, and intensely personal attack launched as retaliation for revealing a sexual assault that occurred decades ago.

## C. Trump Acted Outside the Scope of His Employment as President in Repeatedly Defaming and Insulting Carroll

### 1. Presidents May Unquestionably Engage in Personal Conduct Causing Private Wrongs

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1. "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982). In our legal tradition, and by virtue of being held "accountable to the people through regular elections," *Seila Law*, 140 S. Ct. at 2203, the President "possesses an extraordinary power to

speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). The President thus enjoys a "unique status." *Nixon*, 457 U.S. at 750. He must be available to lead the Nation. In a sense, he "never adjourns." *Clinton v. Jones*, 520 U.S. 681, 713 (1997) (Breyer, J., concurring in the judgment).

But the President "is a person as well as an institution." Laurence H. Tribe, American Constitutional Law 631 (3d ed. 2000). It is a fundamental precept of our constitutional order—recognized by the Framers—that while in office, "far from being above the laws, he is amenable to them in his private character as a citizen." 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863) (James Wilson). And as Chief Justice Marshall anticipated, the demands of a President's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (Va. Cir. Ct. 1807). The Supreme Court has thus recognized that the President may engage in private acts beyond the "'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756; that he remains "subject to the laws for his purely private acts," *Clinton*, 520 U.S. at 696; and that he can be investigated for private criminal misdeeds, *see Trump v. Vance*, 140 S. Ct. 2412, 2426-27 (2020). These cases confirm that all Presidents retain a personal capacity, and the ability to commit private wrongs, during their public service.

This principle is only further supported by Trump's conduct during his tenure in government. More than any other recent president, he repeatedly insisted that

49

aspects of his conduct in office were entirely private and personal—at least when doing so afforded him the prospect of private financial gain or the power to censor critics. *See* Pet. for Writ of Cert. at 15, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("[B]locking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596, 2017 WL 7587415 (Sept. 29, 2017) (arguing that Trump remained free to profit from private commercial transactions with foreign powers while in office, so long as he did not receive "compensation for services rendered . . . in an official capacity or in an employment (or equivalent) relationship with a foreign government"). These filings confirm that Trump did not view his every word and deed as presidential, or as undertaken with official purposes in mind, even when those actions might incidentally have implications relating to his job. By his own admission, Trump sometimes perceived himself as acting in a purely personal capacity—and as pursuing his own private interests—while in office. And as Judge Kaplan found, that is exactly what happened when Trump undertook to destroy Carroll's livelihood and reputation in response to allegations about a crime Trump committed decades before he assumed office.

### 2. Trump Acted for Personal Reasons in Defaming Carroll

In 2019, Carroll revealed to the public that Trump had sexually assaulted her in New York City over twenty years earlier. Like other presidents who have been

accused of misconduct, Trump denied it. But he went *much* further than simply denying her statement and calling for an investigation. He decided to viciously and quite personally attack Carroll. He mocked her appearance, implying he would not have raped her because "she's not my type." A42 ¶¶ 97-98. He also claimed (implausibly) he had never met her and that he had no idea who she was. *See* A38 ¶ 82; A40 ¶ 91. Even as he denied any knowledge of Carroll, he lied about her in ways plainly calculated to punish and retaliate against her for daring to speak the truth. He charged that she had made the whole thing up for financial gain, to increase book sales, and to advance a nefarious political plot. *See* A26 ¶ 11. He also strongly implied that she had falsely accused *other* men of rape—a vicious, horrible, and extremely personal attack against a woman he claimed to know nothing about. *See id.* Trump's statements had a devastating effect on Carroll's livelihood.

DOJ and Trump's lawyers appear embarrassed by the statements they have been tasked with defending. Rightly so. It seems they could not bring themselves to include a single quote from his actual remarks in their argument that he acted within the scope of his employment. They fail even to describe each of his statements and to explain how those lies about Carroll reflected public service, not personal spite.

Yet that is their burden to carry as to *each* defamatory statement. The question here is whether, each time he attacked Carroll, Trump acted in furtherance of his duties as President, or instead in furtherance of personal motives. In answering that

51

question, moreover, the Court does not bend any inferences in Trump's favor. It must view "the tortious conduct in the light most favorable to the plaintiff" based upon the record before it. *Davila v. Lang*, 343 F. Supp. 3d 254, 270-71 (S.D.N.Y. 2018); *see also Bello v. United States*, 93 F. App'x 288, 289-90 (2d Cir. 2004).

