# Nos. 20-3977 & 20-3978

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

E. JEAN CARROLL,
Plaintiff-Appellee,

v.

DONALD J. TRUMP,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Movant-Appellant.

On Appeal from the United States District Court
for the Southern District of New York

**REPLY BRIEF OF APPELLANT UNITED STATES OF AMERICA**

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4747*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................1

ARGUMENT ...........................................................................................................3

I.  The Westfall Act Applies To The President ...........................................................3

    A.  The President is an "employee of the government" under the plain terms of the Act ........................................................................3

    B.  All three branches have recognized that the definitions of "employee" and "agency" are not exclusive ...................................8

    C.  Separation of powers concerns do not provide a reason for denying the President the protection of the Westfall Act ........................12

II.  The District Court Erred In Refusing To Substitute The United States Under The Westfall Act ........................................................................ 13

    A.  A court must focus on whether the conduct is of the type an official performs, not whether the specific act was wrongful ..................14

    B.  Substitution was warranted regardless of which jurisdiction's law applies ...........................................................................20

CONCLUSION ........................................................................................... 24

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ali v. Federal Bureau of Prisons,*
    552 U.S. 214 (2008)......................................................................................11

*Allaithi v. Rumsfeld,*
    753 F.3d 1327 (D.C. Cir. 2014) ..................................................................21

*Bailey v. J & B Trucking Servs., Inc.,*
    590 F. Supp. 2d 4 (D.D.C. 2008) .................................................................21

*Barimany v. Urban Pace LLC,*
    73 A.3d 964 (D.C. 2013)..............................................................................21

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) .......................................................................................5

*Claiborne Pell, U.S. Senate, In re,*
    No. B-199413, 1980 WL 16158 (Comp. Gen. Aug. 11, 1980) .....................9

*Clinton v. Jones,*
    520 U.S. 681 (1997) .....................................................................................18

*Council on Am. Islamic Relations v. Ballenger,*
    444 F.3d 659 (D.C. Cir. 2006) ...............................................3, 15, 17, 18, 19, 20

*Courtney v. United States,*
    230 F.2d 112 (2d Cir. 1956) ........................................................................11

*Cromelin v. United States,*
    177 F.2d 275 (5th Cir. 1949) .........................................................................9

*District of Columbia v. Bamidele,*
    103 A.3d 516 (D.C. 2014) ............................................................................18

*Does 1-10 v. Haaland,*
    973 F.3d 591 (6th Cir. 2020) ................................................................3, 4, 22

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................12

*Hui v. Castaneda*,
559 U.S. 799 (2010) ..........................................................................6

*Jacobs v. Vrobel*,
724 F.3d 217 (D.C. Cir. 2013) .............................................14, 18, 21

*Levin v. United States*,
568 U.S. 503 (2013) ..........................................................................7

*Majano v. United States*,
469 F.3d 138 (D.C. Cir. 2006) ....................................................19, 22

*Maryland ex rel. Levin v. United States*,
381 U.S. 41, *reh'g granted, judgment vacated*,
382 U.S. 159 (1965) ........................................................................11

*McNamara v. United States*,
199 F. Supp. 879 (D.D.C 1961)......................................................10

*M.J. Uline Co. v. Cashdan*,
171 F.2d 132 (D.C. Cir. 1948) .......................................................19

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ..................................................................12, 13

*Operation Rescue Nat'l v. United States*,
975 F. Supp. 92 (D. Mass. 1997), *aff'd*,
147 F.3d 68 (1st Cir. 1998)..........................................................3
147 F.3d 68 (1st Cir. 1998) .........................................................4

*Perks v. Town of Huntington*,
251 F. Supp. 2d 1143 (E.D.N.Y. 2003).....................................22-23

*Rasul v. Myers*,
512 F.3d 644 (D.C. Cir. 2008), *vacated and remanded on other grounds*,
555 U.S. 1083 (2008), *reinstated in relevant part*,
563 F.3d 527 (D.C. Cir. 2009) ...............................................2, 16, 22

*Rausman v. Baugh*,
   682 N.Y.S. 2d 42 (N.Y. App. Div. 1998) .................................................................23

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ...................................................................................................5

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018) ................................................... 14, 15, 16, 17

*Sullivan v. United States*,
   21 F.3d 198 (7th Cir. 1994) .....................................................................................10

*United States v. LePatourel*,
   571 F.2d 405 (8th Cir. 1978) .....................................................................................9

*Weinberg v. Johnson*,
   518 A.2d 985 (D.C. 1986) .......................................................................................15

