*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-SP-745

DONALD J. TRUMP, *et al.*, APPELLANTS,

v.

E. JEAN CARROLL, APPELLEE.

On Certification from
the United States Court of Appeals
for the Second Circuit
(20-3977-CV (Lead); 20-3978-CV (Cons.))

(Argued January 10, 2023           Decided April 13, 2023)

*Alina Habba* and *Michael T. Madaio*, with whom *Jason C. Greaves* was on the brief, for appellant Donald J. Trump.

*Mark R. Freeman*, Attorney, United States Department of Justice, Civil Division, Appellate Staff, with whom *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, *Joshua M. Salzman*, and *Sean R. Janda*, Attorneys, United States Department of Justice, Civil Division, Appellate Staff, were on the brief, for appellant United States of America.

*Joshua Matz*, with whom *Roberta A. Kaplan*, *Matthew J. Craig*, and *Rachel L. Tuchman* were on the brief, for appellee E. Jean Carroll.

*Caroline S. Van Zile*, Solicitor General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time the brief was filed, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Marcella Coburn*, Assistant Attorney General, and *Nitisha Baronia*, Assistant Attorney General, were on the brief for amicus curiae District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, EASTERLY, MCLEESE, DEAHL, HOWARD, ALIKHAN, and SHANKER, *Associate Judges*.

Opinion of the court by *Chief Judge* BLACKBURNE-RIGSBY, with whom BECKWITH, EASTERLY, DEAHL, HOWARD, ALIKHAN, and SHANKER, Associate Judges, join.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 42.

BLACKBURNE-RIGSBY, *Chief Judge*: This case is before the court on a certified question from the United States Court of Appeals for the Second Circuit ("Second Circuit"). The certified question requests clarification of the District of Columbia's *respondeat superior* case law, which involves determining when an employer should be liable for the actions of an employee. The Second Circuit seeks this clarification as it relates to allegedly defamatory statements that then-President Donald J. Trump made in 2019 concerning E. Jean Carroll in response to her public allegations that he sexually assaulted her in a Bergdorf Goodman department store in New York City in the 1990s. *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).

## I. Certified Question of Law and Short Answers

### A. The Certified Question of Law from the Second Circuit

Under the laws of the District [of Columbia], were the allegedly libelous public statements made, during his term in office, by the

President of the United States, denying allegations of misconduct, with regards to events prior to that term of office, within the scope of his employment as President of the United States?

In certifying this question, the Second Circuit sought clarification from this court of the District of Columbia's law of *respondeat superior*. *Id.* at 774-81. In accepting the certified question, this court reframed the certified question as follows:

> [P]art one [of the certified question] asks this court to determine the scope of the President of the United States' employment, therefore the parties' briefs should address whether this court should opine on that aspect of the certified question; and part two [of the certified question] asks this court to clarify its *respondeat superior* case precedents, therefore the parties are further directed to address the extent, if any, to which this court's *respondeat superior* case precedents are unclear as applied to this case, and how this court might clarify or modify those precedents to help resolve the present dispute.

Order, *Trump v. Carroll*, No. 22-SP-745 (Oct. 25, 2022).[1]

We answer our reformulation of the Second Circuit's certified question in reverse order, first addressing the request to clarify District of Columbia law, and

---

[1] *See Akhmetshin v. Browder*, 275 A.3d 290, 292 (D.C. 2022) ("When considering a certified question, however, we are not limited to the designated question of law but may exercise our prerogative to frame the basic issues as we see fit for an informed decision." (cleaned up)).

second explaining why we decline to address the factbound question of whether the

former President was acting within the scope of his employment.

### B. Short Answers to the Certified Question of Law

1. As we explain more fully below, the District of Columbia generally adheres to the Restatement (Second) of Agency's statement of *respondeat superior* law as expressed in § 228. Specifically, the District of Columbia has adopted the framework as set forth in § 228(1)(a)-(d) and § 228(2) defining the scope of employment for which an employer may be held liable. *See Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987) (adopting § 228's definition of the scope of employment). The District of Columbia is not an "internalization" jurisdiction. Further, we do not adopt a categorical reading of *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006).

2. Under the law of the District of Columbia, and on the record before us, whether the President of the United States was acting within the scope of his employment is a question for the factfinder. The record provided to this court would not entitle either party to judgment as a matter of law under any of the standards that govern motions to dismiss, motions for summary judgment, or motions for judgment notwithstanding the verdict. Further, there may also have been additional, critical facts elicited since the certification of the question of law to this court during the completion of discovery, in particular during the deposition of the former President. It is not at all clear to us that the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly referred to as the "Westfall Act," 28 U.S.C. § 2679 *et seq.*, requires an answer to this scope-of-employment question as a matter of law at this preliminary stage. To the extent that it does, then we have no special expertise in answering that question and merely clarify our law to aid the Second Circuit or the United States District Court for the Southern District of New York in doing so. *Cf., e.g., Lyons v. Brown*, 158 F.3d 605, 609 (1st Cir. 1998) ("Federal law determines whether a person is

5

a federal employee and defines the nature and scope of [the person's] official responsibilities.").

## II. Background

A brief overview of the factual and procedural background of this case is helpful to provide context to the certified question we have been asked to answer.

In November 2019, E. Jean Carroll filed a complaint in the Supreme Court of the State of New York, County of New York—the state's trial court. In her complaint, Ms. Carroll alleged, *inter alia*, that she was sexually assaulted and raped by Mr. Trump in the dressing room of a Bergdorf Goodman's department store in New York City in the 1990s. On June 21, 2019, *New York Magazine* published online an excerpt from Ms. Carroll's book in which she publicly detailed her account of the assault for the first time. Ms. Carroll's book was published on July 2, 2019.

In response to the excerpt published in *New York Magazine*, that same day, then-President Trump issued a public statement denying the assault allegations and questioning Ms. Carroll's motives for making a public allegation. The following day, in a statement directly to reporters, he further denied the allegations. Then, two days later, he again denied Ms. Carroll's allegations in an interview with *The Hill*.

Ms. Carroll contends that the content of these statements by the former President operated to defame her by falsely denying the allegations as well as falsely implying that she invented the allegations to make money, increase her book sales, or carry out a political agenda.[2]

Once litigation was underway, the United States invoked the federal Westfall Act, which immunizes federal employees from personal liability and allows for potential recovery against the United States if liability is found. *See* 28 U.S.C. § 2679 *et seq.* The Westfall Act allows the Attorney General to certify that "the defendant employee was acting within the scope of his [or her] office or employment at the time of the incident out of which the claim arose." *Id.* § 2679(d)(2). For

---

[2] Some of the allegedly defamatory statements at issue are: "She is trying to sell a new book—that should indicate her motivation."; "This is a woman who has also accused other men of things, as you know."; "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" The Second Circuit noted, and we agree,

> that the issue before us is totally separate from the substantive merits of the claim underlying this defamation action. That is, in evaluating the scope of employment issue, we do not pass judgment or express any view as to whether Trump's public statements were indeed defamatory or whether the alleged sexual assault had, in fact, occurred. Those questions, which might loom large over this case at some point, are simply not before us in the present appeal.