Here, the record before the Court consists centrally of the Complaint, which sets forth detailed allegations as to Trump's motives for making the defamatory statements. *See* A44-48 ¶¶ 106-28. Although those allegations must be accepted as true, Appellants hardly address them. To summarize: Trump knew who Carroll was when he raped her, A44-45 ¶¶ 106-12; he knew in June 2019 that he had assaulted her and that his denials were false, A45 ¶¶ 113-15; he deliberately lied, and spoke with no concern for the truth, in accusing Carroll of fabricating the accusation in exchange for payment, or as part of a political conspiracy or a plot to increase book sales, A45-46 ¶¶ 116-18; he deliberately lied, or spoke with no concern for the truth, in implying that Carroll had falsely accused other men of sexual assault, A46 ¶¶ 118-19; and he engaged in these personal attacks because they were his *modus operandi*—before and during his time in office—for responding to reports that he had sexually assaulted women, A46-48 ¶¶ 122-27. Simply put, Trump "knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth." A48 ¶ 128. Further, Trump did not lie to advance any interest of the United States; in fact, he

52

did not consider such interests at all. He lied to protect himself from the truth about his pre-office criminal misconduct and, after he knowingly lied about the sexual assault itself, "he surrounded that central lie with a swarm of related lies in an effort to explain why [Carroll] would invent an accusation of rape." A46 ¶ 13.

Applying the law of *respondeat superior* (whether from New York or D.C.), these particularized allegations—which must be read in Carroll's favor, and which neither DOJ nor Trump made any effort to refute below—support only a single conclusion: "President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the comments at issue." SPA60.

That conclusion is bolstered by four additional considerations. *First*, the nature, tone, and content of Trump's statements confirm that he defamed Carroll "pursuant to [his] own personal motives." *Perks*, 251 F. Supp. 2d at 1171. Trump did not simply deny Carroll's accusation, call for an investigation, and make some broader point about politics or public discourse. Instead, with full awareness of his lies and indifference to truth, Trump used the loudest megaphone on the planet to launch a personal attack on Carroll. He implied she was too ugly for him to sexually assault; he charged that she had falsely accused other men of rape; and he concocted a malicious narrative under which Carroll lied to make money or increase book sales or advance some vague political conspiracy. A26 ¶ 11. If this is not evidence of personal ill will and spite, it is hard to imagine what would be. Trump sought to

destroy Carroll after she revealed that he had assaulted her. There is no basis here for concluding that Trump had any presidential obligation to make these statements, or that Trump did so to advance any public or national purpose.

Instead, the natural conclusion is that Trump acted "in an outrageous manner" and "inflict[ed] a punishment out of all proportion to the necessities of his master's business"—thus confirming that he "departed from the scope of employment in performing the act." Restatement (Second) of Agency § 245 cmt. f. Where (as here), an employee "did not handle the situation in a manner expected" of his office and instead behaved like "an individual bent on personal vengeance for a perceived personal affront," courts have not hesitated to conclude that he acted for personal reasons outside the scope of his employment. *District of Columbia v. Coron*, 515 A.2d 435, 438 (D.C. 1986); *see also Armstrong*, 759 F. Supp. 2d at 95 (finding under D.C. law that the tone and content of alleged defamatory letters had "an air of contempt and deprecation" evincing "personal motives"); *Penn Cent.*, 398 A.2d at 32 ("The violent and unprovoked nature of [the employee's] attack indeed suggests a personal as distinguished from business-related motive.").

To be clear, the point is not simply that Trump departed from how prior presidents generally conducted themselves when accused of wrongdoing. It is that his behavior toward Carroll—which far exceeded any public purpose and seemed

54

calculated to punish and retaliate against her for revealing his earlier private sexual misconduct— evinced every recognized hallmark of a personally motivated attack.