*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995) .............................................................................. 3, 22

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) .........................................................................2, 7, 16

*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009) .......................................................................3, 15, 23

## U.S. Constitution:

Art. II, § 1, cl. 8 ............................................................................................................4

## Statutes:

Federal Tort Claims Act (FTCA):
   28 U.S.C. § 2671 ................................................................... 4, 5, 6, 7, 10
   28 U.S.C. § 2674 ......................................................................................12
   28 U.S.C. § 2679(b) .......................................................................... 1, 13
   28 U.S.C. § 2679(b)(1) .................................................................... 3-4

28 U.S.C. § 2679(d) .............................................................................. 1, 13
28 U.S.C. § 2680(a) .................................................................................12-13

Pub. L. No. 80-641, ch. 467, 62 Stat. 423, 434 (1948) .........................................8

Pub. L. No. 97-124, § 1, 95 Stat. 1666, 1666 (1981) ..........................................11

Pub. L. No. 106-518, § 401, 114 Stat. 2410, 2421 (2000)....................................10

3 U.S.C. § 102...........................................................................................4

28 U.S.C. § 451............................................................................... 6, 7, 8

## Legislative Materials:

H.R. Rep. 100-700 (1988).............................................................................9

H.R. Rep. 106-312 (1999).............................................................................11

S. Res. 492, 97th Cong. 2d Sess. (1982), *reprinted in* S. Doc. No. 113-1 (2014),
https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf..............9

## Other Authorities:

*Federal Tort Claims Act—Applicability to Agencies in Other Than
Executive Branch of Government*, 26 Comp. Gen. 891 (1947) ...............................8

*Restatement (Second) of Agency* (Am. Law Inst. 1958):
§ 228(1)(c)..............................................................................................18
§ 245 ....................................................................................................19

## INTRODUCTION AND SUMMARY OF ARGUMENT

Then-President Trump's response to Ms. Carroll's serious allegations of sexual assault included statements that questioned her credibility in terms that were crude and disrespectful. But this case does not concern whether Mr. Trump's response was appropriate. Nor does it turn on the truthfulness of Ms. Carroll's allegations. The case instead addresses whether the Federal Tort Claims Act (FTCA) and the Westfall Act apply to the President and the scope of their application—questions that implicate the institutional interests of the federal government. The district court's resolution of those issues was erroneous, and the government respectfully urges the Court to reverse the decision of the district court.

The FTCA makes the United States liable for the torts committed by its employees within the scope of their employment. The Westfall Act, in turn, makes the FTCA the exclusive means of pursuing such tort claims. *See* 28 U.S.C. § 2679(b). To that end, the Westfall Act creates a mechanism for substituting the United States as the sole defendant in instances where a claim within the scope of the FTCA is filed against federal employees. *Id.* § 2679(d). This case presents the threshold question whether the actions of a sitting President of the United States categorically fall outside the Westfall Act, and also the question of whether Mr. Trump's response to Ms. Carroll fell within the scope of his office or employment.

As to the threshold question, Ms. Carroll urges that the President is not an "employee of the government" for purposes of the FTCA and the Westfall Act. But

those statutes apply broadly to all persons working for or on behalf of the United States, even when unsalaried. They extend not only to the Executive Branch, but to all employees of the Legislative and Judicial branches, including Members of Congress and Supreme Court Justices. Nothing in the text, purpose, or history of the statutes suggests that they exempt from their coverage the President of the United States.

The second question presented is whether a high-ranking elected official subject to close public scrutiny acts within the scope of employment when making public statements denying and responding to serious accusations. The FTCA and Westfall Act, and the common law tort principles that they incorporate, recognize that in some instances employees will commit torts—including intentional torts—for which the employer bears responsibility, even when the employer disapproves of or expressly forbids the tortious conduct. Conduct that falls within the scope of employment for purposes of the Westfall Act thus need not be authorized or acceptable. Indeed, the premise of a scope-of-employment analysis is that a tort may have been committed. Under the Westfall Act, even conduct involving "serious criminality," *Rasul v. Myers*, 512 F.3d 644, 660 (D.C. Cir. 2008), or which runs "contrary to the national security of the United States," *Wilson v. Libby*, 535 F.3d 697, 711-12 (D.C. Cir. 2008), may fall within the scope of employment. In making and defending a Westfall Act certification, therefore, the Department of Justice is not endorsing the allegedly tortious conduct or representing that it actually furthered the

2

interests of the United States.  Nor is a reviewing court making any such determinations in upholding the Department's certification.