*Carroll*, 49 F.4th at 780-81.

litigation that begins in state court, the Attorney General's certification operates to remove the case from state court to the federal district court and to substitute the United States as the only defendant. *Id.* It is this procedural mechanism that immunizes the federal employee from personal liability by allowing recovery only from the United States. *See Carroll*, 49 F.4th at 765-66. Recovery against the United States is possible because, for certain torts, the United States has waived its sovereign immunity from litigation under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Yet for certain torts such as defamation, for which the United States has *not* waived its sovereign immunity under the FTCA, substitution of the United States as the defendant bars any recovery. *See id.* § 2680(h) (outlining the exceptions to the FTCA's waiver of sovereign immunity, including the torts of libel and slander, i.e., defamation). The Attorney General's certification is subject to judicial review. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995).

Pursuant to these procedures, the Attorney General, through his designate, certified that then-President Trump was acting within the scope of his employment, and therefore immune from personal liability under the Westfall Act. Ms. Carroll opposed the United States' motion to substitute itself as the sole defendant in the litigation, challenging the underlying certification on two grounds: she argued that 1) a President is not an employee within the meaning of the Westfall Act; and 2)

then-President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

The timing of when the court must address the scope-of-employment question is somewhat different here than in a traditional civil suit because the court is being asked to determine whether an individual was an employee acting within the scope of their employment prior to discovery rather than after the full development of the record on that question. More importantly, the answer to the scope-of-employment question could have the effect of ending the case before a merits determination is made because the United States has not waived its sovereign immunity for the tort of defamation. This is unlike cases that involve torts for which the United States has waived sovereign immunity because substitution under the Westfall Act does not bar litigation of the merits of the plaintiff's claim or otherwise impede a successful plaintiff's ability to recover from the United States. However, because Ms. Carroll's litigation involves the alleged tort of defamation, for which the United States has *not* waived its sovereign immunity, substitution of the United States prevents a federal court from maintaining the litigation and consequentially bars Ms. Carroll from recovering in any capacity because her case would be dismissed should the motion to substitute be granted.

Ms. Carroll's litigation was removed to the United States District Court for the Southern District of New York. The district court agreed with Ms. Carroll and denied the United States' motion to substitute on both grounds Ms. Carroll raised. *Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). The then-President timely filed a Notice of Appeal.

A split panel of the Second Circuit disagreed with the district court's determination that the President is not an employee of the government under the Westfall Act. The Second Circuit further disagreed with the district court that even if the President were deemed a government employee under the Westfall Act, the President was not acting within the scope of his employment. *See Carroll*, 49 F.4th at 761. The Second Circuit concluded that the former President was "an employee of the Government" within the meaning of the Westfall Act. *Id.* at 72. Additionally, the Second Circuit concluded that the parties conceded the law of the District of Columbia—not New York—applied to determine whether the former President acted within the scope of his employment. *Id.* at 766 & n.6. The Second Circuit, after a review of our case precedents, expressed uncertainty about how the District of Columbia assesses the scope of an employee's employment under the doctrine of *respondeat superior* and whether the District of Columbia employs a traditional

view as expressed in the Restatement, an "internalization view," or a "mixed type of analysis." [3]  *Id.* at 774-76.

Likewise, the Second Circuit expressed uncertainty about whether *Council on American Islamic Relations v. Ballenger*, a case from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), applied District of Columbia *respondeat superior* law consistent with our clarifications herein in its decision immunizing a congressman from liability under the Westfall Act for allegedly defamatory comments made while speaking to the press.  *Id.* at 779-80.

The Second Circuit certified the question to this court.  We accepted the certified question of law pursuant to D.C. Code § 11-723(a) and reframed the certified question to emphasize that "this court might clarify or modify [our

---

[3] The "traditional view" of the scope of employment inquiry, as expressed in the Restatement (Second) of Agency § 228, requires, *inter alia*, that the employee have been "actuated, at least in part, by a purpose to serve the [employer]." *Carroll*, 49 F.4th at 773.  The more modern "internalization view" of the scope of employment inquiry allocates liability as a cost of doing business, thereby requiring a business to "internalize" the costs of an employee's tortious conduct.  *Id.* at 774. "[A] mixed type of analysis[] [is one] in which [the court] internalizes certain costs that cannot comfortably be said to be 'for the benefit' of the business enterprise, but are, nevertheless, described as such."  *Id.* at 774-75.

*respondeat superior*] precedents."  We further voted sua sponte for the en banc court to hear this matter.[4]

### III.  The *Respondeat Superior* Doctrine in the District of Columbia

The principal question we are presented with by the certified question as reformulated by this court is whether, and to what extent, this jurisdiction adheres to the "traditional view" of the scope of employment inquiry of *respondeat superior* set forth in the Restatement (Second) of Agency § 228, or whether this jurisdiction adheres to the internalization approach to the scope of employment inquiry.  On this principal question, we affirm our precedents and confirm that the District of Columbia generally adheres to the analytical framework of the scope of employment inquiry set forth in the Restatement (Second) of Agency § 228(1)-(2):

> (1)  Conduct of a servant is within the scope of employment if, but only if:
> > (a) it is of the kind [the person] is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the master, and

---

[4] Sitting en banc, we have the authority to "overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals [for the District of Columbia Circuit] rendered prior to February 1, 1971."  *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

    (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

    (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Rest. (2d) of Agency § 228.[5]

---

[5] Although the Restatement refers to a master-servant relationship, we have previously recognized that the Restatement applies to all principal-agent relationships, including that of an employer-employee. Accordingly, we use the terms "employer" and "employee" consistent with the factual context in which these appeals typically arise. *See United House of Prayer for All People v. D.C. Dep't. of Transp.*, 285 A.3d 174, 180 n.3 (D.C. 2022) (explaining the interchangeability of these terms). Determination of whether the alleged tortfeasor is an employee for purposes of a *respondeat superior* analysis is a necessary precursor to determining whether their conduct was within the scope of employment. We have not been asked in this certified question to address whether the President of the United States is an employee for purposes of either the Westfall Act or the *respondeat superior* law of the District of Columbia. We, therefore, decline to do so sua sponte.

We also note our use of the term "tortfeasor" to describe the individual who has committed a tort and "victim" to describe the individual who was subjected to the tort reflects that the consideration of whether to impose *respondeat superior* liability analytically follows the determination that a tort has occurred. It is only in certain procedural postures, such as a motion to substitute under the Westfall Act, where analyzing *respondeat superior* liability precedes a determination on the merits of whether a tortious act took place. Accordingly, although we use "tortfeasor" and "victim" to speak generally about *respondeat superior* liability, the use of "alleged tortfeasor" or "alleged victim" may be more appropriate at times.

This court's approval of the Restatement (Second) of Agency's formulation of *respondeat superior* liability dates back to *District of Columbia v. Davis*, where we approvingly cited to § 228 of the Restatement (without quoting specific text) in support of the proposition that the "scope and course of employment means the range or extent of the work to be performed by an employee within the limitations of his authority." 386 A.2d 1195, 1203 (D.C. 1978). A few years later, in *Johnson v. Weinberg* (*Johnson I*), we expressly quoted § 228(1)-(2) for the general definition of "scope of employment," although our decision in that case only relied on a general application of the Restatement's principles; we did not apply the Restatement as a strict test to be satisfied. 434 A.2d 404, 408 (D.C. 1981). Since then, this jurisdiction has generally relied on the definition of "scope of employment" as set forth in § 228, albeit inconsistently, as at various times we have quoted the text for its general principles, *e.g.*, *District of Columbia v. Coron*, 515 A.2d 435, 437 (D.C. 1986), adopted it, *e.g.*, *Moseley*, 534 A.2d at 348 n.4, quoted it approvingly, *e.g.*, *Schecter v. Mechs. Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006), and recognized that we have long endorsed the approach, *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014).