*Second*, and relatedly, Trump's defamatory statements were *intentional* torts. Appellants gloss over the point, but it bears emphasis: as alleged in the Complaint, Trump made each of these statements with actual malice—both literally and in the technical sense. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). That willful state of mind powerfully supports finding that he acted for personal reasons, rather than in furtherance of his job duties. As the D.C. Circuit has recognized, "it would be unusual to find, as a matter of law, that an employee was acting within the scope of her employment [under D.C. law] when she committed an intentional tort," which "by its nature is willful and thus more readily suggests personal motivation." *Majano*, 469 F.3d at 141 (citation omitted). Indeed, it would send a deeply troubling message for the Court to conclude that Trump's defamation spree against Carroll was simply him doing his job. No court has held that the President enjoys comprehensive immunity for willfully slandering a private citizen as retribution for revealing private misconduct he committed before taking office.

*Third*, the subject matter of Trump's statements further demonstrates personal motivations. As Judge Kaplan observed, Trump's "comments concerned an alleged sexual assault that took place decades before he took office, and the allegations have no relationship to the official business of the United States." SPA60-61; *see also*

55

*Perks*, 251 F. Supp. 2d at 1171 (considering subject matter of statements in assessing motives); *Boykin v. District of Columbia*, 484 A.2d 560, 563 (D.C. 1984) (recognizing that prior dealings between the parties "would indicate that the tort was personal"). These are precisely the sorts of defamatory statements relating to sexual misconduct that courts have treated as beyond the scope of employment. *See Ross*, 2 F. Supp. 2d at 531 (intentional torts involving "sexual misconduct and related tortious behavior" are generally understood to result from personal motives).

*Clinton v. Jones* is instructive. There, as here, "a plaintiff [Paula Jones] sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office." SPA55. But unlike Carroll—who alleges that Trump himself defamed her through personal attacks extending far beyond a mere denial—Jones alleged only that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred." *Clinton*, 520 U.S. at 685; *see also Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996) (noting that Jones had focused on actions "by Mr. Clinton's presidential press secretary"). In these respects, the *Clinton* case involved far *more* government action (a coordinated press strategy among White House staff), but significantly *fewer* indicia of personal animus than Trump's attacks on Carroll (the statements at issue were mainly just denials). Presented with these facts, the Supreme Court cautiously

assessed that the defamation claims "arguably may involve conduct within the outer perimeter of the President's official responsibilities." *Clinton*, 520 U.S. at 686.

If the claims in *Clinton* fell "somewhere between being outside the scope of his duties and 'arguably . . . within their outer perimeter,'" SPA56, it follows that the claims here are certainly beyond the "outer perimeter" of presidential duty. Not only are Trump's statements far more outrageous and personally targeted than Clinton's denials of the Jones allegations, but they were uttered (or dictated) by Trump himself as attacks on Carroll following her revelation of his earlier sexual misconduct. In these circumstances, as Judge Kaplan reasoned, "it is difficult to see how conduct that at most is in the 'outer perimeter' of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be." *Id*.

*Fourth*, and finally, the personal nature of Trump's conduct is illuminated by its consistency with the personal attacks he has launched for decades against other women who accused him of sexual misconduct. *See* A46-47 ¶¶ 122-27. Simply put, Trump's attacks on Carroll did not reflect anything unique to his high office, nor did they arise from any distinctively presidential consideration. Rather, they followed directly from a *modus operandi* stretching back decades into his life as a private citizen. This consistency supports the conclusion that Trump's efforts to destroy and discredit Carroll were simply how he responds to any woman who accuses him of

57

sexual misconduct; they had nothing to do with his duties as President. He wanted to punish Carroll for speaking up, so that is exactly what he did.

Indeed, this conduct was far more obviously based on personal motives—and unrelated to his job as President—than actions he has elsewhere described as private. *See supra* at 49-50. Trump viewed profitable commercial dealings with hostile foreign powers (through a business he owned while in office) as personal, not presidential. He insisted that blocking people from a social media platform on which he fired Cabinet secretaries and announced significant public policy was personal, not presidential. Only in a world gone mad could it be presidential, not personal, for Trump to punitively slander a woman for revealing a decades-old sexual assault.