Instead, the question in a Westfall Act case is whether the general type of conduct at issue comes within the scope of employment.  Speaking to the public and the press on matters of public concern is undoubtedly part of an elected official's job.  Courts have thus consistently and repeatedly held that allegedly defamatory statements made in that context are within the scope of elected officials' employment—including when the statements were prompted by press inquiries about the official's private life.  *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (Representative); *see also, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 598-602 (6th Cir. 2020) (Senator and Representative); *Wuterich v. Murtha*, 562 F.3d 375, 383-87 (D.C. Cir. 2009) (Representative); *Williams v. United States*, 71 F.3d 502, 505-07 (5th Cir. 1995) (Representative); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 106-09 (D. Mass. 1997) (Senator), *aff'd*, 147 F.3d 68 (1st Cir. 1998).  The same is true here.

## ARGUMENT

## I.    The Westfall Act Applies To The President

### A.    The President is an "employee of the government" under the plain terms of the Act

The district court held that the President is not an "employee of the government" for purposes of the FTCA and, hence, for the Westfall Act, 28 U.S.C.

3

§ 2679(b)(1). If that were correct, no action taken by the President could give rise to tort liability on the part of the United States. And the United States could never be substituted as the defendant in a tort action against a President in his or her personal capacity, even when the conduct at issue was incontrovertibly taken within the scope of employment.

Until this case, no court had questioned that the Westfall Act applies to the President, as it applies to every other person who draws a federal salary (and many persons who do not). *See, e.g., Does 1-10 v. Haaland*, 973 F.3d 591, 597-98 (6th Cir. 2020) (describing the Westfall Act as covering "all officers, up to the president") (quoting *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 71 (1st Cir. 1998)). As Ms. Carroll acknowledges, courts have approved the substitution of the United States for the President or former-President under the Westfall Act on several prior occasions. *See* Carroll Br. 19 & n.3.

The President is an "employee of the government." He (or she) provides services to the United States in return for a salary. *See* U.S. Const. art. II, § 1, cl. 8; 3 U.S.C. § 102. The definition of the term "employee of the government" found in 28 U.S.C. § 2671 confirms that the statute applies to the President. By its plain terms, the definition sweeps broadly. It "includes . . . officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged [in certain training or duty], and persons acting on

4

behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." *Id.*

The breadth of the definition is apparent. It is introduced by the word "includes," which indicates that the listed categories of employees are illustrative rather than exclusive. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (concluding that use of the word "includes" in a definition "is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive"); *Samantar v. Yousuf*, 560 U.S. 305, 317 n.10 (2010) ("The word 'includes' is usually a term of enlargement, and not of limitation.") (alterations and quotation marks omitted). The definition also eliminates frequent limitations on the understanding of employee to include persons "acting on behalf of a federal agency," even "temporarily" and "without compensation." 28 U.S.C. § 2671.

Ms. Carroll's argument focuses not on whether the President is an employee but on whether the President is an employee of a "federal agency," a term that is also statutorily defined. But the statutory examples of "agency," like the examples of "employee," are not exclusive: the examples are also introduced by the word "includes." 28 U.S.C. § 2671. And, like the examples of employee, they evidence the intent to reach all parts of the federal government, including "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States." *Id.* Indeed, the definition of

5

"federal agency" is so expansive that Congress considered it necessary to specify that it "does *not* include any contractor with the United States." *Id.* (emphasis added). As the Supreme Court has explained, the statute's broad definition, as applied under the Westfall Act, reaches "all federal employees." *Hui v. Castaneda*, 559 U.S. 799, 810 (2010).

Ms. Carroll argues that the President cannot be an officer of a "federal agency," because the statutory definition of that term refers to the "Executive Departments," which she construes as encompassing only fifteen specific cabinet level agencies, all of which exist beneath the President. *See* Carroll Br. 21 (discussing 28 U.S.C. § 451, which states that the word "department" should be construed as referencing only the fifteen cabinet departments "unless the context" suggests otherwise). But as noted, the examples referenced in the definitions of "employee of the government" and "federal agency" are not exclusive. Thus, even assuming that various components of the executive branch do not fall within one of the specific examples called out in the statutory definitions, it would not end the court's inquiry.