In consideration of this long and consistent history of citing to and quoting the Restatement (Second) of Agency, we confirm that the District of Columbia has

formally adopted the language of § 228(1)-(2) to define the scope of employment, but we depart from its language or otherwise construe some of its language more broadly at times. In our view, this approach to the Restatement's formulation of the scope of employment inquiry provides the proper allocation of risk and financial responsibility to the employer for the conduct of their employee. Further, this approach strikes the proper balance of the equities at hand, expanding the allocation of costs to employers beyond those torts that were the product of specific direction, but without holding employers liable for all torts fairly regarded as risks of their business—i.e., the internalization approach.

Our answer to the reformulated certified question requires a broader discussion of the doctrinal concepts in the Restatement to distinguish between the provisions to which we more closely adhere and those which our cases interpret more expansively. We also address other provisions of the Restatement that expound upon the concepts set forth initially in § 228. *See* Rest. (2d) of Agency § 228 cmt. [a] ("Sections 229-236 state the circumstances which determine whether acts can be considered to be within the scope of employment.").

Before discussing each provision of § 228 in turn, we also affirm that under our case precedents, whether an employee was acting within the scope of employment is ordinarily a fact-intensive question for the factfinder, and as such is not subject to determination as a matter of law in resolving a motion to dismiss or a motion for summary judgment. *Axman v. Wash. Gaslight Co.*, 38 App. D.C. 150, 161 (D.C. Cir. 1912); *Blair v. District of Columbia*, 190 A.3d 212, 229 (D.C. 2018); *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979) ("[T]he determination of scope of employment is dependent upon the facts and circumstances of each case.").[6] We further caution that although this opinion details all aspects of the *respondeat superior* inquiry, we expect in many cases not all elements outlined in the Restatement framework will be subject to dispute. In those instances, a factfinder's focus will be limited to only the elements that are in dispute.

---

[6] If no reasonable mind could conclude that the employee was acting within the scope of employment, the issue becomes a question of law for the judge. *See Johnson I*, 434 A.2d at 409; *Blair*, 190 A.3d at 225 n.38.

### A. Whether the Conduct "Is of the Kind [the Person] Is Employed to Perform"

Section 228(1)(a) of the Restatement (Second) of Agency provides that an employer is liable for an employee's tortious conduct in circumstances where the conduct is "of the kind [the person] is employed to perform." This language plainly encompasses an employee's performance of their stated job duties. However, an employer's liability extends beyond that narrow category of conduct. For example, the scope of an individual employee's job functions is not so narrowly construed as to cover only the conduct *expressly* authorized. *Id.* § 229(2).[7] Many employees have informal responsibilities that are as integral to their employment as their formal responsibilities, and therefore are just as sound of a basis for applying *respondeat superior* liability. *See, e.g.*, *id.* § 229(2)(a) (considering "whether or not the act is one commonly done by such servants"); *id.* § 229(2)(f) (considering "whether or not the master has reason to expect that such an act will be done").

---

[7] We find helpful guidance in § 229 of the Restatement (Second) of Agency, titled "Kind of Conduct Within Scope of Employment." *See* Rest. (2d) of Agency § 228 cmt. [a] (explaining that other sections of the Restatement clarify the concepts initially set forth in § 228).

More than that, an employee's conduct falls within the meaning of § 228(1)(a) if that conduct is either "of the same general nature as" *or* "incidental to" the conduct authorized so as to be within the scope of employment. *See id.* § 299(1). As to whether the conduct was "of the same general nature as" the conduct authorized, we view this language from § 229(1) as reflecting an inquiry into the similarity between the tortious conduct and an individual employee's job functions akin to a plain language reading of § 228(1)(a).

As to whether the tortious conduct was "incidental to" the authorized conduct, we view this language as an inquiry into whether the tortious conduct was undertaken *in service of* carrying out an employee's job function. Along these lines, in *Davis*, this court upheld a finding of *respondeat superior* liability against the District of Columbia for an injury resulting from the discharge of an officer's service revolver that he was required to carry on his person. 386 A.2d at 1197-98. This court concluded that the District of Columbia could still be held liable even though the weapon discharged while the officer was unholstering that weapon at a social gathering, rather than at the job site. *Id.* As a basis for imposing liability, this court explained that the act of unholstering the weapon was "surely conduct incidental to" the authorized act of carrying the weapon to ensure officer readiness. *Id.* at 1203.

In discussing this requirement, some of our case precedents have understood this to be a foreseeability inquiry, asking whether "the conduct in question is so unforeseeable as to make it unfair to charge the [employer] with responsibility," *Penn Central*, 398 A.2d at 30, or whether the tortious conduct was "unexpected in view of the [employee's] duties," *Weinberg v. Johnson* (*Johnson II*), 518 A.2d 985, 990 (D.C. 1986). To that end, we utilized language which may have been open to an interpretation that we were moving towards an internalization theory of *respondeat superior* liability that abandoned a meaningful consideration of the relationship between the tortious conduct and the terms of the employment.

We clarify that the District of Columbia has not adopted an internalization theory, but rather this court's prior use of the language of foreseeability reflects a broadening of the permissible nexus between an employee's conduct and their job responsibilities beyond a narrow reading of § 228(1)(a) of the Restatement. Accordingly, our case precedents depart from the Restatement by authorizing victims of intentional torts that do not involve the use of force to prove that the tortious conduct was of the kind the employee was authorized to perform on a narrow theory of foreseeability—that the conduct was "incidental to" the conduct

authorized.[8]  *Cf.* Rest. (2d) of Agency § 228(1)(d) (establishing a foreseeability requirement for torts involving the use of force that are not "unexpectable").[9]

Utilizing a foreseeability analysis can aid in establishing the nexus between the tortious conduct and the terms of the employment that justifies allocating the costs of the tortious conduct to the employer.  We do not view adoption of such a foreseeability analysis as an abandonment of the Restatement because the Restatement puts forth foreseeability (in slightly different terms) as a factor to consider when determining whether the conduct falls within § 228(1)(a).  *See id.* § 229(2)(f) ("whether or not the master has reason to expect that such an act will be done").

---

[8] We do not foreclose the possibility that this foreseeability analysis could be extended to all torts, including negligent (or unintentional) torts.  However, we limit our discussion to intentional torts consistent with the question that has been certified to us.

[9] We maintain this limited understanding of foreseeability because unless the employee was acting under specific direction of their employer or the performance of their job duties expressly calls for the use of force, employees are not typically employed to engage in tortious conduct.