### D.    Appellants' Arguments Rest on Legal and Factual Error

In Appellants' view, the facts of this case are almost entirely irrelevant. They would have the Court issue a sweeping declaration that "an office holder responsible to the electorate is acting within the scope of his office when he responds to accusations and attendant media inquiries that call into question his fitness to hold the public trust." DOJ Br. 31; *see also* Trump Br. 33 (seeking rule that "speaking to the press" is always within employment). Of course, virtually any criticism of an elected official, even if unrelated to their conduct in government, could be described as calling into question their "fitness to hold the public trust." So Appellants' proposed test would automatically find any elected federal official to be within the

58

scope of their employment anytime they respond to anyone (including any private citizen) who criticizes them in any way, including for conduct that occurred decades before they took office. Under Appellants' preferred standard, there is no room to consider the possibility of personal motives—regardless of how private the subject matter may be, how unrelenting and outrageous the response is, or how disconnected it may be from any government business. Moreover, nothing about Appellants' logic explains why this rule should be limited to elected officials: their contentions would map easily onto senior officials in the political branches. At bottom, Appellants ask this Court to announce a doctrine of categorical immunity for government officials, affording them *carte blanche* to use the public platform inherent in their office to attack anyone who criticizes them for anything they have ever done.

Appellants' extreme position is not the law. It rests on premises foreclosed by precedent and inconsistent with our legal traditions. Although Appellants have gerrymandered a theory designed to avoid any engagement with the facts of this case, or the reality of Trump's conduct as alleged in the Complaint, that theory must be rejected—and the Court should therefore affirm the decision below.

The first flaw in Appellants' position is that it effectively collapses the settled, multi-factor standard for *respondeat superior* analysis into a single factor. As they see it—and especially as DOJ frames the analysis, *see* DOJ Br. 31-35—the *only* relevant question is whether a federal official is speaking to the press or responding

to critics. If so, they insist, the analysis is complete and the official was acting within the scope of their employment, since speaking to the press and responding to critics are the types of things that federal officials typically do as part of their jobs. But in both New York and D.C., whether an employee is doing the kind of work he is employed to perform is just *one* factor among several others that must be satisfied in a scope-of-employment analysis. *See Majano*, 469 F.3d at 141 (describing D.C. *respondeat superior* standard); *Rivera*, 34 N.Y.3d at 389-90 (describing New York *respondeat superior* standard). To the extent Appellants seek to write off the remaining elements of *respondeat superior* doctrine, their position rests on legal error and cannot be sustained on that basis. *See, e.g.*, DOJ Br. 34 (suggesting without explanation or citation that the private purpose element may not apply to this case, even though it is settled law in both New York and D.C.).

Indeed, the entire premise of the multi-factor *respondeat superior* standard is that an employee might satisfy the first requirement yet still fall outside the scope of employment—for instance, if his conduct was actuated by a private purpose. *See supra* at 44. Not surprisingly, there is a long line of cases concluding that individuals otherwise engaged in the customary duties of their position veered outside the scope of their employment because some intentional tort they committed was motivated by private purposes. *M.J. Uline Co. v. Cashdan*, 171 F.2d 132 (D.C. Cir. 1948), offers an especially vivid example. There, a hockey player hit the puck at a bystander

60

(injuring him) in the middle of a game. The district court instructed the jury that the player was acting within the scope of his employment, but the D.C. Circuit reversed, explaining that he "may have been, at the moment when he struck the blow, completely indifferent to the work he was employed to do and actuated only by anger or hostility toward the man he tried to injure." *Id.* at 134. *Uline* reflects a principle that has since been applied in many other cases, and that precludes Appellants' position. *E.g., Majano*, 469 F.3d at 142; *Perks*, 251 F. Supp. 2d at 1167; *Armstrong*, 759 F. Supp. 2d at 94; *Penn Cent.*, 398 A.2d at 30; *Coron*, 515 A.2d at 438; *see also, e.g.*, *Bamidele*, 103 A.3d at 525 (holding that, "[a]t least where intentional torts are concerned, it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort").