In any case, the term "executive departments" as used in the statute's definition cannot be narrowed in the manner Ms. Carroll suggests. Such a reading would deny Westfall Act protection not just to the President, but to a potentially significant number of other federal employees. For example, the same statutory provision on which Ms. Carroll relies, 28 U.S.C. § 451, defines the term "agency" to include "any department, independent establishment, commission, administration, authority, board

or bureau of the United States." The definition of "federal agency" in 28 U.S.C. § 2671, however, does not expressly list commissions, administrations, authorities, boards, or bureaus. Those terms also do not fall within § 451's definition of a "department." Thus, if Ms. Carroll were correct that the statutory definition of "executive departments" in the FTCA incorporates the definition in 28 U.S.C. § 451, it would follow that any employee of a "commission, administration, authority, board or bureau" would be left uncovered. This result would run directly contrary to the Supreme Court's recognition that the statute "[s]hields all federal employees from personal liability without regard to agency affiliation or line of work." *Levin v. United States*, 568 U.S. 503, 509 (2013). And Ms. Carroll offers no explanation for why Congress would have chosen to waive immunity only for torts committed by employees of fifteen specific agencies and included only those employees within the scope of the Westfall Act.

In addition, as Ms. Carroll tacitly recognizes, her construction of the statute would exclude from the FTCA and the Westfall Act all officers and employees of the Executive Office of the President, which is not, under her theory, an "agency" within the meaning of the FTCA and the Westfall Act. Accordingly, decisions such as *Wilson v. Libby*, 535 F.3d 697, 711-12 (D.C. Cir. 2008), which applied the Westfall Act to the Vice President's chief of staff, would have been wrongly decided. To avoid this difficulty, Ms. Carroll recognizes in a footnote that "legislative and judicial usage and practice suggest[] that [the Executive Office of the President] may rank among the

7

'executive departments' expressly covered by the FTCA"—even though it is not one of the fifteen cabinet agencies referenced in 28 U.S.C. § 451. Br. 28 n.8. That acknowledgement is correct, but it is incompatible with Ms. Carroll's attempt to limit the statute's reach.

**B. All three branches have recognized that the definitions of "employee" and "agency" are not exclusive**

To our knowledge, the United States has never disclaimed liability for torts committed by an executive branch employee on the ground that the employee was not employed by one of the fifteen cabinet level departments identified in 28 U.S.C. § 451. To the contrary, all three branches of government have long construed the statute broadly. In the immediate wake of the enactment of the FTCA, the Comptroller General concluded that "an examination of the entire act and its legislative history requires a conclusion that no agencies or employees are excluded from the operation of the act." *Federal Tort Claims Act—Applicability to Agencies in Other Than Executive Branch of Government*, 26 Comp. Gen. 891, 892 (1947). And the following year, Congress—consistent with the view of the Comptroller General— appropriated funds to the Library of Congress for the payment of FTCA claims. *See, e.g.*, Pub. L. No. 80-641, ch. 467, 62 Stat. 423, 434 (1948). Ms. Carroll argues that the Comptroller's decision was insufficiently reasoned (Br. 31-32 n.10), but it reflects a contemporaneous understanding of the statute's scope that has remained in place for decades. Although Ms. Carroll asserts that the Comptroller General later reversed its

8

position in 1980 (Br. 32 n.10), the cited decision expressly reaffirmed the 1947

opinion and also reiterated that the FTCA applies to the legislative branch, even

though the statutory definition did not yet include express language to that effect. *See*

*In re Claiborne Pell, U.S. Senate*, No. B-199413, 1980 WL 16158 (Comp. Gen. Aug. 11,

1980).

Moreover, both Congress and the Judiciary established procedures for the

payment of FTCA claims well before the FTCA's definition of "federal agency" was

amended in 1988 to explicitly reference the legislative and judicial branches. *See*

Opening Br. 14; *see also* S. Res. 492, 97th Cong. 2d Sess. (1982), *reprinted in* S. Doc. No.

113-1, at 194-95 (2014);[1] *United States v. LePatourel*, 571 F.2d 405, 409 (8th Cir. 1978).

Accordingly, the committee report accompanying the amendment describes how the

effect of the amendment is "to make explicit" that the statute applies to the legislative

and judicial branches. H.R. Rep. 100-700, at 8 (1988).

Ms. Carroll responds by noting three cases in which the government argued, or

courts held, that the FTCA did not apply to a judicial or legislative officer prior to the

1988 amendment. Carroll Br. 31-32. But *Cromelin v. United States*, 177 F.2d 275 (5th

Cir. 1949), involved a suit against a judge for acts taken in a judicial capacity, a

circumstance where it was thought that application of the FTCA would create

particular concerns. *See LePatourel*, 571 F.2d at 410 (discussing the issue). And

---

[1] https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf.