20

However, this expansion is not boundless and the determination of whether the conduct gives rise to liability remains tied to the underlying nature of the employment. *Cf. Penn Central*, 398 A.2d at 32 (inquiring whether the conduct was "the more or less inevitable toll of a lawful enterprise" (citation omitted)). That is why, for example, the District of Columbia case precedents have focused on whether the conduct was an "outgrowth of a job-related controversy," *id.* at 30, rather than whether the conduct was "incidental to" the conduct authorized, Rest. (2d) of Agency § 229(1).[10] Whether the conduct was the "outgrowth of a job-related controversy" has also been framed as an inquiry into whether the conduct was the "outgrowth of the employees' instructions or job assignments," *e.g.*, *Penn Central*, 398 A.2d at 32, or the "outgrowth of a job-related dispute," *e.g.*, *Hechinger Co. v. Johnson*, 761 A.2d 15, 25 (D.C. 2000). Regardless of the specific language utilized, we do not view this as a separate inquiry, but rather the same inquiry couched in language more reflective of the fact-specific context in which the tortious conduct arose. *See Johnson I*, 434 A.3d at 408 (discussing whether the tort was the outgrowth of a job-related controversy); *Hechinger Co.*, 761 A.2d at 25 (using "job-related controversy" and "job-related dispute" interchangeably). Importantly, under this

---

[10] This is not the same as the inquiry we discuss *infra* concerning whether the employee was motivated by a purpose to serve their employer, although many of the underlying considerations will be applicable to both inquiries.

type of inquiry, the application of *respondeat superior* liability extends beyond holding an employer liable only for conduct that was "specifically authorized." *Penn Central*, 398 A.2d at 30. The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy.


### B. Whether the Conduct "Occurs Substantially Within the Authorized Time and Space Limits"


Section 228(1)(b) of the Restatement (Second) of Agency limits an employer's liability to the employee's conduct that "occurs substantially within the authorized time and space limits." Present in this formulation are three distinct considerations. The first is that the employee's tortious conduct "occurs substantially within the authorized time . . . limits," which is a temporal element. Rest. (2d) of Agency § 228(1)(b). Second is that the employee's tortious conduct "occurs substantially within the authorized . . . space limits," which is a spatial element. *Id*. Third, inherent to both of these formulations is that the conduct need only be "substantially" within the authorized time and space limits. *Id*. We have

previously adopted § 228(1)(b)[11] as a part of the Restatement definition of scope of employment. We take the opportunity now to further discuss how our cases have implicitly applied § 228(1)(b). We are conscious of the fact that the parties in this certified question have divergent views of the authorized time and space of limits of the employment of an elected official.

Generally, an employer is at risk of being held vicariously liable for their employee's conduct only while that employee is on duty at their job site, subject to considering the specific circumstances of the employment.[12] The employee's conduct does not need to be absolutely within the authorized space and time of the employment, only "substantially," which counsels against a strict understanding of where and when an employee was on duty. Rest. (2d) of Agency § 228(1)(b).

---

[11] *E.g.*, *Moseley*, 534 A.2d at 348 n.4.

[12] *See, e.g.*, Rest. (2d) of Agency §§ 233-234; *id.* § 233 cmt. [a] ("When [the time of employment] begins and terminates is determined by the terms of the employment and all the facts of the situation."); *id.* § 233 cmt. [b]; *id.* § 234 cmt. [a] ("The rule as to place is dependent upon the same considerations as those relevant to time.").

Defining the authorized space and time of employment is more difficult for employees who are by the nature of their job "always on duty." In this context, it is harder to clearly define what may be the authorized time and space limits of that employment. We do not endeavor to address all of these circumstances, recognizing again that this remains a fact-intensive inquiry resistant to categorical dispositions. What our precedents reflect about this issue, however, is the principle that the employer is generally only liable under *respondeat superior* for their "always on duty" employee while the employee is sufficiently engaged with their employment. *See, e.g.*, *Bamidele*, 103 A.3d at 526 (holding that the District of Columbia was not vicariously liable for an assault by an off-duty police officer not engaged in a police action against the victim of the assault).

Our case precedents have most directly addressed the question of when an always-on-duty employee is, in fact, acting within the scope of employment in the context of police officers. Police officers are, by nature of their employment, considered always on duty, but may be colloquially referred to as "off duty" when not working their primary shift or otherwise actively engaged in police work. *See Davis*, 386 A.2d at 1202-05 (explaining how the officer was considered to be always on duty according to the Metropolitan Police Department regulations at the time, but "technically" within the "off-duty classification" at the time of the tortious conduct).

In these cases, we focused our inquiry on whether the officers were obligated by law to take action and whether, based on the evidence in the record, the officers "intend[ed] to take police action" against the victims. *Bamidele*, 103 A.3d at 526; *see also Coron*, 515 A.2d at 438. In *Bamidele* (and *Coron*), our determination that the officers should be considered "off-duty" and thus outside the scope of employment was informed by the evidence that the officers were considered to be off-duty, dressed in civilian clothing, and otherwise attending to personal business prior to the tortious conduct. *Bamidele*, 103 A.3d at 526; *Coron*, 515 A.2d at 438. Consequentially, the officers were not considered to be engaged in the act of policing. Conversely, in *Blair*, we concluded that a reasonable jury could find that evidence in the record reflected that the officer's tortious assault was an exercise of his duty to react to an assault on fellow officers (and bouncers of the venue where the fight broke out). 190 A.3d at 228-29. In that sense, although the officer was off duty and in civilian clothing, because his intervention stemmed from his duty to respond as an officer to an assault, his conduct could be described as actual engagement with his employment. *Id.* Implicit in our prior holdings is an understanding that the tortious conduct of employees without conventional time and space limits on their employment potentially carries the risk of vicarious liability to the employer only if the employee's tortious conduct could be classified as that of an employee engaging with their employment.

## C. Whether the Conduct "Is Actuated, at Least in Part, by a Purpose to Serve the Master"

Section 228(1)(c) of the Restatement (Second) of Agency requires that the employee's tortious conduct was "actuated, at least in part, by a purpose to serve the master." This formulation provides for three separate elements, all of which a plaintiff must prove. The first two are set forth plainly in the Restatement's text. First, the employee must have been "actuated . . . by a purpose to serve the master." This is the "purpose" element. Second, the employee need only have been actuated "at least in part" by that purpose. This is the "quantum" element. The third element, however, is not plainly stated in the Restatement, yet is intrinsic to the inquiry in our cases: at what moment—or moments—of time do we consider the employee's motivation? This is the "timing" element.

### 1. Purpose Element

The purpose element is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer. Our focus is on the subjective state of mind of the tortfeasor-employee, notwithstanding our statement in *Johnson II* that "the test for scope of employment is an objective one, based on all the facts and circumstances." *Johnson II*, 518 A.2d

at 991.[13]   As a part of this purpose inquiry, we consider direct and circumstantial evidence of the employee's state of mind.[14]   *See* Rest. (2d) of Agency § 235 cmt. [a] ("It is the state of the servant's mind which is material.  Its external manifestations are important only as evidence."); *see also Blair*, 190 A.2d at 227 (discussing the record evidence concerning both the circumstances in which the tort arose as well as the officer's thoughts about whether he was on duty and acting within the scope of his employment).   Further, in addition to considering the employee's reported state of mind, to the extent such direct evidence exists, the factfinder can make credibility determinations about the stated reasons that the tortious conduct was undertaken or otherwise draw reasonable inferences from the facts.[15]

---

[13] Sitting en banc, we disavow the language in *Johnson II* that the scope-of-employment inquiry is an objective inquiry.