This leads to Appellants' second major error: their claim that Trump acted within the scope of his employment if even a scintilla of the motivation for each of his statements attacking Carroll was not purely private. *See* Trump Br. 40-42. That description of the law is mistaken. As Judge Kaplan recognized, while an "action need not be 'wholly in furtherance of the employer's business'" to fall within the scope of employment, "a slight purpose to serve the master is not enough." SPA48 (quoting *Blair*, 190 A.3d at 226). Therefore, "[c]onduct of a servant [that] is . . . *too little actuated* by a purpose to serve the master' is not within the scope of employment." *Id.* (quoting *Bamidele*, 103 A.3d at 525) (emphasis added); *see also*

61

*Majano*, 469 F.3d at 141 (stating and applying the "too little actuated" test); *Overton*, 180 A.D.2d at 957 (3d Dep't. 1992) (disagreeing "that the doctrine of *respondeat superior* should apply solely because an activity which benefits an employee personally could also have a possible benefit to the employer"); *Island Associated Cooperative Inc. v. Hartmann*, 118 A.D.2d 830, 831 (2d Dep't 1986) (citing the Restatement (Second) of Agency §§ 231, 288); *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979) (holding New York law requires consideration of many factors).[16]

Simply put, "a real but insubstantial purpose to serve the master is insufficient." SPA51-52. Applied here, that principle supports a clear conclusion: "Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office. Neither the media reports nor the underlying allegations have any relationship to his official duties." SPA58. All that is particularly true given the circumstances described above demonstrating

---

[16] Insisting otherwise, Appellants cite *Blair v. District of Columbia*, 190 A.3d 212 (D.C. 2018). But *Blair* did not purport to change D.C. law, which has always followed the Second Restatement of Agency, including its "too little actuated" principle. *See, e.g.*, *Bamidele*, 103 A.3d at 525 & n.6 ("We have long endorsed the Second Restatement's approach."); *see also Council on Am.-Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (acknowledging this principle). To the extent *Blair* may suggest a more restrictive approach than the D.C. courts have followed for many decades, that suggestion is dicta, since the facts did not present a borderline scenario where the difference could have mattered. *See Blair*, 190 A.3d at 216-17 (police officer announced he was on duty and instructed people to leave the premises before his alleged assault on the plaintiff).

62

that his motives in insulting, degrading, and defaming Carroll were indeed personal.[17]

This leads to Appellants' final and most fundamental error. It is settled law that the *respondeat superior* inquiry is intensely context dependent—so much so that it is presumptively entrusted to juries as a fact issue. *See Majano*, 469 F.3d at 140-41 (collecting D.C. cases); *Rivera*, 34 N.Y.3d at 390 (collecting New York cases). In contravention of that rule, Appellants essentially ask this Court to hold *as a matter of law* that the classically *fact-intensive* scope-of-employment test is necessarily met whenever a federal official speaks to the press or responds to critics—without regard to any other conceivably relevant factual consideration.

The cases Appellants cite do not support that counterintuitive proposition. For starters, none of them involved defamatory statements remotely as targeted and personal as Trump's repeated attacks on Carroll. Nor did they involve circumstances where the speaker had cause for personal animus and retaliation against someone who had revealed their own criminal wrongdoing. Instead, most of the cases that Appellants cite involved workaday statements by Members of Congress on pending

---

[17] The fact that Trump uttered these statements while speaking about other topics is not a point in his favor. *Contra* Trump Br. 45. It shows his willingness to take advantage of his office while pursuing a personal agenda against Carroll. An official is not free to retaliate against someone who reveals their private sexual misconduct, so long as they also discuss public policy later in the same interview.

legislative matters or events linked to ongoing congressional deliberation. And in each of those cases, judges relied not on generalities about speaking to the press, but instead on a careful study of the specific facts surrounding the challenged statements to assess whether government officials acted in furtherance of their public duties.

In *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009), for instance, a U.S. Marine sued Congressman John Murtha—the then-Ranking Member of the House Appropriations Committee's Subcommittee on Defense—for remarks he had given criticizing the Defense Secretary's handling of the Iraq War. In the course of those remarks, Murtha stated that a particular squad (in which the plaintiff had served) had been responsible for the death of civilians in Haditha, Iraq. *See id.* at 378-80. The plaintiff alleged that Murtha sought only private political gain by embarrassing the Defense Secretary. *See id.* at 384. Faced with these facts, the D.C. Circuit easily found that Murtha was actuated by a desire to serve the master: "Attacking the credibility of Defense Secretary Rumsfeld, the man who was the public face of the war in Iraq, was . . . part and parcel of Congressman Murtha's job as a legislator charged with overseeing military affairs and of his efforts to serve his constituents by advancing legislation to bring home American troops stationed in Iraq." *Id.* at 385. *Wuterich* confirms that when Members of Congress critique Executive Branch officials and policies, while overseeing those officials and pushing legislative reform to those policies, they are not acting for private reasons unrelated to their jobs.