*McNamara v. United States*, 199 F. Supp. 879 (D.D.C 1961), specifically rejected Ms. Carroll's argument that the definitions in 28 U.S.C. § 2671 are exclusive. *See* 199 F. Supp. at 880. In any case, Ms. Carroll does not identify a single case or authority suggesting that the FTCA does not apply to an executive branch employee.

Ms. Carroll also notes that Congress has amended the terms "employee of the government" and "federal agency" over the years, and infers that such amendments were necessary to reach categories of employees not specifically designated in the statute. Br. 31. As discussed, however, it was understood that both Congress and the Judiciary were covered by the FTCA prior to the 1988 amendment. And other amendments likewise do not show that the definition, notwithstanding its inclusive language, is in fact exclusive. Ms. Carroll emphasizes that Congress amended the definition of "employee of the government" to include "any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18." *See* Pub. L. No. 106-518, § 401, 114 Stat. 2410, 2421 (2000). She urges that the effect of this amendment was to expand the scope of the definition in order to reach employees of Federal public defender organizations, who previously were uncovered, a change that would have been inexplicable if these employees were already covered under the statute. Carroll Br. 30. But federal public defenders were held to be "employees of the government" well before the amendment. *See Sullivan v. United States*, 21 F.3d 198, 201-02 (7th Cir. 1994). The purpose of the amendment was

10

not to reach public defenders for the first time, but rather, to "*exempt* federal public defenders from the Tort Claims Act for claims related to representational services and rely instead on the malpractice provisions of 18 U.S.C. §3006A(g)(3)." H.R. Rep. 106-312, at 26 (1999) (emphasis added).

The 1981 amendment that expanded the definition of "employee of the government" to include members of the National Guard when engaged in certain federal duties also does not suggest that the definition's examples are exclusive. *See* Pub. L. No. 97-124, § 1, 95 Stat. 1666, 1666 (1981). Long before this amendment, several courts of appeals—including this Court—held that the FTCA applied to civilian National Guard members under certain circumstances. *See Courtney v. United States*, 230 F.2d 112 (2d Cir. 1956). The Supreme Court ultimately concluded otherwise, not based on any textual limits in the FTCA's definition of "employee of the government," but rather, based on specific considerations demonstrating that Congress had intended for National Guard members to be treated solely as State employees. *See Maryland ex rel. Levin v. United States*, 381 U.S. 41, 53, *reh'g granted, judgment vacated*, 382 U.S. 159 (1965). That reasoning has no application here.

Ms. Carroll's invocation of the principle that statutes should generally be read to avoid superfluity thus disregards the express directive that the term "federal agency" merely "includes" specified entities and is at odds with the consistent understanding of the FTCA over the decades. *See also Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 227 (2008) (recognizing that when a statute contains general language

11

followed by specific enumerated examples, it is sometime appropriate to accept a "broad interpretation" of the general clause, even when doing so "could render the specific enumerations unnecessary").[2]

### C. Separation of powers concerns do not provide a reason for denying the President the protection of the Westfall Act

Citing *Franklin v. Massachusetts*, 505 U.S. 788 (1992), Ms. Carroll also argues that even if the statutory definition otherwise reaches all executive branch employees, it should not be understood to encompass the President. But this argument turns *Franklin* on its head. The FTCA creates a cause of action against the United States in circumstances where a governmental employee or officer would face tort liability under state law. *See* 28 U.S.C. § 2674. Excluding the President from the scope of the statute would not protect the President or shield his actions from judicial scrutiny—it would merely leave him to defend those actions in his personal capacity (and presumptively at his own expense).

Furthermore, separation-of-powers concerns are ameliorated here by the FTCA's discretionary function exception, which precludes judicial scrutiny of whether the President abused his discretion in the performance of his official duties. *See* 28

---

[2] Ms. Carroll does not defend the district court's conclusion that applying the Westfall Act to the President would create incongruities with other provisions of the FTCA (Opening Br. 20-22), the court's waiver analysis (Opening Br. 22-24), or the court's reliance on Congress's supposed constructive knowledge of the President's immunity from tort liability under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (Opening Br. 25-26).

U.S.C. § 2680(a). Ms. Carroll notes that the principle recognized in *Franklin* has applications outside the context of abuse-of-discretion review. Carroll Br. 37. But she fails to show that this is a circumstance that implicates the separation-of-powers concerns that animate the *Franklin* principle. She notes that a scope-of-employment analysis directs judicial attention to conduct that may be at the outer limit of a federal employee's duties. Carroll Br. 39. But in the immunity context, courts consider the analogous question of whether a President acted within the outer perimeter of his official responsibility. *See Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Performing a similar analysis here would not create constitutional concerns.