[14] In considering more than just the employee's reported state of mind, we do not suggest that this is a *partially* subjective test that considers both the employee's subjective state of mind *and* whether that subjective state of mind was on some level reasonable (i.e., objective).  *See, e.g.*, *District of Columbia v. Murphy*, 635 A.2d 929, 932 (D.C. 1993) (describing a partially subjective test for a defense to a false arrest claim that focuses on both the officer's good faith belief that their conduct was lawful and that the belief was reasonable).  We mean that in addition to any direct evidence that may be elicited about the employee's state of mind, we also consider circumstantial evidence.

[15] Generally, a finding of *respondeat superior* liability will result in an employee and employer being held jointly and severally liable given the derivative nature of the liability.  *See Smith v. District of Columbia*, 399 A.2d 213, 215 n.3 (D.C. 1979) ("These defendants are jointly liable for this award, as [one defendant's] liability stems from its position as [the other defendant's] employer under the theory

Likewise, we have viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim. *Coron*, 515 A.2d 438 ("[The employee's] entire behavior during this incident reflected that of an individual bent on personal vengeance for a perceived personal affront.").[16] We have also viewed it as relevant whether the tort was the "outgrowth of a job-related controversy." *Penn Central*, 398 A.2d at 30.

---

of *respondeat superior*."). However, in some contexts such as the Westfall Act, a finding that the employee was acting within the scope of their employment may immunize them from liability. In such a context, it would be appropriate to consider evidence suggesting the employee has an incentive to describe their conduct as motivated by a purpose to serve their employer to immunize themselves from personal liability. Likewise, in other contexts, employees may be incentivized to describe their conduct as solely motivated by a personal purpose, to preserve their relationship with their employer. It is also appropriate to consider evidence tending to establish or disprove this motivation.

[16] *See also Dilli v. Johnson*, 107 F.2d 669, 670 (D.C. Cir. 1939) ("[T]here was no prior grievance or personal animosity between the employee and the customer . . . ."). Although *Dilli* is an opinion that predates the establishment of this court as the highest court of the District of Columbia, because it is a decision of the D.C. Circuit "rendered prior to February 1, 1971, we recognize that [it] . . . constitute[s] the case law of the District of Columbia." *M.A.P.,* 285 A.2d at 312. Several of our case precedents have cited to *Dilli*, *e.g.*, *Johnson II*, 518 A.2d at 991, and so we see no reason to abandon it sitting en banc.

Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance. Conversely, inquiries into whether the tort was the outgrowth of a job-related controversy allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated. As such, were the inquiry limited to the tortious conduct itself without the underlying context, the characteristics of that conduct might misleadingly appear to be personal in nature, especially where the underlying conduct is either discouraged or expressly prohibited by the employer. *See Boykin*, 484 A.2d at 563 ("[T]he fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act." (quoting Rest. (2d) of Agency § 245 cmt. f)). In sum, our case precedents take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct, as may be appropriate under the facts presented.

*2.    Quantum Element*

Section 228(1)(c) of the Restatement (Second) requires that the employee have been motivated "at least in part" by a purpose to serve the employer.  This is the quantum element.  We clarify our formal adoption of the standard that an employer will be held liable so long as the employee was motivated "at least in part" to serve the employer's interests consistent with § 228(1)(c) of the Restatement (Second).  This "at least in part" requirement has long been recognized in the District of Columbia.  For example, even prior to the Restatement (Second), this court explained that *respondeat superior* liability could be based on an employee who "partially [acted] in furtherance of the [employer's] business."  *Penn Central*, 398 A.2d at 31.  And in our most recent case, *Blair*, we affirmed our application of the "at least in part" standard, explaining that "an employee's actions need not be wholly in furtherance of the employer's business" and "the conduct need only be in part to serve the employer's interests."  190 A.3d at 226.  Accordingly, we see no reason to revisit our standard that, so long as an employee was motivated "at least in part" to serve the employer's interests, *respondeat superior* liability may apply.

The more challenging question, however, is what minimum quantum of purpose to serve the employer is sufficient to hold an employer liable.  The "at least

in part" standard strikes us as a minimum requirement for the quantum of purpose that necessitates at least some discernable purpose to serve the employer. This standard does not foreclose that an employee could be concurrently motivated by a personal purpose. *See Hechinger Co.*, 761 A.2d at 24 ("[I]f the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge."). Nor does it preclude that such a personal purpose could be the employee's predominant purpose. *See generally* Rest. (2d) of Agency § 236 cmt. [b] ("The fact that the predominant motive of the servant is to benefit himself . . . does not prevent the act from being within the scope of employment."). If it is established that the employee was motivated "at least in part" to serve the employer, the employee's conduct will be considered to be within the scope of employment. *See Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) ("While it is probable that the vast majority of sexual assaults arise from purely personal motives, it is nevertheless possible that an employee's conduct may . . . still be 'actuated, at least in part, by a desire to serve [the employer's] interest.'" (second alteration in original)).

However, as we have recognized in other cases, the Restatement (Second) also provides that if the employee's conduct is "too little actuated" by that purpose, then

the employee's conduct would be outside of the scope of employment. *See, e.g.*, *Johnson I*, 434 A.2d at 408 (quoting Rest. (2d) of Agency § 228(2)). Due to the perceived inconsistencies between these standards, the Restatement (Third) of Agency utilizes the language that the employer will not be held liable so long as the employee's tortious conduct was "not intended by the employee to serve *any* purpose of the employer." Rest. (3d) of Agency § 7.07 (emphasis added). This means that liability will be extended unless there was "no purpose" to serve the employer. *Id.* § 7.07 cmt. [b].

We recognize that the pattern jury instructions in the District of Columbia do not incorporate the "too little actuated" standard. *See, e.g.*, Standardized Civil Jury Instructions for the District of Columbia, No. 80 (1968 ed.) (using terms "in whole or in part" and "any"), No. 82 (using term "in whole or in part"), and No. 6.02 (rev. ed. 2012) (using terms "at least partly" and "solely"). However, pattern jury instructions are "neither the law nor necessarily a correct statement thereof." *Edelen v. United States*, 560 A.2d 527, 529 n.9 (D.C. 1989). Likewise, although other jurisdictions may not have expressly endorsed the application of the "too little actuated" standard to qualify the "at least in part" standard, we view our commitment of this consideration to the factfinder as consistent with the policy judgment of this

32

jurisdiction to commit the ultimate question of liability to the factfinder.[17]  As such,
we view it as consistent with our precedents to have the factfinder determine whether
it is sensible to hold an employer liable in light of how actuated the employee was
by a purpose to serve their employer.