64

That said, *Wuterich* does *not* stand for the doubtful, disturbing proposition that *anytime* a federal officer attacks anyone who has criticized him, he is doing his job. *Contra* DOJ Br. 32. Nor does *Wilson v. Libby* support that position: like *Wuterich*, it involved actors and motivations deeply enmeshed in debates over United States public policy. *See* 535 F.3d 697, 712-13 (D.C. Cir. 2008) (holding that senior officials who acted with the goal of defending the administration's handling of war-related intelligence were within the scope of their employment in revealing a CIA operative whose husband had published criticism of U.S. intelligence policy). The other cases Appellants cite lend even less support to their position.[18]

That leaves only *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), upon which Appellants place principal reliance. *See* DOJ

---

[18] *See Does 1-10*, 973 F.3d at 599-601 (Representative Haaland and Senator Warren acted within the scope of their employment while "reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall"); *Williams*, 71 F.3d at 507 (Chairman of the House Appropriations Committee acted within the scope of his employment when he criticized a lobbyist while discussing the status of an appropriations bill pushed by that same lobbyist); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 94–95 (D. Mass. 1997) (Senator Kennedy acted within the scope of his employment when he criticized a violent anti-abortion organization while speaking about a bill he had sponsored—which was set for a vote the next day—meant to protect access to women's health clinics from that very group); *Chapman v. Rahall*, 399 F. Supp. 2d 711, 713-15 (W.D. Va. 2005) (Congressman acted within the scope of his employment when he criticized a commentator while responding to a question about his ties to a political group that some constituents associated with terrorism).

Br. 31; Trump Br. 34. That reliance is misplaced. In *Ballenger*, a congressman spoke to a reporter about the dissolution of his marriage (which he thought his constituents would care about) and, in the course of that discussion, glancingly stated that CAIR was the "fund-raising arm for Hezbollah." *Id.* at 662. When CAIR sued for libel, the D.C. Circuit upheld dismissal of its claim, concluding that the Congressman's "conduct was motivated—at least in part—by a legitimate desire to discharge his duty as a congressman," since there was a "nexus" between answering questions about his personal life and his ability to carry out his political agenda. *Id.* at 664-66.

Although this case and *Ballenger* both involve the discussion of an elected official's personal life, that is where the similarity ends. In *Ballenger*, the evidence did not disclose any particular reason for the statement about CAIR. There was no evidence of any animus or retaliatory motive. It appears the Congressman randomly made a single stray comment about CAIR—a group actively engaged in lobbying and governmental affairs—while explaining his wife's dissatisfaction with life in D.C. Further, he had submitted to the district court a detailed affidavit testifying that his purpose in discussing his marriage was to ensure his efficacy as a legislator.[19]

In contrast, here there is overwhelming evidence that Trump willfully and repeatedly singled out Carroll for malicious lies. He attacked her three times over

---

[19] *See* Affidavit of Cass Ballenger, *Council on Am.-Islamic Relations v. Ballenger*, 366 F. Supp. 2d 28 (D.D.C. 2005) (No. 03 Civ. 2488).

66

four days. He implied that she was too ugly to sexually assault. He accused her of falsifying experiences of sexual assault by other men. He concocted dark schemes and imputed vile motives. He did all this against a private citizen (not a leading civil rights and advocacy organization actively involved in political deliberations). He acted with obvious private motives—consistent with his prior practice—to punish and retaliate against her for revealing his decades-old crime. Whereas the statements in *Ballenger* register as reckless, Trump knew exactly what he was doing. And he has submitted no evidence disputing the allegations in the Complaint.