In sum, there is no reason to exclude the President from the Westfall Act's expansive coverage.

## II.   The District Court Erred In Refusing To Substitute The United States Under The Westfall Act

The United States is potentially liable, and substitution under the Westfall Act is permissible, for torts committed within the "scope of . . . employment." 28 U.S.C. § 2679(b), (d). The key inquiry is whether the conduct at issue is of the type an official generally performs, rather than whether the particular allegedly tortious act was improper. Even reprehensible conduct—including intentional torts—can fall within the scope of employment. The specific conduct need not constitute an act of "public service" to be within scope. Carroll Br. 51.

13

In this case, the Director of the Torts Branch of the Civil Division of the Department of Justice certified on behalf of the Attorney General that the President was acting within the scope of his office or employment with respect to the allegations in the complaint. A53-A54. The government does not dispute that many of the statements alleged in the complaint were unwarranted and disrespectful. But that is not the relevant inquiry. The district court's reasoning in setting aside the scope certification misapprehends the legal principles relevant to the scope of employment determination.

## A. A court must focus on whether the conduct is of the type an official performs, not whether the specific act was wrongful

**1.** The premise of a scope-of-employment inquiry is that the defendant has committed a tort. Thus, in undertaking a scope-of-employment inquiry, a court must look to "the type of act" the defendant took, rather than its "wrongful character." *Jacobs v. Vrobel*, 724 F.3d 217, 221-22 (D.C. Cir. 2013).

Tort suits alleging actionable misconduct by senior officials of the United States during their terms in office, while not commonplace, are also not rare. The D.C. Circuit has on several occasions considered whether such claims fall within the scope of the officials' employment. The court discussed several of those decisions in *Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018), noting that "[e]xtensive precedent makes clear that alleging a federal employee violated policy or even laws in the course of her employment—including specific allegations of defamation or of potentially

14

criminal activities—does not take that conduct outside the scope of employment." *Id.* at 126. The claims in that case stemmed in part from the allegation that former Secretary of State Hillary Clinton's use of a private email server to convey sensitive information led to the attack on the American diplomatic compound in Benghazi that had resulted in the death of plaintiffs' children. The D.C. Circuit explained that the scope of employment inquiry "'focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" *Id.* at 126-27 (quoting *Council on Am. Islamic Rel. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (quoting *Weinberg v. Johnson*, 518 A.2d 985, 992 (D.C. 1986)). "What matters is whether the underlying activity itself was part of the employee's duties." *Id.*

Surveying relevant decisions, the *Smith* court noted that, in *Ballenger,* "because responding to media inquiries was one of the congressman's authorized duties, such responses fell within the scope of employment even when defamatory." *Smith*, 886 F.3d at 127. Similarly, in *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009), a congressman's media interviews about a military incident, even if defamatory, were likewise within the scope of employment. *Id.*

*Smith* also noted decisions outside the defamation context in which charges of serious and, indeed, criminal misconduct were recognized to be within a federal official's scope of employment. Thus, "senior officials alleged to have implemented and supervised systemic torture of Guantanamo Bay detainees acted within the scope

15

of their employment because their responsibilities included detaining and interrogating suspected enemy combatants[.]" *Smith*, 886 F.3d at 127 (discussing *Rasul v. Myers*, 512 F.3d 644, 656-59 (D.C. Cir.), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part*, 563 F.3d 527, 528-29 (D.C. Cir. 2009)). Similarly, "[e]xecutive officials acted within their scope of employment when disclosing a covert operative's identity for retributive reasons while speaking to the press." *Id.* (discussing *Wilson*, 535 F.3d at 712).

**2.** Applying these established principles to this case, the statements by then-President Trump fell within the scope of his employment. The district court's contrary conclusion was premised on an assumption that the statements were not within the scope because "President Trump's views on [Ms. Carroll's] sexual assault allegation" were not pertinent to his employment since "they reveal nothing about the operation of government" (SPA53) and "[n]either the media reports nor the underlying allegations have any relationship to his official duties" (SPA58). That premise was mistaken.

When members of the White House media asked then-President Trump to respond to Ms. Carroll's serious allegations of wrongdoing, their questions were posed to him in his capacity as President. Likewise, when Mr. Trump responded to those questions with denials of wrongdoing made through the White House press office or in statements to reporters in the Oval Office and on the White House lawn, he acted within the scope of his office. Elected public officials can—and often must—address

16

allegations regarding personal wrongdoing that inspire doubt about their suitability for office. Such wrongdoing can include not only the serious charges of criminal behavior leveled here, but a range of activities including fraud and malfeasance. Officials do not step outside the bounds of their office simply because they are addressing questions regarding allegations about their personal lives. Thus, in *Ballenger*, the D.C. Circuit concluded that a congressman acted within the scope of employment when he allegedly engaged in defamation during an interview to explain the reasons for his separation from his wife. 444 F.3d at 662. The district court's contrary reasoning in this case fails to appreciate the responsibility that elected officials owe the public to respond to serious allegations that cast doubt on their fitness for office.