   While we have affirmed that the District of Columbia retains the "too little
actuated" standard, we do not parse out an exact threshold at which an employee
was "actuated, at least in part" by a purpose to serve the employer, but "too little
actuated" for their conduct to be within the scope of employment.  Instead, this
court's decisions have consistently entrusted this question to the factfinder to decide
whether, upon a showing that the employee acted with at least a partial purpose to

---

   [17]  Although the "too little actuated" standard may not be expressly
incorporated into the pattern jury instructions of other jurisdictions, it has not been
abandoned wholesale by other jurisdictions.  *See, e.g.*, *Olson v. Connerly*, 457
N.W.2d 479, 480 (Wisc. 1990) (explaining that conduct is outside of the scope of
employment if it is either "too little actuated by a purpose to serve the employer or
if it is motivated entirely by the employee's own purpose").  Further, even if other
jurisdictions have not explicitly anchored their scope-of-employment test to the
language of "too little actuated," other jurisdictions still utilize a quantum framing
akin to "insignificant."  *See, e.g.*, *Bell v. VPSI, Inc.*, 205 S.W.3d 706 (Tex. App.
2006) ("an appreciable extent"); *Dodson v. Carlson*, 14 N.E.3d 781 (Ind. 2014) ("an
appreciable extent").  While it is true that these cases do not expressly characterize
this language as modifying an "at least in part" standard, such language necessarily
suggests that an employee could have a partial motivation to serve the employer that
fails to be significant enough to hold the employer liable.

serve their employer's interest, that purpose was not too little actuated. In other words, the factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest. It is a balancing and weighing of the evidence, both direct and circumstantial, to determine whether the quantum of purpose is more than insignificant.

### 3. *Timing Element*

In the case of intentional torts, an additional "timing" element arises, requiring us to address what the pertinent timeframe is for assessing an employee's purpose.[18] This raises two subsidiary questions. First, what scope of circumstances should the factfinder consider in determining the employee's purpose? Second, when must the employee possess the requisite purpose for the employer to be held liable? Our case law has not defined specifically what period of time is relevant, recognizing that a categorical rule would be incompatible with our general principle that *respondeat superior* is a factbound inquiry and different factual circumstances present different moments in time that inform that inquiry. However, we provide the following

---

[18] As with note 8 *supra*, we do not foreclose the possibility that this inquiry could be applied to an unintentional (i.e., negligent) tort depending on the circumstances presented. However, we limit our discussion to intentional torts as that is the question that has been certified to us.

guidance from our case law in recognition of the fact that the former President's allegedly defamatory statements were made in different contexts (i.e., a press release, a statement to reporters, and a statement during an interview), and accordingly what may be true of the former President's purpose in making one statement may not be true as to another statement.

First, we conclude that the temporal scope of circumstances the factfinder should consider to discern the employee's purpose in acting should be construed quite broadly. *See, e.g.*, *Dilli*, 107 F.2d at 670 ("It is conceded that there was no prior grievance or personal animosity between the employee and the customer—indeed, that there was no acquaintance."). As such, the factfinder is free to consider any probative, relevant evidence tending to establish the employee's purpose behind their conduct, regardless of how temporally remote that may be from the moment of the tort.

Second, we conclude that the employee need not possess the requisite purpose to serve the employer at the precise moment of time in which the tort was committed, but rather *respondeat liability* can be established where the employee possessed the requisite purpose in the moments preceding the commission of the tort when

warranted by the factual context.  Our case law does not subscribe to the view that the factfinder must look at the entire course of conduct as the Restatement (Third) gravitates towards.[19]  Neither do our cases narrowly look at only the moment in which the tort was committed, recognizing that some context is important for the factfinder to properly weigh the evidence.  Such a narrow reading disregards that the timing inquiry ultimately relates back to the underlying "conduct" of the servant—not just the tortious conduct.  It also fails to capture the total mosaic of the employee's potentially shifting motivations and whether there was an employer-related impetus to the employee's conduct at one time that fell out.  Accordingly, on this question, we acknowledge that our case precedents expand somewhat on a narrow reading of the Restatement (Second).

Examining only the split second moment of the actual commission of the tort—absent some context—could unfairly limit employer liability and is otherwise inconsistent with our case precedents.  *See Argenbright Sec.*, 782 A.2d at 758-59 (looking at the employee's conduct prior to the tortious assault); *see also Blair*, 190

---

[19] As our cases suggest, we think consideration of the entire course of conduct rather than a narrower period of time would too broadly impose liability on employers.  *See* Rest. (3d) of Agency § 7.07 cmt. [b] ("An independent course of conduct represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls.").

A.3d at 228 (looking at the police officer's conduct after the tortious assault). Instead, looking at the moments before the tort allows the factfinder to consider facts necessarily relevant to the question of whether the employee's action was "actuated" by a purpose to serve the employer. *See, e.g.*, *Argenbright Sec.*, 782 A.2d at 758 ("[T]he search was initiated by [the employee] only after he had reason to believe that his employer's interests had been affected (i.e., that merchandise had been stolen by the person he was about to search)."); *see also Hechinger Co.*, 761 A.2d at 25 (considering whether the tort "grew out of a job-related controversy"). Similarly, allowing the factfinder to consider facts relevant to the moments after the tort allows for consideration of instances in which that employer-related purpose has potentially fallen out. *See, e.g.*, *Argenbright Sec.*, 782 A.2d at 758 ("At what point, if ever, [the employee's] personal desires motivated his alleged physical contact with [the victim] is a factual question that should have been considered by a jury.")

\*  \*  \*

We emphasize that each section of the Restatement (Second) represents a distinct inquiry that the factfinder must undertake and a plaintiff must satisfy. *See* Rest. (2d) of Agency § 228 (using the word "and" conjunctively to describe the

factors for *respondeat superior*).[20]   It is not sufficient that an employee was authorized to act in the manner they did, or that the conduct, being authorized, was within the time and space of the employee's general employment—the factfinder must specifically consider whether, in the moments surrounding the employee's conduct, there is evidence that the employee was, in fact, motivated by the purpose of serving the master.[21]   However, as previously cautioned, in many cases not all elements outlined in the Restatement framework will be subject to dispute.

---

[20] This conjunctive reading is affirmed by the Second Restatement, which states that

> [t]he rule [holding that conduct by an employee too minimally motivated by a purpose to serve their employer is outside the scope of employment] applies although the servant would be authorized to do the very act done *if it were done* for the purpose of serving the master, and although outwardly the act appears to be done on the master's account.

Rest. (2d) of Agency § 235 cmt. [a] (emphasis added).

[21] This is not to say evidence tending to establish one of these requirements may not tend to establish another.  *See* Rest. (2d) of Agency § 235 cmt. [a] ("If . . . the servant does the very act directed, or does the kind of act which he is authorized to perform within working hours and at an authorized place, there is an inference that he is acting within the scope of employment.").

### D. Whether, if Force Is Intentionally Used by the Employee Against Another, the Use of Force Is Not Unexpectable by the Employer

As it concerns the intentional use of force, § 228(1)(d) provides that *respondeat superior* liability is limited to circumstances where "the use of force is not unexpectable by the [employer]." Our case precedents and our doctrine of *respondeat superior* do not diverge when the tort at issue is based on the use of force. Accordingly, when considering whether the use of force was "unexpectable," the factfinder should undertake the same foreseeability analysis for intentional torts considered under § 228(1)(a) of the Restatement (Second), discussed in Section III.A, *supra*.[22] We view this required adherence to a foreseeability element for torts involving the use of force as consistent with our case precedents, including *Dilli*, *Johnson II*, and *Hechinger Co.*, and not the pronouncement of a new standard as it concerns tort liability for the use of force.

---

[22] In reaching this conclusion, we reject the limitation imposed by some other jurisdictions that an employee's use of force is only expectable if that employee has been expressly employed to perform acts which involve the use of force. *See* Rest. (2d) of Agency § 245 cmt. [b]. Accordingly, in this jurisdiction, employer liability for an employee's use of force is a coextensive inquiry as to whether the use of that force was foreseeable.