To be sure, *Ballenger* recognizes that there may be circumstances in which an official discusses his private life for reasons related to his job. *See* 444 F.3d at 664-66. That makes sense: officials may sometimes need to comment on their private lives to do their jobs effectively. But nowhere does *Ballenger* (or any other case) articulate a rule that elected officials always and everywhere act with public purposes—and thus within their employment—when speaking to the press about their private lives. To the contrary, *Ballenger* explicitly denies any broad-based rule of immunity for "gratuitous slander in the context of statements of a purely personal nature." *Id.* at 666. It then emphasizes that its result "cannot be divorced from its facts"—which differ mightily from those presented here. *See id.*

At bottom, Appellants' theory (which they wrongly impute to *Ballenger*) is that federal officials may defame anyone in their dealings with the press—at any

67

time, for any reason, no matter how private the subject matter or how outrageous their attacks—because doing so might improve their political or electoral position. That is especially true, it seems, if the target of the officials' attacks has dared to criticize them, even for private misconduct that occurred long ago. On that view, the personal is political: there is no need to demonstrate any connection between the defamatory statements and some aspect of public policy or administration. Trump was free to undertake repeated private tortious acts for personal gain, and to be seen as furthering the interests of his job as President in doing so, since pursuing his own private interests in punishing Carroll might incidentally result in political gain.

This reasoning is wrong as a matter of *respondeat superior* law, which looks to an employee's actual motive for committing intentional torts. *See* SPA53 ("[T]here is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment."). It is also wrong in a much deeper sense. No President should be heard to argue that he is free to willfully injure private citizens who reveal that he raped them because inflicting such harm might help him politically and is thus part of his job. That reasoning disgraces the American Presidency and the rule of law. It most immediately calls to mind King Louis XIV's declaration, "*L'état, c'est moi.*"[20]

---

[20] Judge Kaplan recognized the perils of Appellants' argument. "Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns

In exchange for a promise to serve the country and all who live here, federal officials are vested with great power. It is a betrayal of this public trust to weaponize that power while pursuing selfish interests in silencing and retaliating against those who reveal private malfeasance. A White House job is not a promise of unlimited authority to brutalize victims of prior wrongdoing through vicious, personal, defamatory attacks. That is not the law—and this Court should not make it so.

**E.      At a Minimum, This Court Should Remand to Allow for Discovery**

In the district court, Carroll explained that if the court were inclined to grant DOJ's substitution motion, it should first authorize limited discovery and hold an evidentiary hearing to resolve any material factual disputes as to whether Trump acted within the scope of his employment. A357. Because the district court denied the motion to substitute, it did not reach that argument. In the event that this Court were to conclude that the district court erred, the proper course would be to vacate the judgment and remand for discovery so that the district court may decide the scope-of-employment issue on a more complete record. *See Fountain v. Karim*, 838 F.3d 129, 138 (2d Cir. 2016); *see also, e.g.*, *Stokes v. Cross*, 327 F.3d 1210, 1214

---

his character—without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office." SPA54.

69

(D.C. Cir. 2003); *Ballenger*, 444 F.3d at 663 (recognizing that the district court authorized discovery); *Operation Rescue*, 975 F. Supp. at 101 (same).

## CONCLUSION

For the reasons set forth above, the decision below should be affirmed.


April 16, 2021                                      Respectfully submitted,

                                                   */s/ Roberta A. Kaplan*
                                                   Roberta A. Kaplan
                                                   Joshua Matz
                                                   Raymond P. Tolentino
                                                   KAPLAN HECKER & FINK LLP
                                                   350 Fifth Avenue | Suite 7110
                                                   New York, NY 10118
                                                   rkaplan@kaplanhecker.com
                                                   (212) 763-0883

                                                   Leah Litman
                                                   701 South State Street
                                                   Ann Arbor, MI 48103
                                                   leah@llitman.com
                                                   (734) 647-0549

                                                   *Counsel for Plaintiff-Appellee*

70

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's Order of April 6, 2021, granting Appellee's motion to file an oversized brief of not more than 18,000 words. This brief contains 17,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated:  April 16, 2021                                    */s/ Roberta A. Kaplan*
                                                         Roberta A. Kaplan

                                                         *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2021, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

Dated:  April 16, 2021

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan

*Counsel for Plaintiff-Appellee*