Ms. Carroll emphasizes that Mr. Trump went "further than simply denying" her allegations because—in the course of his denials—he attacked her appearance, impugned her motives, and implied that she had made false accusations against others. Carroll Br. 51. Those statements were without question unnecessary and inappropriate. But they all pertained to the denial of wrongdoing—which cannot be cleanly severed from the accompanying explanation here. The fact that the additional statements were, at minimum, inappropriate does not automatically take them outside the limits of the scope of employment. *Cf. Smith*, 886 F.3d at 126-27 (the scope-of-employment test "focuses on the underlying dispute or controversy" and "is broad

17

enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf") (citation omitted).

Ms. Carroll argues that the statements at issue here were made for personal reasons. As discussed, however, the relevant question is whether the general type of conduct is within the scope of the former President's office. Responding to allegations of misconduct falls within the category of activities that form part of any President's office. The distasteful nature of some of the remarks here does not alter the office-related nature of the response for purposes of the scope of employment analysis. As the D.C. Circuit noted in *Ballenger,* "[t]he Restatement's text reveals that even a *partial* desire to serve the master is sufficient." 444 F.3d at 665 (citing *Restatement (Second) of Agency* § 228(1)(c) (Am. Law Inst. 1958)); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014) ("[I]f the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives"); s*ee also Jacobs*, 724 F.3d at 222-23 (recognizing that "[c]onclusory allegations" provide insufficient basis to infer that an employee was not at least partially motivated by a desire to serve his employer when he allegedly committed defamation in the performance of an act undertaken in his capacity as an employee).

As these decisions illustrate, Ms. Carroll is incorrect to suggest that alleged intentional torts rarely, if ever, fall within the scope of employment. The cases on which she relies are inapposite. In *Clinton v. Jones*, 520 U.S. 681 (1997), the Supreme

Court reserved the question of whether the alleged defamation there would fall within the outer perimeter of the President's official responsibilities because "the matter [wa]s not before [the Court]." *Id.* at 686 n.3. *Majano v. United States*, 469 F.3d 138 (D.C. Cir. 2006), involved an assault by one worker on another that was disconnected from the attacker's performance of any job responsibility. In *M.J. Uline Co. v. Cashdan*, 171 F.2d 132 (D.C. Cir. 1948), the plaintiff was a spectator at hockey game who was hit over the head with a hockey stick by one of the players. And the provision of the *Restatement (Second) of Agency* that Ms. Carroll cites for the proposition that "outrageous" acts indicate that an employee has departed from scope of employment is specifically addressed to torts involving the use of force. Carroll Br. 45 (discussing *Restatement (Second) of Agency* § 245). It is cases like *Ballenger, Wuterich* and *Wilson* that resemble the circumstances here.

Ms. Carroll's efforts to distinguish the holding or reasoning of *Ballenger* are similarly unavailing. Carroll Br. 65-68. As noted, the congressman in that case asked for an interview in order to explain the reasons for his separation from his wife, "chief among them being his wife's dissatisfaction with life in Washington, D.C." 444 F.3d at 662. The congressman elaborated that "his wife became increasingly uncomfortable living across the street from the headquarters of the Council on American–Islamic Relations," which he then described as the "fund-raising arm for Hezbollah," an entity that had been designated a foreign terrorist organization by the State Department. *Id.* The congressman thus gratuitously accused the plaintiff of

being an agent for a foreign terrorist organization in an interview he had requested to discuss his separation from his wife. Ms. Carroll offers no persuasive basis for distinguishing *Ballenger* for purposes of the scope of employment analysis.