**IV. This Court Does Not Adopt a Categorical Reading of the
District of Columbia Circuit's Decision in
*Council on American Islamic Relations v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006)**

The Second Circuit identified *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), as a case that applied District of Columbia *respondeat superior* law in the context of the Westfall Act to a defamation claim against a member of Congress, and asked this court to consider whether it adopted *Ballenger*. We decline to adopt a categorical reading of *Ballenger* that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment.

We note that *Ballenger* disclaims that it was creating such a categorical rule. *See id.* at 666. Its ultimate conclusion that Congressman Ballenger was acting within the scope of his employment rested on undisputed, affirmative evidence in the record that his purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities.[23] *Id.* at 665-66.

---

[23] In this respect, the record before the court in *Ballenger* is materially different than the record as certified to this court, which is disputed by the parties. Although generally the question of whether an employee was acting within the scope of employment must be resolved by a trier of fact, where no reasonable minds could differ (i.e., because the record compels only one conclusion), the court may enter judgment as a matter of law as the court did in *Ballenger*. *See Hechinger Co.*, 761

Accordingly, we decline to adopt a categorical reading of *Ballenger* because, as previously explained, the District of Columbia's precedents have consistently adhered to a fact-bound inquiry to determine whether the conduct of an employee is within the scope of employment. We have never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment, and we decline to do so now.

## V. Conclusion

In sum, we answer the certified question by affirming that the District of Columbia generally adheres to § 228 of the Restatement (Second) of Agency's traditional view of the scope-of-employment inquiry of *respondeat superior*, although our case precedents construe more expansively some of the concepts set forth therein.

---

A.2d at 24 ("The court may enter judgment as a matter of law only where, viewing the evidence in the light most favorable to the non-moving party, 'the probative facts are undisputed and where reasonable minds can draw but one inference from them.'" (quoting *Johnson I*, 434 A.2d at 407)).

In response to the part of the certified question requesting that we define the scope of employment of the President of the United States, we decline to do so. That is a fact-intensive question for the factfinder and cannot be resolved as a matter of law in either party's favor on the record before us. We do not adopt a categorical reading of *Ballenger v. Council on American Islamic Relations* that resolves the scope-of-employment inquiry for elected officials on a per se basis. As such, we leave for the Second Circuit or Southern District of New York to resolve whether the former President was acting within the scope of his employment in the first instance, consistent with District of Columbia law, as clarified herein.

We direct the Clerk of the Court to certify this answer to the United States Court of Appeals for the Second Circuit and to the parties.

*So ordered.*

MCLEESE, *Associate Judge*, concurring in part and dissenting in part: I concur in the court's short answers to the certified question, and I agree with much of what is said in the opinion for the court. I disagree, however, with the court's conclusions on three specific topics. I therefore respectfully concur in part and dissent in part.

## I. Foreseeability

I agree with the court's holding that foreseeability should be required for all intentional torts, not only for those intentional torts involving the use of force. *Supra* at 17-19. In my view, however, adopting that approach narrows rather than broadens the scope of employer liability under the Second Restatement of Agency, by turning a factor into a requirement. *See Restatement (Second) of Agency* §§ 228(1)(d) (requiring that intentional torts involving use of force not be "unexpectable"), 229(2)(f) (generally, whether employer "has reason to expect that such an act will be done" is factor to be considered in determining whether act is "so similar to or incidental to the conduct authorized as to be within the scope of employment") (Am. L. Inst. 1958).

More generally, I also agree that conduct can potentially be within the scope of employment if the conduct is either of the same general nature as authorized conduct or incidental to authorized conduct. *Restatement (Second) of Agency* § 229(1). Contrary to the apparent suggestion in the opinion for the court, *supra* at 17-19, I view the question whether conduct falls within the latter category as related

to but distinct from, rather than equivalent to, the question whether the conduct was foreseeable.

## II. "Too Little" Purpose

I would discard as confusing and unnecessary the concept of conduct that is "too little actuated" by a purpose to benefit the employer. *Restatement (Second) of Agency* § 228(2). That language appears to be inconsistent with the principle stated in the preceding subsection of § 228 of the Second Restatement that conduct can be within the scope of employment if "it is actuated, at least in part, by a purpose" to benefit the employer. *Id.* § 228(1)(c); *see also id*. § 236 cmt. b ("The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant *to any appreciable extent*, the master is subject to liability if the act otherwise is within the service . . . .") (emphasis added); *id.* § 219 cmt. e (listing exceptional circumstances in which employer may be liable for torts of employees "acting solely for their own purposes and hence not in the scope of employment"). For that reason, the drafters of the Third Restatement discarded the phrase "too little actuated," instead excluding from the scope of employment conduct "not intended by the employee to serve any purpose of the

employer." *Restatement (Third) of Agency* § 7.07 (Am. L. Inst. 2006); *see also id.* cmt. b (formulations in Second Restatement "are not entirely consistent; an act motivated by some purpose to serve the employer could still be 'too little actuated' to be within the scope of employment") (emphasis omitted).

The drafters of the Third Restatement explained that "most cases apply the standard stated" in the Third Restatement. *Restatement (Third) of Agency* § 7.07 cmt. b. That appears to be an understatement. I have not found, and the opinion for the court in this case does not cite, any decision from any other court that takes the approach reflected in the opinion for the court: directing juries to find employers not liable even if tortious conduct was motivated in part to benefit the employer and otherwise would be within the scope of employment, if the jury finds that the motive to benefit the employer was in some unspecified sense "insignificant." *Supra* at 32-33. To the contrary, the overwhelming weight of authority appears to support the principle that conduct may be within the scope of employment as long as the conduct is motivated in any part to benefit the employer. *See, e.g.*, *L.B. v. United States*, 515 P.3d 818, 822, 825 (Mont. 2022) ("at least partially motivated"; "an appreciable extent"); *Salo v. Tyler*, 417 P.3d 581, 589 (Utah 2018) ("motivated at least to some degree"); *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244 (Mich. 2011) (not "intended solely to further the employee's individual interests"); *N.X. v. Cabrini Med. Ctr.*,

765 N.E.2d 844, 847 (N.Y. 2002) (employee must not have had "wholly personal motives"). Pattern jury instructions from various jurisdictions reflect the same general approach. *See, e.g.*, Va. Model Jury Instructions – Civil, No. 8.050 (rev. ed. 2022) ("to some extent"). I have found no pattern jury instruction from any jurisdiction that reflects the approach adopted by the court in this case.

The opinion for the court suggests that the concept of "too little" purpose is an established part of the law of this jurisdiction. *Supra* at 31-33. Because we are sitting en banc, we would be free to discard the concept even if it were a settled part of our law. In any event, I do not agree that the concept is a settled part of our law. It is true that we have cited the phrase "too little actuated" in passing in a few of our scope-of-employment cases. *See, e.g.*, *Schechter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006). Contrary to the statement in the opinion for the court, however, our decisions have not "consistently entrusted" juries with the responsibility to determine whether an employee's purpose to benefit an employer was "too little" in some sense. *Supra* at 32. Rather, the vast majority of our scope-of-employment cases do not mention that concept at all. *E.g.*, *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018). More importantly, in cases reaching back well over one hundred years, decisions in this jurisdiction have repeatedly stated the applicable test in terms that contradict the concept of "too little" purpose.