Ms. Carroll raises the concern that allowing substitution here would give license to all high-ranking officials to defame any private critic in any manner whatsoever. Carroll Br. 58-59, 68-69. The D.C. Circuit addressed the same concern "that a holding in favor of Ballenger 'would immunize many federal employees for any gratuitous slander in the context of statements of a purely personal nature.'" *Ballenger*, 444 F.3d at 666. The court correctly explained that its holding could not properly be construed in this manner, stressing that the allegedly defamatory statement occurred in the course of an interview regarding a subject that had become one of concern to the congressman's constituency. *Id.* at 665-66. The same is true here.[3]

**B.    Substitution was warranted regardless of which jurisdiction's law applies**

**1.** Ms. Carroll seeks to avoid many of the precedents cited above by urging that New York law, rather than District of Columbia law, should governs the scope-of-employment analysis. Because the employment relationship between a President and the United States is centered in the District of Columbia, however, that jurisdiction's *respondeat superior* law naturally applies. Whether a President acts within the scope of

---

[3] Ms. Carroll does not defend the district court's "master-servant" analysis (Opening Br. 36-39), or its reliance on waiver principles (Opening Br. 35).

his employment should be judged consistently under that body of law, rather than the varying laws of the fifty states in which plaintiffs can assert they experienced injury as a result of the President's conduct.

Ms. Carroll argues that New York has the most significant relationship to this dispute, notwithstanding that the case was filed against a sitting President who addressed nationally publicized allegations in response to questions posed at the White House itself. Whatever the merit of this argument, at most, it suggests that District of Columbia courts might apply substantive New York defamation law here. It does not suggest that District of Columbia courts would apply New York law regarding scope of employment.

The District of Columbia considers choice-of-law questions "issue by issue." *Barimany v. Urban Pace LLC*, 73 A.3d 964, 967 (D.C. 2013); *see Bailey v. J & B Trucking Servs., Inc.*, 590 F. Supp. 2d 4, 10 (D.D.C. 2008) ("That District of Columbia tort law governs the negligence and proximate cause aspects of this case does not necessarily mean that it also governs the *respondeat superior* aspect of this case."). There can be no dispute that the District of Columbia, rather than New York, has the most significant interest in the employment relationship between the President and the United States. And in cases involving suits against federal officials, the D.C. Circuit has repeatedly applied District of Columbia law as "the substantive law of the jurisdiction where the employment relationship exists." *Jacobs*, 724 F.3d at 221; *see also Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) ("The question of whether a particular act falls

21

within the scope of employment is governed 'by the law of the place where the employment relationship exists.'" (quoting *Majano,* 469 F.3d at 141)); *Rasul,* 512 F.3d at 655 (same).

Ms. Carroll notes that, in two other cases involving defamation suits against federal officials, courts applied the *respondeat superior* law of the state where the plaintiff resided. Carroll Br. 43 (citing *Does 1-10*, 973 F.3d at 599; and *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995)). Neither case addressed the interest of the District of Columbia as the seat of the national government and place of employment. And neither case analyzed the choice-of-law principles governing the *respondeat superior* inquiry separately from the question of which state's substantive tort law was applicable. The Court should look to those cases not for their choice-of-law analyses, but rather because they illustrate that courts applying the *respondeat superior* law of a range of jurisdictions have recognized public officials were acting within the scope of their offices in making allegedly defamatory statements. *See Does 1-10*, 973 F.3d at 599-602 (Kentucky law); *Williams*, 71 F.3d at 507 (Texas law).

**2.** In any event, Ms. Carroll identifies no significant distinctions between the principles of law applied by the District of Columbia and New York courts. There is no reason to conclude that application of the same general *respondeat superior* principles as understood by New York courts would dictate a different result than the application of those principles by the D.C. Circuit, and the decisions cited by Ms. Carroll provide no support for that supposition. In *Perks v. Town of Huntington*, 251 F.

22

Supp. 2d 1143 (E.D.N.Y. 2003), a councilwoman filed an allegedly false police report about a former paramour, and in *Rausman v. Baugh*, 682 N.Y.S. 2d 42 (N.Y. App. Div. 1998), a hospital employee accused her supervisor of sexual harassment. These decisions shed no light on the application of *respondeat superior* principles to allegedly defamatory statements made by public officials on matters of public interest in response to direct media inquiries.

Finally, although Ms. Carroll asks in the alternative for discovery, she fails to explain what aspects of the record she believes are incomplete, and otherwise fails to demonstrate entitlement to discovery. *See Wuterich,* 562 F.3d at 381 (describing burdens that plaintiff must carry to obtain discovery in challenging a Westfall Act certification). The question, again, is not whether some of the statements were defamatory, but whether addressing questions regarding highly publicized accusations falls within types of activities that are a part of the President's office. That question can be resolved as a matter of law here.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
 *s/ Joshua M. Salzman*
JOSHUA M. SALZMAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4747*
  *joshua.m.salzman@usdoj.gov*

June 2021

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,836 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua M. Salzman*
JOSHUA M. SALZMAN