46

*See, e.g.*, *id.* ("To be within the scope of employment, the tortious activity must be actuated, at least in part, by a purpose to further the master's business, and this intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.") (internal quotation marks omitted); *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 938 (D.C. 2002) (conduct outside scope of employment if "solely for the employee's own purposes"); *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986) ("intended by the agent only to further [the agent's] own interest, not done for the employer at all") (brackets and internal quotation marks omitted); *id.* at 990 ("solely for the servant's own purposes") (brackets and internal quotation marks omitted); *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C. 1979) ("intended by the agent only to further [the agent's] own interest, not done for the employer at all"; "purely personal" motivation) (brackets and internal quotation marks omitted); *District of Columbia v. Davis*, 386 A.2d 1195, 1203 (D.C. 1978) ("done for the employee's purposes only"); *Meyers v. Nat'l Detective Agency, Inc.*, 281 A.2d 435, 437 (D.C. 1971) ("solely for [the employee's] own purposes"); *Presley v. Com. Credit Corp.*, 177 A.2d 916, 918 (D.C. 1962) ("done for the servant's purposes only"); *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951) ("done for the agent's purposes only") (internal quotation marks omitted); *Park Transfer Co. v. Lumbermens Mut. Cas. Co.*, 142 F.2d 100, 100 (D.C. Cir. 1944) (same); *Fletcher v. Balt. & Potomac R.R.*, 6 App. D.C. 385, 393-94 (D.C. Cir. 1895) (citing

with approval jury instruction stating that respondeat superior liability was unavailable if alleged tortfeasor acted "wholly for a purpose of his own"), *rev'd on other grounds*, 168 U.S. 135 (1897) (holding that question whether employer itself was negligent should have been submitted to jury).

I have found no case in which this court explicitly stated that juries should be responsible for determining whether an employee's purpose to benefit the employer was in some sense "too little." To the contrary, in the one case that I have found in which this court squarely focused on jury instructions on this topic, the court specifically approved an instruction that used terms such as "at least in part," "any," and "wholly unrelated," and made no reference to the concept of "too little" purpose. *Weinberg*, 518 A.2d at 990-91 & n.11; *see also Fletcher*, 6 App. D.C. at 393-94 (citing similar instruction with approval). In light of the foregoing, it should not be surprising that, as the opinion for the court acknowledges, *supra* at 31, juries in this jurisdiction do not appear to have ever been asked to decide whether an employee's intent to benefit the employer was in some sense "too little."

I thus do not view this as a case in which the court is deciding to retain a settled principle of law. Rather, I view it as a case in which the court is choosing to adopt a new principle of law that is not supported by our prior decisions or by the

law of other jurisdictions and that has been abandoned by the institutional author that initially wrote the confusing words on which the court relies.

The only reason the court gives for adopting its "insignificant" purpose test is that doing so will permit "the factfinder [to] determine whether it is sensible to hold an employer liable." *Supra* at 32. I do not see, and the court does not explain, why it is in fact desirable to let a jury find an employer not liable for an employee's tortious conduct that was motivated in part to benefit the employer and otherwise would be within the scope of employment, if the jury thinks that it is not "sensible" to hold the employer liable, because the employee's motive to benefit the employer was in some unspecified sense "insignificant." I do not understand the basis on which a jury should make such a judgment. Moreover, as previously noted, as far as I am aware no other jurisdiction burdens juries with such a responsibility.

### III.  Temporal Relationship Between Tortious Conduct and Purpose to Benefit Employer

The Second Restatement seems to require that the tortious conduct itself be intended to benefit the employer. *See Restatement (Second) of Agency* §§ 228(1)(c) (conduct is within scope of employment if "it [i.e., the conduct] is actuated, at least in part, by a purpose to serve the master"), 245 cmt. f ("The master, however, is

relieved from liability . . . if the servant has no intent to act on [the] master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them."). Some older cases in this jurisdiction appear to explicitly reflect the same requirement. *See, e.g.*, *M.J. Uline Co. v. Cashdan*, 171 F.2d 132, 134 (D.C. Cir. 1948) (focusing on alleged tortfeasor's purpose at "moment when he struck the blow").

I fully agree with the court that a jury determining whether a given allegedly tortious act was motivated to benefit an employer can appropriately consider evidence about purposes the employee had at other times, including times well before and well after the act. *Supra* at 34. That is different, however, from a rule that permits imposition of liability on employers for acts of an employee that are not taken with any purpose to benefit the employer but that are closely related in some way to acts that were motivated to benefit the employer. As noted, the Second Restatement seems to generally preclude such liability, as do some of our older cases. The court correctly notes, however, that at least some of our more recent cases are hard to square with that aspect of the Second Restatement. *Supra* at 35-36; *see, e.g.*, *Weinberg*, 518 A.2d at 991 ("As the law has evolved, the intent or purpose criterion has become broad enough to embrace an intentional tort arising out of any dispute that was originally undertaken on the employer's behalf.")

(internal quotation marks omitted); *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 63 (D.C. 1983) (holding that jury question existed as to whether allegedly tortious act was within scope of employment, because "there is some indication that the shooting was the outgrowth of a job related encounter").

I have my doubts about the "arising out of/outgrowth" expansion of the approach reflected in the Second Restatement. I do not believe that this court has ever clearly articulated a rationale for that expansion. Moreover, the court at times has confusingly suggested that the question whether a tortious act is a direct outgrowth of a job-related controversy goes to foreseeability rather than to whether the employee acted with the requisite purpose to benefit the employer. *See, e.g.*, *Blair*, 190 A.3d at 226 ("[T]he employee's tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.") (ellipses and internal quotation marks omitted). I am not sure that it would be essential to resolve this issue in order to adequately respond to the certified question, but my somewhat tentative view is that the court should align itself with the Second Restatement on this point and require that the allegedly tortious act itself have been motivated, at least in part, to benefit the employer.

The court in this case does not simply endorse the idea that conduct not intended to benefit the employer can be within the scope of employment if the conduct arises out of a job-related dispute.  Rather, the court seems to me to recharacterize that idea in ways that both narrow and broaden the idea.  The court appears to hold that the idea applies only if the employee had a purpose to benefit the employer in the "moments" before the allegedly tortious act at issue.  *Supra* at 34-36.  I am not aware that our prior cases have ever suggested such a tight temporal requirement, and the court does not cite any such case from this jurisdiction or any other.

On the other hand, the court does not seem to limit the idea, as our prior cases apparently do, to the outgrowth of job-related disputes.  Rather, the court instead seems to adopt a general rule that even if the allegedly tortious act itself was not intended to benefit the employer, the act can be treated as within the scope of employment as long as the employee had such a motive in the moments before the act.  *Supra* at 34-36.  The court cites no decisions supporting so sweeping a view, and I am not aware of any.  Moreover, the view seems to have surprising consequences.  For example, consider a case in which an employee is making a delivery by car; gets out of the car to walk to a nearby home to make the delivery; happens to see a person the employee has long hated for personal reasons walking

by; and goes over and punches that person in the face. Under the approach adopted by the court in this case, that conduct could be viewed as within the scope of employment (subject to the question whether it was foreseeable that the employee might get involved in a personal altercation while working).

In sum, I would follow the Second Restatement and hold that the employee's purpose to benefit the employer must exist at the time of the allegedly tortious act.